No. 24-10951

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RYAN, L.L.C.,

Plaintiff-Appellee,

CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA; BUSINESS ROUNDTABLE; TEXAS ASSOCIATION
OF BUSINESS; LONGVIEW CHAMBER OF COMMERCE,

Intervenor-Plaintiffs-Appellees,

v.

FEDERAL TRADE COMMISSION,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Texas

**OPENING BRIEF FOR APPELLANT**

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB
SEAN R. JANDA
URJA MITTAL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7248*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-4895*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendant-appellant is a government party. 5th Cir. R. 28.2.1.

*s/ Urja Mittal*

URJA MITTAL

## STATEMENT REGARDING ORAL ARGUMENT

The district court universally vacated a rule issued by the Federal Trade Commission. The rule reflects the Commission's determination that most non-competes are unfair methods of competition prohibited by the FTC Act. 15 U.S.C. § 45(a)(1). Given the interests of the Commission and the public in enforcement of the rule, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

STATEMENT OF JURISDICTION ................................................................. 3

STATEMENT OF THE ISSUES ....................................................................... 3

STATEMENT OF THE CASE .......................................................................... 4

     A.    Legal Background ............................................................................ 4

     B.    Factual and Procedural Background ............................................... 8

SUMMARY OF ARGUMENT ....................................................................... 17

STANDARD OF REVIEW ............................................................................. 20

ARGUMENT .................................................................................................. 20

I.    The Commission Has Authority To Issue The Non-Compete Rule ................ 20

     A.    The Commission Has Statutory Authority To Issue Rules To
          Prevent Unfair Methods Of Competition .................................... 20

     B.    The District Court's And Plaintiffs' Contrary Arguments Are
          Unpersuasive ................................................................................ 29

II.    The Non-Compete Rule Is Not Arbitrary And Capricious .............................. 38

     A.    The Commission Reasonably Concluded That Non-Competes
          Are Restrictive And Tend To Negatively Affect Competitive
          Conditions .................................................................................... 39

     B.    The District Court's Contrary Conclusions Are Unavailing ................... 41

          1.    The District Court Improperly Concluded That The Rule
               Is Not Supported By The Record ...................................... 41

          2.    The District Court Disregarded The Commission's
               Analysis Of Alternatives ................................................... 44

III.   The District Court Erred In Universally Vacating The Rule ............................. 46

    A.   The District Court Improperly Concluded Universal Relief Was Compelled By The APA And Failed To Consider Constitutional And Equitable Principles ............................................................................. 47

    B.   Constitutional And Equitable Principles Preclude Universal Vacatur In This Case ............................................................................. 50

CONCLUSION ....................................................................................................... 55

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                 **Page(s)**

*Alabama Ass'n of Realtors v. Department of Health & Human Servs.*,
  594 U.S. 758 (2021) .......................................................................................... 37

*American Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991) ....................................................................................23, 30

*Amin v. Mayorkas*,
  24 F.4th 383 (5th Cir. 2022) .......................................................................... 38

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ......................................................................49, 54

*Association of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010) .......................................................................... 53

*Atlantic Ref. Co. v. FTC*,
  381 U.S. 357 (1965) ........................................................................................ 5

*AT&T Corp. v. Iowa Utils. Bd.*,
  525 U.S. 366 (1999) ...................................................................................... 30

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ................................................................. 32, 35, 36, 37

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021),
  *aff'd in part and rev'd in part on other grounds*, 599 U.S. 255 (2023).................................. 24

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...................................................................................... 51

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) .......................................................................48, 49

*Central & S.W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) .......................................................................... 49

*CFTC v. Schor,*
    478 U.S. 833 (1986) ................................................................ 27

*Chamber of Commerce of the U.S. v. FTC,*
    732 F. Supp. 3d 674 (E.D. Tex. 2024) ................................. 13, 14

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ................................................................ 33

*FCC v. National Citizens Comm. for Broad.,*
    436 U.S. 775 (1978) ................................................................ 23

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................ 43

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ................................................... 47

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
    129 F.3d 826 (5th Cir. 1997) ................................................... 52

*FTC v. Motion Picture Advert. Serv. Co.,*
    344 U.S. 392 (1953) .................................................................. 5

*FTC v. Sperry & Hutchinson Co.,*
    405 U.S. 233 (1972) ............................................................... 6, 7

*FTC v. Texaco, Inc.,*
    393 U.S. 223 (1968) ............................................................... 5, 7

*Gill v. Whitford,*
    585 U.S. 48 (2018) ............................................................... 49, 51

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................ 51

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ................................................................ 48

*Heckler v. Campbell,*
    461 U.S. 458 (1983) ................................................................ 30

*Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*,
586 U.S. 123 (2019) ................................................................. 27

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999) ................................................................. 35

*King v. Housing Auth. of the City of Huntsville*,
670 F.2d 952 (11th Cir. 1982) ................................................. 33

*Lopez v. Davis*,
531 U.S. 230 (2001) ................................................................. 30

*Maryland v. King*,
567 U.S. 1301 (2012) ............................................................... 54

*Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*,
498 U.S. 211 (1991) ................................................................. 30

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................. 38, 43

*Mourning v. Family Publ'ns Serv., Inc.*,
411 U.S. 356 (1973) ................................................................. 22

*National Fed'n of the Blind of Tex., Inc. v. Abbott*,
647 F.3d 202 (5th Cir. 2011) ................................................... 20

*National Petroleum Refiners Ass'n v. FTC*,
482 F.2d 672 (D.C. Cir. 1973) ........................................ 7, 24, 25

*NLRB v. Bell Aerospace Co.*,
416 U.S. 267 (1974) ................................................................. 38

*North Carolina v. FERC*,
112 F.3d 1175 (D.C. Cir. 1997) ............................................... 42

*Sierra Club v. U.S. Dep't of Interior*,
990 F.3d 909 (5th Cir. 2021) ................................................... 38

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ................................................................. 48

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ................................................................. 52

*10 Ring Precision, Inc. v. Jones*,
722 F.3d 711 (5th Cir. 2013) ................................................... 38

*Texas Clinical Labs, Inc. v. Sebelius*,
612 F.3d 771 (5th Cir. 2010) ................................................... 38

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
110 F.4th 762 (5th Cir. 2024) .................................................. 50

*Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
120 F.4th 494 (5th Cir. 2024) .................................................. 49

*Thorpe v. Housing Auth. of the City of Durham*,
393 U.S. 268 (1969) ................................................................. 23

*Trump v. Hawaii*,
585 U.S. 667 (2018) ................................................................. 51

*United States v. American Tobacco Co.*,
221 U.S. 106 (1911) ................................................................... 9

*United States v. JS & A Grp., Inc.*,
716 F.2d 451 (7th Cir. 1983) ................................................... 25

*United States v. Storer Broad. Co.*,
351 U.S. 192 (1956) ................................................................. 33

*United States v. Texas*,
599 U.S. 670 (2023) ......................................................47, 48, 49

*Wages & White Lion Invs., LLC v. Food & Drug Admin.*,
16 F.4th 1130 (5th Cir. 2021) .................................................. 46

*West Virginia v. EPA*,
597 U.S. 697 (2022) ......................................................35, 36, 37

**Statutes:**

FTC Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914) ................................20-21

Magnuson-Moss Warranty—Federal Trade Commission Improvement Act,
Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................................. 7, 25
§ 202(c), 88 Stat. at 2198 ..................................................................... 26

5 U.S.C. § 301 .............................................................................................. 33

5 U.S.C. § 702(1) ................................................................................... 48, 49

5 U.S.C. § 703 ........................................................................................ 47, 48

5 U.S.C. § 706(2) ................................................................................... 16, 47

15 U.S.C. § 45 ................................................................................................ 4

15 U.S.C. § 45(a)(1) ......................................................................... 1, 4, 20

15 U.S.C. § 45(a)(2) .................................................. 1, 4, 15, 17, 20, 21

15 U.S.C. § 45(b) ...................................................................................... 5, 32

15 U.S.C. § 45(*l*) .......................................................................................... 32

15 U.S.C. § 46 ................................................................................................ 4

15 U.S.C. § 46(g) .................................................. 1, 2, 5, 15, 17, 21, 26, 33

15 U.S.C. § 57a ............................................................................................ 25

15 U.S.C. § 57a(a) ..................................................................................... 7-8

15 U.S.C. § 57a(a)(2) ............................................................... 7, 8, 25, 26

15 U.S.C. § 57a(b) .......................................................................................... 8

15 U.S.C. § 57b-3(a)(1) ......................................................................... 8, 28

15 U.S.C. § 57b-3(a)(1)(A) .......................................................... 8, 28, 36

15 U.S.C. § 1194(c) ...................................................................................... 34

15 U.S.C. § 2310(a)(2) ................................................................................. 34

28 U.S.C. § 1291 ............................................................................................ 3

28 U.S.C. § 1331 ................................................................................ 3

52 U.S.C. § 30107(a)(8) .................................................................... 33

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 3

**Legislative Materials:**

120 Cong. Rec. 40,713 (1974) ........................................................ 27

S. Rep. No. 93-1408 (1974) (Conf. Rep.) .................................. 26, 27

**Other Authorities:**

Authors' Guild, Comment Letter on Proposed Rule (Apr. 19, 2023),
    https://perma.cc/F4RM-EAYN .................................................. 12

FTC, *Annual Report of the Federal Trade Commission* (1962),
    https://perma.cc/PT38-T4RR ..................................................... 7

FTC, Commission File No. P221202, *Policy Statement Regarding the Scope of Unfair
    Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10,
    2022), https://perma.cc/2G3F-2UW9 ..................................... 6, 39

FTC, *Constituent Support for the FTC's Noncompete Rule: Texas – Statewide Impact*,
    https://perma.cc/8FU9-GMPD ................................................. 11

FTC, *FTC Cracks Down on Companies that Impose Harmful Noncompete Restrictions on
    Thousands of Workers* (Jan. 4, 2023), https://perma.cc/NFB2-3NJR ......................... 10

Thomas W. Merrill & Kathryn Tongue Watts,
    *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467
    (2002) ...................................................................................... 32

Non-Compete Clause Rule,
    88 Fed. Reg. 3482 (Jan. 19, 2023) ......................................... 9, 10

Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024) ............................ 2, 6, 7, 8, 9, 10, 11, 12, 13, 24, 39,
                                                                                  40, 41, 42, 43, 44, 45, 46, 54

*Prevent*, 7 The Century Dictionary and Cyclopedia 4716 (1911) ..................................... 21

*Prevent*, Webster's New International Dictionary of the English Language 1960
(2d ed. 1942) ................................................................................................................ 21

Small Bus. Majority, Comment Letter on Proposed Rule (Apr. 19, 2023),
https://perma.cc/8PDE-74MW ............................................................................ 12, 53

Small Bus. Majority *et al.*, Comment Letter on Proposed Rule (Apr. 19, 2023),
https://perma.cc/GF8G-EBJ4 .............................................................................. 12, 53

# INTRODUCTION

More than a century ago, Congress provided that "[u]nfair methods of competition in or affecting commerce" are "unlawful." 15 U.S.C. § 45(a)(1). Congress also established the Federal Trade Commission, a bipartisan expert agency "empowered and directed to prevent" entities "from using unfair methods of competition." *Id.* § 45(a)(2). Congress vested the Commission with powers to carry out that directive, including the power "to make rules and regulations." *Id.* § 46(g).

