No. 24-10951

# In the United States Court of Appeals for the Fifth Circuit

RYAN, L.L.C.,

*Plaintiff–Appellee*,

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,

*Intervenor-Plaintiffs–Appellees*,

v.

FEDERAL TRADE COMMISSION,

*Defendant–Appellant*.

*On Appeal from the United States District Court
for the Northern District of Texas*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT–APPELLANT

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: January 8, 2025

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................. i

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF CONTENTS .............................................................................. iii

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT ............................................................................................... 7

    I.    The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Likely Did Not Intend ........................................................................ 7

    II.   The FTC's Noncompete Clause Rule Does Not Trigger the Major Questions Doctrine ............................................................................. 11

    III.  Extending the Major Questions Doctrine to Cases Like This Would Undermine Textualism and the Separation of Powers ...................... 23

CONCLUSION ............................................................................................ 30

CERTIFICATE OF SERVICE ...................................................................... 1A

CERTIFICATE OF COMPLIANCE ............................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .................................................... 3, 9, 15, 21, 22

*Alliance for Fair Bd. Recruitment v. SEC*,
--- F.4th ----, 2024 WL 5078034
(5th Cir. Dec. 11, 2024) (en banc) .................. 3, 7, 8, 11, 12, 18, 19, 21, 25, 26

*ATS Tree Servs., LLC v. FTC*,
No. 24-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024) ................ 15

*Biden v. Missouri*,
595 U.S. 87 (2022) ..................................................... 8, 15, 19, 25

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......................................... 2-4, 7, 9, 10, 12, 21, 22, 24-27

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........................................................... 23, 24

*Bradford v. Dep't of Lab.*,
101 F.4th 707 (10th Cir. 2024) ............................................ 3, 12

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984) ................................................ 14

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ..................................... 2, 9, 15, 17, 19, 20, 22

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......................................................... 18, 25

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......................................................... 23

iv

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*King v. Burwell,*
    576 U.S. 473 (2015)................................................................ 18, 22

*Little Sisters of the Poor v. Pennsylvania,*
    591 U.S. 657 (2020)................................................................ 24

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024)................................................................ 5, 6, 24-27

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)................................................................ 8

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
    512 U.S. 218 (1994)................................................................ 17

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022)................................................................ 9, 12, 15, 20-22

*Nat'l Petrol. Refiners Ass'n v. FTC,*
    482 F.2d 672 (D.C. Cir. 1973)................................................ 13, 14, 16

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) .................................................... 3, 11

*New Prime Inc. v. Oliveira,*
    586 U.S. 105 (2019)................................................................ 27

*NLRB v. SW Gen., Inc.,*
    580 U.S. 288 (2017)................................................................ 16

*Pension Benefit Guar. Corp. v. LTV Corp.,*
    496 U.S. 633 (1990)................................................................ 19

*Properties of the Villages, Inc. v. FTC,*
    No. 24-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024)............... 16, 18

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. Craft*,
  535 U.S. 274 (2002).............................................................. 20

*United States v. JS & A Grp., Inc.*,
  716 F.2d 451 (7th Cir. 1983)................................................ 13

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014).................................................... 2, 3, 9, 21, 22

*West Virginia v. EPA*,
  597 U.S. 697 (2022)......................................... 2-13, 15, 17-19, 21, 22, 24-29

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018)........................................................ 5, 23

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  594 U.S. 338 (2021)............................................................... 19

## STATUTES AND LEGISLATIVE MATERIALS

51 Cong. Rec. (1914)............................................................... 14, 19

H.R. 527, 118th Cong. (2002)................................................... 20

H.R. 7917, 93d Cong., 2d Sess. (1974) .................................. 20

Pub. L. No. 89-92, 79 Stat. 282 (1965)................................... 13

Pub. L. No. 93-637, 88 Stat. 2183 (1975)............................... 20

5 U.S.C. § 801 ......................................................................... 28

5 U.S.C. § 804 ......................................................................... 28

15 U.S.C. § 45(a)(2)................................................................. 17

**Page(s)**

15 U.S.C. § 45(*l*) ..................................................................... 16

15 U.S.C. § 46(g) ..................................................................... 4, 16, 17

15 U.S.C. § 57a(a)(2) ............................................................... 13, 16

15 U.S.C. § 57b-3(a)(1) ........................................................... 16

15 U.S.C. § 57b-3(a)(1)(A) ...................................................... 17


EXECUTIVE BRANCH MATERIALS

Care Labeling of Textile Wearing Apparel, 36 Fed. Reg. 23,883 (Dec. 16, 1971) ............................................................... 14, 15

16 C.F.R. § 910.4 ..................................................................... 23

31 Fed. Reg. 3,342 (Mar. 3, 1966) ............................................ 13

35 Fed. Reg. 4,614 (Mar. 17, 1970) .......................................... 13

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ........... 19, 21

Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971) ..................................... 15


BOOKS, ARTICLES, AND OTHER AUTHORITIES

Kevin Arlyck, *Delegation, Administration, and Improvisation*, 97 Notre Dame L. Rev. 243 (2021) ........................................... 28

Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81 (2021) .................................. 28

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379 (2021) ....................................................................... 29

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021)........................................ 28

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021) ....................................................................... 28

Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174 (2022)...... 27

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997) ....................................................................... 23

Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262 (2022) ....................................................................... 27

Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022).................................................................. 28

# INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to the progressive promise of the Constitution's text and history. CAC has studied the development and scope of the major questions doctrine, along with its implications for the separation of powers, and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The major questions doctrine applies only in "extraordinary" cases, when agencies radically transform their authority by citing vague provisions to claim "breathtaking" new powers beyond their traditional roles and expertise. This is not a major questions case. The FTC was created to prevent unfair methods of competition nationwide. Its statute explicitly authorizes rulemaking to carry out that mandate, and the agency began issuing binding rules six decades ago. Congress responded by preserving, not withdrawing, that authority. And regulating noncompete agreements falls squarely within the FTC's expertise. For these reasons and others, applying the major questions doctrine to the Noncompete Clause Rule would defy precedent. It would also run roughshod over textualism and the separation of powers.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

In a series of cases over recent years, the Supreme Court concluded that agencies were claiming enormous and surprising new authority despite indications that Congress did not mean to grant that authority. Taking stock of this case law, *West Virginia v. EPA* explicitly recognized a "major questions doctrine," explaining that "there are 'extraordinary cases' that call for a different approach" from "routine statutory interpretation." 597 U.S. 697, 721-24 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).

In these "extraordinary" cases, courts take an extraordinary approach. Rather than simply determining the meaning of a statute's text, courts weigh various factors outside of the text—including political controversy, prior agency practice, economic implications, and legislative history—to help decide whether a "major question" is implicated. If so, courts require "clear congressional authorization" for the agency's action. *Id.* at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The major questions doctrine thus departs from "the ordinary tools of statutory interpretation." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). Accordingly, the Supreme Court has limited its application to "extraordinary" claims of authority, *id.* at 503, that amount to a "fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at 728).

The doctrine thus has two requirements.  First, the agency's claim must represent a "transformative expansion in [its] regulatory authority," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324), reaching "beyond what Congress could reasonably be understood to have granted," *id.*  Second, the scope of this new power must be "breathtaking," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), with "staggering" economic and political significance, *Nebraska*, 600 U.S. at 502; *see Alliance for Fair Bd. Recruitment v. SEC*, --- F.4th ----, 2024 WL 5078034, at *16-17 (5th Cir. Dec. 11, 2024) (en banc) (the doctrine applies when an action is "novel" and "outside [the agency's] ordinary regulatory domain" in addition to having "staggering" economic and political significance); *accord Bradford v. Dep't of Lab.*, 101 F.4th 707, 725-28 (10th Cir. 2024); *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (the doctrine applies only "[i]f both prongs are met").

The doctrine's first requirement is satisfied when agencies assert "unheralded" new power by twisting the "vague language" of "ancillary" provisions to "make a radical or fundamental change to a statutory scheme," particularly where the agency "has no comparative expertise" in the area it seeks to regulate and where Congress has "conspicuously and repeatedly" denied that same power to the agency.  *West Virginia*, 597 U.S. at 723-24, 748 (quotation marks omitted).  All told, the agency's action must transform the statute "from one sort of

scheme of ... regulation into an entirely different kind." *Id.* (brackets and quotation marks omitted).

Here, however, the FTC has not exploited an "obscure, never-used section of the law" to assert a new type of power outside its "comparative expertise." *Id.* at 711, 729 (quotation marks omitted). The Noncompete Clause Rule implements a core responsibility Congress assigned the agency—preventing methods of competition it determines to be unfair. Relying on its authority "to make rules and regulations for the purpose of carrying out" that mandate, 15 U.S.C. § 46(g), the FTC began issuing binding rules 60 years ago—including high-profile rules with significant national effects. Courts upheld this authority, and Congress preserved it in subsequent amendments. The Rule thus reflects no "change to [the] statutory scheme," much less a "radical or fundamental change." *West Virginia*, 597 U.S. at 723 (quotation marks omitted).

Extending the major questions doctrine to cases like this would not only conflict with Supreme Court precedent but would also undermine textualism. Unlike "the ordinary tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, the major questions doctrine emphasizes factors outside of a statute's text and structure, including the subjective expectations of the legislators who passed it and the practical ramifications of agency action. *See id.* at 500-07. Some of these factors require judges to venture beyond their expertise into non-legal evaluations

of politics or economics. Many of these factors have no bearing on a statute's original public meaning because they hinge on developments that occurred after its passage. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("every statute's meaning is fixed at the time of enactment" (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018))).

Precisely because the major questions doctrine is "distinct" from "routine statutory interpretation," *West Virginia*, 597 U.S. at 724, it is reserved for the most extraordinary cases, in which staggering new assertions of power—despite their "textual plausibility," *id.* at 722—are at odds with other evidence of congressional intent. Courts must not abandon their duty to determine the "single, best meaning" of a statute using the "traditional interpretive tools," *Loper Bright*, 603 U.S. at 400, simply because an agency's action is economically and politically significant.

