IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

◆◆

RYAN, L.L.C.,

*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,

*Intervenor Plaintiffs-Appellees,*

—v.—

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**BRIEF FOR *AMICI CURIAE***
**CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT**
**SYSTEM, CALIFORNIA STATE TEACHERS' RETIREMENT**
**SYSTEM, BRAD LANDER, THE COMPTROLLER OF**
**THE CITY OF NEW YORK, ZEVIN ASSET MANAGEMENT,**
**THE INTERFAITH CENTER ON CORPORATE**
**RESPONSIBILITY, AND TRILLIUM ASSET MANAGEMENT**

MOLLY J. BOWEN
COHEN MILSTEIN SELLERS
   & TOLL PLLC
1100 New York Avenue NW,
   Suite 500
Washington, DC 20005
(202) 408-4600

MARK VANDENBERG
COHEN MILSTEIN SELLERS
   & TOLL PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797

*Attorneys for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10951, *Ryan, L.L.C. v. Federal Trade Commission*

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 26.1, 29(a)(4)(a), and 5th Cir. R. 29.2, *amici curiae* are a group of institutional investors and asset managers that hold or manage, collectively, trillions of dollars in assets. None have a parent corporation, and no publicly held corporation holds ten percent of any of their stock.

The undersigned counsel of record further certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

| *Plaintiff-Appellee* | *Counsel for Plaintiff-Appellee* |
|---|---|
| Ryan, L.L.C. | Eugene Scalia<br>Charles William Fillmore<br>Aaron David Hauptman<br>Elizabeth Ashley Kiernan<br>Andrew G. I. Kilberg<br>Amir Cameron Tayrani<br>Joshua Robert Zuckerman |
| *Intervenor Plaintiffs-Appellees* | *Counsel for Intervenor Plaintiffs-Appellees* |
| Chamber of Commerce of the United States of America<br>Business Roundtable<br>Texas Association of Business<br>Longview Chamber of Commerce | Jeffrey B. Wall<br>Tyler Stephen Badgley<br>Judson O. Littleton<br>Robert Lee Sayles<br>Jordan Landrum Von Bokern |

| Defendant-Appellant | Counsel for Defendant-Appellant |
|---|---|
| Federal Trade Commission | Urja Mittal<br>Taisa M. Goodnature<br>Sean Janda |
| **Amici Curiae in support of Defendant-Appellant** | **Counsel for Amici Curiae** |
| California Public Employees' Retirement System<br>California State Teachers' Retirement System<br>Brad Lander, Comptroller of the City of New York<br>Zevin Asset Management<br>The Interfaith Coalition on Corporate Responsibility<br>Trillium Asset Management | Molly J. Bowen<br>Mark Vandenberg |

Respectfully submitted,

*/s/ Molly J. Bowen*
Molly J. Bowen

*Attorney of Record for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

IDENTITY AND INTEREST OF AMICI CURIAE ................................................1

SUMMARY OF THE ARGUMENT ....................................................................3

ARGUMENT .......................................................................................................4

    I.     Human Capital Management and Workforce Policy Impact the Value of Long-Term Investments ........................................................4

    II.    A Uniform, National Approach is Necessary Due to the Inability of Individual Workers to Meaningfully Avoid or Challenge Noncompete Agreements ...................................................12

CONCLUSION ...................................................................................................14

CERTIFICATE OF COMPLIANCE ...................................................................17

# TABLE OF AUTHORITIES

**Cases**

*In re Alphabet S'holder Derivative Litig.*,
19-cv-341522 (Superior Ct. of Cal.)......................................................4

*In re McDonald's Corp. S'holder Derivative Litig.*,
C.A. 2021-0324-JTL (Del. Ch.)............................................................4

*In re Pinterest Derivative Litig.*,
20-cv-08331 (N.D. Cal.)......................................................................4

*Rudi v. Wexner*,
20-cv-3068 (S.D. Ohio)........................................................................4

