**No. 24-10951**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### RYAN L.L.C.

Plaintiff-Appellee,

### CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS; LONGVIEW CHAMBER OF COMMERCE,

Intervenor Plaintiffs-Appellees
v.

### FEDERAL TRADE COMMISSION

Defendant-Appellant.

On Appeal from the United States District Court for the Northern District of Texas
No. 3:24-cv-00986 (Brown, J.)

**Brief of *Amicus Curiae* Open Markets Institute in Support of Defendant-Appellant**

SANDEEP VAHEESAN
TARA PINCOCK
OPEN MARKETS INSTITUTE
655 15th St NW
  Suite 310
Washington, DC 20005

KIRK COOPER
  *Counsel of Record*
COOPER APPEALS, P.L.L.C.
10420 Montwood Drive
  Suite N-405
El Paso, Texas 79935
915-289-8282
kirk@cooperappeals.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the Open Markets Institute states that it is a non-profit corporation and, as such, no entity has any ownership interest in it.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................. iii

**INTEREST OF THE *AMICUS CURIAE***....................................1

**SUMMARY OF ARGUMENT**.........................................................1

**ARGUMENT**.....................................................................................5

   **I.**   **The FTC Has Expansive and Flexible Authority to Prohibit Unfair Methods of Competition.**...................................................5

   **II.**   **The FTC Has Clear Statutory Authorization to Write Competition Rules.**........................................................................9

   **III.**   **The FTC's Non-Compete Clause Rule Is Not Arbitrary and Capricious**..............................................................................12

**CONCLUSION**................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985) ..................................14

*Atl. Ref. Co. v. FTC*, 381 U.S. 357 (1965) ...................................................................7

*Bostock v. Clayton Cnty, Ga.*, 590 U.S. 644 (2020)............................................. 4, 10

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ..............................16

*E.I. du Pont de Nemours & Co. v. F.T.C.*, 729 F.2d 128 (2d Cir. 1984) ........... 2, 8, 9

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)............................... 12, 16

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................. 4, 12, 13

*FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966)..........................................................3, 8

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)...........................................9

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)............................................9

*FTC v. Texaco, Inc.*, 393 U.S. 223 (1968)..................................................................8

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .............................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)................................................................................................................16

*Nat'l Petroleum Refiners Ass'n v. FTC.*, 482 F.2d 672 (D.C. Cir. 1973) ... 3, 4, 9, 10

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984).........15

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ...........................................................11

*Shell Oil Co. v. FTC*, 360 F.2d 470 (5th Cir. 1966) ..................................................8

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ......................................7

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)..............................................7

*United States v. JS & A Group, Inc.*, 716 F.2d 451 (7th Cir. 1983) ........................10

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)...........................................11

## Statutes

15 U.S.C. § 2..............................................................................................................7

15 U.S.C. § 46(g) .....................................................................................................3, 9

5 U.S.C. § 706 ..........................................................................................................12

## Regulations

Advertising and Labeling as to Size of Sleeping Bags, 28 Fed. Reg. 10900 (Oct. 11, 1963), repealed by 60 Fed. Reg. 65528 (Dec. 20, 1995).................................11

Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964), repealed by 30 Fed. Reg. 9484 (July 29, 1965) ......................................................................11

## Legislative Materials

51 Cong. Rec. 11 (1914) ..........................................................................................3, 6

51 Cong. Rec. 11,179 (1914) ................................................................6

51 Cong. Rec. 11,228 (1914) ................................................................5

51 Cong. Rec. 11,455 (1914) ................................................................7

51 Cong. Rec. 12,030 (1914) ................................................................7

51 Cong. Rec. 12,792 (1914) ................................................................5

51 Cong. Rec. 13,118 (1914) ................................................................7

51 Cong. Rec. 14,927 (1914) ................................................................7

S. Rep. No. 597, at 13 (1914) ..............................................................6

## Other Authorities

Evan P Starr, Research, https://sites.google.com/site/starrevan/research ...............13

## INTEREST OF THE *AMICUS CURIAE*[1]

The Open Markets Institute is a non-profit organization dedicated to protecting democracy and individual liberties from concentrated economic power and control. Open Markets does so by promoting fair competition throughout our political economy, a broadly shared prosperity, and innovation that serves the public interest. Open Markets regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public. It does not accept any funding or donations from for-profit corporations.

