No. 24-10951

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RYAN, L.L.C.,
PLAINTIFF-APPELLEE,

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
BUSINESS ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, AND
LONGVIEW CHAMBER OF COMMERCE,
INTERVENOR PLAINTIFFS-APPELLEES,

v.

FEDERAL TRADE COMMISSION,
DEFENDANT-APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION
No. 3:24-cv-986, Hon. Ada E. Brown

**BRIEF OF THE DISTRICT OF COLUMBIA, NEW JERSEY, ARIZONA, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF THE FEDERAL TRADE COMMISSION**

MATTHEW J. PLATKIN
Attorney General
State of New Jersey

JEREMY FEIGENBAUM
Solicitor General

NATHANIEL I. LEVY
BRYCE K. HURST
MARCUS D. MITCHELL
Deputy Attorneys General

25 Market Street
Trenton, NJ 08625
(212) 416-8016
marcus.mitchell@law.njoag.gov

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

MARK A. RUCCI
Assistant Attorney General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as *amici curiae* are government entities.  5th Cir. R. 28.2.1.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ......................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT ....................................................................................4

    I.    Restrictions On Non-Competes Vary Meaningfully By State ..............4

        A.    Most states regulate non-competes through statutes, giving rise to a patchwork of legislative solutions to curb their use ......................................................................4

        B.    Other states rely on common-law reasonableness inquiries to invalidate overly restrictive non-competes ...........................8

        C.    States' experiences enforcing restrictions on non-competes reveal significant progress, but challenges remain......................................................................11

    II.    The FTC's Rule Establishes A Uniform, Predictable Federal Floor That Fosters Competition And Protects Workers And States, Especially In Multistate Labor Markets And Across Crucial Industries ................................................................18

        A.    The Rule will promote competition, innovation, increased wages, and predictability ........................................................19

        B.    The Rule is especially helpful for multistate labor markets ................................................................................22

        C.    The Rule particularly benefits the healthcare industry .............26

CONCLUSION ................................................................................30

# TABLE OF AUTHORITIES

*Cases*

*ADP, LLC v. Kusins*, 215 A.3d 924 (N.J. Super. Ct. App. Div. 2019).................. 23

*Application Grp., Inc. v. Hunter Grp., Inc.*,
    72 Cal. Rptr. 2d 73 (Cal. Ct. App. 1998)........................................................... 16

*BDO Seidman v. Hirshberg*, 712 N.E. 2d 1220 (N.Y. 1999) .................................. 9

*Data Mgmt., Inc. v. Greene*, 757 P.2d 62 (Alaska 1988) ...................................... 10

*Edwards v. Arthur Andersen LLP*, 189 P.3d 285 (Cal. 2008) .................................. 5

*Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021).......... 1

*Hess v. Gebhard & Co.*, 808 A.2d 912 (Pa. 2002) ................................................. 10

*Innovation Ventures v. Liquid Mfg.*, 885 N.W. 2d 861 (Mich. 2016) ................... 11

*Kennedy v. Kennedy*, 584 S.E. 2d 328 (N.C. Ct. App. 2003) ............................. 9, 10

*KidsKare, P.C. v. Mann*, 350 P.3d 1228 (N.M. Ct. App. 2015)............................ 10

*Lamp v. Am. Prosthetics, Inc.*, 379 N.W. 2d 909 (Iowa 1986)................................ 9

*Lovelace Clinic v. Murphy*, 417 P.2d 450 (N.M. 1966) ........................................... 9

*Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604 (N.J. 2004).................. 9

*New Haven Tobacco Co. v. Perrelli*, 559 A.2d 715 (Conn. App. Ct. 1989) ............ 9

*Reed, Roberts Assocs. v. Strauman*, 353 N.E. 2d 590 (N.Y. 1976)......................... 9

*Rullex Co., LLC v. Tel-Stream, Inc.*, 232 A.3d 620 (Pa. 2020) ............................. 23

*Statutes*

5 U.S.C. § 706 ........................................................................................................... 1

28 R.I. Gen. Laws § 28-59-2 .................................................................................... 6

28 R.I. Gen. Laws § 28-59-3 .................................................................... 6

35 Pa. Cons. Stat. § 10321 ................................................................... 24

820 Ill. Comp. Stat. 90/10 ..................................................................... 5

Ariz. Rev. Stat. Ann. § 23-494 ............................................................... 7

Ark. Code Ann. § 4-75-101 .................................................................... 7

Cal. Bus. & Prof. Code § 16600 ............................................................. 5

Cal. Lab. Code § 23 ............................................................................... 8

Cal. Lab. Code § 432.5 ........................................................................... 8

Cal. Lab. Code § 433 ............................................................................. 8

Colo. Rev. Stat. § 8-2-113 ................................................................... 6, 8

Conn. Gen. Stat. § 20-14p ................................................................. 7, 29

Conn. Gen. Stat. § 31-50a ...................................................................... 7

D.C. Code § 32-581.01 ....................................................................... 6, 24

D.C. Code § 32-581.04 ............................................................................ 8

Fair Contracting for Health Care Providers Act, P.L. 846, No. 74, § 1(4) ....... 24, 29

Fla. Stat. Ann. § 542.335 ......................................................................... 7

Iowa Code Ann. § 135Q.2 ........................................................................ 7

Md. Code Ann., Lab. & Empl. § 3-716 ................................................... 6, 24

Me. Rev. Stat. tit. 26, § 599-A ............................................................ 6, 7

Me. Rev. Stat. tit. 26, § 599-B .............................................................. 8

Mich. Comp. Laws § 445.771 .............................................................. 11

Mich. Comp. Laws § 445.784 ............................................................... 11

Minn. Stat. § 181.988 ........................................................................... 5

N.D. Cent. Code § 9-08-06 .................................................................... 5

N.H. Rev. Stat. Ann. § 275:70-a ............................................................ 6

N.J. Stat. Ann. §§ 34:11-69 to -81 ........................................................ 23

N.M. Stat. Ann. § 24A-4-2 ................................................................... 17

Nev. Rev. Stat. § 613.050 ...................................................................... 8

Nev. Rev. Stat. § 613.195 ...................................................................... 8

Nev. Rev. Stat. § 613.200 ...................................................................... 8

Okla. Stat. Ann. § 15-219A ................................................................... 5

Or. Rev. Stat. § 653.295 ........................................................................ 6

S.D. Codified Laws 53-9-11.1 ............................................................... 7

Tex. Bus. & Com. Code Ann. § 15.05 ................................................... 7

Va. Code Ann. § 40.1-28.7:8 ............................................................. 6, 8