Non-competes, as their name indicates, restrain competition by preventing workers from taking a job with a competing employer or starting a competing business. Employers across industries now use non-competes to restrict the job mobility of not just senior executives and highly skilled employees but also low-wage and entry-level workers. Non-competes negatively affect competitive conditions by suppressing wages, inhibiting new business formation and job creation, and decreasing innovation.

In 2018, the Commission began evaluating whether non-competes are unfair methods of competition prohibited by the FTC Act. The Commission solicited and reviewed tens of thousands of comments from the public—which resoundingly supported defining non-competes as unfair methods of competition—and analyzed economic evidence about the proliferation and effects of non-competes.

After evaluating the evidence, the Commission determined that non-competes meet the standard for unfair methods of competition prohibited by the FTC Act. The

Commission subsequently promulgated the Non-Compete Rule, which defines most existing non-competes as unfair methods of competition and therefore unenforceable (subject to an exception for certain senior executives) and bans the future use of most non-competes. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024).

The district court took no issue with most of the Commission's factual and legal conclusions. In particular, the court did not quarrel with the Commission's expert finding that an employer's use of non-competes is an unfair method of competition. The district court nevertheless deemed the Non-Compete Rule invalid and vacated it universally.

First, disregarding the plain text of the FTC Act and Supreme Court precedent, the district court concluded that the Commission lacks statutory authority to issue rules defining unfair methods of competition. The court asserted that the FTC Act provision authorizing the Commission to "make rules and regulations for the purpose of carrying out" the Act, 15 U.S.C. § 46(g), permits the Commission to issue only "housekeeping" rules or "rules of agency organization procedure or practice." ROA.5628-29 (quotation omitted). Neither the statutory text nor any principle of statutory construction supports the district court's cramped view of the Commission's authority. The FTC Act authorizes the Commission to issue rules defining unfair methods of competition and does not limit the Commission to issuing "housekeeping" or procedural rules. Statutory context and history confirm that Congress gave the Commission the authority to promulgate binding rules.

The district court also concluded that the Rule is arbitrary and capricious based on several fundamental misunderstandings of the rulemaking record. The Commission reasonably examined extensive evidence regarding the negative effects of non-competes on competitive conditions and explained that the evidence supported the Commission's determination that non-competes meet the standard for unfair methods of competition. The Commission also explained why the Non-Compete Rule was an appropriate response, and each of the district court's contrary conclusions is contradicted by the record.

The district court compounded its errors by entering a universal vacatur of the Rule, despite previously recognizing that universal relief was not necessary to redress the injuries plaintiffs asserted. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. The court entered final judgment on August 20, 2024. ROA.5639. The government filed a timely notice of appeal from final judgment on October 18, 2024. ROA.5640; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The district court universally vacated the Rule on the grounds that the Commission lacks statutory authority to issue substantive rules defining unfair methods of competition and that the Rule is arbitrary and capricious. The issues presented are:

3

1. Whether the FTC Act empowers the Commission to issue substantive rules defining a practice as an unfair method of competition;

2. Whether the Rule is arbitrary and capricious; and

3. Whether the district court's universal vacatur was impermissibly overbroad.

## STATEMENT OF THE CASE

### A.     Legal Background

**1.** The Federal Trade Commission Act, originally enacted in 1914 and since amended on various occasions, "declared unlawful" all "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). The Act also declared unlawful "unfair or deceptive acts or practices in or affecting commerce." *Id.*

In addition, the FTC Act established the Commission as a bipartisan expert agency with authority to enforce the Act's prohibitions. The Act "empowered and directed" the Commission "to prevent persons" and other entities subject to the Commission's jurisdiction "from using unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(2).

Congress endowed the Commission with various powers to help it carry out its mandate to enforce the FTC Act's mandates, two of which are particularly relevant here. First, in Section 5(b),[1] Congress empowered the Commission to initiate

---

[1] Consistent with the Non-Compete Rule and the district court's opinion, this brief refers to 15 U.S.C. §§ 45 and 46 as Sections 5 and 6 (of the FTC Act), respectively.

administrative enforcement actions when it determines an entity "has been or is using any unfair method of competition." 15 U.S.C. § 45(b). Second, in Section 6, titled "[a]dditional powers of Commission," Congress provided that the "Commission shall also have power" to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act. *Id.* § 46(g). This provision also states that the Commission shall have the power to "classify corporations." *Id.*

**2.** When Congress enacted the FTC Act, the phrase "unfair methods of competition" was a new statutory term, not defined in the Act itself. The FTC Act was enacted after the Sherman Act and almost contemporaneously with the Clayton Act—two other antitrust statutes that the Commission enforces. The Supreme Court subsequently recognized that the FTC Act's prohibition on "unfair methods of competition" was designed to "supplement and bolster," rather than merely duplicate, the Sherman and Clayton Acts. *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953). Specifically, the FTC Act empowered the Commission "to combat in their incipiency trade practices that exhibit a strong potential for stifling competition." *FTC v. Texaco, Inc.*, 393 U.S. 223, 225 (1968). "[T]he task of defining 'unfair methods of competition' was left to the Commission," *id.*, which would be required "'to apply the rule enacted by Congress to particular business situations,'" *Atlantic Ref. Co. v. FTC*, 381 U.S. 357, 367 (1965). Congress "explicitly considered[] and rejected" the task of defining unfair methods of competition itself, instead granting the

Commission the flexibility and authority to address evolving unfair methods of competition. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972).

As explained in a recent Commission policy statement synthesizing the relevant case law, an "unfair method of competition" is characterized by two features. *See* FTC, Commission File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022), https://perma.cc/2G3F-2UW9 (Section 5 Policy Statement). First, the conduct must be a "method of competition" rather than "merely a condition of the marketplace," such as "high concentration or barriers to entry." *Id.* at 8. Second, the conduct must be "unfair," which means that it "goes beyond competition on the merits"—that is, beyond competition in the form of a better product or service. *Id.* at 8-9.

Determining whether a particular practice goes beyond competition on the merits requires analyzing "two key criteria": (1) whether the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory," or "otherwise restrictive or exclusionary"; and (2) whether the conduct "tend[s] to negatively affect competitive conditions," such as by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement 9 & nn.51-52; *see also* 89 Fed. Reg. at 38,358-59. Consistent with Congress's intent that the Commission be able to halt unfair methods of competition in their incipiency under Section 5, the Commission need not prove that an individual use of a practice directly caused actual harm. Rather, the Commission may consider "the anticompetitive

tendencies of such a system." *Texaco*, 393 U.S. at 230. In other words, the

Commission may properly assess whether the conduct tends to harm competitive

conditions "in the aggregate along with the conduct of others engaging in the same or

similar conduct." 89 Fed. Reg. at 38,358; *see also id.* at 38,358 nn.288-90; *see Sperry &*

*Hutchinson Co.*, 405 U.S. at 244 (explaining that the analysis does not turn on proving

the "anticompetitive consequences after the manner of the antitrust laws").

    **3.** Starting in 1963, the Commission routinely invoked its Section 6(g)

rulemaking authority to issue legislative rules to prevent unfair methods of

competition and unfair or deceptive acts or practices. *See* 89 Fed. Reg. at 38,349-50; *see*

*also* FTC, *Annual Report of the Federal Trade Commission* 35-36 (1962),

https://perma.cc/PT38-T4RR. In 1973, the D.C. Circuit upheld the Commission's

statutory authority to issue legislative rules designating practices as unfair methods of

competition or unfair or deceptive acts or practices. *See National Petroleum Refiners Ass'n*

*v. FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973).

    Two years later, Congress amended the FTC Act in the Magnuson-Moss

Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88

Stat. 2183 (1975). The Magnuson-Moss amendments restricted the Commission from

relying on its preexisting Section 6(g) rulemaking authority to regulate unfair or

deceptive acts or practices, 15 U.S.C. § 57a(a)(2), and enacted a new statutory

provision codifying the Commission's authority to promulgate "rules which define

with specificity acts or practices which are unfair or deceptive acts or practices," *id.*

§ 57a(a). The amendments also adopted specific procedural requirements for such rules. *Id.* § 57a(b). At the same time, Congress provided that the Magnuson-Moss amendments "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." *Id.* § 57a(a)(2).

A separate provision, enacted in 1980, establishes procedural requirements for certain Commission rulemakings and defines a "rule" as a rule promulgated under Section 6 or 18 of the FTC Act. 15 U.S.C. § 57b-3(a)(1). It exempts "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice" from those procedural requirements. *Id.* Additionally, it provides that those procedural requirements apply to an amendment to a rule if the Commission "estimates that such amendment will have an annual effect on the national economy of $100,000,000 or more." 15 U.S.C. § 57b-3(a)(1)(A).