Overuse of the major questions doctrine would also erode critical limits on the judiciary's role. The doctrine aims to promote "separation of powers principles" by preventing agencies from exceeding Congress's "legislative intent." *West Virginia*, 597 U.S. at 723. But in the process, the doctrine constrains Congress too, blocking its efforts to authorize agency action whenever courts decide that a major question is implicated, unless Congress used language that courts deem sufficiently clear. The doctrine does so based on a presumption that "Congress intends to make major policy decisions itself, not leave those decisions

to agencies." *Id.* Yet that presumption is at odds with congressional practice dating to the Founding, as well as Congress's manifest intent in the Congressional Review Act to allow agencies to issue rules with vast practical consequences. *Cf. Loper Bright*, 603 U.S. at 399 ("Presumptions have their place in statutory interpretation, but only to the extent that they approximate reality."). The risk of judicial aggrandizement in applying this presumption is further exacerbated by the subjective, political nature of some of the factors employed by the doctrine.

These tensions make clear why the Supreme Court has confined the major questions doctrine to the most extraordinary cases, involving stark attempts to disregard an agency's limited mandate. When an agency claims stunning new powers that appear incongruous with the relevant statutory scheme, the history of its implementation, the agency's own expertise, and Congress's conspicuous withholding of such power from the agency, then "a practical understanding of legislative intent" may call for hesitation. *West Virginia*, 597 U.S. at 723. But when radical innovation of that sort is absent, artificially narrowing the meaning of a statute's text would undermine, not vindicate, Congress's authority.

# ARGUMENT

## I. The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Likely Did Not Intend.

"[W]hile the major questions 'label' may be relatively recent, it refers to 'an identifiable body of law that has developed over a series of significant cases.'" *Nebraska*, 600 U.S. at 504-05 (quoting *West Virginia*, 597 U.S. at 724). Under those cases, a major question arises only when an agency makes "a radical or fundamental change to a statutory scheme" by claiming "an unheralded power representing a transformative expansion in [its] regulatory authority." *West Virginia*, 597 U.S. at 723-24 (quotation marks omitted). The issue is not whether agencies are asserting "highly consequential power," but rather whether they are asserting "highly consequential power *beyond what Congress could reasonably be understood to have granted*." *Id.* (emphasis added).

Two requirements must therefore be met. First, an agency's "newfound" power must be so "unprecedented" and outside of the agency's "comparative expertise" that it goes beyond what Congress could have intended. *Id.* at 724, 728-29 (quotation marks omitted); *see Alliance*, 2024 WL 5078034, at *16-17 (applying the doctrine to "novel" regulation that "intrud[ed] into the province of other agencies"). The agency's newly claimed power, in short, must reflect "a fundamental revision of the statute, changing it from [one sort of] scheme of ...

regulation into an entirely different kind." *West Virginia*, 597 U.S. at 701
(quotation marks omitted).  Second, the agency must be claiming an
"[e]xtraordinary grant[] of regulatory authority" by asserting "extravagant statutory
power over the national economy."  *Id.* at 723-24; *see Alliance*, 2024 WL 5078034,
at *16.

   Importantly, therefore, the economic and political significance of an agency
action cannot alone trigger the major questions doctrine, so long as the action "fits
neatly within the language of the statute" and aligns with the agency's role.  *Biden
v. Missouri*, 595 U.S. 87, 93-94 (2022) (per curiam).  For example, the Court
refused to apply the doctrine to a vaccination mandate that allegedly "put more
than 10 million healthcare workers to the choice of their jobs or an irreversible
medical treatment."  *Id.* at 108 (Alito, J., dissenting).  Despite its significant
impact, the mandate was not "surprising" because "addressing infection problems
in Medicare and Medicaid facilities is what [the HHS Secretary] does."  *Id.* at 95
(majority opinion).  Likewise, the Court found no major question when the EPA
decided whether to regulate greenhouse gas emissions, despite the immense stakes,
because that decision involved no "counterintuitive" departure from the agency's
"pre-existing mandate."  *Massachusetts v. EPA*, 549 U.S. 497, 530-31 (2007).

   Only when extraordinary economic and political significance is paired with
a dubious transformation of an agency's role does the doctrine come into play.  No

major questions case has involved economic and political significance alone. *See West Virginia*, 597 U.S. at 724-29 ("unheralded" and "transformative" use of "ancillary provision[s]" reaching beyond the agency's "comparative expertise"); *Nebraska*, 600 U.S. at 501-03 (use of "never previously claimed powers" to work a "fundamental revision of the statute" and assert "virtually unlimited power to rewrite [it]"); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 112, 118 (2022) (per curiam) ("*NFIB*") (a type of mandate "never before imposed" that regulated beyond the agency's "sphere of expertise" despite Congress's choice to deny the agency this power); *Realtors*, 594 U.S. at 761, 764-65 ("unprecedented" claim of power with "no limit" that required reading selected text "in isolation"); *Util. Air*, 573 U.S. at 324 ("unheralded" and "transformative" power that "the statute [was] not designed to grant"); *Brown & Williamson*, 529 U.S. at 126, 160 (new reliance on "cryptic" provisions to assert power "inconsistent with the ... overall regulatory scheme").