**Other Authorities**

Alexander J.S. Colvin and Heidi Shierholz, Noncompete
agreements, Economic Policy Institute (Dec. 10, 2019),
https://www.epi.org/publication/noncompete-agreements/............................12

Andrea Hsu, Many workers barely recall signing noncompetes, until
they try to change jobs, NPR (Jan. 13, 2023),
https://www.npr.org/2023/01/13/1148446019/ftc-rule-ban-
noncompetes-low-wage-workers-trade-secrets. ...................................................6

Ayesha Bell Hardaway, The Paradox of the Right to Contract:
Noncompete Agreements as Thirteenth Amendment Violations, 39
Seattle U. L. Rev. 957 (2016) ...............................................................9

Business Commission to Tackle Inequality, Tackling inequality: the
need and opportunity for business action,
https://tacklinginequality.org/files/introduction.pdf...........................7

California State Teachers Retirement System, Comment Letter on
Proposed Rule to Ban Non-Compete Clauses (Apr. 19, 2023),
https://www.regulations.gov/document/FTC-2023-0007-20914 ........................5

Decio Coviello, Erika Deserranno, and Nicola Persico, Minimum
Wage and Individual Worker Productivity: Evidence from a Large
US Retailer, Journal of Political Economy, Volume 130, Number 9
(July 29, 2022) ...................................................................................7

Eric A. Posner, *The Antitrust Challenge to Covenants Not to Compete in Employment Contracts*, 83 Antitrust L.J. 165 (2020) ...................................8

Evan Starr et al., *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019)........................................................................................................8

Evan Starr et al., *The Behavioral Effects of (Unenforceable) Contracts*, 36 J.L. Econ. & Org. 633 (2020)...............................12, 13

Fed. R. App. P. 29 .......................................................................................1

Jirs Meuris & Carrie Leana, *The Price of Financial Precarity: Organizational Costs of Employees' Financial Concerns*, 29(3) Organization Science 398 (2018) ........................................................9

J.J. Prescott & Evan Starr, *Subjective Beliefs about Contract Enforceability*, 53(2) J. of Legal Studies 435 (2024) .............................13, 14

John (Jianqiu) Bai, Ashleigh Eldemire & Matthew Serfling, *The effect of labor mobility on corporate investment and performance over the business cycle*, 166 Journal of Banking and Finance, 15 (2024), https://doi.org/10.1016/j.jbankfin.2024.107258 .................................11

Julian Mark, *Noncompete clauses are everywhere, even for dancers and hair stylists*, Washington Post (Mar. 10, 2023), https://www.washingtonpost.com/business/2023/03/10/noncompete-agreements-ftc/..................................................................................6

*Living Wage & the Engagement Gap: Using a Systems Lens to Build Portfolio Value Through Improved Wages*, The Shareholder Commons (2023), available at https://theshareholdercommons.com/wp-content/uploads/2023/11/Labor-and-Inequality-Case-Study-FINAL-1.pdf ........................................................................................10

Marshall L. Fisher, Jayanth Krishnan & Serguei Netessine, *Retail Store Execution: An Empirical Study*, The Wharton School, University of Pennsylvania (2006), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2319839 ........................10

Marty Stempniak, FTC bans most noncompete clauses, drawing praise from radiologists, Radiology Business (Apr. 24, 2024), https://radiologybusiness.com/topics/healthcare-management/healthcare-staffing/ftc-bans-most-noncompete-clauses-drawing-praise-radiologists ................................................................6

Matt Marx, Employee Non-compete Agreements, Gender, and Entrepreneurship, 33 Org. Sci. 1756 (2022)........................................................9

Matthew S. Johnson et al., The Labor Market Effects of Legal Restrictions on Worker Mobility (Dec. 2023), available at https://www.nber.org/system/files/working_papers/w31929/w31929.pdf ................................................................................................................9

Michael Lipsitz & Evan Starr, Low-Wage Workers and the Enforceability of Noncompete Agreements, 68 Mgmt. Sci. 143 (2021) ................................................................................................................9