## SUMMARY OF ARGUMENT

The district court improperly assumed the role of a national economic regulator when it invalidated the Federal Trade Commission's ("FTC" or "Commission") non-compete clause rule. Congress created the FTC to halt harmful conduct in the marketplace and gave the Commission broad latitude to identify unfair methods of competition. The FTC has routinely exercised these powers since it was established more than a century ago. The decision by the district court, however, effectively rewrote the plain text of the FTC Act and thereby deprived the

---

[1] All parties consent to the filing of this *amicus* brief. No counsel for a party has authorized this brief in whole or in part, and no party, party's counsel, or any other person, other than *amicus curiae* or its counsel, has contributed money that was intended to fund preparing or filing this brief.

FTC of its congressionally established power to write competition rules. Further, it disregarded the ample evidentiary record compiled by the FTC in support of the prohibition on non-compete clauses. Instead of following the plain text of the FTC Act and applying established principles of administrative law, the district court usurped policymaking functions reserved to Congress and the agencies it has created.

Congress gave the Commission expansive authority to identify and prohibit conduct that it deems unfair methods of competition. Congressional supporters of the FTC Act wanted to stop unfair competitive practices before firms could obtain and maintain monopolistic market positions. As is clear from the congressional record, they intended the FTC's authority to be "broad and flexible" in order to stop unfair competitive practices before they grew into a bigger problem. *See E.I. du Pont de Nemours & Co. v. F.T.C.*, 729 F.2d 128, 136 (2d Cir. 1984).

The drafters of the FTC Act consciously used a phrase—unfair methods of competition—that was broad and elastic. They wanted to use a term that was sufficiently broad because they knew it would be impossible to catalog all unfair competitive practices. The term "unfair methods of competition" was not found in the Sherman Act, nor in the Clayton Act, which Congress was debating in parallel to the FTC Act in 1914. They chose this term because it was not tied to an existing body of law. Moreover, they intended the Act to "cover[] every practice and

method between competitors upon the part of one against the other that is against public morals." 51 Cong. Rec. 11,112 (1914) (Sen. Newlands).

The courts have repeatedly stressed the breadth of the FTC Act's prohibition on unfair methods of competition. Indeed, practices that are permissible under the Sherman and Clayton Acts may still violate the FTC Act. Because of the Act's broad latitude, courts have recognized that the Commission can stop restraints of trade in their incipiency "without proof that they amount to an outright violation of . . . the Clayton Act or other provisions of the antitrust laws." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 322 (1966).

The FTC has express authority to make competition policy through rulemaking. Contrary to the district court's conclusion, the text of the FTC Act clearly and unambiguously grants the FTC the power to write substantive regulations. Congress granted the Commission the power "to make rules and regulations for the purpose of carrying out the provisions of [the FTC Act]." 15 U.S.C. § 46(g). The D.C. Circuit described this text as "clear as it is unlimited." *Nat'l Petroleum Refiners Ass'n v. FTC.*, 482 F.2d 672, 693 (D.C. Cir. 1973). Indeed, the choice of the phrase "rules and regulations" indicates a congressional desire to grant the FTC authority to write *both* procedural and substantive rules.

In matters of statutory construction, text is supreme and trumps external materials. As Justice Gorsuch wrote for the Supreme Court in 2020, "When the

3

express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton Cnty, Ga.*, 590 U.S. 644, 653 (2020). The D.C. Circuit followed this exact approach in concluding that the FTC can write substantive rules. The court wrote, "Ambiguous legislative history cannot change the express legislative intent." *Nat'l Petroleum Refiners Ass'n*, 482 F.2d at 686.

The FTC's rule is backed by ample evidence and careful reasoning that more than satisfies the standards of the Administrative Procedure Act ("APA"). The district court, however, erroneously concluded the non-compete clause rule is arbitrary and capricious. The standard of review under the APA is a deferential one. The Supreme Court has held that "a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The district court's decision flouts this Supreme Court directive.