Vt. Stat. Ann. 26, § 281 ........................................................................ 7

Wash. Rev. Code § 49.62.020 ............................................................... 7

Wash. Rev. Code § 49.62.080 ............................................................... 8

Wash. Rev. Code §§ 49.62.020 - .040 .................................................... 5

## Regulations

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024)
................................................. 1, 4, 6, 13, 16, 17, 18, 19, 20, 21, 24, 26, 27, 28

*Other Authorities*

Alan B. Krueger & Eric Posner, *Corporate America is Suppressing Wages for Many Workers*, N.Y. Times (Feb. 28, 2018), tinyurl.com/mrxphkdb ................. 2

Alexis Hofmann, Comment on Non-Compete Clause Rule (Jan. 11, 2023), tinyurl.com/2kzjjr4d ........................................................................... 26

Am. College of Physicians, Comment on Non-Compete Clause Rule (Mar. 3, 2023), tinyurl.com/mwnhxsbv ............................................. 27

Am. College of Surgeons, Comment on Non-Compete Clause Rule (Apr. 18, 2023), tinyurl.com/3rbvney6 ................................................. 27

Am. Nurses Ass'n, Comment on Non-Compete Clause Rule (Mar. 6, 2023), tinyurl.com/3bd2jbx2 ........................................................................... 27

Assurance of Discontinuance/Voluntary Compliance (July 23, 2024), tinyurl.com/y9ubjmrv ......................................................................... 13

Catherine L. Fisk, *Reflections on The New Psychological Contract and the Ownership of Human Capital*, 34 Conn. L. Rev. 765 (2002) .............. 16, 20, 25

Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms*, 70 Ohio St. L.J. 1127 (2009) ................................................. 15

Dana Byrne, Comment on Non-Compete Clause Rule (Jan. 12, 2023), tinyurl.com/384pcxfa ......................................................................... 28

David Weil, The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It (2014) ......................................... 18

Econ. Innovation Grp., Comment on Non-Compete Clause Rule (Apr. 14, 2023), tinyurl.com/yahtk8a7 ............................................. 21

Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompetes in the U.S. Labor Force*, 64 J.L. & Econ. 53 (2021) ............................................. 15

Evan Starr *et al.*, *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019) ....... 19

Evan Starr *et al.*, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J.L. Econ & Org. 633 (2020) ...................................................... 20

Ga. Academy of Family Physicians, Comment on Non-Compete Clause Rule (Apr. 10, 2023), tinyurl.com/2vwecbeu ............................................................ 27

Isaac Chotiner, *What A Ban On Non-Compete Agreements Could Mean For American Workers*, The New Yorker (Jan. 10, 2023), tinyurl.com/mr3hf2xm .................................................................................... 18

James Pritsiolas, Comment on Non-Compete Clause Rule (Jan. 20, 2023), tinyurl.com/2c27d23s ..................................................................................... 28

Jay C. Shambaugh & Ryan Nunn, *Policy Actions That Would Revitalize Wage Growth*, Brookings Inst. (Apr. 17, 2018), tinyurl.com/75cehc58 ...................... 2

Julieta Ryder, Comment on Non-Compete Clause Rule (Jan. 13, 2023), tinyurl.com/bd65re4j .......................................................................................... 28

Matt Marx & Ryan Nunn, *The Chilling Effect of Non-Compete Agreements*, The Hamilton Proj. (May 20, 2018), tinyurl.com/yaanddhv ............................ 17

Matthew S. Johnson *et al.*, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 31,929, 2023) ................................................................................................... 19

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2021) ........................................ 12

Michelle Long *et al.*, *What the FTC's New Protections From Non-Compete Agreements Mean in a Mostly Non-Profit Hospital Industry*, Kaiser Fam. Found. (July 24, 2024), tinyurl.com/2y8uspa3 ............................ 29

Mohammad Khan, Comment on Non-Compete Clause Rule (Jan. 10, 2023), tinyurl.com/f46zfsp5 ........................................................................................... 26

Najah Farley, *Non-Compete Provisions in Context*, Nat'l Emp. L. Proj. (Sept. 27, 2018), tinyurl.com/5e4x8m5b .......................................................... 15

Natarajan Balasubramanian *et al.*, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349 (2022) ............................................................................ 12

Off. Econ. Pol'y, U.S. Dep't of Treasury, *Non-compete Contracts: Economic Effects and Policy Implications* (Mar. 2016), tinyurl.com/42sa22rb ................ 15

Press Release, D.C. Off. of the Att'y Gen., *Worker Alert: Noncompete Provisions Are Now Illegal for Many D.C. Workers* (Feb. 21, 2023), tinyurl.com/wnzcs32m ...................................................................... 14

Press Release, Off. of the Mass. Att'y Gen., *Three Fast Food Chains Agree to End Use of No-Poach Agreements* (Mar. 2, 2020), tinyurl.com/5azze3r8 .................................................................................................. 13

Press Release, Off. of the N.Y. Att'y Gen., *A.G. Schneiderman Announces Settlement with Jimmy John's to Stop Including Non-Compete Agreements in Hiring Packets* (June 22, 2016), tinyurl.com/bj55bur6 ................................ 14

Press Release, Off. of the N.Y. Att'y Gen., *Attorney General James Ends Unfair Labor Practices at Major Auto Services Company* (July 31, 2024), tinyurl.com/48dptc48 ........................................................................ 13

Public Comment Letter from 18 State Attorneys General on Proposed Non-Compete Clause Rule (Apr. 19, 2023), tinyurl.com/mue2sn2w .......... 16, 18, 19

Rachel Arnow-Richman, *The New Enforcement Regime*, 50 Seton Hall L. Rev. 1223 (2020) ................................................................. 5, 6

Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. Rev. 575 (1999) .......................................................................... 2

Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 452 (2011) ..................... 20

Sophie Quinton, *These days, even janitors are required to sign non-compete clauses*, USA Today (May 27, 2017), tinyurl.com/8a4j3y34 ........................... 6

Spencer Woodman, *Amazon makes even temporary warehouse workers sign 18 month non-competes*, The Verge (March 26, 2015), tinyurl.com/2z36xz2x ........................................................................ 6

*State Noncompete Law Tracker*, Econ. Innovation Grp. (Oct. 11, 2024), tinyurl.com/5yvfa8sh ................................................................................. 5

Tyler Boesch *et al.*, *Non-Compete Contracts Sideline Low-Wage Workers*,
Fed. Reserve Bank of Minneapolis (Oct. 15, 2021), tinyurl.com/8va43azv ......20

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

The District of Columbia, New Jersey, Arizona, California, Colorado, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington (collectively, "*Amici* States") file this brief as *amici curiae* in support of appellant the Federal Trade Commission and its rule prohibiting employers from entering into and enforcing most non-compete clauses nationwide. *See* Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Rule"). The district court granted plaintiff-appellees' motions for summary judgment and set aside the Rule nationwide based on its determination that "the FTC exceeded its statutory authority in implementing the Rule," and that "the Rule is arbitrary and capricious" under the Administrative Procedure Act, 5 U.S.C. § 706. ROA.5625, 5639. *Amici* States write to explain that the FTC properly considered important aspects of the serious problems that non-competes cause and offered a more-than-reasonable explanation for its decision to promulgate the Rule. *Accord Fed. Commc'n Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In fact, based on their experiences enforcing restrictions on non-competes in a diverse set of jurisdictions, *Amici* States contend that the Rule will provide a uniform and predictable federal regulation to benefit workers and foster greater innovation and competition in critical industries.