**B.    Factual and Procedural Background**

**1.** Non-competes undermine economic liberty by preventing workers from freely switching employers or launching their own businesses. Concern about non-competes "dates back centuries," and their enforceability has long been restricted "based on public policy concerns." 89 Fed. Reg. at 38,343. Today, non-competes "are generally subject to greater scrutiny" under state law "than other employment terms," and have been subject to scrutiny under federal antitrust law since before the FTC

8

Act. *Id.*; *see, e.g.*, *United States v. American Tobacco Co.*, 221 U.S. 106, 183 (1911) ("constantly recurring" use of non-competes, among other practices, violated the Sherman Act).

In recent years, "[c]oncerns about non-competes have increased substantially." 89 Fed. Reg. at 38,343. Non-competes are now widespread, proliferating far beyond senior executives and highly compensated employees, and the Commission estimates that one in five American workers—or approximately 30 million workers—is subject to a non-compete. *See id.* at 38,346; *see also id.* (citing study finding that more than half of workers bound by non-competes were hourly workers). Recent "[c]hanges in State laws governing non-competes" allowed "researchers to better isolate the effects of non-competes, giving rise to a body of empirical research" documenting the harms caused by non-competes. *Id.* at 38,343. This research has found that "the use of non-competes by employers tends to negatively affect competition in labor markets, suppressing earnings for workers across the labor force," and "to negatively affect competition in product and service markets, suppressing new business formation and innovation." *Id.*

In 2018, the Commission began to evaluate whether non-competes are unfair methods of competition. The Commission invited public comment on non-competes, as part of a set of hearings on competition and consumer protection issues in 2018 and 2019. *See* Non-Compete Clause Rule, 88 Fed. Reg. 3482, 3497 (Jan. 19, 2023). In 2020, the Commission held a public workshop on non-competes and received

hundreds of public comments addressing a potential non-compete rulemaking. *Id.* In 2021, the Commission initiated investigations into several companies' use of non-competes; those investigations culminated in 2023 with consent decrees settling the Commission's charges that the non-competes constituted unfair methods of competition and prohibiting enforcement of the non-competes. *See* 89 Fed. Reg. at 38,344; *see also* FTC, *FTC Cracks Down on Companies that Impose Harmful Noncompete Restrictions on Thousands of Workers* (Jan. 4, 2023), https://perma.cc/NFB2-3NJR.

In parallel, the Commission determined that the widespread problem of non-competes would be more efficiently and effectively addressed through rulemaking than individual adjudications. The Commission issued a Notice of Proposed Rulemaking in 2023 proposing a rule that would have classified all non-competes as unfair methods of competition and required employers subject to the Commission's jurisdiction to rescind all existing non-competes. *See* 88 Fed. Reg. 3482.

**2.** During the rulemaking, the Commission sought and received tens of thousands of public comments, evaluated the comments and relevant economic research, and conducted its own empirical analyses. After assessing the evidence, the Commission concluded that non-competes (1) are a method of competition, as opposed to a condition of the marketplace, 89 Fed. Reg. at 38,374, (2) are restrictive and exclusionary, *id.*, and (3) tend to negatively affect competition in labor, product, and service markets, *id.* at 38,379-402, 38,406-11. The Commission also found that non-competes with workers other than senior executives are exploitative and coercive

10

because they are almost always imposed unilaterally by employers with superior bargaining power, typically without meaningful negotiation or compensation, *id.* at 38,374-79; that is less often true for senior executives, who are more likely to bargain over, and receive compensation for, non-competes, *id.* at 38,405-06.

Following its expert assessment of the economic evidence, the Commission found that non-competes reduce competition and mobility in labor markets, limit the movement of workers between firms, reduce productivity, and suppress wages—not only for workers who are subject to non-competes, but even for those who are not. *See* 89 Fed. Reg. at 38,379-84. The Commission also determined that non-competes reduce competition in product and service markets by inhibiting new business formation and innovation and limiting the access to the workforce that competitors need to start and expand. This in turn may increase concentration and consumer prices. *See id.* at 38,388-91, 38,394-95.

The proposed rule received overwhelming public support. *See* 89 Fed. Reg. at 38,344 (approximately 25,000 of the 26,000 comments supported the proposal). Many comments described workers with non-competes that had prevented them from starting competing businesses or taking better jobs and recounted the harms that workers experienced as a result. *See id.* at 38,344-46; FTC, *Constituent Support for the FTC's Noncompete Rule: Texas – Statewide Impact*, https://perma.cc/8FU9-GMPD (summarizing comments from workers in Texas detailing the harms from non-competes). Others described how non-competes bound them to employers with

"religious principles in conflict" with their own, 89 Fed. Reg. at 38,345, or had "a chilling effect on speech," Authors' Guild, Comment Letter on Proposed Rule (Apr. 19, 2023), https://perma.cc/F4RM-EAYN. The Small Business Majority, a "network of more than 85,000 small businesses," joined by hundreds of small businesses, submitted comments explaining the negative effects that non-competes can have on entrepreneurs' ability to start businesses and hire qualified talent. *See* Small Bus. Majority, Comment Letter on Proposed Rule (Apr. 19, 2023), https://perma.cc/8PDE-74MW; Small Bus. Majority *et al.*, Comment Letter on Proposed Rule (Apr. 19, 2023), https://perma.cc/GF8G-EBJ4.

Finally, the Commission found that "the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate." 89 Fed. Reg. at 38,463. The Commission found that the widespread use of non-competes, in the aggregate, has negative externalities—such as adverse effects on workers and consumers who are not themselves subject to non-competes—that may be difficult to ameliorate in an individual adjudication. The Commission found that these externalities are better addressed in a rulemaking. *See id.* at 38,463-64.

For these reasons, the Commission adopted the Non-Compete Rule. The Rule provides that in most cases, it is an unfair method of competition under Section 5(a) of the FTC Act for employers to enter into non-competes after the Rule's effective date, September 4, 2024. 89 Fed. Reg. at 38,342. The Rule also prohibits employers from enforcing existing non-competes except with respect to senior executives and

requires employers to notify current and former employees subject to such non-competes that the non-competes are unenforceable. *See id.* The Rule estimates that prohibiting non-competes will increase new business formation by 2.7% annually and spur innovation, including by leading to over 100,000 new patents over 10 years. *Id.* at 38,470-71. The Rule also estimates that worker earnings will increase by $400 to $488 billion over 10 years, *id.* at 38,470, and consumer prices will drop, *id.* at 38,478.

**3.** Plaintiff Ryan, LLC, a global tax services firm that has non-competes with its principals and employees, filed this suit challenging the Non-Compete Rule. ROA.133. Four business associations—the Chamber of Commerce, Business Roundtable, Texas Association of Business, and Longview Chamber of Commerce—separately challenged the Rule in the Eastern District of Texas. The U.S. Chamber of Commerce, Texas Association of Business, and Longview Chamber of Commerce asserted that some member companies use non-competes, and the Business Roundtable, an association of chief executives, asserted some members' companies use non-competes. *See Chamber of Commerce of the U.S. v. FTC*, 732 F. Supp. 3d 674, 678 (E.D. Tex. 2024). The associations sought relief for their entire memberships but did not disclose their members' identities and did not establish that all their members use non-competes or oppose the Rule. *See Chamber of Commerce of the U.S. v. FTC*, No. 6:24-cv-148 (E.D. Tex. Apr. 30, 2024), Dkt. No. 23. After plaintiffs disclosed that Ryan is a member of the Texas Association of Business, the Eastern District of Texas suit was stayed to permit the associational plaintiffs to seek intervention in this case.

*See Chamber of Commerce*, 732 F. Supp. 3d at 683. The associational plaintiffs were subsequently permitted to intervene as plaintiffs in this case. ROA.842.[2]

Plaintiffs initially sought a nationwide preliminary injunction against the Non-Compete Rule, which the district court granted in part. The court held that plaintiffs were likely to succeed on their claim that the FTC Act does not authorize the Commission to promulgate substantive rules defining unfair methods of competition, as well as on their claim that the Rule is arbitrary and capricious. ROA.3506-18.

The district court rejected plaintiffs' request for nationwide relief, however, because plaintiffs had not provided any reason "as to how or why nationwide injunctive relief is necessary to provide complete relief to Plaintiffs." ROA.3526. The district court further concluded that the intervenor-plaintiffs had not provided "sufficient evidence" about the members on whose behalf they were proceeding to warrant "extend[ing] injunctive relief to members" of the intervenor-plaintiff associations. ROA.3526. Thus, the court entered a tailored stay and preliminary injunction that prohibited the Commission from enforcing the Non-Compete Rule against plaintiffs only. *See* ROA.3527, 3529-30.

**4.** The parties cross-moved for summary judgment, and the district court granted plaintiffs' motions for summary judgment on their claims that the

---

[2] This brief refers to Ryan and the intervenor-plaintiffs collectively as "plaintiffs." Where the distinction between the two is relevant, the brief refers to them respectively as "Ryan" and "intervenor-plaintiffs."

Commission is not statutorily authorized to issue the Non-Compete Rule and that the Rule is arbitrary and capricious.

First, the district court held that the Commission does not have statutory authority to issue substantive rules defining unfair methods of competition but instead has authority to issue only "housekeeping" rules or "rules of agency organization procedure or practice" concerning unfair methods of competition. ROA.5628-29 (quotation omitted). In so holding, the court acknowledged that the FTC Act directs the Commission to "prevent" the use of unfair methods of competition and empowers the Commission "to make rules and regulations for the purpose of carrying out" the Act. ROA.5626 (first quoting 15 U.S.C. § 45(a)(2); and then quoting *id.* § 46(g)). The court concluded, however, that those provisions do not "expressly grant the Commission authority to promulgate substantive rules regarding unfair methods of competition." ROA.5627.

The district court offered assorted reasons for its interpretation of the statute. Relying on a law review article proposing a new canon of construction, the court concluded that its interpretation was consistent with the "lack of a statutory penalty" for violating rules issued pursuant to Section 6(g). ROA.5628-29. The court also asserted that the "location" of Section 6(g) is "suspect," because it is not a "primary" and "independent" provision but instead part of a list of "almost entirely investigative powers" in Section 6 of the FTC Act. ROA.5629-30. Finally, the court rejected the Commission's arguments that the statutory history makes clear that the Commission

is empowered to promulgate substantive rules defining unfair methods of competition. ROA.5630-33.