In *West Virginia*, for instance, the Court described the EPA's attempt to "substantially restructure the American energy market" as giving the agency "unprecedented power over American industry." 597 U.S. at 724, 728 (quotation marks omitted). But the agency's plan was not merely significant in scope—the Court concluded that it represented a "transformative expansion" of authority based on an "unheralded" power that converted the statutory scheme "into an

entirely different kind." *Id.* at 724, 716, 728 (quotation marks omitted). This "newfound power" was based on "the vague language of an ancillary provision[]," required expertise not traditionally held by the EPA, and was an approach that Congress "repeatedly declined to enact itself." *Id.* at 724 (quotation marks omitted).

*Biden v. Nebraska* confirmed these demanding standards in applying the major questions doctrine to a student debt relief plan. This "extraordinary program" was judged to be completely unlike prior exercises of the same statutory authority. 600 U.S. at 502-03. Indeed, the executive branch was claiming "virtually unlimited power to rewrite the Education Act" and "unilaterally define every aspect of federal student financial aid." *Id.* at 502. This was "a fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation into an entirely different kind." *Id.* (quoting *West Virginia*, 597 U.S. at 728). Notably, the Court *first* concluded that the agency was asserting a new type of authority that Congress likely did not intend, *id.* at 500-02, and only then determined that this assertion had "staggering" economic and political significance, *id.* at 502. Unless both criteria are met, the major questions doctrine does not apply. *Accord West Virginia*, 597 U.S. at 724-32.

**II.    The FTC's Noncompete Clause Rule Does Not Trigger the Major Questions Doctrine.**

As explained above, "[t]he Supreme Court has adopted a two-prong framework to analyze the major questions doctrine."  *Su*, 121 F.4th at 14; *see Alliance*, 2024 WL 5078034, at *16.  "First, [courts] ask whether the agency action is 'unheralded' and represents a 'transformative expansion' in the agency's authority in the vague language of a long-extant, but rarely used, statute.  Second, [courts] ask if the regulation is of 'vast economic and political significance' and 'extraordinary' enough to trigger the doctrine."  *Su*, 121 F.4th at 14 (quoting *West Virginia*, 597 U.S. at 716, 721, 724-25) (citations omitted); *see Alliance*, 2024 WL 5078034, at *16-17.

Here, the FTC's authority to restrict noncompete clauses through rulemaking does not transform the agency's power beyond congressional expectations—as confirmed by both Congress's and the courts' responses to the FTC's first use of binding rules long ago.  And while the Noncompete Clause Rule may have widespread effects, reflecting the FTC's national mandate, that alone does not make this case "extraordinary" enough to trigger the major questions doctrine.

**A.  Transformative Expansion Beyond Congressional Intent**

No matter how great its economic and political significance, agency action triggers the major questions doctrine only if it represents a "radical or fundamental change to a statutory scheme" that Congress is "very unlikely" to have intended.

*West Virginia*, 597 U.S. at 723 (quotation marks omitted); *see Nebraska*, 600 U.S. at 504 ("Congress did not unanimously pass the HEROES Act with such power in mind").  To identify such radical departures from congressional intent, the doctrine looks for eyebrow-raising novelty, conflict with the overall statutory scheme, reliance on cryptic or ancillary provisions, mismatch with agency expertise, and congressional activity suggesting the agency lacks the authority it asserts.  *See Bradford*, 101 F.4th at 725-28.  Those telltale signs are absent here.

### 1.  *Belated assertions of novel authority*

The major questions doctrine is skeptical of "unprecedented" claims of "unheralded power" newly discovered in "a long-extant statute," suggesting that an agency is reaching "beyond what Congress could reasonably be understood to have granted."  *West Virginia,* 597 U.S. at 728, 724 (quotation marks omitted); *e.g.*, *Alliance*, 2024 WL 5078034, at *16 (applying doctrine where an agency "has never claimed the [relevant] authority").  The agency's action must be "strikingly unlike" its past efforts.  *NFIB*, 595 U.S. at 118; *see Nebraska*, 600 U.S. at 496 (the agency created a "fundamentally different loan forgiveness program," in which "[n]o prior limitation … is left standing").

Interpreting the FTC Act as authorizing substantive rulemaking is not a "novel reading of the statute."  *West Virginia*, 597 U.S. at 716.  The FTC first embraced this reading in the early 1960s—when Americans were being introduced

to Beatlemania.  Although the FTC long relied on adjudications alone to flesh out the meaning of "unfair methods of competition," *see Nat'l Petrol. Refiners Ass'n v. FTC*, 482 F.2d 672, 684, 693-94 (D.C. Cir. 1973), it began supplementing that approach through rulemaking in 1963, covering practices ranging from representations about television sizes, 31 Fed. Reg. 3,342 (Mar. 3, 1966), to credit card solicitations, 35 Fed. Reg. 4,614 (Mar. 17, 1970).  When industry challenged the FTC's authority to issue such rules, courts upheld it.  *See Nat'l Petrol. Refiners*, 482 F.2d at 678; *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983); *cf. West Virginia*, 597 U.S. at 725 (the EPA's only attempt at a similar rule "was never addressed by a court").