Michael Reich, Likely Effects of a $15 Federal Minimum Wage by 2024 (Berkeley, CA: UC Berkeley Center on Wage and Employment Dynamics, 2019), available at https://www.congress.gov/116/meeting/house/108844/witnesses/HHRG-116-ED00-Wstate-ReichM-20190207.pdf ..........................................................7

Natalia Emanuel & Emma Harrington, Firm Frictions and the Payoffs of Higher Pay: Labor Supply and Productivity Responses to a Voluntary Firm Minimum Wage, Harvard University Working Paper (2022), available at https://drive.google.com/file/d/1IMwvmZLIJomiFIWgqKbCNrCXTZ-q-3ZV/view?pli=1 ......................................................................10

Natarajan Balasubramanian et al. "Employment Restrictions on Resource Transferability and Value Appropriation from Employees." SSRN 3814403 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403 ........................13

New York City Comptroller Brad Lander, New York City Council Majority Leader Keith Powers, and Chair Tiffany Cabán, Comment Letter on Proposed Rule to Ban Non-Compete Clauses (Apr. 19, 2023), https://www.regulations.gov/document/FTC-2023-0007-21025 ................................................................................................5

Ocean Tomo, Intangible Asset Market Value Study,
 https://oceantomo.com/intangible-asset-market-value-study/ .............................4

Office of Economic Policy of the U.S. Dep't of the Treasury, Non-
 compete Contracts: Economic Effects and Policy Implications
 (Mar. 2016)
 https://home.treasury.gov/system/files/226/Non_Compete_Contrac
 ts_Econimic_Effects_and_Policy_Implications_MAR2016.pdf ....................7, 8

Oregon State Treasury, Comment Letter on Proposed Rule to Ban
 Non-Compete Clauses (Apr. 12, 2023),
 https://www.regulations.gov/document/FTC-2023-0007-20917 ........................5

Sampsa Samila & Olav Sorenson, Noncompete Covenants: Incentives
 to Innovate or Impediments to Growth, 57 Mgmt. Sci. 425 (2011)..................11

S&P Global, How good human capital management creates
 competitive advantage (July 7, 2023),
 https://www.spglobal.com/esg/insights/featured/special-
 editorial/how-good-human-capital-management-creates-competitive-
 advantage ..........................................................................................................4

Shelby R. Buckman, Laura Y. Choi, Mary C. Daly & Lily M.
 Seitelman, The Economic Gains from Equity, Federal Reserve
 Bank of San Francisco, Working Paper 2021-11 (2021), available
 at https://www.frbsf.org/economic-research/publications/working-
 papers/2021/11/ ................................................................................................9

Tyler Boesch et al., New data on non-compete contracts and what
 they mean for workers, Federal Reserve Bank of Minneapolis
 (June 21, 2023),
 https://www.minneapolisfed.org/article/2023/new-data-on-non-
 compete-contracts-and-what-they-mean-for-workers. ........................................6

U.S. Government Accountability Office, Noncompete Agreements
 (May 2023), https://www.gao.gov/assets/gao-23-103785.pdf ..........................13

Zevin Asset Management, Comment Letter on Proposed Rule to Ban
 Non-Compete Clauses (Apr. 19, 2023),
 https://www.regulations.gov/document/FTC-2023-0007-21087 ........................5

16 C.F.R. § 910.1-6 (2024) .......................................................................................3

**IDENTITY AND INTEREST OF AMICI CURIAE**

*Amici* the California Public Employees' Retirement System ("CalPERS"), California State Teachers' Retirement System ("CalSTRS"), Brad Lander, the Comptroller of the City of New York, Zevin Asset Management, the Interfaith Center on Corporate Responsibility ("ICCR"), and Trillium Asset Management recognize that national policy on the economy and the workforce is one factor impacting the long-term value of their investments.[1]

CalPERS is the largest public pension system in the United States. CalPERS serves over 2.1 million members and has a portfolio exceeding $500 billion. CalPERS works to ensure that the public companies it invests in are managed to generate long-term sustainable investment returns, including through engaging on corporate governance.