In substituting its own policy judgment for that of the FTC, the district court apparently failed to review the FTC's evidence and analysis in the 165-page notice of final rulemaking. The FTC evaluated the entire body of evidence on non-compete clauses, examined justifications for the use of these contracts, and identified more targeted methods of protecting firms' investments in knowledge, knowhow, and business relationships. Based on the evidentiary record and careful

4

reasoning, the Commission met its burden under the APA when it concluded that

non-compete clauses should be categorically banned for workers.

## ARGUMENT

### I.    The FTC Has Expansive and Flexible Authority to Prohibit Unfair Methods of Competition.

Congress gave the FTC expansive authority to identify and outlaw conduct

that the Commission deems unfair methods of competition. The FTC was created

in response to congressional and popular frustration with the Sherman Act—the

narrow judicial interpretations of this law specifically. Congressional supporters of

the FTC Act wanted to stop unfair competitive practices before firms successfully

employed them to obtain monopolistic market positions.

Members of Congress recognized that attempting to catalog all unfair

competitive practices in a bill was an exercise in futility. They were aware of many

of the commonly used unfair competitive practices, such as boycotts, exclusive

dealing, espionage, and tying. 51 Cong. Rec. 11,228 (1914) (remarks of Sen.

Robinson). Yet, corporations and their sophisticated counsel would always develop

new strategies and tactics to obtain an unfair competitive edge. One senator likened

it to burglars who are constantly identifying new methods of breaking locks. 51

Cong. Rec. 12,792 (1914) (remarks of Sen. Brandegee). A representative of the

Illinois Manufacturers' Association remarked that "there were too many unfair

practices to define, and after writing 20 of them into the law it would be quite possible to invent others." S. Rep. No. 597, at 13 (1914).

By design, the drafters used a phrase—unfair methods of competition—that was broad and elastic. This open-ended character is a feature of the law, not a bug. This term was not found in the Sherman Act, nor in the Clayton Act that Congress was debating and developing in parallel with the FTC Act. They chose "unfair methods of competition" because it was capacious, flexible, and not tied to an existing body of court decisions. Senator Newlands, the chief sponsor of the law in the Senate, declared that the law would "cover[] every practice and method between competitors upon the part of one against the other that is against public morals." 51 Cong. Rec. 11,112 (1914). Senator Hollis, who played a major role in the legislative development of the FTC Act, touted its flexibility as a virtue. 51 Cong. Rec. 11,179 (1914).

Further, Congress delegated interpretation of the phrase to the new FTC. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) ("[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term.") (internal quotations omitted). Rather than entrusting the courts with primary interpretive authority, Congress set up a specialized administrative body for the task. A leading proponent of the FTC Act in the House of Representatives stated that interpretation and application of unfair methods of

6

competition was "best accomplished through the action of an administrative body of practical men thoroughly informed in business who will be able to apply the rule enacted by Congress to particular business situations." 51 Cong. Rec. 14,927 (1914) (remarks of Rep. Covington). As the Supreme Court wrote, "Congress intentionally left development of the term 'unfair' to the Commission." *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 367 (1965).

Preventing the emergence of monopolies was a major theme in the legislative debates. Senator Reed expressed his aim to "strike those [unfair] acts in their incipiency instead of after they have been actually worked out into a complete system of monopoly or restraint of trade." 51 Cong. Rec. 13,118 (1914). Similarly, Senator Cummins believed the law would "prevent the beginning of the attempt to monopolize, the beginning of the insidious efforts toward the restraint of trade and commerce." 51 Cong. Rec. 11,455 (1914). Senator Newlands, likewise, declared that his goal was to "check monopoly in the embryo." 51 Cong. Rec. 12,030 (1914).

Accordingly, Congress outlawed unfair methods of competition in general. Unlike Section 2 of the Sherman Act, Congress did not limit the application of the prohibition on unfair methods of competition only to monopolists and near-monopolists. 15 U.S.C. § 2; *see also United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993).