*Amici* States have a strong interest in protecting the millions of American workers subject to non-competes, many of whom face other significant challenges in today's labor market. These clauses constrain workers' earning power and suppress wages, limit worker mobility, and worsen workplace conditions, particularly for workers who cannot meaningfully negotiate. *See* Alan B. Krueger & Eric Posner, *Corporate America is Suppressing Wages for Many Workers*, N.Y. Times (Feb. 28, 2018), tinyurl.com/mrxphkdb ("Employers . . . can control and intimidate workers by putting terms in their contracts that limit their ability to find new jobs even after they leave their old one.").

*Amici* States also have an interest in promoting innovation and fostering competition. Research reveals that prohibiting non-competes stimulates wage growth and spurs the creation of new companies to address challenges in critical industries, such as healthcare. *See, e.g.*, Jay C. Shambaugh & Ryan Nunn, *Policy Actions That Would Revitalize Wage Growth*, Brookings Inst. (Apr. 17, 2018), tinyurl.com/75cehc58; Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. Rev. 575 (1999) (explaining that California's ban on non-competes contributed to the economic prosperity of Silicon Valley).

Given these concerns, a diverse array of states across the country have restricted non-competes. A federal rule complements the groundwork these states

have already laid to address the problem and does so in a predictable way that allows for greater uniformity and enforcement in job markets that cross state lines.

## SUMMARY OF ARGUMENT

I.  Non-competes prevent millions of American workers from taking new jobs and starting new businesses.  Most states therefore ban or strictly regulate these clauses.  Today, 40 states and the District of Columbia have statutes restricting the use of non-competes, which range from categorical bans to protections for a specific subset of workers or industries.  In other states, courts apply common-law "reasonableness" tests to invalidate unfair or exploitative covenants.  While states have achieved success in limiting the harmful effects of non-competes, they continue to face challenges eliminating this pervasive practice.

II.  As *Amici* States know, non-competes decrease worker mobility, depress wages, and worsen workplace conditions.  By setting a national floor, the Rule will increase competition for employees, foster new business activity and innovation, and yield greater legal consistency in multistate labor markets.  Research indicates that restricting non-competes not only benefits workers, but also promotes entrepreneurship and startup activity.  In large multistate markets, particularly where states have divergent non-compete regulations, the Rule eliminates uncertainty and provides workers greater mobility across these markets without having to bear the risk of litigation or relocation.  Finally, the Rule especially benefits the healthcare

industry—along with the patients it serves—and complements existing state laws concerning healthcare providers.

## ARGUMENT

### I.  Restrictions On Non-Competes Vary Meaningfully By State.

Non-competes are used widely throughout the United States.  Nearly one in five workers—approximately 30 million Americans—are subject to a non-compete clause, and an estimated 38% of workers have been subject to one at some time in their careers.  89 Fed. Reg. at 38,346; FTC Br. at 9.  Before the FTC promulgated the Rule barring most non-competes nationwide, the regulation of those clauses fell to the states.  States have taken various approaches to regulating non-competes.  Some have enacted statutes that either categorically ban such clauses or that protect a specific subset of employees or industries.  Others leave their regulation to common-law "reasonableness" inquiries, meaning workers must resort to litigation to nullify or weaken unfair non-competes.  Although states have seen ample success in enforcing statutory and common law restrictions, they nonetheless face persistent challenges in regulating this pervasive and exploitative practice.

#### A.  Most states regulate non-competes through statutes, giving rise to a patchwork of legislative solutions to curb their use.

States have long regulated non-competes to provide their workers with the freedom to pursue new opportunities and to allow their labor markets to operate fairly.  Today, 40 states and the District of Columbia have enacted legislation

4

limiting or outright banning the use of non-competes. *See State Noncompete Law Tracker*, Econ. Innovation Grp. (Oct. 11, 2024), tinyurl.com/5yvfa8sh.

State legislative approaches vary significantly. Four states have banned the use of non-competes entirely. Since 1872, California has banned "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind." Cal. Bus. & Prof. Code § 16600 (citing *Edwards v. Arthur Andersen LLP*, 189 P.3d 285 (Cal. 2008)). So too have Minnesota, North Dakota, and Oklahoma, with the latter two states' bans dating back to the mid-to-late nineteenth century. *See* Minn. Stat. § 181.988 (enacted in 2023 without retroactive effect); N.D. Cent. Code § 9-08-06 (largely mirroring the ban in place since 1865); Okla. Stat. Ann. § 15-219A (although recodified, resembling the original 1890 law); *see also* Rachel Arnow-Richman, *The New Enforcement Regime*, 50 Seton Hall L. Rev. 1223, 1231, 1236-38 (2020) (describing "California-style bans" as those "that seek to void all forms of employee noncompetes").

At least nine states and the District of Columbia tailor legislation to protect vulnerable workers earning below certain income thresholds. *See, e.g.*, 820 Ill. Comp. Stat. 90/10(a) (prohibiting non-competes for workers earning $75,000 or less annually); Wash. Rev. Code §§ 49.62.020-.040 (income threshold at $100,000 for employees and $250,000 for independent contractors, adjusted annually for

inflation); D.C. Code § 32-581.01(13) ($150,000); Colo. Rev. Stat. § 8-2-113(2) ($101,250); Or. Rev. Stat. § 653.295(1)(e) ($100,533).

A handful of states use their minimum wage laws or the federal poverty limit as the starting point for tailoring the reach of their statutory non-compete restrictions. *See, e.g.*, Me. Rev. Stat. tit. 26, § 599-A(3) (prohibiting non-competes for workers earning at or below 400% of the federal poverty level); 28 R.I. Gen. Laws §§ 28-59-3(4), 28-59-2(7) (at or below 250% of the federal poverty level); Md. Code Ann., Lab. & Empl. § 3-716 (at or below 150% of the state's minimum wage); N.H. Rev. Stat. Ann. § 275:70-a (at or below 200% of the federal minimum wage); Va. Code Ann. § 40.1-28.7:8 (at or below the average weekly wage).