The district court also concluded that the Rule is arbitrary and capricious. In the court's view, the record was inadequate to support the Rule because the Commission "relied on a handful of studies" studying the effects of state non-compete policies, because "no state has enacted a non-compete rule as broad as the FTC's Rule," and because the Commission "failed to sufficiently address alternatives" to the Rule and to assess "reliance interests." ROA.5635-36.

Turning to remedy, the district court vacated the Rule in its entirety, asserting that the Administrative Procedure Act (APA) "require[s]" a court to "'set aside'" any agency action that is in excess of statutory authority or arbitrary and capricious. ROA.5637 (quoting 5 U.S.C. § 706(2)). The court rejected the Commission's argument that relief should be limited to plaintiffs, asserting that "the APA does not contemplate party-specific relief." ROA.5637. Thus, the court did not address whether equitable principles supported universal vacatur or consider whether narrower relief would be appropriate. Finally, the court "decline[d] to address" the parties' arguments regarding whether "vacatur" was an appropriate remedy in this case, apparently on the view that there is a distinction between "vacating" and "setting aside" a rule. *See* ROA.5638 n.14. The court entered a final judgment that "sets aside the Non-Compete Rule" and states that "the Rule shall not be enforced or otherwise take effect." ROA.5639.

16

## SUMMARY OF ARGUMENT

**I.** The FTC Act authorizes the Commission to issue rules defining unfair methods of competition, including the Non-Compete Rule. That conclusion follows from the plain text of the statute, which declares unfair methods of competition unlawful and empowers the Commission to "make rules and regulations for the purpose of carrying out" the Act. 15 U.S.C. § 46(g). The natural reading of that plain language is confirmed by the Act's directive that the Commission "prevent" the use of unfair methods of competition, *id.* § 45(a)(2)—a directive that inherently contemplates forward-looking rulemaking.

That proper understanding of the statute is supported by every other relevant indicator of statutory meaning. The language that Congress employed in the FTC Act to grant Commission rulemaking authority is nearly identical to the language that Congress employed in statutes conferring legislative rulemaking authority on other agencies. Any remaining doubt was eliminated decades ago when, following a D.C. Circuit decision that held Section 6(g) confers legislative rulemaking authority, Congress revisited the Commission's powers and expressly preserved the Commission's competition rulemaking authority. Other provisions of the FTC Act reinforce Congress's intent to authorize the Commission to promulgate rules defining unfair methods of competition.

**II.** The district court likewise erred in concluding that the Rule is arbitrary and capricious on grounds refuted by the record and largely unexplained by the court. The

17

Commission reasonably concluded that non-competes are unfair methods of competition after analyzing dozens of economic studies, tens of thousands of public comments, and the results of its own empirical modeling. The district court improperly disregarded this evidence. For instance, the court cast aside the Commission's findings on the ground that the agency cited a "handful" of studies analyzing changes in state law. ROA.5635. In fact, the Commission reasonably relied on many high-quality empirical studies quantifying the harms from non-competes. These included studies analyzing state-law changes in non-compete enforceability because such studies are less likely to be affected by confounding variables. The agency also reviewed meta-analyses and relied on studies of nationally representative data. The district court disregarded the Commission's determination that the most methodologically robust studies were generally consistent in their findings regarding the negative effects of non-competes.

The other purported defects that the district court identified were likewise contradicted by the record. The Commission identified four states with categorical bans on non-competes and conducted its own economic analysis to model the effects of a nationwide ban using the best evidence available. The Commission also weighed the benefits and drawbacks of alternatives to the Rule and addressed settled expectations and reliance interests in the existing legal regime.

**III.** The district court's universal vacatur of the Rule is unwarranted and unnecessary to remedy plaintiffs' alleged injuries. The court did not conclude that

18

such sweeping relief was appropriate as a matter of equity—instead, the court asserted that such relief was the required remedy. But the text of the APA, considered alongside the backdrop against which the APA was enacted and this Court's precedents, makes clear that universal vacatur is not automatic or compelled but is instead a discretionary equitable remedy.

Constitutional and equitable principles require limiting any relief to the named plaintiffs and excluding unidentified members of plaintiff organizations. As an initial matter, both Article III and principles of equity counsel that a court's remedial authority is generally limited to redressing plaintiffs' specific injuries. Any relief ordered by the court should therefore be party-specific. Additionally, although the associational plaintiffs claim to represent hundreds of thousands or potentially millions of unidentified members, those plaintiffs have failed—and in fact, disclaimed any intent—to establish the requisite indicia of membership to litigate on behalf of their memberships. Regardless, equitable principles compel limiting relief to members of the organizations that are clearly identified and have agreed to be bound by the court's judgment. The substantial equities in support of the Rule, which the Commission has determined will have considerable benefits for workers, businesses, and the economy, further support these limits on any relief.

## STANDARD OF REVIEW

The district court's judgment rests on errors of law that are subject to de novo review. *See National Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## ARGUMENT

## I.    The Commission Has Authority To Issue The Non-Compete Rule

### A.    The Commission Has Statutory Authority To Issue Rules To Prevent Unfair Methods Of Competition

The FTC Act confers authority on the Commission to issue substantive rules defining unfair methods of competition, including the Non-Compete Rule. That conclusion flows directly from the Act's plain text and is supported by decades of Supreme Court precedent construing similar statutory language to confer similar authority. The Commission's statutory authority to issue rules defining unfair methods of competition is also confirmed by statutory history and context.

**1.** The FTC Act confers authority on the Commission to issue legislative rules defining unfair methods of competition, including the Non-Compete Rule.

Section 5(a) of the FTC Act declares that "[u]nfair methods of competition in or affecting commerce" are unlawful, 15 U.S.C. § 45(a)(1), and "empower[s] and direct[s]" the Commission "to prevent" the use of unfair methods of competition, *id.* § 45(a)(2). Section 6(g) of the Act then authorizes the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act." FTC Act, Pub.

20

L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914); *see also* 15 U.S.C. § 46(g) (substituting "subchapter" for "Act"). The meaning of that express grant of rulemaking authority is clear: The Commission is authorized to issue "rules and regulations" to "carry[] out" Section 5(a)'s directive—that is, to "prevent" the use of "[u]nfair methods of competition in or affecting commerce." Nothing about the statutory text cabins the Commission's authority to issuing only procedural or organizational rules.

The Commission's power to define unfair methods of competition through rulemaking is further confirmed by Section 5(a)'s directive to the Commission to "prevent" entities "from using unfair methods of competition." 15 U.S.C. § 45(a)(2). This statutory directive to "prevent" unfair methods of competition necessarily contemplates forward-looking, prophylactic rulemaking to address unfair methods of competition. *See Prevent*, 7 The Century Dictionary and Cyclopedia 4716 (1911) (defining "prevent" at the time of the FTC Act's enactment as "[t]o take previous measures against" or "[t]o keep from existing or occurring"); *accord Prevent*, Webster's New International Dictionary of the English Language 1960 (2d ed. 1942) ("To keep from happening, existing, succeeding, etc., esp. by precautionary measures; … to render impossible by advance provisions."). Interpreting the FTC Act to foreclose the Commission's authority to exercise its substantive rulemaking authority would undermine Congress's directive to "prevent" unfair methods of competition.

Thus, the plain text of Section 6(g) authorizes the Commission to issue rules enforcing the statutory prohibition on unfair methods of competition. That

rulemaking authority necessarily encompasses the authority to make factual findings and determine that a particular practice constitutes an unfair method of competition, without needing to individually assess the evidence of actual direct harms each time a company engages in the practice. That is a key feature and purpose of rulemaking, as the Supreme Court has long recognized. *See infra* p. 30.

**2.** The Commission's authority is further supported by Supreme Court precedent, stretching back decades, interpreting nearly identical language in other agencies' statutes as conferring substantive rulemaking authority.

For example, in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973), the Supreme Court upheld a Federal Reserve Board regulation issued pursuant to the Board's authority to "prescribe regulations to carry out the purposes of" the Truth in Lending Act. *Id.* at 361 (quotation omitted). As the Court explained, when a statute "states simply that the agency may 'make … such rules and regulations as may be necessary to carry out the provisions of this Act,'" the statute confers rulemaking authority to carry out the Act's substantive mandates. *Id.* at 369 (alteration in original). The "validity of a regulation promulgated" pursuant to such statutory language "will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Id.* (quotation omitted); *see also id.* at 370 (explaining, in the context of such statutory language, that "[w]hen [a] command is so explicit … nothing short of express limitation or abuse of discretion … should undermine the action taken to execute it" (quotation omitted)).

Similarly, in *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268 (1969), the Supreme Court held valid a Department of Housing and Urban Development regulation issued pursuant to its statutory authority to "make" "rules and regulations as may be necessary to carry out the provisions of" the agency's enabling statute. *Id.* at 277 (quotation omitted). The Court described that authority as a "general rulemaking power" and confirmed that it authorized the agency to promulgate a binding rule. *Id.* at 274, 277. As in *Mourning*, the Court confirmed that this grant of rulemaking authority permits the agency to promulgate rules so long as they have a "reasonable relationship" to the substantive provisions of the enabling statute. *Id.* at 281.

These cases are part of a long line of precedent confirming that statutory language identical or nearly identical to Section 6(g) authorizes agencies to promulgate legislative rules to carry out the substantive mandates set forth in the agencies' enabling statutes. *See, e.g.*, *American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 609-10 (1991) (stating that the National Labor Relations Act provision authorizing the National Labor Relations Board to "make" "such rules and regulations as may be necessary to carry out the provisions" of the statute conferred "unquestionably sufficient" authority to issue legislative rules (quotation omitted)); *FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 779, 793-94 (1978) (holding that the Communications Act provision authorizing the Federal Communications Commission to "[m]ake such rules and regulations … as may be necessary to carry out the provisions of" the statute "supplies a statutory basis for the [FCC] to issue regulations" and confers "general

23

rule-making authority" (first alteration in original) (quotation omitted)); *Brackeen v. Haaland*, 994 F.3d 249, 354 (5th Cir. 2021) (en banc) (per curiam) (holding that the Indian Child Welfare Act provision authorizing the Secretary of the Interior to "promulgate such rules and regulations as may be necessary to carry out the provisions" of the statute "clearly grants" authority "to promulgate standards that are binding upon all parties" (quotation omitted)), *aff'd in part and rev'd in part on other grounds*, 599 U.S. 255 (2023).