From the start, Congress was aware of the FTC's claimed authority and declined to disturb it.  Congress acted to modify specific rules, but conspicuously never touched the agency's authority to issue them.  *E.g.*, Pub. L. No. 89-92, § 5, 79 Stat. 282, 283 (1965) (superseding FTC rule about cigarette-package labeling but leaving in place the agency's rulemaking authority).  Instead, subsequent legislation only strengthened the agency's interpretation.  After the D.C. Circuit affirmed the FTC's rulemaking authority, Congress added procedural requirements for certain types of rules but clarified that those requirements did "not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition."  15 U.S.C. § 57a(a)(2).  And in 1980, Congress further confirmed its

understanding that the FTC may issue binding rules with far-reaching economic impacts. *See infra* at 16-17. This is not a case in which a surprising new claim of authority has caught Congress by surprise.

Nor is it significant that the FTC only recently turned its attention to noncompete agreements. Congress designed the Commission to respond to changing market conditions and address emerging threats to competition: the flexibility of the FTC's unfair-methods standard "could be adapted to the variety of business practices with anticompetitive effects." *Nat'l Petrol. Refiners*, 482 F.2d at 702. Congress took that approach because it was "utterly impossible" to identify all the "numerous practices which constitute unfair competition." 51 Cong. Rec. 11,084 (1914). The FTC could instead "cope with new threats to competition as they arise." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir. 1984).

Utilizing this authority, the FTC long ago began issuing binding rules with far-reaching effects. For instance, in 1971 it required clothing manufacturers to include care instructions on each garment's tag, over industry objections that implementation costs would be "tremendous[]" and "incalculable." Care Labeling of Textile Wearing Apparel, 36 Fed. Reg. 23,883, 23,888 (Dec. 16, 1971). That rule affected virtually every American consumer. And it reflected a change in market conditions: retail clerks had once been a knowledgeable source of garment-

care information, but with the growth of mass production and mail-order purchases, omitting care instructions became sufficiently harmful to qualify as an unfair or deceptive trade practice. *Id.* at 23,886; *see also, e.g.*, Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971) (similarly affecting every American purchaser of gasoline).

In sum, the Noncompete Clause Rule is not "strikingly unlike" the agency's past efforts. *NFIB*, 595 U.S. at 118.

### 2. *Incongruence with statutory scheme*

A newly claimed authority that fits poorly within the overall regulatory structure may signal a "fundamental revision of the statute." *West Virginia*, 597 U.S. at 728 (quotation marks omitted); *see also Brown & Williamson*, 529 U.S. at 137; *Realtors*, 594 U.S. at 763-64. But the FTC's authority to regulate noncompete agreements through rulemaking "fits neatly within the language of the statute." *Missouri*, 595 U.S. at 93.

Section 5 of the FTC Act directs the agency to "prevent" unfair methods of competition, "an inherently forward-looking directive" that goes beyond "remediating or stopping past harm." *ATS Tree Servs., LLC v. FTC*, No. 24-1743, 2024 WL 3511630, at *14 (E.D. Pa. July 23, 2024). Section 6, in turn, provides a bevy of powers to supplement this authority, including the power "to make rules and regulations for the purpose of carrying out *the provisions of this subchapter*."

15 U.S.C. § 46(g) (emphasis added). Plainly, therefore, the FTC may issue rules under Section 6(g) to effectuate its mandate under Section 5. *Cf. NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017) (courts must respect Congress's use of internal cross-references).

Notably, "[n]othing in Section 6 says it is limiting the FTC's rulemaking to 'procedural' rules." *Properties of the Villages, Inc. v. FTC*, No. 24-316, 2024 WL 3870380, at *5 (M.D. Fla. Aug. 15, 2024). And using binding rules to construe the term "unfair methods of competition" promotes both efficiency and prior notice in adjudications. *See Nat'l Petrol. Refiners*, 482 F.2d at 684. Nor does the lack of a penalty in Section 6(g) suggest otherwise, because the FTC enforces its unfair-methods-of-competition rules through adjudications under Section 5, which prescribes the available remedies. *See* 15 U.S.C. § 45(*l*).

Indeed, the surrounding statutory context confirms, rather than calls into doubt, the FTC's rulemaking power. The agency's "authority ... to prescribe rules ... with respect to unfair methods of competition" is expressly excluded from the restrictions on other types of rulemaking—confirming the existence of this authority. *Id.* § 57a(a)(2). Moreover, strictly procedural rules are exempt from various requirements that govern Section 6 rulemaking—a carveout that would be meaningless if Section 6 authorized *only* procedural rules. *Id.* § 57b-3(a)(1). Finally, the Act recognizes that Section 6 rulemaking can "have an annual effect

on the national economy of $100,000,000 or more," *id.* § 57b-3(a)(1)(A), further indicating the existence of substantive, not merely procedural, rulemaking authority.