CalSTRS is the world's largest educator-only public pension fund. Established in 1913, CalSTRS provides retirement, disability and survivor benefits to California's more than 1 million public school educators and their beneficiaries. The market value of the CalSTRS investment portfolio was approximately $352.5 billion as of November 30, 2024.

---

[1] All parties consent to the filing of this motion. No counsel for a party authored this brief in whole or in part and no party, counsel for a party, or other person made a monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

Brad Lander is the Comptroller of the City of New York. In that capacity, he serves as the investment advisor to five New York City Retirement Systems, which collectively hold over $280 billion in assets under management on behalf of over 700,000 active members and retirees.

Zevin Asset Management is an investment manager with global focus that integrates sustainability into professional active investment management for clients, including individuals, families, foundations, religious institutions, and non-profits.

ICCR is a coalition of more than 300 institutional investors collectively holding over $4 trillion in assets under management. Its members are a cross section of religious investors, foundations, asset managers, pension funds, endowments, and other long-term institutional investors, most of which owe fiduciary duties to clients and beneficiaries.

Trillium Asset Management offers investment strategies and services with the goal of advancing humankind towards a global sustainable economy, a just society, and a better world by combining investment solutions with active ownership. The firm delivers equity, fixed income, and alternative investments to institutions, intermediaries, high net worth individuals, and other charitable and non-profit organizations with the goal to provide positive impact and long-term value.

## SUMMARY OF THE ARGUMENT

*Amici* respectfully submit this brief in support of the Federal Trade Commission ("FTC"), urging reversal of the District Court's entry of summary judgment and subsequent vacatur of the FTC's rule.

Widespread concern about the impact of coercive noncompete agreements on worker mobility and fair competition led the FTC to adopt a national, uniform rule banning noncompete agreements (the "Noncompete Rule"). 16 C.F.R. § 910.1-6 (2024). This decision was supported by major institutional investors with collectively trillions of dollars of assets under management because they recognize that noncompete agreements harm the economy: they depress wages, cause workers to stay in jobs that are not the best fit, prevent firms from accessing the best workers, and reduce innovation.

The FTC's creation of a comprehensive rule that allowed all firms to compete for workers on more equal footing has been deterred by a few businesses across the country. In the Northern District of Texas, a tax services firm challenged the Noncompete Rule. The District Court for the Northern District of Texas found that the FTC does not have substantive rulemaking authority over methods of unfair competition and that the Noncompete Rule was arbitrary and capricious, and granted plaintiff summary judgment and set aside the Noncompete Rule. That decision was in error. The Noncompete Rule was thoroughly considered and carefully tailored to

address the problem at hand. From the perspective of *Amici*, the FTC's chosen approach of a national, uniform rule is critical to a fair and free economy and Plaintiff-Appellee's proposed alternative – case-by-case adjudication – is inadequate to address the broader problem of harms inflicted on the economy by noncompete agreements. The Noncompete Rule is, accordingly, a standard exercise of the FTC's power to regulate anti-competitive behavior that should be upheld.

## ARGUMENT

### I. Human Capital Management and Workforce Policy Impact the Value of Long-Term Investments

Human capital management and workforce policy impact the value of long-term investments in publicly traded companies. For example, industry groups with greater investment in human capital are correlated with greater revenue generated through innovation, including new services and products and enhancing existing services and products.[2] Corporate value is increasingly based on people, not physical property.[3] Long-term investors are therefore mindful of the efficient operation of

---

[2] S&P Global, How good human capital management creates competitive advantage (July 7, 2023), https://www.spglobal.com/esg/insights/featured/special-editorial/how-good-human-capital-management-creates-competitive-advantage.

[3] *See, e.g.*, Ocean Tomo, Intangible Asset Market Value Study, https://oceantomo.com/intangible-asset-market-value-study/ (finding that in the last fifty years, intangible assets have comprised a steadily increasing percentage of the value of S&P 500 companies, from 17% in 1975 to 90% in 2020).

labor markets, including the ability of firms to obtain the best employees and employees to participate fully in the U.S. economy.