The courts have repeatedly stressed the breadth of the FTC Act's prohibition on unfair methods of competition. The FTC can arrest trade restraints in their incipiency "without proof that they amount to an outright violation of . . . the Clayton Act or other provisions of the antitrust laws." *Brown Shoe Co.*, 384 U.S. at 322. Two years after the *Brown Shoe* decision, the Court affirmed this theme and stated, "Congress enacted s 5 of the Federal Trade Commission Act to combat in their incipiency trade practices that exhibit a strong potential for stifling competition." *FTC v. Texaco, Inc.*, 393 U.S. 223, 225 (1968). Congress intended the FTC's authority to be "broad and flexible" in order to enjoin unfair competitive practices well before they created monopolies. *E.I. du Pont de Nemours*, 729 F.2d at 136. This Court wrote that "Section 5 is intended to halt practices in their incipiency that may show promise of developing into violations of the Sherman and Clayton Acts and to defeat practices not specifically proscribed by those laws but contrary to the principles animating the Sherman and Clayton Acts." *Shell Oil Co. v. FTC*, 360 F.2d 470, 479 (5th Cir. 1966).

Importantly, the FTC is not confined by the letter or spirit of the antitrust laws. In a landmark 1972 decision on the FTC's authority, the Supreme Court stated that when interpreting its unfair methods of competition power, the Commission may "consider[] public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." *FTC v. Sperry &*

8

*Hutchinson Co.*, 405 U.S. 233, 244 (1972). As such, the FTC can consider broader public policy when identifying and challenging unfair methods of competition. *Id.* at n.5. A unanimous Court affirmed this broad interpretation of the FTC's unfair methods of competition power, stating it "encompass[es] not only practices that violate the Sherman Act and the other antitrust laws, but also practices that the Commission determines are against public policy for other reasons." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986). In recognition of this broad authority, the Second Circuit wrote that the Commission may prohibit unfair methods of competition practices that are "a violation of the antitrust laws *or* collusive, coercive, predatory, restrictive or deceitful." *E.I. du Pont de Nemours*, 729 F.2d at 137 (emphasis added).

## II.    The FTC Has Clear Statutory Authorization to Write Competition Rules.

The text of the FTC Act clearly and unambiguously grants the FTC the power to write substantive regulations. Congress granted the Commission authority "to make rules and regulations for the purpose of carrying out the provisions of [the FTC Act]." 15 U.S.C. § 46(g). The D.C. Circuit described this text as "clear as it is unlimited." *Nat'l Petroleum*, 482 F.2d at 693.

In matters of statutory construction, text is supreme and trumps external materials. In 2020, Justice Gorsuch, writing for a Supreme Court majority, offered this directive on statutory construction: "When the express terms of a statute give

9

us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 590 U.S. at 653. While predating the *Bostock* decision by almost 50 years, the D.C. Circuit's approach to statutory construction in *National Petroleum* is strikingly similar. The court wrote, "Ambiguous legislative history cannot change the express legislative intent." *Nat'l Petroleum*, 482 F.2d at 686; *see also United States v. JS & A Group, Inc.*, 716 F.2d 451, 454 (7th Cir. 1983) (following *National Petroleum* and declining to elevate extratextual considerations over the text of the statute).

By contrast to the textualist approach of *National Petroleum*, the district court's summary judgment decision disregards the plain text of the FTC Act. Nothing in the text limits the FTC's authority to writing only "housekeeping rules." Indeed, the choice of the phrase "rules and regulations" indicates a congressional desire to grant the FTC authority to write *both* procedural and substantive rules. As an illustration of this point, the Federal *Rules* of Civil Procedure concerns procedure while the Code of Federal *Regulations* contains substantive regulations. Rather than analyze the statutory text with care, the district court looked to external sources such as legislative history and scholarly articles and used those sources to subordinate "the written word" of Congress. *Bostock*, 590 U.S. at 653. Thus, the district court's reading of 6(g) represents a brazen judicial rewriting of the plain words of Congress.