These "vulnerable worker bans," *i.e.*, those tied to a worker's income, *see* Arnow-Richman, *supra*, at 1231, are designed to curb the use of non-competes for workers in the most precarious financial positions, such as cleaning and maintenance workers, home health aides, nail salon technicians, interns, temporary delivery drivers, and even nonprofit volunteers. *See, e.g.*, Sophie Quinton, *These days, even janitors are required to sign non-compete clauses*, USA Today (May 27, 2017), tinyurl.com/8a4j3y34; Spencer Woodman, *Amazon makes even temporary warehouse workers sign 18 month non-competes*, The Verge (March 26, 2015), tinyurl.com/2z36xz2x; *see also* 89 Fed. Reg. at 38,343.

Other states maintain restrictions based on the length of time a non-compete is enforceable. Washington has a rebuttable presumption that all non-competes exceeding 18 months are "unreasonable and unenforceable." Wash. Rev. Code § 49.62.020(2). That presumption cannot be overcome absent "clear and convincing evidence" that the duration "is necessary to protect the [employer]'s business or goodwill." *Id.* In Arkansas, a non-compete restriction of up to two years is presumptively reasonable. Ark. Code Ann. § 4-75-101(d). And in Florida, a restriction of six months or less is presumed reasonable; a restriction greater than two years is presumed unreasonable. Fla. Stat. Ann. § 542.335.

Targeting critical industries is another way states mitigate the negative impact of non-competes. Nearly a dozen states limit the use of non-competes in some healthcare employment contracts. *See, e.g.*, Iowa Code Ann. § 135Q.2; S.D. Codified Laws 53-9-11.1; Tex. Bus. & Com. Code Ann. § 15.05(i); Conn. Gen. Stat. § 20-14p. Other states restrict non-competes for veterinarians, Me. Rev. Stat. tit. 26, § 599-A(3)(B), broadcast journalists, Ariz. Rev. Stat. Ann. § 23-494, security guards, Conn. Gen. Stat. § 31-50a, and cosmetologists and barbers, Vt. Stat. Ann. 26, § 281, to name just a few examples.

Beyond rendering some or all non-competes unlawful, states employ both civil and criminal penalty schemes to bolster enforcement. In Virginia, an employer who enters into or attempts to enforce an unlawful non-compete with a low-wage

employee is subject to a $10,000 civil penalty for each violation.  Va. Code. Ann. § 40.1-28.7:8.  Virginia also imposes fines on employers who fail to post information regarding the non-compete law in the workplace.  *Id.*; *see also, e.g.*, D.C. Code § 32-581.04(d)(4) (subjecting an employer to a penalty of $250 for each violation of the disclosure requirement, to be paid to each employee subjected to the violation). Employers who violate Maine's law restricting non-competes may be fined a minimum of $5,000.  Me. Rev. Stat. tit. 26, § 599-B.  So too in Nevada, *see* Nev. Rev. Stat. §§ 613.195, .200, with the added penalty that if fines or administrative penalties are imposed against an employer, the employer may also be liable to pay for "investigative costs and attorney's fees," *id.* § 613.050(3).

A smaller subset of states has also imposed criminal penalties for employers found to have violated non-compete restrictions.  In California, employers who attempt to enforce non-competes may be found guilty of a misdemeanor and either fined up to $1,000, imprisoned for up to six months, or both.  *See* Cal. Lab. Code §§ 23, 432.5, 433; *see also, e.g.*, Colo. Rev. Stat. § 8-2-113.  And beyond government enforcement, some state legislatures have empowered private plaintiffs by creating private rights of action to invalidate non-competes.  *See, e.g.*, Wash. Rev. Code § 49.62.080; Colo. Rev. Stat. § 8-2-113(8); D.C. Code § 32-581.04(c)(1).

**B.    Other states rely on common-law reasonableness inquiries to invalidate overly restrictive non-competes.**

Other states apply common law analyses to assess the lawfulness of a non-compete.    In these states, courts typically apply a "reasonableness" inquiry, evaluating state-specific factors like the employer's legitimate business interest, hardship on the employee, the geographic scope and duration of the restriction, and the public interest.    *See, e.g.*, *Lovelace Clinic v. Murphy*, 417 P.2d 450, 454 (N.M. 1966); *BDO Seidman v. Hirshberg*, 712 N.E. 2d 1220 (N.Y. 1999); *Kennedy v. Kennedy*, 584 S.E. 2d 328, 334 (N.C. Ct. App. 2003); *Lamp v. Am. Prosthetics, Inc.*, 379 N.W. 2d 909, 910 (Iowa 1986); *Maw v. Advanced Clinical Commc'ns, Inc.*, 846 A.2d 604, 609 (N.J. 2004); *New Haven Tobacco Co. v. Perrelli*, 559 A.2d 715 (Conn. App. Ct. 1989).

These common law assessments vary significantly between states, as courts have articulated distinct formulations of reasonableness thresholds.    For example, in New York, courts evaluate whether a non-compete is "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public[,] and not unreasonably burdensome to the employee."    *Reed, Roberts Assocs. v. Strauman*, 353 N.E. 2d 590, 593 (N.Y. 1976).    Under North Carolina common law, courts will uphold a non-compete if it is "(1) in writing, (2) based upon valuable consideration, (3) reasonably necessary for the protection of legitimate business interests, (4) reasonable as to the time and territory, and (5) not otherwise against

public policy." *Kennedy*, 584 S.E. 2d at 333. In Pennsylvania, courts must first ask whether the non-compete is ancillary to the taking of employment before evaluating four other factors. *See Hess v. Gebhard & Co.*, 808 A.2d 912, 918-20 (Pa. 2002). And in Alaska, if an overbroad non-compete can be "reasonably altered" to render it enforceable, then courts are instructed to do so unless they determine "the covenant was not drafted in good faith," a burden that falls on the employer. *Data Mgmt., Inc. v. Greene*, 757 P.2d 62, 64 (Alaska 1988).