**3.** Though the statutory text leaves no doubt about the Commission's competition rulemaking authority, Congress confirmed the authority when ratifying it in subsequent amendments to the FTC Act.

Between 1963 and 1978, the Commission exercised its Section 6(g) authority to promulgate dozens of legislative rules aimed at preventing unfair methods of competition and unfair or deceptive acts or practices. *See* 89 Fed. Reg. at 38,349-50. In 1973, the D.C. Circuit addressed a challenge to one of these rules, in which the plaintiffs argued that "the Commission lacks authority under its governing statute to issue" "substantive rules defining the statutory standard of illegality." *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 673-75 (D.C. Cir. 1973).

The court of appeals rejected that argument, explaining that "the face of the statute" "specifically provides for rule-making by the Commission." *National Petroleum*, 482 F.2d at 676. The court explained that its construction of the statute "to permit the Commission to promulgate binding substantive rules" accorded with "the

24

construction courts have given similar provisions in the authorizing statutes of other administrative agencies." *Id.* at 678-81 (collecting statutes and cases). To find otherwise, the court explained, "would render the Commission ineffective to do the job assigned it by Congress." *Id.* at 697-98; *see also United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983) (agreeing with, and "incorporat[ing] by reference," *National Petroleum*'s "lengthy discussion of the Commission's rulemaking authority under section 6(g)").

Two years after the D.C. Circuit's decision—and following a decade in which the Commission had routinely promulgated legislative rules pursuant to Section 6(g), including rules invoking the Commission's authority to regulate unfair methods of competition—Congress revisited the Commission's rulemaking authority. In 1975, Congress enacted amendments to the FTC Act, which were codified as Section 18 of the Act. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183. Those amendments imposed additional procedural constraints on the Commission's authority to prescribe rules governing unfair or deceptive acts or practices, including "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 57a. Congress also enacted language providing that the "Commission shall have no authority under" the Act—"other than its authority" under Section 18—"to prescribe any rule with respect to unfair or deceptive acts or practices." *Id.* § 57a(a)(2). And Congress prohibited the Commission from promulgating rules governing unfair

or deceptive acts or practices without complying with Section 18's procedural requirements by amending Section 6(g) to provide that the Commission may issue rules and regulations "except as provided in" Section 18(a)(2). *Id.* § 46(g).

At the same time, Congress kept intact Section 6(g)'s grant of competition rulemaking authority. Congress specified that its amendments did not undermine the "validity" of any "prior" rules promulgated under Section 6(g), and it provided that the Commission could continue to use Section 6(g) for any rules that were "substantially completed" when the 1975 Act was enacted. Pub. L. No. 93-637, § 202(c), 88 Stat. at 2198. And in Section 18, Congress provided that the restriction on using other sections of the FTC Act to prescribe rules relating to unfair or deceptive acts or practices "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2).

This preservation of rulemaking authority was not referring to some abstract or theoretical authority. Rather, Congress knew about the Commission's and D.C. Circuit's understanding of Section 6(g) as authorizing substantive rules and declined to disturb that authority with respect to rules defining unfair methods of competition. In enacting the amendments, Congress considered and rejected a proposal that would have prohibited the Commission from "prescribing rules with respect to unfair competitive practices." S. Rep. No. 93-1408, at 30 (1974) (Conf. Rep.). The conference report adopting the final text of the amendments reiterated Congress's

understanding that the 1975 amendments "do[] not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition." *Id.* at 32. Confirming Congress's awareness of existing law, the Senate debate immediately before the vote on the conference report discussed *National Petroleum* and the Commission's competition rulemaking authority. *See* 120 Cong. Rec. 40,713 (1974) (statement of Sen. Hart) (quoting *National Petroleum* and explaining that the new procedural requirements established in the 1975 amendments "are limited to unfair or deceptive acts or practices rules").

In short, throughout the 1960s and early 1970s, the Commission routinely exercised its Section 6(g) authority to promulgate binding legislative rules defining both unfair methods of competition and unfair or deceptive acts or practices, and the D.C. Circuit upheld that exercise of authority. When Congress revisited the Commission's authority, it imposed additional procedural requirements on the Commission's authority to define unfair or deceptive acts or practices while declining to curtail the Commission's Section 6(g) authority with respect to rules defining unfair methods of competition.

Congress thus ratified the Commission's competition rulemaking authority. *See Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123, 131 (2019) ("[W]e presume that when Congress reenact[s]" the same language, it "adopt[s an] earlier judicial construction of that phrase."); *CFTC v. Schor*, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative

interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (quotation omitted)).

**4.** Multiple other FTC Act provisions confirm that Section 6(g) permits the Commission to promulgate substantive rules defining unfair methods of competition.

First, a different provision of the FTC Act, enacted in 1980, confirms that the Commission's Section 6(g) rulemaking authority encompasses the authority to issue legislative rules. Specifically, the provision establishes procedural requirements for all Commission rulemakings and defines a "rule" as a rule promulgated under Section 6 or 18 of the Act. 15 U.S.C. § 57b-3(a)(1). The provision exempts from those procedural requirements all "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." *Id.* Thus, this provision confirms that the Commission's Section 6(g) rulemaking authority must encompass legislative rules, or else the provision's reference to Section 6 would be superfluous.

Second, a different part of the 1980 amendments includes language recognizing that the Commission's exercise of its Section 6(g) rulemaking authority may properly have substantial national effects. Specifically, the provision states that the procedural requirements therein apply to an amendment to a rule if the Commission "estimates that such amendment will have an annual effect on the national economy of $100,000,000 or more." 15 U.S.C. § 57b-3(a)(1)(A). That provision confirms that

Congress understood the Commission may promulgate legislative rules, including under Section 6(g), because such rules are more likely than interpretive rules or statements of policy to have economic effects of this size.

### B. The District Court's And Plaintiffs' Contrary Arguments Are Unpersuasive

The district court nonetheless concluded that the Commission is not statutorily authorized to issue substantive rules defining unfair methods of competition. Instead, the court indicated that the Commission may enforce the FTC Act's prohibition on such practices only through case-by-case adjudications. In the court's view, Section 6(g) authorizes the Commission to adopt only "housekeeping" or procedural rules governing the conduct of those adjudications. *See* ROA.5628-29 (quotation omitted).

The district court's conclusion is unpersuasive and undermined by substantial Supreme Court precedent confirming that statutory provisions with nearly identical language authorize substantive rulemaking, even when an agency is also empowered to enforce a statute through adjudication. None of the district court's other arguments support atextual limitations on the Commission's express rulemaking authority either. Finally, although plaintiffs urged the district court to rely on the major-questions doctrine to cabin Section 6(g)'s authority, the district court properly declined to accept that invitation.

**1.** The district court's analysis rests on a fundamental misunderstanding of the statutory scheme as authorizing only case-by-case adjudication. Section 6(g) expressly

confers the authority to make rules and regulations to carry out the FTC Act's substantive mandates, including the directive to prevent unfair methods of competition. As explained, the language in Section 6(g) authorizing the Commission to promulgate binding rules is substantially identical to the language used in statutes that the Supreme Court has consistently interpreted to confer legislative rulemaking authority. *See supra* pp. 22-24.

Moreover, the Supreme Court has repeatedly held that such a rulemaking provision authorizes an agency to engage in legislative rulemaking to carry out its substantive mandate even when the enabling statute also allows the agency to carry out the same substantive mandate through adjudication. So long as Congress has conferred rulemaking authority on the agency, then "even if a statutory scheme requires individualized determinations, the decisionmaker may rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." *American Hosp. Ass'n*, 499 U.S. at 612; *accord Lopez v. Davis*, 531 U.S. 230, 243-44 (2001); *see also, e.g., AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378-80 (1999); *Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 223-24 (1991). "A contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding." *Heckler v. Campbell*, 461 U.S. 458, 467 (1983).

That is exactly what the Commission did in this rulemaking. No party disputes that the Commission may properly initiate individual enforcement actions against

employers who use non-competes, but such individual enforcement actions will present recurring questions regarding the tendencies of non-competes to negatively affect competitive conditions. The Commission resolved those questions with the Rule by evaluating the relevant evidence and determining on a class-wide basis that non-competes are restrictive and exclusionary, that they tend to negatively affect competitive conditions, and that non-competes for workers other than senior executives exhibit additional indicia of unfairness. By resolving those issues of general applicability through rulemaking rather than adjudication, the Commission weighed substantial public input, provided clear notice to affected parties, and ensured the even-handed application of the FTC Act's prohibitions.

**2.** The additional reasons that the district court proffered in support of its atextual limitation of Section 6(g) to procedural rules do not support its conclusion. The scattered inferences drawn by the district court cannot supersede the plain statutory text, particularly given the statutory history and context. And even on their own terms, the district court's conclusions are unpersuasive.

First, the district court relied on a 2002 law review article proposing a new canon of construction that, as far as the Commission is aware, no court—except the district court—has ever adopted. The article proposed that New Deal-era rulemaking provisions should be interpreted to authorize legislative rulemaking only if the provisions expressly specify penalties for violations of those rules. *See* ROA.5628-29. The article itself acknowledges, however, that "Supreme Court decisions touching on

31

rulemaking grants" following the APA's enactment "betrayed no awareness" of this convention and "there is little evidence that the typical member of Congress was aware of the convention." Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 475, 519, 577 (2002). This district court's reliance on this supposed convention was therefore error. *Cf. Biden v. Nebraska*, 600 U.S. 477, 509 (2023) (Barrett, J., concurring) ("Even if the judiciary's adoption of [strong-form] canons can be reconciled with the Constitution, it is undeniable that they pose 'a lot of trouble' for 'the honest textualist.'").