The overall statutory scheme therefore bolsters the plain reading of Sections 5 and 6, which allow the FTC to "make rules and regulations" to "carry[] out" the "prevent[ion]" of unfair methods of competition.  15 U.S.C. §§ 46(g), 45(a)(2).

### 3. *Reliance on obscure and ancillary provisions*

The major questions doctrine is wary of newly claimed authority that rests on "'subtle device[s]'" or "cryptic" delegations. *Brown & Williamson*, 529 U.S. at 160 (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994)).  *West Virginia*, for instance, emphasized that the EPA was using an "obscure," "ancillary," "little-used backwater" of the statute for its far-reaching policy.  597 U.S. at 711, 724, 730 (quotation marks omitted).

Here, Sections 5 and 6(g) are not cryptic or obscure but textually clear: the FTC may "make rules and regulations" to "carry out[]" its mandate to "prevent ... unfair methods of competition."  15 U.S.C. §§ 45(a)(2), 46(g).  Nor are these provisions a "little-used backwater" of the statute.  As discussed, the FTC relied on them to issue a host of prominent rules in the twentieth century, garnering the approval of both Congress and the courts.

To be sure, Section 6 "deals primarily with reports and investigative powers," and "the 'rules and regulations' portion of Section 6(g) has to share space with 'classifying corporations.'" *Properties of the Villages*, 2024 WL 3870380, at \*8. But even if this gave an ancillary appearance to Section 6(g) when originally enacted, the FTC's later reliance on that provision as a central feature of its authority—together with Congress's fortification of that reading in subsequent legislation—has diminished whatever force this consideration might once have had in discerning congressional intent.

### 4. *Mismatch between asserted power and agency expertise*

An agency's expertise sheds significant light on whether it is claiming a power that Congress did not likely intend. "[W]hen [an] agency has no comparative expertise in making certain policy judgments ... Congress presumably would not task it with doing so." *West Virginia*, 597 U.S. at 729 (quotation marks omitted); *see Gonzales v. Oregon*, 546 U.S. 243, 266 (2006) (doubting that Congress entrusted "medical judgments" to an official "who lacks medical expertise"); *King v. Burwell*, 576 U.S. 473, 486 (2015) (similar); *Alliance*, 2024 WL 5078034, at \*16 (applying doctrine where agency "stepp[ed] outside its ordinary regulatory domain" and "intrud[ed] into the province of other agencies").

This factor weighs strongly in the FTC's favor, for there is no credible argument "that an agreement not to compete falls outside the meaning of a 'method

of competition.'" Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,353 n.216 (May 7, 2024). Congress established the FTC to develop expertise in market conditions and prevent practices that unfairly hamper competition. *See* 51 Cong. Rec. 11083 (1914). For over a century, the agency has done just that. Here, drawing on its expertise and extensive investigation, the FTC concluded that noncompete agreements unfairly interfere with competition. 89 Fed. Reg. at 38,461. Simply put, this "is what [the FTC] does." *Missouri*, 595 U.S. at 95.

Thus, it does not "raise an eyebrow," *Alliance*, 2024 WL 5078034, at *16 (quoting *West Virginia*, 597 U.S. at 730), that the FTC would investigate and prohibit a trade practice that expressly limits the ability to compete.

### 5. *Subsequent legislative activity*

The Supreme Court has sometimes considered congressional activity after a statute's enactment, such as failed bills, in its major questions analysis. *E.g.*, *West Virginia*, 597 U.S. at 731 (failure of cap-and-trade legislation suggested EPA's similar approach was unauthorized). But other cases have downplayed such evidence. *E.g.*, *Brown & Williamson*, 529 U.S. at 155-56 (disclaiming reliance "on Congress' failure to act").

The Court's usual guidance is that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation marks omitted),

and that failed bills are "a particularly dangerous ground" for doing so, *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 362 n.9 (2021), because "several equally tenable inferences may be drawn from such inaction," *United States v. Craft*, 535 U.S. 274, 287 (2002) (quotation marks omitted).

That is the case here. While Congress has considered bills limiting noncompete agreements, *e.g.*, H.R. 527, 118th Cong. (2023), many factors could explain their failure to pass—including quibbles with their specific terms or a desire to continue leaving the details of "unfair methods of competition" to the FTC. There is certainly no evidence of "Congress' consistent judgment to deny [the FTC] this power." *Brown & Williamson*, 529 U.S. at 160. Plaintiffs have identified no action Congress has actually taken to limit the FTC's ability to regulate noncompete agreements. *Cf. NFIB*, 595 U.S. at 119 (citing "a majority vote of the Senate disapproving the regulation").

Nor has Congress denied the FTC binding rulemaking authority over unfair methods of competition. On the contrary, Congress rejected proposals to strip the FTC of that authority after it was validated by the courts, *e.g.*, H.R. 7917, § 202, 93d Cong., 2d Sess. (1974), and instead took steps to make sure it was leaving this power in place, *see* Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193 (1975).