Investors have demonstrated their concern about human capital management and workforce policy's impact on long-term investments through their engagement on these issues. For example, in recent years there have been multiple lawsuits alleging breaches of fiduciary duty premised on failure to oversee compliance with employment or labor law.[4] Given the significance of these issues, it is therefore unsurprising that major investors and asset managers took an interest in the FTC's Noncompete Rule, with multiple submitting comments during the rule-making process.[5] They supported the Noncompete Rule because, in one *Amicus's* words, "it will ensure that noncompete agreements will no longer limit workers' freedom to

---

[4] *See, e.g.*, *In re McDonald's Corp. S'holder Derivative Litig.*, C.A. 2021-0324-JTL (Del. Ch.); *In re Pinterest Derivative Litig.*, 20-cv-08331 (N.D. Cal.); *Rudi v. Wexner*, 20-cv-3068 (S.D. Ohio); *In re Alphabet S'holder Derivative Litig.*, 19-cv-341522 (Superior Ct. of Cal.).

[5] California State Teachers Retirement System, Comment Letter on Proposed Rule to Ban Non-Compete Clauses (Apr. 19, 2023), https://www.regulations.gov/document/FTC-2023-0007-20914; Zevin Asset Management, Comment Letter on Proposed Rule to Ban Non-Compete Clauses (Apr. 19, 2023), https://www.regulations.gov/document/FTC-2023-0007-21087; New York City Comptroller Brad Lander, New York City Council Majority Leader Keith Powers, and Chair Tiffany Cabán, Comment Letter on Proposed Rule to Ban Non-Compete Clauses (Apr. 19, 2023), https://www.regulations.gov/document/FTC-2023-0007-21025; Oregon State Treasury, Comment Letter on Proposed Rule to Ban Non-Compete Clauses (Apr. 12, 2023), https://www.regulations.gov/document/FTC-2023-0007-20917.

change jobs to raise their pay, obtain better working conditions, and/or achieve upward mobility in their careers."

*Amici's* concern about noncompete agreements and support for the Noncompete Rule is well-founded. The FTC estimates that 30 million workers, *18% of all workers in the United States*, are bound by noncompete agreements, which create an artificial restraint on worker mobility, to the detriment of workers, firms, and the national economy. Noncompete agreements prevail across all industries – from high-paid to low-wage workers, including hairstylists, engineers, CEOs, and Amazon factory workers.[6] Noncompete agreements inhibit the free flow of workers, keeping some individuals in jobs they may otherwise prefer to leave and preventing them from taking a job where their skills and talent may be better utilized and they could achieve higher pay and higher productivity. The impact of noncompete

---

[6] *See, e.g.*, Julian Mark, Noncompete clauses are everywhere, even for dancers and hair stylists, Washington Post (Mar. 10, 2023), https://www.washingtonpost.com/business/2023/03/10/noncompete-agreements-ftc/; Andrea Hsu, Many workers barely recall signing noncompetes, until they try to change jobs, NPR (Jan. 13, 2023), https://www.npr.org/2023/01/13/1148446019/ftc-rule-ban-noncompetes-low-wage-workers-trade-secrets; Marty Stempniak, FTC bans most noncompete clauses, drawing praise from radiologists, Radiology Business (Apr. 24, 2024), https://radiologybusiness.com/topics/healthcare-management/healthcare-staffing/ftc-bans-most-noncompete-clauses-drawing-praise-radiologists; Tyler Boesch et al., New data on non-compete contracts and what they mean for workers, Federal Reserve Bank of Minneapolis (June 21, 2023), https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers.

agreements is not limited to the firms that choose to use them, but rather the spillover effects are felt nation-wide. As the U.S. Department of the Treasury - Office of Economic Policy found, the "reduced job churn caused by non-competes is itself a concern for the U.S. economy" because it disrupts "achieving a better matching of workers and firms."[7] This artificial reduction in worker mobility has particularly pernicious effects on depressing wages and stifling innovation, which in turn negatively impact investors.