10

Given the clear grant of statutory authority to write rules, the FTC historically employed rulemaking as an important method of policymaking. In the 1960s, the FTC wrote dozens of competition and consumer protection rules restricting a wide range of practices. *E.g.*, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964), repealed by 30 Fed. Reg. 9484 (July 29, 1965); Advertising and Labeling as to Size of Sleeping Bags, 28 Fed. Reg. 10900 (Oct. 11, 1963), repealed by 60 Fed. Reg. 65528 (Dec. 20, 1995). Moreover, an agency does not forfeit its statutory authority merely because it has chosen not to exercise its powers for a long time. *United States v. Morton Salt Co.*, 338 U.S. 632, 647-648 (1950). The FTC's powers "are not lost by being allowed to lie dormant, any more than nonexistent powers can be prescripted by an unchallenged exercise." *Id.* at 647.

Federal agencies have broad latitude to decide whether to make policy through adjudication or rulemaking. The Supreme Court ruled that federal agencies have the discretion to make policy through either approach. *SEC v. Chenery Corp.*, 332 U.S. 194, 201-02 (1947). In general, that decision is not one for courts to second guess after the fact.

In addition to being entirely permissible under administrative law, the FTC's decision to proceed through rulemaking has critical procedural and substantive

advantages over policymaking through adjudication. First, the Commission had the opportunity to review the entire body of quantitative and qualitative evidence on non-compete clauses. Second, the Commission, as required by the Administrative Procedure Act, solicited public comment and used this collective wisdom—more than 26,000 comments—to refine its final rule. Third, a rule applies to all firms subject to the Commission's jurisdiction. Adjudication, by contrast, would result in consent orders applicable only to businesses that it sued and would not bind all other businesses, including those similarly situated to parties found liable by the FTC. A rule creates a level competitive playing field, whereas adjudication does not.

## III.    The FTC's Non-Compete Clause Rule Is Not Arbitrary and Capricious.

The standard of review under the APA's arbitrary and capricious test is a deferential one. 5 U.S.C. § 706. The Supreme Court has held that "a court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423; s*ee also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (describing courts' role in applying arbitrary and capricious standard as "narrow"). The district court's decision, however, flouts this directive. In substituting its own policy judgment for that of the FTC, the district court apparently failed to review the Commission's evidence and analysis in the 165-page notice of final rulemaking. This apparent failure indicates arbitrary and

capricious decision-making by the district court on summary judgment, not the FTC in its rulemaking.

The FTC compiled ample evidence in support of the rule. Staff exhaustively reviewed the quantitative and qualitative evidence on the incidence and effects of non-compete clauses. Instead of cherry-picking the evidence, they reviewed and presented studies finding both harms and benefits from the use of non-compete clauses by employers. In dismissing the support for the rule as limited to a "handful of studies," the district court either failed to review the evidentiary record or rewrote the record—which would be a judicial choice that is in direct conflict with the standards set by the APA. *Prometheus Radio Project*, 592 U.S. at 423.[2]

Based on this substantial evidence, the FTC concluded that non-compete clauses have significant adverse effects on workers, competitors, and consumers. In its evidentiary review, the FTC found that the mere *existence* of a non-compete clause between a worker and an employer depresses labor market mobility through an in terrorem effect, reducing wages and wage growth, impeding business formation, and hurting socially beneficial innovation.

The Commission showed great care in assessing the quality and credibility of the evidence it reviewed. Since correlations between the use or enforceability of

---

[2] Indeed, a few of the scholars cited in the rule have on their own published more than a handful of peer reviewed studies. *See, e.g.*, Evan P Starr, Research, https://sites.google.com/site/starrevan/research.

non-competes and economic outcomes do not establish causation, the FTC methodically assessed the research design in each of the studies on which it relied, taking into account the credibility of each study's findings according to the principles of causal inference. For example, the FTC appropriately placed greater weight on studies that relied on natural experiments than those that relied on cross-sectional comparisons. The FTC found that, on balance, the empirical literature finding adverse effects of non-compete clauses far outweighed evidence to the contrary. One study cited in the rule found that adverse wage effects extended even to the highest levels of professionals (i.e., corporate executives). By contrast, the FTC found the studies that determined non-compete clauses benefited workers, a conclusion contrary to the other cited studies, all suffered from methodological problems that made them unreliable.