While these multi-factor tests allow some flexibility depending on the circumstances of employment contracts, they can make it difficult for workers to know whether a non-compete clause is reasonable and enforceable. As a result, they can require workers to engage in protracted litigation to vindicate their rights. Take, for example, the case of Dr. Tyler Mann, a New Mexico dentist who was alleged to have violated a non-compete with his former employer KidsKare, an operator of dental service providers across New Mexico. *See KidsKare, P.C. v. Mann*, 350 P.3d 1228 (N.M. Ct. App. 2015). New Mexico state courts were tasked with deciding whether the provision that restricted Mann from working for one year after concluding his employment and within 100 miles of his previous employer was a "reasonable restraint"—a fact-bound inquiry asking whether the restraint is "against public policy" or one that creates a "detriment to the public interest in the possible loss of services" measured against the "preservation of the freedom to contract." *Id.*

10

at 1231 (citations omitted).  After nearly five years of litigation, the district court found that the 100-mile restriction was unreasonable and rewrote the covenant to impose only a 30-mile restriction.  *Id.* at 1231-33.

Moreover, in some states without statutory regulation of non-competes, workers also often attempt to seek relief under state antitrust law.  For example, in Michigan, the Michigan Antitrust Reform Act governs contracts that impose a restraint of trade, which includes some non-competes.  *See Innovation Ventures v. Liquid Mfg.*, 885 N.W. 2d 861, 873 (Mich. 2016) (citing Mich. Comp. Laws § 445.771 *et seq.*).  The Michigan Act instructs courts to defer to interpretations of federal antitrust law for evaluating the reasonableness of non-competes in some circumstances.  *See, e.g.*, Mich. Comp. Laws § 445.784(2).  But such cases—like common law analyses—are resource intensive and unpredictable.  They are also time-consuming and frequently require expert economic analyses to define a relevant market, the employer's share of that market, and the effects of the challenged non-compete on that market.  Well-heeled plaintiffs can prevail in such cases, but the fact-intensive inquiry can often lead to unpredictable outcomes that take years to resolve.

### C.   States' experiences enforcing restrictions on non-competes reveal significant progress, but challenges remain.

As enforcers of statutory and common law restrictions on non-competes, states investigate complaints brought by workers, file lawsuits where appropriate,

and educate the public about the availability of legal protections. In doing so, states have seen firsthand how non-competes can substantially harm workers by limiting their mobility and depressing their wages, and how they can harm employers by limiting the pool of available high-quality talent. Although states have seen success in enforcing statutory and common law restrictions on non-competes, they have also experienced challenges in regulating this pervasive practice.

Predictably, where states have restricted non-competes, workers' wages and mobility have increased. For instance, researchers found that after Oregon passed a law in 2008 banning non-competes for low-wage workers, wages and job mobility for such workers increased, particularly for women. *See* Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2021). In Hawaii, a similar spike in new-hire wages and job mobility resulted after a 2015 non-compete restriction for technology workers. *See* Natarajan Balasubramanian *et al.*, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022).

States have taken a variety of enforcement actions to combat the harmful effects of non-competes. Just last year, the Attorneys General of Colorado, Illinois, Maryland, Massachusetts, Minnesota, New York, and Pennsylvania announced a settlement to resolve allegations of unfair labor practices involving the use of non-

competes at oil change and auto services facilities owned and operated by Valvoline and its subsidiaries. *See* Press Release, Off. of the N.Y. Att'y Gen., *Attorney General James Ends Unfair Labor Practices at Major Auto Services Company* (July 31, 2024), tinyurl.com/48dptc48. Valvoline required its low-wage hourly employees to sign non-competes that prohibited them from working in the oil change business at "any store within 100 miles of a Valvoline location for one year after leaving" the company. *Id.* Under the settlement, Valvoline agreed to notify its current and former employees, and Valvoline's franchisees, that the non-competes are no longer in effect. In fact, the notice sent out by Valvoline tracked the model language adopted by the FTC in the Rule. *Compare* Assurance of Discontinuance/Voluntary Compliance at 18-19 (July 23, 2024), tinyurl.com/y9ubjmrv, *with* 89 Fed. Reg. 38,503-04.

States have worked to tamp down the use of non-competes among fast-food workers too. Beginning in 2019, the Massachusetts Attorney General led a 14-state coalition that stopped major fast-food franchises—including Dunkin' Donuts, Arby's, Five Guys, Little Caesars, and Panera Bread—from using provisions that restricted the right of fast-food service workers to move between franchises. *See* Press Release, Off. of the Mass. Att'y Gen., *Three Fast Food Chains Agree to End Use of No-Poach Agreements* (Mar. 2, 2020), tinyurl.com/5azze3r8. The coalition was able to stop the franchisors from continuing to include or enforce the clauses, as

well as impose requirements that they post notices in all locations to inform employees of their rights. *Id.*

Similarly, the New York Attorney General reached a settlement with Jimmy John's to stop the sandwich chain's use of non-competes that prevented employees from working at companies that derived at least 10% of sales from selling sandwiches within two miles of a Jimmy John's store for two years after leaving the company. *See* Press Release, Off. of the N.Y. Att'y Gen., *A.G. Schneiderman Announces Settlement with Jimmy John's to Stop Including Non-Compete Agreements in Hiring Packets* (June 22, 2016), tinyurl.com/bj55bur6.

After the District of Columbia passed its 2022 law restricting the use of non-competes for most workers, the D.C. Attorney General established a multilingual email and phone hotline for District workers who believe that they have been asked to sign or adhere to an illegal non-compete. *See* Press Release, D.C. Off. of the Att'y Gen., *Worker Alert: Noncompete Provisions Are Now Illegal for Many D.C. Workers* (Feb. 21, 2023), tinyurl.com/wnzcs32m. The District has received numerous complaints from District workers, leading it to increase its investigatory and enforcement resources. *See, e.g., id.* (announcing a settlement requiring a District fitness center to cease using non-competes for covered employees).

Despite the states' best efforts, however, some employers continue to circumvent enforcement. Non-competes remain pervasive because employers know

many workers are ill-informed about the existence or illegality of such provisions, many workers lack the ability to meaningfully bargain with their employer, and variations in state laws result in worker confusion, particularly given the interconnected nature of the modern labor market. *See* Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms*, 70 Ohio St. L.J. 1127, 1147-52 (2009); *see also* Section II.B, *infra*. In fact, many employers are aware that certain non-competes are illegal or unenforceable, yet they include them in employment contracts with the hope of deterring employees from leaving their jobs. *See* Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompetes in the U.S. Labor Force*, 64 J.L. & Econ. 53, 61 (2021). For example, in California, where non-competes have been unenforceable since 1872, non-competes continue to appear in employment contracts throughout the state at rates similar to the rest of the country. *See, e.g.*, Najah Farley, *Non-Compete Provisions in Context*, Nat'l Emp. L. Proj. (Sept. 27, 2018), tinyurl.com/5e4x8m5b (noting that 19% of California's workers report signing a non-compete); Off. Econ. Pol'y, U.S. Dep't of Treasury, *Non-compete Contracts: Economic Effects and Policy Implications* (Mar. 2016), tinyurl.com/42sa22rb.