Regardless, the FTC Act does provide a penalty for a rule violation. The Commission's sole means of enforcing an unfair-method-of-competition rule is through administrative adjudication, and the Act specifies the penalty that follows such an adjudication: a cease-and-desist order, *see* 15 U.S.C. § 45(b), which, if violated, can result in civil penalties or a mandatory injunction, *see id.* § 45(*l*). Congress did not need to specify any other penalty for violating a rule.

Nor is it relevant whether Section 6(g) is a sufficiently "primary" or "independent" provision, as the district court suggested. ROA.5629-30. In describing the location of Section 6(g) as "suspect," ROA.5629, the district court cited no authority to support the notion that an agency's rulemaking authority is limited when it is conferred in the same section as other powers. As explained, many statutory provisions worded similarly to Section 6(g) have long been construed to confer substantive rulemaking authority, *see supra* pp. 22-24—including provisions that, like

Section 6(g), appear as part of a list of other powers rather than in an independent section, *see, e.g., United States v. Storer Broad. Co.*, 351 U.S. 192, 203 (1956); *King v. Housing Auth. of the City of Huntsville*, 670 F.2d 952, 954-55 (11th Cir. 1982); *see also* 52 U.S.C. § 30107(a)(8). Nor does it matter what other unrelated powers Section 6 enumerates. *See* ROA.5629. Section 6(g)'s text unambiguously grants the authority to "make rules and regulations for purposes of carrying out" the FTC Act's substantive mandates, and the case law confirms such language confers substantive rulemaking authority.

The district court's conclusion that Section 6(g) authorizes only "housekeeping" or procedural rules is likewise unfounded. ROA.5628 (quotation omitted). Nowhere does the text of the FTC Act so limit the Commission's rulemaking authority, and the rulemaking provision bears no textual resemblance to the paradigmatic "housekeeping" statute the court referenced, 5 U.S.C. § 301. ROA.5628 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979)). That "housekeeping" statute authorizes agency heads to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." *Chrysler*, 441 U.S. at 309 (quoting 5 U.S.C. § 301). In contrast, Section 6(g) confers rulemaking authority "for the purpose of carrying out the provisions of" the FTC Act, 15 U.S.C. § 46(g), without reference to "housekeeping" duties akin to those in 5 U.S.C. § 301.

33

Finally, the district court improperly inferred that the existence of other statutes "expressly allowing force of law rulemaking related to specific subjects" implies that Section 6(g) does not authorize "substantive rulemaking." ROA.5631. In the district court's view, the statutory provisions addressing rulemaking in specific subject areas "would be superfluous" if Section 6(g) permitted legislative rulemaking. ROA.5631. But Congress's decision to require the Commission to address specific topics through rulemaking has no bearing on whether the Commission had existing discretionary authority to issue substantive rules. In any event, those specific provisions direct— and do not merely authorize—the Commission to issue rules regarding certain subjects. *See, e.g.*, 15 U.S.C. § 1194(c) ("The Commission is authorized and directed to prescribe such rules and regulations … as may be necessary and proper for administration and enforcement of [the Flammable Fabrics Act]."); *id.* § 2310(a)(2) ("The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this chapter applies."). Those provisions are not rendered superfluous by the general grant of discretionary rulemaking authority.

**3.** Plaintiffs also argued in district court that the major-questions doctrine precludes interpreting Section 6(g) in accordance with its plain meaning: as authorizing the Commission to promulgate rules defining unfair methods of competition. *See* ROA.3629-33, 3692-93. But major-questions principles do not

support plaintiffs' and the district court's cramped interpretation of Section 6(g), and the district court properly declined to invoke those principles.

In certain "extraordinary cases," the Supreme Court has held that "separation of powers principles and a practical understanding of legislative intent" counsel caution before "read[ing] into ambiguous statutory text the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted). In certain such cases, the Supreme Court has said that the agency "must point to clear congressional authorization" for its action. *Id.* (quotation omitted).

Those extraordinary cases do not support the conclusion that the Commission lacks substantive rulemaking authority and do not support plaintiffs' construction of the statute. The major-questions doctrine is an application of the principle that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721 (quotation omitted). The doctrine is an "interpretive tool" for "discerning—not departing from—the text's most natural interpretation." *Nebraska*, 600 U.S. at 508, 511 (Barrett, J., concurring).

"[I]n any case of statutory construction," the court's analysis "begins with the language of the statute" and, "where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (quotation omitted). As explained, the text of Section 6(g) makes clear—especially when considered in context—that the Commission has authority to promulgate substantive rules defining unfair methods of competition. *See supra* pp. 20-29. The major-

35

questions doctrine does not demand a contrary result. After all, the doctrine "does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority." *Nebraska*, 600 U.S. at 516 (Barrett, J., concurring).

Notably, Congress expressly contemplated that the rules that the Commission promulgates to enforce the FTC Act's substantive mandates may have relatively large economic effects. Congress enumerated requirements that would apply to any regulatory amendment with "an annual effect on the national economy of $100,000,000 or more," 15 U.S.C. § 57b-3(a)(1)(A), specifically envisioning rulemaking with substantial national economic effects. Thus, by its terms, the FTC Act obviates any concerns that the major-questions doctrine is relevant to the Non-Compete Rule.

Even if the statutory interpretation question were less clear, the major-questions doctrine would not be implicated here, where the Commission's assertion of authority—to promulgate a rule defining an unfair method of competition—is squarely within the Commission's core expertise and mandate. The major-questions doctrine applies in those "extraordinary" circumstances where an agency has asserted authority of such unusual "history" and "breadth" and "significance" that there is "a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721 (quotation omitted). The Court's application of the doctrine has generally reflected its view that agencies were finding "elephants in mouseholes" by relying on "relatively narrow statutes" to ground "broad invocations

of power" or attempting to "regulate[] outside [their] wheelhouse." *Nebraska*, 600 U.S. at 517-18 (Barrett, J., concurring) (quotation omitted).

For example, in *West Virginia*, the Court perceived the Environmental Protection Agency to be relying on a "little-used backwater" provision of the Clean Air Act "that was designed to function as a gap filler" to support the agency's authority to issue the Clean Power Plan, which would have "restructur[ed] the Nation's overall mix of electricity generation." 597 U.S. at 720, 724, 730. Similarly, in *Alabama Ass'n of Realtors v. Department of Health & Human Services*, the Centers for Disease Control and Prevention relied on its general authority to "prevent the introduction, transmission, or spread of communicable diseases" as a basis for a nationwide "eviction moratorium." 594 U.S. 758, 760-61 (2021) (per curiam) (quotation omitted). The Court perceived that general authority to be a "wafer-thin reed on which to rest such sweeping power." *Id.* at 765.

The Non-Compete Rule does not implicate these concerns. The Rule is a targeted regulatory effort to prohibit a specific unfair method of competition, which rests comfortably within the Commission's core regulatory authority under Section 5(a) of the FTC Act—a substantive centerpiece of the enabling statute. As explained, Congress vested the Commission with the statutory authority to implement Section 5(a)'s substantive prohibition on unfair methods of competition through rulemaking and adjudication. *See supra* pp. 4-5. Plaintiffs have not disputed that the Commission may initiate enforcement actions against the use of non-competes to enforce Section

37

5(a)'s prohibition on unfair methods of competition. And as the Supreme Court has long recognized, an agency with both rulemaking and adjudication authority may carry out its substantive mandate through rulemaking even when its enabling statute allows adjudications as an alternative. *See supra* p. 30; *cf. NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974). The major-questions doctrine does not provide otherwise.

## II.    The Non-Compete Rule Is Not Arbitrary And Capricious

The district court erred in concluding that the Non-Compete Rule is arbitrary and capricious under the APA. ROA.5634. In weighing whether an agency action is arbitrary and capricious, the court's "task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). "[A] court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and must "uphold an agency's action 'if its reasons and policy choices satisfy minimum standards of rationality,'" *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013). The court begins with the "presumption that the agency's decision is valid," *Texas Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010), and exercises "narrow and highly deferential" review, particularly when the agency's expertise is involved, *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quotation omitted).

The Commission properly concluded that non-competes are unfair methods of competition based on the rulemaking record, and the district court's conclusion that

38

the Rule was arbitrary and capricious was premised on a series of incorrect assertions that the record refutes.

### A. The Commission Reasonably Concluded That Non-Competes Are Restrictive And Tend To Negatively Affect Competitive Conditions

The Commission's conclusion that non-competes are an unfair method of competition is supported by the rulemaking record and the case law. As explained, an unfair method of competition is conduct that (1) is "coercive, exploitative, collusive, abusive, deceptive, predatory" or "otherwise restrictive or exclusionary"; and (2) "tend[s] to negatively affect competitive conditions" by, for example, tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement 9; *see* 89 Fed. Reg. at 38,358-59; *supra* p. 6.

In the rulemaking, the Commission conducted an exhaustive analysis of the economic literature and comments submitted during the rulemaking process. Based on this review, the Commission concluded that non-competes are facially restrictive and exclusionary, and with respect to workers other than senior executives, the Commission found that non-competes are exploitative and coercive. *See* 89 Fed. Reg. at 38,374-79. The Commission also found that non-competes tend to (and in actual effect do) negatively affect competitive conditions in labor, product, and service markets by preventing workers from starting competing businesses and by preventing employers from competing to hire the best workers. *See id.* at 38,374-402, 38,406-11. The Commission found that by cutting off competition, non-competes suppress labor

39

mobility, depress earnings, reduce job quality, decrease new business formation, and stifle innovation; and that non-competes may elevate market concentration and consumer prices while reducing product and service quality and consumer choice. *See id.* at 38,379-402. The rulemaking record is replete with evidence supporting these conclusions. *See id.* Thus, the Commission concluded that non-competes are unfair methods of competition.