## B. Economic and Political Significance

Because Congress uses agencies to help solve nationwide problems, much of what they do has economic and political significance. To implicate the major questions doctrine, a newly claimed authority must be "staggering," *Nebraska*, 600 U.S. at 502, "breathtaking," *Realtors*, 594 U.S. at 764, and "extravagant," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324); *see Alliance*, 2024 WL 5078034, at *16 (finding both the economic and political significance of the agency's action to be "staggering").

The impact of agency action is sometimes self-evident, as when agencies purport to "decid[e] how Americans will get their energy," *West Virginia*, 597 U.S. at 729, spend "nearly one-third of the Government's $1.7 trillion in annual discretionary spending," *Nebraska*, 600 U.S. at 503, "impos[e] a vaccine mandate on 84 million Americans," *NFIB*, 595 U.S. at 118, or claim authority "to take whatever measures [an agency] deems necessary to control the spread of COVID–19," *Realtors*, 594 U.S. at 763.

More often, gauging economic significance involves complex, debatable financial predictions. Here, some costs and benefits of the Noncompete Clause Rule cannot be quantified, but the FTC estimates that it may affect millions of workers and yield increased earnings, greater innovation, and other benefits. *See* 89 Fed. Reg. at 38,343, 38,467. It is not obvious that the economic ramifications

here match the measurable effects considered in prior cases. *Cf. Nebraska*, 600 U.S. at 502 ($500 billion charged to taxpayers); *Realtors*, 594 U.S. at 764 ($50 billion in immediate costs to landlords).

Moreover, a major question requires vast "economic *and* political significance." *Nebraska*, 600 U.S. at 502 (emphasis added). The Supreme Court consistently uses "and" in that formulation—never "or." *See id.*; *West Virginia*, 597 U.S. at 700; *NFIB*, 595 U.S. at 117; *Realtors*, 594 U.S. at 764; *Burwell*, 576 U.S. at 486; *Util. Air*, 573 U.S. at 324; *Brown & Williamson*, 529 U.S. at 160. Beyond carrying a high price tag, therefore, an agency's initiative must also be the subject of "earnest and profound debate across the country." *Nebraska*, 600 U.S. at 504 (quoting *West Virginia*, 597 U.S. at 732). But noncompete clauses hardly seem to carry the political salience of, say, climate change, the student debt program, or the government's emergency COVID responses.

Opponents of the FTC's rule have argued that it "intrudes into an area that is the particular domain of state law." *Realtors*, 594 U.S. at 764. But this overreads the *Realtors* opinion. While the CDC was never thought to have authority over "the landlord-tenant relationship" until the eviction moratorium intruded into that area, *id.*, business arrangements that unfairly limit competition have always been in the heartland of the FTC's authority. The mere fact that federal measures co-regulate an area alongside state law does not implicate the major questions

doctrine (or the separate federalism canon).  Just as Congress may "legislate in areas traditionally regulated by the states," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), federal agencies may implement that legislation by promulgating rules that overlap with state regulation.  *Cf.* 16 C.F.R. § 910.4 (limiting the Noncompete Clause Rule's preemptive effect on state enforcement).  Virtually every FTC action concerns practices that could also be regulated by the states.  It takes much more to make agency action "extraordinary."

## III.  Extending the Major Questions Doctrine to Cases Like This Would Undermine Textualism and the Separation of Powers.

As shown above, the Supreme Court has limited the major questions doctrine to "extraordinary" cases in which a rigorous two-part standard is met. Following that precedent helps ameliorate the doctrine's serious tensions with both textualism and the separation of powers.

"The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020).  Courts should therefore "interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute."  *Wis. Cent.*, 585 U.S. at 277 (quotation marks omitted); *cf.* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22-23, 29-30 (1997) (discounting legislative history, pragmatic concerns, and Congress's perceived goals).

Departing from these principles, however, the major questions doctrine emphasizes factors outside of a statute's text and structure, including economic fallout, political controversy, legislators' subjective expectations, and how an agency has previously implemented the statute. Many of these factors postdate the statute's passage and therefore cannot have informed its meaning, which is "fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400 (quotation marks omitted). And because the doctrine requires sifting through various extratextual considerations with undetermined relative weights, it resembles the type of multi-factor balancing test that textualists typically disparage.

Accordingly, Justices across the ideological spectrum have recognized the problems the doctrine poses for textualists. *See Nebraska*, 600 U.S. at 507-08 (Barrett, J., concurring) ("[S]ome articulations of the major questions doctrine on offer ... should give a textualist pause."); *West Virginia,* 597 U.S. at 751 (Kagan, J., dissenting) (calling the doctrine a "get-out-of-text free card[]"). The Court itself has acknowledged that the doctrine is "distinct" from "routine statutory interpretation." *Id.* at 724 (majority opinion).

After all, when the text of a statute gives an agency broadly worded authority, "imposing limits on an agency's discretion" based on extratextual considerations is to "alter, rather than to interpret," the statute. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020). Statutory language should not be

artificially constrained due to "undesirable policy consequences," *Bostock*, 590 U.S. at 680, or because a policy "goes further than what the [agency] has done in the past," *Missouri*, 595 U.S. at 95. Instead, "courts must respect the delegation." *Loper Bright*, 603 U.S. at 413.