*Wage Depression*: Noncompete agreements depress wages market-wide, which in turn leads to decreased productivity and reduced consumer spending, contributing to lower corporate profits.[8] A Department of the Treasury study found

---

[7] Office of Economic Policy of the U.S. Dep't of the Treasury, Non-compete Contracts: Economic Effects and Policy Implications (Mar. 2016) at 4, https://home.treasury.gov/system/files/226/Non_Compete_Contracts_Econimic_Effects_and_Policy_Implications_MAR2016.pdf.

[8] *See, e.g.*, Decio Coviello, Erika Deserranno, and Nicola Persico, Minimum Wage and Individual Worker Productivity: Evidence from a Large US Retailer, Journal of Political Economy, Volume 130, Number 9 (July 29, 2022) (finding increased productivity after a minimum wage increase); Michael Reich, Likely Effects of a $15 Federal Minimum Wage by 2024 (Berkeley, CA: UC Berkeley Center on Wage and Employment Dynamics, 2019), available at https://www.congress.gov/116/meeting/house/108844/witnesses/HHRG-116-ED00-Wstate-ReichM-20190207.pdf (finding that minimum wage increase enhances consumer spending); Business Commission to Tackle Inequality, Tackling inequality: the need and opportunity for business action at 21, https://tacklinginequality.org/files/introduction.pdf (noting that closing the living wage gap worldwide could generate an additional $4.56 trillion annually through increased productivity and spending).

that stricter noncompete enforcement was "associated with both lower wage growth and lower initial wages."[9] This is unsurprising, given that these agreements keep workers in jobs they would prefer to leave, and reduce incentives for employers to offer more competitive pay to attract workers. Professor Eric Posner of the University of Chicago School of Law found that wages "generally decline rather than increase in states that enforce or strictly enforce noncompetes . . . Noncompetes straightforwardly harm workers by depriving them of possible future offers."[10] Additionally, one of the most significant ways that workers can increase their wages is to change jobs or threaten to do so; noncompete agreements remove that leverage.[11]

These effects are particularly significant for lower-wage workers. After noncompete agreements were banned in the state of Oregon, wages for hourly workers increased by 2.3% across the state and by 4.6% in the industries that had

---

[9] Office of Economic Policy of the U.S. Dep't of the Treasury, Non-compete Contracts: Economic Effects and Policy Implications (Mar. 2016) at 19, https://home.treasury.gov/system/files/226/Non_Compete_Contracts_Econimic_Effects_and_Policy_Implications_MAR2016.pdf.

[10] Eric A. Posner, The Antitrust Challenge to Covenants Not to Compete in Employment Contracts, 83 Antitrust L.J. 165, 165 (2020).

[11] Evan Starr et al., Mobility Constraint Externalities, 30 Org. Sci. 961 (2019).

particularly high rates of noncompete agreement usage prior to the ban.[12] They are also particularly significant for women and people of color who research has shown are more likely to abide by noncompete agreements, thus particularly undermining mobility and entrepreneurship in these communities.[13] In addition to the wage impact, noncompete agreements can lock workers into hostile, discriminatory, or unsafe work environments, instead of allowing them to exit for better workplaces.

Crucially, low wages can have harmful effects on employees' ability to perform at work, lowering overall company performance, which in turn hurts profitability and therefore investors.[14] Racial and gender-based income disparities decrease overall GDP by trillions of dollars, damaging the overall economy and long-term investors such as *Amici*.[15]

---

[12] Michael Lipsitz & Evan Starr, Low-Wage Workers and the Enforceability of Noncompete Agreements, 68 Mgmt. Sci. 143, 144 (2021).

[13] Matt Marx, Employee Non-compete Agreements, Gender, and Entrepreneurship, 33 Org. Sci. 1756 (2022); *see also* Matthew S. Johnson et al., The Labor Market Effects of Legal Restrictions on Worker Mobility (Dec. 2023), available at https://www.nber.org/system/files/working_papers/w31929/w31929.pdf; Ayesha Bell Hardaway, The Paradox of the Right to Contract: Noncompete Agreements as Thirteenth Amendment Violations, 39 Seattle U. L. Rev. 957 (2016).