The FTC went a step further and supplemented the academic research with evidence from public comments. Even so, the non-compete clause rule does not stand on this anecdotal evidence supplied by the public. Rather, the comments affirmed and bolstered the academic findings. This evidentiary record is similar to the record that supported the FTC's Credit Practices Rule, which was upheld by the D.C. Circuit. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 986 (D.C. Cir. 1985).

The FTC's raft of quantitative and qualitative evidence does not need to meet a supreme level of evidence to satisfy the standards of the APA. While the

district court wished for better forms of evidence in support of the non-compete clause rule, the D.C. Circuit noted that such judicial desires do not alter the deferential standard of review that is required under the law: "The fact that an agency's decision . . . rests on a set of evidentiary facts less desirable or complete than one which would exist in some regulatory utopia does not alter our role." *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1140 (D.C. Cir. 1984).

Further, the FTC reviewed the purported benefits of non-compete clauses and examined the availability of less restrictive alternatives to contracts. Rather than dismiss employer interests, the FTC recognized the need for businesses to protect trade secrets and investments in employee training and customer relationships. The Commission, however, concluded that non-compete clauses are an overbroad and flawed tool to achieve these goals and identified more targeted methods of protecting business interests, including trade secret law and non-solicitation agreements. Additionally, the FTC explained that employers can retain workers through regular raises and promotions and fair treatment at the workplace rather than relying on contracts that restrict worker mobility.

The FTC also considered alternatives to a complete prohibition on non-compete clauses. It analyzed disclosure requirements and a standard of presumptive illegality as alternatives. The FTC found that these alternatives would

not protect workers, firms, and consumers from the documented harms of non-compete clauses.

The FTC acted reasonably in enacting a complete ban. The overwhelming evidence that it compiled showed employers' use of non-compete clauses is harmful. While recognizing employers' need to protect firm-specific investments, the Commission identified several more targeted alternatives. In light of the abundant evidence compiled and its detailed reasoning, it reasonably concluded that the use and enforcement of non-compete clauses are unfair methods of competition that violate the FTC Act. As such, the FTC established a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

The FTC more than satisfied its burden under the APA. It did what the Supreme Court directed agencies to do—and then some—by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, under the "narrow" scope of judicial review, *Fox*, 556 U.S. at 513, the rule satisfies the requirements of the APA.

## CONCLUSION

For the reasons stated above, the order granting Ryan L.L.C. summary judgment and enjoining the non-compete clause rule nationwide should be reversed.

Dated: January 9, 2025

Respectfully submitted,

*s/* Kirk Cooper
KIRK COOPER
   COUNSEL OF RECORD
COOPER APPEALS, P.L.L.C.
10420 MONTWOOD DRIVE, SUITE N-405
EL PASO, TEXAS 79935
915-289-8282
KIRK@COOPERAPPEALS.COM

SANDEEP VAHEESAN
TARA PINCOCK
OPEN MARKETS INSTITUTE
655 15th Street, NW, Suite 310
Washington, DC 20005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and accurate copy of the foregoing to be

served to counsel of record for all parties via ECF.

Dated: January 9, 2025

*s/* Kirk Cooper
KIRK COOPER
  COUNSEL OF RECORD
COOPER APPEALS, P.L.L.C.
10420 MONTWOOD DRIVE, SUITE N-405
EL PASO, TEXAS 79935
915-289-8282
KIRK@COOPERAPPEALS.COM

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I am an attorney for *amicus curiae* Open Markets Institute (OMI). Pursuant to Fed. R. App. P. 32(a), I certify that the foregoing brief of OMI is in 14-point, proportionately spaced Palatino Linotype font. According to the word processing application used to draft this brief (Microsoft Word 365), the brief contains 3851 words, not including the certificate of interested parties, table of contents, table of authorities, and this certificate of compliance.

/s/ Kirk Cooper

Kirk Cooper

*Counsel for Amicus Curiae*

DATED: January 9, 2025