Employers nevertheless include unenforceable non-compete provisions in employment contracts because workers may be ill-informed about state-law protections. One scholar has termed this phenomenon the presumptive reliance on

the "*in terrorem* value" of non-competes, where sophisticated employers take advantage of an employee's lack of knowledge of the unenforceability of certain terms. *See* Catherine L. Fisk, *Reflections on The New Psychological Contract and the Ownership of Human Capital*, 34 Conn. L. Rev. 765, 782-83 (2002). In response, the Attorneys General of California and the District of Columbia have submitted letters to their respective state bars in support of a proposed opinion that attorneys have an ethical duty not to counsel or assist a client in using unlawful non-competes. *See* Public Comment Letter from 18 State Attorneys General on Proposed Non-Compete Clause Rule 9-10 (Apr. 19, 2023), tinyurl.com/mue2sn2w.

Aside from unlawful terms in employment contracts, employers have also attempted to evade regulations of non-competes by inserting choice-of-law provisions designating the law of another state where such a provision is lawful. *See* 89 Fed. Reg. at 38,377 ("[N]on-competes may be used in States in which they are unenforceable because . . . the employer might be able to forum-shop to apply the law of another jurisdiction more favorable to non-competes."). Not all these attempts have been successful. For instance, California courts have refused to allow such circumvention. *See, e.g.*, *Application Grp., Inc. v. Hunter Grp., Inc.*, 72 Cal. Rptr. 2d 73, 82-90 (Cal. Ct. App. 1998). In New Mexico, the state legislature stepped in to protect the state's non-compete ban for healthcare workers, nullifying any provision that "makes the agreement subject to the laws of another state" or

"requires any litigation arising out of the agreement to be conducted in another state." N.M. Stat. Ann. § 24A-4-2(B). And in the District of Columbia, the Attorney General often must undertake fact-specific and resource-intensive jurisdictional inquiries related to complaints from workers traveling between the District and Maryland claiming they are being subjected to an unlawful non-compete. *See* Public Comment Letter, *supra*, at 11; *see also* Section II.B, *infra*.

These efforts by employers to circumvent state prohibitions on non-competes hit low- and middle-income workers the hardest. As the FTC explained when promulgating the Rule, even if a non-compete is likely unenforceable, most workers "generally may not be willing to file lawsuits against deep-pocketed employers to challenge [it]." *See* 89 Fed. Reg. 38,486. This understandable reluctance of employees to take on the burden of litigation results in them simply complying with the unlawful provisions rather than risking a lawsuit. *See* Matt Marx & Ryan Nunn, *The Chilling Effect of Non-Compete Agreements*, The Hamilton Proj. (May 20, 2018), tinyurl.com/yaanddhv. Such reluctance by workers to assert their rights shifts the substantial burden of enforcement back on the states. A uniform federal rule will substantially relieve that burden by reducing workers' uncertainty about whether they are subject to an illegal non-compete.

II.    **The FTC's Rule Establishes A Uniform, Predictable Federal Floor That Fosters Competition And Protects Workers And States, Especially In Multistate Labor Markets And Across Crucial Industries.**

The FTC's Rule provides crucial protection for American workers—and, in turn, fosters competition for the benefit of states.  Workers today earn less for the same output as their grandparents did 70 years ago, due in part to globalization and technological change.  *See* Public Comment Letter, *supra*, at 2 nn. 3-5; *see also, e.g.*, David Weil, The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It 100 (2014).  Non-competes exacerbate that trend. They lower worker mobility, depress wages, and worsen workplace conditions across a swath of industries.  *See* FTC Br. at 9, 13, 40.  The nationwide Rule barring most non-competes will mitigate those significant harms.   *See* 89 Fed. Reg. at 38,343.

The Rule's benefits extend far beyond improvements for workers.  By increasing workers' ability to move flexibly between jobs, the Rule will lead to a more competitive labor market, resulting in new business activity and higher quality innovation.  *See* Isaac Chotiner, *What A Ban On Non-Compete Agreements Could Mean For American Workers*, The New Yorker (Jan. 10, 2023), tinyurl.com/mr3hf2xm (citing research from economist Evan Starr).  And the Rule's federal floor will bring much-needed legal predictability to both employers and workers nationwide.  This is most true in those labor markets in metropolitan areas

18

that span state borders, where employees, employers, and government officials alike must navigate inconsistent regimes, in which some states fully or partially restrict non-competes, but others do not.  Moreover, the Rule's positive impacts may be particularly noticeable in the healthcare industry, as competitive labor markets for healthcare practitioners will contribute to more accessible and affordable care for patients.

### A.    The Rule will promote competition, innovation, increased wages, and predictability.

Restrictions on the use and enforceability of non-competes are associated with increased wages and job mobility.  *See* Public Comment Letter, *supra*, at 3-4 & nn. 9-15.  Indeed, workers who are barred from seeking a new job in the industry or geography of their choosing have fewer professional options and thus cannot leverage competing offers to secure higher wages from their current employers. Non-competes, therefore, suppress upward wage pressure created by competition among employers, offsetting the benefits to workers of an otherwise competitive labor market.  *See, e.g.*, Matthew S. Johnson *et al.*, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 31,929, 2023); FTC Br. at 9, 13, 40.  And in states where non-competes are more likely to be valid under state law, all workers—even those not subject to non-competes—experience reduced job mobility and lower wages.  *See* Evan Starr *et al.*, *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019); 89 Fed. Reg. at

38,382 (citing research that non-competes also exacerbate gender and racial earnings gaps).

Non-competes also impact workers, especially low-wage workers, who lack the resources or bargaining power to negotiate or challenge them. *See* Tyler Boesch *et al.*, *Non-Compete Contracts Sideline Low-Wage Workers*, Fed. Reserve Bank of Minneapolis (Oct. 15, 2021), tinyurl.com/8va43azv; 89 Fed. Reg. at 38,375 (finding "non-competes with workers other than senior executives" are "unilaterally imposed by a party with superior bargaining power, typically without meaningful negotiation or compensation"). And as noted above, even in jurisdictions where non-competes are more strictly regulated, they still constrain workers through *in terrorem* effects. *See* Evan Starr *et al.*, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J.L. Econ & Org. 633 (2020); Fisk, *supra*, at 782-83. For many, the possibility of a lawsuit is enough to keep them from seeking or accepting new employment. By rendering non-competes unlawful nationwide, the Rule will limit these many pernicious impacts.