The Commission also explained that non-competes have substantial negative spillover effects. For instance, the Commission identified evidence consistently showing the harms from non-competes on businesses and workers who are not themselves subject to non-competes. *See* 89 Fed. Reg. at 38,460-64. The evidence showed that non-competes tend to reduce the earnings and job mobility for both workers who are subject to non-competes and those who are not. *See, e.g.*, *id.* at 38,383 (citing study showing "increases in non-compete enforceability in one State have negative impacts on workers' earnings in bordering States"); *id.* (citing study showing that "when the rate of use of non-competes in an industry in a State is higher, wages are lower for workers who do not have non-competes but who work in the same State and industry"). The Commission also found that non-competes tend to negatively affect competitive conditions by locking up talented workers and thereby inhibiting new business formation and reducing innovation—which affects even businesses, consumers, and workers not bound by non-competes. *See id.* at 38,388-98;

*see also id.* at 38,398-99 (citing evidence of non-competes contributing to increased industrial concentration and consumer prices).

The Commission concluded that its findings were not undermined by the interests proffered in support of non-competes, such as promoting training, protecting sensitive information, and promoting competition. *See* 89 Fed. Reg. at 38,421-34. As the Commission explained, employers remain free to protect those interests in other ways, such as nondisclosure agreements, patents, and trade secrets law to protect intellectual property interests. *See id.* at 38,424-26. To protect investments in employee training, employers and workers can negotiate employment contracts in which employees agree to a length of employment tailored to recoup the employer's investment. *Id.* at 38,424. Employers also remain free to compete on the merits by offering better jobs. *See id.* The Commission explained that these alternative approaches may protect employers' interests without inhibiting competition to the degree that non-competes do.

### B. The District Court's Contrary Conclusions Are Unavailing

The district court improperly concluded that the Rule is arbitrary and capricious based on assertions that the record refutes.

### 1. The District Court Improperly Concluded That The Rule Is Not Supported By The Record

First, the district court erroneously cast aside the Commission's findings on the ground that the Commission only "relied on a handful of studies that examined the

economic effects of various state policies toward noncompetes." ROA.5635. This was improper for several reasons. First, the Commission properly gave weight to research assessing the effects of changes in state laws governing non-compete enforceability because those analyses were highly probative. As the Commission explained in the Rule, those studies were likelier to demonstrate the causal effects of changes in the law and were less likely to be affected by confounding variables. *See* 89 Fed. Reg. at 38,372-73. Second, the Commission reviewed meta-analyses of these studies, which the district court overlooked. For instance, the Commission relied on a meta-analysis of "all legal changes in the enforceability of non-competes from 1991 to 2014 across the entire labor force" and determined that "substantial decreases" in the enforceability of non-competes increase labor mobility in industries that use non-competes at a high rate. *Id.* at 38,380-81. Third, the Commission's analysis was not limited to studies assessing the effects of state non-compete laws; the agency drew on many high-quality empirical studies quantifying the harms from non-competes, including studies involving nationally representative data. *See, e.g., id.* at 38,381.

Furthermore, the district court improperly relied on the notion that the Commission failed to cite "evidence" regarding the effects of a "categorical ban" on non-competes. ROA.5635. The Commission acted reasonably given the extensive evidence regarding the harmful effects of non-competes across industries and geographies. "An agency need not 'have perfect information before it takes any action[,]'" *North Carolina v. FERC*, 112 F.3d 1175, 1190 (D.C. Cir. 1997), and even

given limited data and "serious uncertainties," an agency need only "explain the evidence which is available[] and … offer a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 52. The APA does not require an agency to shore up evidence of what the world would look like *if* its action, which has yet to be taken, had already been taken, for such a standard would effectively preclude new action. The Commission nevertheless performed its own economic analysis modeling the effects of a nationwide ban using the best evidence available. *See* 89 Fed. Reg. at 38,466-502. In so doing, the Commission discharged its obligation to analyze the available evidence to determine whether it supports the Rule. *Cf. FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021) ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.").

Moreover, the district court was incorrect that "no state" has enacted a non-compete rule "as broad as" the Commission's. ROA.5635. Four states have adopted categorical bans on non-competes, as the Rule explains. *See* 89 Fed. Reg. at 38,424 n.767. In any event, the APA does not require an agency to identify an identical state law to justify its exercise of its independent federal statutory authority.

Finally, the district court enumerated various purported defects in the Rule— each refuted by the record. ROA.5635. The district court offered no support for its assertion that the Rule is "based on inconsistent and flawed empirical evidence," ROA.5635, and the Rule explains that just the opposite is true. The Commission applied its "longstanding expertise assessing empirical evidence relating to the effects

of various practices on competition" and gave greater weight to studies with methodologies that are "more likely to yield accurate, reliable, and precise results." 89 Fed. Reg. at 38,372. The Commission's approach to evaluating the evidence accorded with "best practices in the economic literature," *id.*, and the Commission found that the most methodologically robust studies were broadly consistent in their findings regarding the negative effects of non-competes, *see id.* at 38,396.

The district court was also mistaken to say the Commission did not "consider the positive benefits" of non-competes and "disregard[ed] the substantial body of evidence supporting" non-competes. ROA.5635. To the contrary, the Commission analyzed each of the claimed benefits and arguments in support of non-competes, and ultimately concluded that they did not alter the Commission's conclusion that non-competes are unfair methods of competition. *See supra* p. 41; *accord* 89 Fed. Reg. at 38,421-34.

### 2.  The District Court Disregarded The Commission's Analysis Of Alternatives

The district court's arbitrary-and-capricious analysis was also wrong because it rested on the unsupported assertion that the Commission did not "sufficiently address alternatives to issuing the Rule." ROA.5636. The Commission assessed a range of alternatives to the Rule: a rebuttable presumption of unlawfulness; different standards for different categories of workers; disclosure rules; reporting rules; requirements to

compensate workers for non-competes; state-by-state regulation instead of a uniform federal rule; and case-by-case enforcement only. *See* 89 Fed. Reg. at 38,457-65.

The Commission thoroughly explained why each of these alternatives was inadequate to ameliorate the harmful effects of non-competes. The agency noted that various alternatives would introduce complexity and uncertainty, and that this would increase employers' compliance costs and make it likelier that employers would continue to use unlawful non-competes. *See* 89 Fed. Reg. at 38,458. The Commission also noted that certain alternatives, like the disclosure rule, would not "mitigate the competitive harms caused by non-competes in the aggregate." *Id.* at 38,459. And a rule governing only some non-competes, or limiting only the scope or duration of non-competes, would "still tend to inhibit efficient matching between workers and employers, with spillover effects on new business formation and innovation." *Id.* at 38,461. The Commission reasonably determined that the Rule would best address the problems these alternatives posed.

Contrary to the district court's assertion, *see* ROA.5636, the Commission expressly considered potential reliance interests in the existing legal regime, *see* 89 Fed. Reg. at 38,355 n.254. For instance, the Commission assessed whether it would be appropriate to retain the current patchwork of state regulation and concluded that the adverse consequences of taking no action outweighed settled expectations and reliance interests. *See id.* at 38,462, 38,465; *see also id.* at 38,403 (discussing reliance interests in connection with non-competes for workers other than senior executives);

*id.* at 38,412 (explaining the Rule's carveout for senior executives in light of reliance interests). That these analyses appeared in sections that were not headlined "reliance interests" does not render the rule arbitrary and capricious.

In any event, the district court's focus on reliance interests was misplaced because it was premised on inapposite case law. The district court relied on a decision addressing situations in which agencies "rescind[] or alter[] a prior policy" and therefore must consider "reliance interests" in their prior positions. *Wages & White Lion Invs., LLC v. Food & Drug Admin.*, 16 F.4th 1130, 1139 (5th Cir. 2021) (alteration omitted). No such interests were at issue here because the Commission had not previously taken a contrary position on the question of whether non-competes are unfair methods of competition.

## III.    The District Court Erred In Universally Vacating The Rule

Even if plaintiffs were correct on the merits of their claims, the district court erred in vacating the Rule universally. The district court failed to consider either the balance of equities or the public interest and instead treated universal relief as flowing automatically from its conclusion that the Rule exceeded the Commission's authority and was not properly explained. That reasoning was erroneous, and constitutional and equitable principles do not support extending any vacatur beyond the named plaintiffs.

### A.    The District Court Improperly Concluded Universal Relief Was Compelled By The APA And Failed To Consider Constitutional And Equitable Principles

The court erred in ordering universal vacatur of the Rule without considering equitable principles. The court at no point concluded that universal relief was necessary to remedy any of plaintiffs' injuries or was consonant with equitable principles. To the contrary, the court had previously declined to extend relief beyond plaintiffs at the preliminary-injunction stage, concluding that plaintiffs had not demonstrated that the sweeping remedy they requested was "necessary to provide complete relief" to them. ROA.3526. At final judgment, however, the court appeared to view universal relief as required by the APA. *See* ROA.5637-38.

That is incorrect. Although this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022), the APA does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, *see* 5 U.S.C. § 703, and there is little indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions," *id.* § 706(2); *see United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle, instructing that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). The APA provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702(1). Given that Congress incorporated traditional equitable principles into the APA, there is no reason to conclude that Congress compelled courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case" with the "set aside" language in § 706. *Texas*, 599 U.S. at 695 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment).

This construction of the APA as permitting, but not requiring, universal vacatur is consistent with this Court's precedent. This Court has understood universal vacatur of agency action to be a discretionary equitable remedy—not one that is automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding, without contradiction from any other member of the Court, that the district court could consider on remand "a more

limited remedy" than universal vacatur of the rule, and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also id.* (recognizing that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" (quoting *Gill v. Whitford*, 585 U.S. 48, 73 (2018))); *Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). This Court has recently reaffirmed that in certain situations, "party-specific vacatur is definitely appropriate." *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 120 F.4th 494, 510 (5th Cir. 2024). That is consistent with the APA, which does not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1).

Universal relief also conflicts with principles of Article III and equity, "incentivize[s] forum shopping," "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburdens courts' "emergency dockets." *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). Vacatur can also "render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes," sometimes even "sweep[ing] up nonparties who may not wish to receive the benefit of the court's decision." *Texas*, 599 U.S. at 703 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment). These concerns are particularly acute here, given the two other challenges to the Rule that were pending before the district court entered universal vacatur, one of which is now on appeal, *see Properties of the Vills., Inc.*

49

*v. FTC*, No. 24-13102 (11th Cir.), and the other of which was voluntarily dismissed following the improper entry of universal relief in this case, *see ATS Tree Servs., LLC v. FTC*, No. 24-1743 (E.D. Pa. Oct. 4, 2024), Dkt. No. 92.