To be sure, other interpretive canons demand heightened clarity from certain laws. But these rules center on questions about the *legal* effects of statutes, such as whether they apply retroactively. By contrast, the major questions doctrine incorporates hazy, non-legal inquiries such as whether a topic is "the subject of an earnest and profound debate," *West Virginia*, 597 U.S. at 732 (quoting *Gonzales*, 546 U.S. at 267), or is "politically divisive," *Alliance*, 2024 WL 5078034, at *16. Thus, even when the doctrine is employed to reflect "common sense" about how Congress likely delegates authority, *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring), it still requires courts to look outside the text and make subjective assessments about non-legal questions. And it still allows political and social developments over time to change how a statute's words are interpreted.

The Court's recent decision in *Loper Bright* provides further reason for caution before applying the doctrine. *Loper Bright* underscores that all statutes "have a single, best meaning," and that ambiguity does not relieve courts "of their obligation to independently interpret" statutes using "the traditional interpretive tools." 603 U.S. at 400, 397. A court may not short-circuit its inquiry into a

statute's best meaning simply because significant issues are at stake, because that too would be "to *ignore*, not follow, the reading the court would have reached had it exercised its independent judgment." *Id.* at 398-99 (quotation marks omitted); *see Alliance*, 2024 WL 5078034, at *15 (employing the doctrine only where it "confirms our interpretation of the statute's ordinary meaning").

Loper Bright also refused to allow a "sweeping presumption of congressional intent" to serve as "a distraction from the question that matters: Does the statute authorize the challenged agency action?" 603 U.S. at 401, 406. The major questions doctrine similarly rests on a blanket presumption of congressional intent—that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 723. And deciding whether a "major question" is present similarly risks distracting from the statutory question that matters. "The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes." *Loper Bright*, 603 U.S. at 403.

Precisely because the major questions doctrine departs from "the ordinary tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, it is reserved for "extraordinary" cases in which an agency tries to transform its authority "into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at 728).

Applying the doctrine more broadly also risks undermining the elected branches. While the doctrine is meant to promote "separation of powers principles," *West Virginia*, 597 U.S. at 723, an aggressively applied doctrine raises its own separation-of-powers concerns, shifting authority to the courts. As a judicial creation that "directs how Congress must draft statutes," Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 276 (2022), the doctrine risks becoming "a license for judicial aggrandizement," Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174, 175, 200 (2022).

At bottom, the major questions doctrine disallows "plausible" readings of a statute based on concerns about real-world impacts, agency practice, and legislators' perceived expectations. *E.g.*, *Nebraska*, 600 U.S. at 503-05. But distorting a statute's "single, best meaning," *Loper Bright*, 603 U.S. at 400, because of cost, political controversy, or other post-enactment developments risks "amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands," *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (quotation marks omitted).

The possibility that the doctrine's "justifying presumption" may be "a fiction" heightens these concerns. *Loper Bright*, 603 U.S. at 404; *see id.* at 399 (interpretive presumptions should be employed "only to the extent that they

approximate reality"). In *West Virginia*, the Court provided no citation for its assertion that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." 597 U.S. at 723. And that presumption runs contrary to congressional practice dating to the Founding. As historical scholarship has demonstrated, the earliest Congresses repeatedly granted the executive vast discretion to resolve critical policy questions concerning the era's most pressing challenges.[2]

This presumption is also in tension with Congress's explicit choice today to allow agencies to make decisions with immense consequences. Under the Congressional Review Act, agencies must identify "major" rules (defined by economic impact, *see* 5 U.S.C. § 804) when reporting new regulations to Congress. These major rules "shall take effect" unless Congress acts to disapprove them. *Id.* § 801. Thus, Congress has expressly empowered agencies to make decisions with "major" consequences and has made those agency decisions presumptively valid, not presumptively invalid. *See* Chad Squitieri, *Major Problems with Major*

---

[2] *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021); Kevin Arlyck, *Delegation, Administration, and Improvisation*, 97 Notre Dame L. Rev. 243 (2021); Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81 (2021); Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power*, 130 Yale L.J. 1288 (2021).

*Questions*, Law & Liberty (Sept. 6, 2022), https://lawliberty.org/major-problems-with-major-questions.

The potential for encroachment on the elected branches underscores the need to employ the doctrine only in truly "extraordinary" cases, in which an agency seeks a "transformative expansion" of its power beyond what Congress likely intended. *West Virginia*, 597 U.S. at 724. If the judiciary instead "starts to reject Congress's legislation on important matters precisely because it is important," it risks eroding the courts' status as non-political arbiters of the law. Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379, 391 (2021). That would not serve the separation of powers but instead would severely undermine it.

## CONCLUSION

For the foregoing reasons, this Court should hold that the major questions doctrine does not apply here.

Respectfully submitted,

Dated: January 8, 2025

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on January 8, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 8th day of January, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,370 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 8th day of January, 2025.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*