[14] Jirs Meuris & Carrie Leana, The Price of Financial Precarity: Organizational Costs of Employees' Financial Concerns, 29(3) Organization Science 398, 412–13 (2018).

[15] Shelby R. Buckman, Laura Y. Choi, Mary C. Daly & Lily M. Seitelman, The Economic Gains from Equity, Federal Reserve Bank of San Francisco,

Increased wages, on the other hand, can improve firm-level and overall economic performance and benefit investors such as *Amici*.[16] One study from Wharton found that a minimal increase in wages at retail stores could lead to a significant multiplier in sales for stores, boosting the retail company's performance.[17] Another found that the cost of increased pay was fully offset by decreased turnover and increased productivity, again improving company performance and profitability.[18]

*Stifled Innovation*: Academic research has repeatedly demonstrated that noncompete agreements stifle innovation because they reduce the flow of information across firms, misallocate employes and firms, and deter entrepreneurship, among other reasons. This is borne out through studies of changes

---

Working Paper 2021-11 at 17–18 (2021), available at https://www.frbsf.org/economic-research/publications/working-papers/2021/11/.

[16] Living Wage & the Engagement Gap: Using a Systems Lens to Build Portfolio Value Through Improved Wages, The Shareholder Commons at 4–5 (2023), available at https://theshareholdercommons.com/wp-content/uploads/2023/11/Labor-and-Inequality-Case-Study-FINAL-1.pdf.

[17] Marshall L. Fisher, Jayanth Krishnan & Serguei Netessine, Retail Store Execution: An Empirical Study, The Wharton School, University of Pennsylvania at 3 (2006), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2319839.

[18] Natalia Emanuel & Emma Harrington, Firm Frictions and the Payoffs of Higher Pay: Labor Supply and Productivity Responses to a Voluntary Firm Minimum Wage, Harvard University Working Paper at 6–7 (2022), available at https://drive.google.com/file/d/1IMwvmZLIJomiFIWgqKbCNrCXTZ-q-3ZV/view?pli=1.

in rates of innovation before and after policy changes are implemented increasing the enforceability of noncompete agreements, often measured by frequency and quality of patenting behavior. The Johnson, Lipsitz, and Pei (2023) study found that increased enforceability of noncompete agreements reduced patenting by 16-19% in the subsequent decade and reduced rates of new business formation. These results have been corroborated in other studies as well. A 2011 study found that increases in venture capital funding were three times as effective at creating new firms in regions where noncompete agreements were not enforced compared to regions where such agreements were enforced.[19]

Increased innovation and investment results in higher profits and valuations, which benefit long-term investors such as *Amici*. A 2024 study found that more mobile labor markets, i.e. those with less enforcement of noncompete agreements, experience greater investment during periods of economic expansions, which in turn leads to greater sales, profits, and valuations.[20]

[19] Sampsa Samila & Olav Sorenson, Noncompete Covenants: Incentives to Innovate or Impediments to Growth, 57 Mgmt. Sci. 425, 432 (2011).

[20] John (Jianqiu) Bai, Ashleigh Eldemire & Matthew Serfling, The effect of labor mobility on corporate investment and performance over the business cycle, 166 Journal of Banking and Finance, 15 (2024), https://doi.org/10.1016/j.jbankfin.2024.107258.

## II.    A Uniform, National Approach is Necessary Due to the Inability of Individual Workers to Meaningfully Avoid or Challenge Noncompete Agreements

*Amici* support the FTC's decision to regulate noncompete agreements through a uniform national rule, rather than putting the onus on individual workers to avoid or challenge noncompete agreements on a case-by-case basis.