The Rule's salutary effects go beyond aiding workers. By increasing competition in the labor market, the Rule facilitates entrepreneurship and new business formation. In fact, in those states where non-competes are broadly allowed, entrepreneurship and startup activity are lower than in states with restrictions on their enforceability. *See* Sampsa Samila & Olav Sorenson, *Noncompete Covenants:*

*Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 452 (2011). Non-competes are also linked to business concentration in a range of sectors, resulting in fewer choices for consumers. *See* 89 Fed. Reg. 38,391-92 (citing business concentrations "from tech companies, to hair salons, to physician practices, and many more."). And non-competes not only stymie startups from forming but also "tend[] to reduce the number of employees [that] new firms" in "innovative industries" are "able to hire," thus impeding those firms' opportunities for growth. *Id.* That matters because the entry of new, competing firms can "lower[] prices" and "rais[e] the quality of products and services." *Id.* By "reduc[ing] startup rates" and "slow[ing] productivity growth," non-competes create "significant drag on U.S. dynamism." Econ. Innovation Grp., Comment on Non-Compete Clause Rule (Apr. 14, 2023), tinyurl.com/yahtk8a7. As the Rule states, non-competes "reduce innovation" by preventing startup activity, making it harder for startups to find workers, and limiting the flow of people—and thus of innovative ideas—between firms. 89 Fed. Reg. at 38,389; *see id.* at 38,394 (citing research on patents indicating non-competes "decrease the rate of 'breakthrough' innovations"); FTC Br. at 13, 40.

Moreover, the Rule will benefit workers and employers by creating greater predictability in the regulation of non-competes across jurisdictions. In place of a patchwork of state statutory proscriptions and common-law standards, a federal floor will help employers and employees focus on doing their work, rather than fighting

about where that work may or may not take place.  By declaring non-compete clauses an unfair method of competition across all states, the Rule evens the playing field between workers and employers and produces greater legal predictability and uniformity.  These changes will thus benefit workers, businesses, and states' economies.

### B.    The Rule is especially helpful for multistate labor markets.

Greater legal predictability will have a particularly strong impact on labor markets that span multiple states, which present unique challenges.  Specifically, in labor markets with a geographic radius crossing the borders of two or more states, workers and employers must often navigate how a non-compete clause applies under each state's legal regime, *i.e.*, whether regulated by a statute, subject to a common-law reasonableness inquiry, or a combination of the two.  Moreover, even if non-competes are less enforceable or even banned in one jurisdiction, some employers in these labor markets may still universally use non-competes in all their employment contracts, while some smaller businesses may struggle to navigate multiple states' laws.  As a result, this legal fragmentation within a single labor market can hamper states' efforts to enforce their laws and protect workers.

Take New Jersey and Pennsylvania as one example.  The neighboring cities of Camden and Philadelphia are part of a metropolitan area with more than 6.2 million people and millions of workers, many of whom are subject to non-competes.

Both states' courts employ fact-sensitive reasonableness tests to govern the enforceability of non-competes generally.  *Compare ADP, LLC v. Kusins*, 215 A.3d 924, 943-44 (N.J. Super. Ct. App. Div. 2019), *with Rullex Co., LLC v. Tel-Stream, Inc.*, 232 A.3d 620, 624-25 (Pa. 2020).  Of course, even different courts in the same jurisdiction can decide the reasonableness of the same non-compete clause differently.  *See, e.g.*, *ADP*, 215 A.3d at 944 (citing examples).  But the risk grows when two states' common-law tests are applied to the same non-compete clause across multiple jurisdictions.  What results are workers who are similar in all relevant respects but are potentially subject to different restrictions because of the state standard applied by the court in which they happen to find themselves.

Statutory restrictions on non-competes in certain industries in New Jersey and Pennsylvania create additional asymmetry.  For example, New Jersey recently enacted legislation prohibiting non-competes for certain domestic workers, such as caregivers and housekeepers.  *See* N.J. Stat. Ann. §§ 34:11-69 to -81.  Because Pennsylvania lacks such a law, a domestic worker employed in Pennsylvania and bound by a non-compete, but who wishes to work (and may already live) in New Jersey, would have to assess two states' statutory and common law on the enforceability of non-competes, including potentially complex choice-of-law questions.  That is prohibitive for most, if not all, workers.

Similarly, Pennsylvania recently passed the Fair Contracting for Health Care Practitioners Act, which voids any non-competes that hinder certain healthcare practitioners' ability to treat or accept new patients in specified circumstances. *See* 35 Pa. Cons. Stat. § 10321 *et seq*. (codifying Act of July 17, 2024, P.L. 846, No. 74). But New Jersey has no such law, meaning that—as a practical matter—some doctors bound by non-competes in Camden cannot pursue opportunities on the other side of the Delaware River in Philadelphia.

Likewise, while both the District of Columbia and Maryland prohibit non-competes for workers earning below a certain income, their thresholds are different. The District's law applies to most workers who earn under $150,000, D.C. Code § 32-581.01(13), while Maryland prohibits non-competes for most workers earning less than 150% of the state's minimum wage (roughly $46,800 under current law), Md. Code Ann., Lab. & Empl. § 3-716. This is further complicated when factoring in where the work is performed. District law has a fact-specific location requirement that applies to a worker who spends "more than 50% of his or her work time for the employer working in the District." D.C. Code § 32-581.01(6)(A)(i); *id.* § 32-581.01(6)(A)(ii) (stating the converse); *see also* 89 Fed. Reg. at 38,453 (explaining how remote work creates cross-border complications). The federal Rule alleviates these cross-jurisdictional complexities.

Disparities in state law also create structural incentives for employers to use non-competes in shared labor markets, making enforcement more difficult. To start, as noted, even unenforceable non-competes can advance employers' interests and reduce labor mobility through *in terrorem* effects. *See* Fisk, *supra*, at 782-83. Worse yet, proliferation of non-competes, combined with the lack of clarity about their enforceability, decreases the likelihood that workers—particularly low-wage workers who are most dependent on their earnings—will file a complaint with state enforcement authorities. But even when complaints lead to enforcement actions, the costly, fact-intensive litigation is inferior to a uniform rule that addresses these legal rights and responsibilities on the front end nationwide. In fact, state-law differences can complicate, rather than simplify, multistate enforcement. States that wish to coordinate enforcement efforts in shared labor markets often must first undertake their own time-intensive and costly investigations and analyses, undermining swift and consistent enforcement.