The district court declined to consider any of these arguments, seemingly on the view that they were irrelevant because they addressed whether "vacatur" was appropriate and the court was instead "set[ting] aside" the Rule. ROA.5638 n.14 (quotation omitted). That view was misplaced. This Court has stated that the APA provision directing courts "to set aside unlawful agency actions" is what "allow[s] a district court's vacatur," *Texas Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (quotation omitted); in other words, "vacatur" and "set aside" are different terms to describe the same relief.

### B.    Constitutional And Equitable Principles Preclude Universal Vacatur In This Case

The district court entered universal vacatur of the Rule without identifying any extraordinary circumstances supporting universal relief, and without considering the balance of equities and the public interest. Had the district court considered the relevant constitutional and equitable principles, it would have been a clear abuse of discretion to conclude that universal vacatur was justified. Those principles required the district court to limit any vacatur to the named plaintiffs and any identified members of the organizational plaintiffs.

First, Article III and equitable principles support limiting relief to the plaintiffs. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill*, 585 U.S. at 66 (alteration and quotation omitted). Equitable principles reinforce this limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Such relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

Thus, to the extent vacatur—rather than specific declaratory or injunctive relief—was required to redress plaintiffs' injuries, it should have been limited to the named plaintiffs. *See* ROA.5637-38. When entering a plaintiff-specific preliminary injunction, the district court concluded that universal relief was unwarranted because plaintiffs had not explained why a more tailored remedy would not "provide complete relief" to plaintiffs. ROA.3526. The district court should have followed the same course at final judgment.

Second, the district court erred in extending relief to the untold numbers of unidentified members that the associational plaintiffs say they represent, including the "approximately 300,000 members" and "indirectly … more than three million U.S. businesses" that the U.S. Chamber of Commerce claims to represent. ROA.1009. As

the Commission explained in district court, the associational plaintiffs have not

established standing to litigate on behalf of their unidentified members because they

have not shown that they are bona fide membership organizations. Plaintiffs have not

identified any "indicia of membership," such as "a clearly articulated and

understandable membership structure" with members who "elect[] the governing

body"; nor have they explained how their members direct or control the organization.

*Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997)

(quotation omitted).

To the contrary, the associational plaintiffs disclaimed any intent to

demonstrate the relevant "indicia of membership," ROA.4366 (quotation omitted),

arguing that requiring such a showing would be "inconsistent" with the Supreme

Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard*

*College*, 600 U.S. 181 (2023). But that decision is inapposite. In *Students for Fair*

*Admissions*, an association alleged it had 47 members and sought to proceed on behalf

of four members who filed declarations stating their support for the lawsuit. *See id.* at

201. The Court noted that where "an organization has identified members and

represents them in good faith, our cases do not require further scrutiny into how the

organization operates." *Id.*

The associational plaintiffs may be able to establish their standing to seek relief

on behalf of the specific members that they have identified—in this case, three

members of the U.S. Chamber of Commerce, *see* ROA.3761, 3769, 3789—but *Students*

*for Fair Admissions* does not support these plaintiffs' standing to seek relief on behalf of thousands or millions of unidentified members who do not control the associations or this litigation, and who may not even know about the litigation or that they may be bound by a judgment. Relief extending to these unidentified members was particularly inappropriate here, where the associational plaintiffs did not show that their unidentified members use enforceable non-competes, oppose the Rule, or would benefit from vacatur. The associations thus failed to carry their burden to prove that "resolution of the claims benefits the association's members." *Association of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010).

These fundamental rules governing Article III standing for associational plaintiffs are particularly pressing here, where at least some unidentified members of these associations likely support and benefit from the Rule. As the Commission found, and as the comments reflect, the Rule will benefit many businesses by increasing their ability to hire qualified workers and by spurring innovation. *See* Small Bus. Majority, Comment Letter on Proposed Rule, *supra*; Small Bus. Majority *et al.*, Comment Letter on Proposed Rule, *supra*.

Even if the associational plaintiffs had established Article III standing to sue on behalf of their unidentified members, equitable principles warrant limiting relief to identified members who agreed to be bound by the judgment. Such a restriction on relief would promote the longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf.*

*Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring). Any contrary approach risks giving parties multiple bites at the apple, undermining basic principles of preclusion.

Third, the Commission and public's substantial interests in the Rule underscore the need to limit vacatur. Whenever the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted). That is particularly true here, where the district court did not dispute the Commission's determination that non-competes are generally unfair methods of competition.

Moreover, as the Commission explained in the Rule, non-competes have substantial negative effects on workers, competing businesses, and the public. Non-competes inhibit new business formation and prevent efficient, market-based matching between workers and employers, which in turn reduces productivity, wages, and labor mobility. *See* 89 Fed. Reg. at 38,379-84, 38,388-91, 38,394-95. The Commission estimated that the Rule would likely have significant salutary effects across the economy, leading to more than 100,000 new patents, a 2.7% annual increase in new businesses, increased worker earnings by more than $400 billion over 10 years, and lower consumer prices. *See id.* at 38,433, 38,470, 38,478. The district court's universal vacatur of the Rule undermines all these benefits.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

MICHAEL S. RAAB
SEAN R. JANDA

*s/ Urja Mittal*

URJA MITTAL
*Attorneys, Appellate Staff*
*Civil Division, Room 7248*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-4895*
*urja.mittal@usdoj.gov*

January 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on January 2, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Urja Mittal*
URJA MITTAL

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,970 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Urja Mittal*
URJA MITTAL

**ADDENDUM**

## TABLE OF CONTENTS

15 U.S.C. § 45(a) ................................................................................................ A1

15 U.S.C. § 46(g) ............................................................................................... A2

15 U.S.C. § 57a(a)-(b) ....................................................................................... A2

15 U.S.C. § 57b-3(a) .......................................................................................... A4

**15 U.S.C. § 45(a)**

**§ 45. Unfair methods of competition unlawful; prevention by Commission**

**(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade**

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.], except as provided in section 406(b) of said Act [7 U.S.C. 227(b)], from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

(3) This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless—

(A) such methods of competition have a direct, substantial, and reasonably foreseeable effect—

(i) on commerce which is not commerce with foreign nations, or on import commerce with foreign nations; or

(ii) on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

(B) such effect gives rise to a claim under the provisions of this subsection, other than this paragraph.

If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States.

(4) (A) For purposes of subsection (a), the term "unfair or deceptive acts or practices" includes such acts or practices involving foreign commerce that—

(i) cause or are likely to cause reasonably foreseeable injury within the United States; or

(ii) involve material conduct occurring within the United States.

(B) All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available for acts and practices described in this paragraph, including restitution to domestic or foreign victims.

. . .

## 15 U.S.C. § 46(g)

### § 46. Additional powers of Commission

The Commission shall also have power—

. . .

### (g) Classification of corporations; regulations

From time to time classify corporations and (excepted as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

. . .

## 15 U.S.C. § 57a(a)-(b)

### § 57a. Unfair or deceptive acts or practices rulemaking proceedings

### (a) Authority of Commission to prescribe rules and general statements of policy

(1) Except as provided in subsection (h), the Commission may prescribe—

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), except that the Commission shall not develop or promulgate any trade rule or regulation with regard to the regulation of the development and utilization of the standards and certification activities pursuant to this section. Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

(2) The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of

this title). The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.

**(b) Procedures applicable**

(1) When prescribing a rule under subsection (a)(1)(B) of this section, the Commission shall proceed in accordance with section 553 of title 5 (without regard to any reference in such section to sections 556 and 557 of such title), and shall also

(A) publish a notice of proposed rulemaking stating with particularity the text of the rule, including any alternatives, which the Commission proposes to promulgate, and the reason for the proposed rule;

(B) allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

(C) provide an opportunity for an informal hearing in accordance with subsection (c); and

(D) promulgate, if appropriate, a final rule based on the matter in the rulemaking record (as defined in subsection (e)(1)(B)), together with a statement of basis and purpose.

(2) (A) Prior to the publication of any notice of proposed rulemaking pursuant to paragraph (1)(A), the Commission shall publish an advance notice of proposed rulemaking in the Federal Register. Such advance notice shall—

(i) contain a brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission; and

(ii) invite the response of interested parties with respect to such proposed rulemaking, including any suggestions or alternative methods for achieving such objectives.

(B) The Commission shall submit such advance notice of proposed rulemaking to the Committee on Commerce, Science, and Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives. The Commission may use such additional mechanisms as the Commission considers useful to obtain suggestions regarding the content of the area of inquiry before the publication of a general notice of proposed rulemaking under paragraph (1)(A).

(C) The Commission shall, 30 days before the publication of a notice of proposed rulemaking pursuant to paragraph (1)(A), submit such notice to the

Committee on Commerce, Science, and Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives.

(3) The Commission shall issue a notice of proposed rulemaking pursuant to paragraph (1)(A) only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent. The Commission shall make a determination that unfair or deceptive acts or practices are prevalent under this paragraph only if—

(A) it has issued cease and desist orders regarding such acts or practices, or

(B) any other information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices.

. . .

## 15 U.S.C. § 57b-3(a)

## § 57b-3(a). Rulemaking process

## (a) Definitions

For purposes of this section:

(1) The term "rule" means any rule promulgated by the Commission under section 46 or section 57a of this title, except that such term does not include interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice. Such term does not include any amendment to a rule unless the Commission—

(A) estimates that such amendment will have an annual effect on the national economy of $100,000,000 or more;

(B) estimates that such amendment will cause a substantial change in the cost or price of goods or services which are used extensively by particular industries, which are supplied extensively in particular geographic regions, or which are acquired in significant quantities by the Federal Government, or by State or local governments; or

(C) otherwise determines that such amendment will have a significant impact upon persons subject to regulation under such amendment and upon consumers.

(2) The term "rulemaking" means any Commission process for formulating or amending a rule.