A national approach puts all companies on equal footing. It eliminates the negative spillover effects on businesses that choose not to use noncompete agreements. And it enhances the nationwide flow of labor, allowing workers and firms to find the best matches.[21]

Moreover, individual workers cannot meaningfully avoid noncompete agreements. As noted above, their utilization is widespread across the economy, including across highly-varied job duties. Multiple studies have found that 30% or more of surveyed firms use noncompete agreements for *all* of their employees – regardless of their access to competitive information or trade secrets that could, potentially, justify the use of a noncompete agreement.[22]

---

[21] In contrast, where noncompete agreements are utilized, researchers see a correlation with workers redirecting their search from competitor firms to noncompetitors – a choice driven not by choice or optimal matching of firms and employers but rather concern about violating a noncompete agreement. Evan Starr et al., The Behavioral Effects of (Unenforceable) Contracts, 36 J.L. Econ. & Org. 633 (2020).

[22] *See, e.g.*, Alexander J.S. Colvin and Heidi Shierholz, Noncompete agreements, Economic Policy Institute (Dec. 10, 2019), https://www.epi.org/publication/noncompete-agreements/ (survey found that

Nor can individual workers meaningfully challenge noncompete agreements. Research shows that workers generally believe their noncompetes are enforceable, even when they have clearly illegal or overbroad characteristics.[23] Those beliefs and fear of breaking a contract or facing legal liability makes workers reluctant to challenge noncompete agreements. Indeed, even knowing that an agreement is unenforceable does not remove their chilling effect. A study using nationally representative data found that workers cited noncompete agreements as a reason they turned down job offers from competitor firms at equal rates in states that did and did not enforce noncompete agreements – it was not the actual legal enforceability but rather the fear of potential liability that drove worker behavior, to their detriment.[24] Noncompete agreements are

---

31.8% of surveyed firms used noncompete agreements with all employees and 49.4% used them for some employees); Natarajan Balasubramanian et al. "Employment Restrictions on Resource Transferability and Value Appropriation from Employees." Available at SSRN 3814403 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403 (survey found that 29.5% of surveyed firms used noncompete agreements with all employees and 66.5% used them for some employees); U.S. Government Accountability Office, Noncompete Agreements (May 2023), https://www.gao.gov/assets/gao-23-103785.pdf (survey found that 55% of firms used noncompete agreements with some workers).

[23] J.J. Prescott & Evan Starr, Subjective Beliefs about Contract Enforceability, 53(2) J. of Legal Studies 435 (2024).

[24] Evan Starr et al., The Behavioral Effects of (Unenforceable) Contracts, 36 J.L. Econ. & Org. 633 (2020).

associated with workers redirecting their job search from competitor firms to noncompetitors, even when their noncompete is unenforceable.[25]

Unfortunately, many firms perpetuate worker misunderstanding. Firms in states that *do not enforce* noncompete agreements were found to be twice as likely to remind workers about the terms of their noncompete agreement after they get a job offer from a competitor.[26] Again, the fear of a lawsuit or the moral or reputational concern of violating a contract restrains worker mobility. Further, there is anecdotal evidence that firms are reluctant to hire workers bound by noncompete agreements, even when the agreement is likely unenforceable.

Given the impacts on the economy as a whole, and the inability of individual workers to meaningfully avoid or challenge noncompete agreements, the FTC's approach of a uniform, national rule is warranted.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the Court reverse the lower court's decision and permit the Noncompete Rule to come into effect.

---

[25] *Id.*

[26] Prescott & Starr, Subjective Beliefs about Contract Enforceability.

Date: January 9, 2024

/s/ Molly J. Bowen

Molly J. Bowen
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue NW
Suite 800
Washington, DC 20005
Tel: 202-408-4600
mbowen@cohenmilstein.com

Mark Vandenberg
COHEN MILSTEIN SELLERS &
TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
mvandenberg@cohenmilstein.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

*/s/ Molly J. Bowen*
Molly J. Bowen

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 2618 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word 365 in 14-point Times New Roman font, a proportionally spaced typeface.

*/s/ Molly J. Bowen*
Molly J. Bowen

*Counsel for Amici Curiae*