Ultimately, the patchwork of state regulation and common-law tests contributes to the proliferation of non-competes in shared labor markets that cross state lines, while also making it harder for workers to challenge non-competes and for states to bring targeted enforcement actions. The FTC's Rule will provide greater certainty and uniformity, and, therefore, benefit workers, employers, and states' economies.

### C.    The Rule particularly benefits the healthcare industry.

The FTC's Rule provides significant benefits to industries that are indispensable to states' economies, such as the healthcare field. Like in other industries, non-competes prevent physicians and other healthcare providers from moving between job opportunities. Indeed, many physicians and healthcare practitioners submitted public comments on the FTC's proposed Rule explaining the hardship of being unable to change jobs without moving significant distances, or even out of state, to comply with non-competes' geographic provisions. *See, e.g.*, Mohammad Khan, Comment on Non-Compete Clause Rule (Jan. 10, 2023), tinyurl.com/f46zfsp5 ("Hospitals and private equity know that their workers cannot easily get up and leave and work 50 miles away. We have families and homes. They know the hospital next door won't be a competitive threat because their workers can't work there."); Alexis Hofmann, Comment on Non-Compete Clause Rule (Jan. 11, 2023), tinyurl.com/2kzjjr4d ("Professionals should not need to completely leave their [hard-]earned credentials or move across the country to continue serving their local communities."). Research suggests doctors view non-competes as forcing them to choose between remaining in their jobs and "abandon[ing]" their patients. *See* 89 Fed. Reg. at 38,400 (76.7% of respondents in 2022 survey of Louisiana surgeons held this view, which the FTC found "accords with the many comments

26

. . . describing how patients must drive long distances to maintain continuity of care").

Critically, non-competes negatively impact healthcare practitioners and the patients they serve. In promulgating the Rule, the FTC noted that "[h]undreds of physicians and other commenters in the healthcare industry stated that non-competes negatively affect physicians' ability to provide quality care and limit patient access to care," adding "that the vast majority of comments from physicians and other stakeholders in the healthcare industry assert that non-competes result in worse patient care." 89 Fed. Reg. 38,400-01. Some of the country's most prominent medical organizations agree, citing the negative link between non-competes and patient care. *See, e.g.*, Am. College of Physicians, Comment on Non-Compete Clause Rule at 2-3 (Mar. 3, 2023), tinyurl.com/mwnhxsbv; Am. College of Surgeons, Comment on Non-Compete Clause Rule at 2 (Apr. 18, 2023), tinyurl.com/3rbvney6; Ga. Academy of Family Physicians, Comment on Non-Compete Clause Rule at 2 (Apr. 10, 2023), tinyurl.com/2vwecbeu; Am. Nurses Ass'n, Comment on Non-Compete Clause Rule at 2 (Mar. 6, 2023), tinyurl.com/3bd2jbx2.

That non-competes impact patient care is unsurprising. Restrictions on doctors' and nurses' ability to change jobs prevents those practitioners from "bringing their knowledge and expertise to new practices," limiting the exchange of

ideas and care models. *See* Dana Byrne, Comment on Non-Compete Clause Rule (Jan. 12, 2023), tinyurl.com/384pcxfa. Indeed, practitioners who begin their careers at non-profit employers may be less likely to move to a non-profit provider that serves a different subset of the population. *See* James Pritsiolas, Comment on Non-Compete Clause Rule (Jan. 20, 2023), tinyurl.com/2c27d23s. These impacts can be magnified in rural areas where access to healthcare is already more limited. *See* Julieta Ryder, Comment on Non-Compete Clause Rule (Jan. 13, 2023), tinyurl.com/bd65re4j.

Moreover, non-competes restrict market entry of new providers, making care more expensive. The healthcare industry has become increasingly concentrated, with fewer insurers, hospitals, and physician groups than in the past. *See* 89 Fed. Reg. at 38,398. Non-competes compound that concentration; dominant healthcare systems use non-competes to lock in employees, preventing them from starting their own practices or working for would-be competitors. *Id.* In the end, that market concentration contributes to higher costs for consumers. *Id.* Not only does that harm patients, but it harms those who pay for healthcare—including, of course, states themselves.

Given these effects, some state legislatures have recognized the need for greater regulation of non-competes in this field. For example, Pennsylvania's legislature enacted the Fair Contracting for Health Care Practitioners Act in part to

28

address the shortage of healthcare providers, finding that "[n]oncompete covenants in health care inhibit competition that benefits employees and patients and can deter needed health care practitioners from wanting to practice in Pennsylvania." Fair Contracting for Health Care Providers Act, P.L. 846, No. 74, § 1(4), tinyurl.com/5ynec4bc; *see also, e.g.*, Conn. Gen. Stat. § 20-14p (codifying Public Act 23-97) (legislative history reflecting the concern with non-competes making healthcare markets worse for Conn. Residents and physicians); *supra* pp. 7-8 (listing state regulations of non-competes in the healthcare industry); Michelle Long *et al.*, *What the FTC's New Protections From Non-Compete Agreements Mean in a Mostly Non-Profit Hospital Industry*, Kaiser Fam. Found. (July 24, 2024), tinyurl.com/2y8uspa3.

The FTC's Rule alleviates these concerns nationwide. By removing non-competes, healthcare workers will not have to move significant distances to avoid geographic restrictions. And by finding employment in the same area, practitioners will be more likely to maintain patient relationships and avoid disrupting care. That greater professional freedom will facilitate the creation and growth of new practices, thus diminishing concentration in the healthcare industry, fostering competition and innovation, and ultimately reducing healthcare costs for patients.

## CONCLUSION

This Court should reverse the judgment of the district court.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General
State of New Jersey

JEREMY FEIGENBAUM
Solicitor General

NATHANIEL I. LEVY
BRYCE K. HURST
MARCUS D. MITCHELL
Deputy Attorneys General

Office of the Attorney General for
  New Jersey
25 Market Street
Trenton, NJ 08625
(212) 416-8016
marcus.mitchell@njoag.gov


January 2025

BRIAN L. SCHWALB
Attorney General
District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

MARK A. RUCCI
Assistant Attorney General

Office of the Attorney General for
  the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

On behalf of:

KRISTIN K. MAYES
*Attorney General*
*State of Arizona*
2005 North Central Avenue
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
1515 Clay Street
Oakland, CA 94612

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 North French Street
Wilmington, DE 19801

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

LETITIA JAMES
*Attorney General*
*State of New York*
The Capitol
Albany, NY 12224

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2025, I electronically filed the foregoing amicus brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

**CERTIFICATE OF COMPLIANCE**

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,466 words, excluding exempted parts. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE