No. 24-10951

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT
_____

RYAN, L.L.C,
*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,
*Intervenors-Plaintiffs-Appellees*

v.

FEDERAL TRADE COMMISSION
*Defendant-Appellant.*
_____

On Appeal from the United States District Court
for the Northern District of Texas
_____

**BRIEF OF THE AMERICAN ANTITRUST INSTITUTE
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT**

_____

DAVID O. FISHER
SENIOR COUNSEL
   *Counsel of Record*
RANDY M. STUTZ
PRESIDENT
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 905-5420

*Counsel for Amicus Curiae the American Antitrust Institute*

January 9, 2025

**AMICUS CURIAE'S**
**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**
**PURSUANT TO FIFTH CIRCUIT RULE 29.2**

No. 24-10951

RYAN, L.L.C,
*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,
*Intervenors-Plaintiffs-Appellees*

v.

FEDERAL TRADE COMMISSION
*Defendant-Appellant.*

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, counsel for amicus curiae American Antitrust Institute submits this supplemental certificate of interested persons to fully disclose all those with an interest in the amicus brief and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Amicus curiae **American Antitrust Institute** is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporation has an ownership interest in it of any kind.

Dated: January 9, 2025        Respectfully submitted,
s/ David O. Fisher

David O. Fisher
*Counsel for Amicus Curiae*
*American Antitrust Institute*

# TABLE OF CONTENTS

AMICUS CURIAE'S SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS PURSUANT TO FIFTH CIRCUIT RULE 29.2 ..................................... i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES........................................................................ iv

INTEREST OF AMICUS CURIAE ...................................................... 1

SUMMARY OF ARGUMENT................................................................ 1

ARGUMENT ........................................................................................ 3

I.  THE COURT SHOULD ADOPT THE FTC'S INTERPRETATION OF SECTION 6(G) OF THE FTC ACT ................................................... 3

    A.  The Plain Text of Section 6(g) Authorizes Rules and Regulations to Prevent UMCs ............................................... 4

    B.  The "Contextual Whole" of the FTC Act Accords with the Plain Meaning of Section 6(g) .......................................... 5

        1.  The FTC Act Was Created to Interdict Harm to Competition in Its Incipiency and to Fill Gaps in the Sherman Act ................................. 7

        2.  UMC Rulemakings Fit Naturally with the FTC's Incipiency Mandate and the Overall Statutory Scheme ..................................... 12

        3.  The District Court's Holding and the Plaintiffs' Arguments Are Belied by the Contextual Whole of the FTC Act............................... 18

II. THE RULE SATISFIES THE APA'S ARBITRARY-AND-CAPRICIOUS STANDARD .......................................................................... 23

CONCLUSION..................................................................................... 28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*AMG Capital Mgmt., LLC v. FTC*,
   593 U.S. 67 (2021) ............................................................19

*Anago, Inc. v. Tecnol Med. Products, Inc.*,
   976 F.2d 248 (5th Cir. 1992)...............................................9

*Atl. Ref. Co. v. FTC*,
   381 U.S. 357 (1965) ...........................................................12

*Baylor Cnty. Hosp. Dist. v. Price*,
   850 F.3d 257 (5th Cir. 2017)..................................... 25, 27

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ........................................................6, 15

*Black v. Pan Am Labs., L.L.C.*,
   646 F.3d 254 (5th Cir. 2011) ...............................................5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ...........................................................11

*Davis v. HSBC Bank*,
   691 F.3d 1152 (9th Cir. 2012).............................................11

*E. I. Du Pont de Nemours & Co. v. FTC*,
   729 F.2d 128 (2d Cir. 1984)................................10, 11, 15

*F. Hoffmann-La Roche Ltd v. Empagran S.A.*,
   542 U.S. 155 (2004) .........................................................7, 23

*Fashion Originators' Guild v. FTC*,
   312 U.S. 457 (1941) ...........................................................12

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ...........................................................24

iv

*FTC v. Beech-Nut Packing Co.*,
    257 U.S. 441 (1922) ......................................................12

*FTC v. Brown Shoe Co.*,
    384 U.S. 316 (1966) ......................................................12

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948) ........................................................3

*FTC v. Motion Picture Adver.*,
    344 U.S. 392 (1953) ................................................ 10, 26

*FTC v. Qualcomm Inc.*,
    411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019)....................15

*FTC v. R. F. Keppel & Bro., Inc.*,
    291 U.S. 304 (1934) ......................................................15

*FTC v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972) .....................................................3, 11

*FTC v. Texaco, Inc.*,
    393 U.S. 223 (1968) ......................................................10

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) ......................................................17

*Havoco of Am., Ltd. v. Shell Oil Co.*,
    626 F.2d 549 (7th Cir. 1980)............................................9

*In re McWane, Inc.*,
    2012 FTC LEXIS 283 (F.T.C. Aug. 9, 2012) .....................13

*In re Processed Egg Prods. Antitrust Litig.*,
    851 F. Supp. 2d 867 (E.D. Pa. 2012)................................15

*In re Step N Grip, LLC*,
    2015 FTC LEXIS 259 (Oct. 27, 2015)...............................14

*In re Valassis Commc'ns,*
    141 F.T.C. 247 (March 7, 2006) .................................................................. 13–14

*King v. Burwell,*
    576 U.S. 473 (2015) ........................................................................6, 7

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024)................................................................... 23, 24

*Nat'l Petroleum Refiners Ass'n v. FTC,*
    482 F.2d 672 (D.C. Cir. 1973) .................................................................5

*NCAA v. Alston,*
    594 U.S. 69 (2021) ........................................................................8

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
    416 U.S. 267 (1974) .................................................................. 14, 15

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
    472 U.S. 284 (1985) ........................................................................9

*Nynex Corp. v. Discon,*
    525 U.S. 128 (1998) .......................................................................10

*Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018) ........................................................................8

*FTC v. Procter & Gamble Co.,*
    386 U.S. 568 (1967) .......................................................................11

*QBE Syndicate 1036 v. Compass Minerals La., Inc.,*
    95 F.4th 984 (5th Cir. 2024) .................................................................7

*Seago v. O'Malley,*
    91 F.4th 386 (5th Cir. 2024) .................................................................4

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) .................................................................. 14, 15

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993) ...................................................................9

*Tex. Brine Co., L.L.C. v. Am. Arbitration Ass'n*,
  955 F.3d 482 (5th Cir. 2020)..................................................4–5

*Tex. Med. Ass'n v. United States HHS*,
  120 F.4th 494 (5th Cir. Oct. 30, 2024).......................... 24, 25, 26, 28

*Texas v. United States EPA*,
  91 F.4th 280 (5th Cir. 2024) .................................... 24, 25, 26

*United States v. JS & A Grp., Inc.*,
  716 F.2d 451 (7th Cir. 1983)......................................................6

*United States v. Morton's Salt Co.*,
  338 U.S. 632 (1950) .................................................................4

*Vanderstok v. Garland*,
  86 F.4th 179 (5th Cir. 2023) ...................................................6

*Vitol, Inc. v. United States*,
  30 F.4th 248 (5th Cir. 2022) ...................................................6

**Statutes**

15 U.S.C. § 1 ...............................................................................8

15 U.S.C. § 2 ...............................................................................8

15 U.S.C. § 4 ...............................................................................8

15 U.S.C. § 15 .............................................................................8

15 U.S.C § 45(a) ....................................................................3, 10

15 U.S.C § 45(b) ..........................................................................3

15 U.S.C. § 46(g) .........................................................................4

15 U.S.C. § 57a(a)(2) ..........................................................................4, 21

5 U. S.C. § 706(2)(A) ..............................................................................23

**Other Authorities**

Federal Trade Commission Improvements Act of 1980,
   Pub. L. No. 96-252, 94 Stat. 374 (1980) .............................................21

Keynote Remarks of Commissioner Terrell McSweeny, *The Clayton and FTC*
   *Acts: 100 Years of Looking Ahead*, Clayton Act 100th Anniversary Symposium,
   ABA, Washington, D.C. (Dec. 4, 2014) ...........................................7–8

Stephen Calkins, *Counterpoint: The Legal Foundation of the Commission's*
   *Use of Section 5 to Challenge Invitations to Collude is Secure*,
   Antitrust Spring 2000 .......................................................................13

Kurt Walters, *Reassessing the Mythology of Magnuson-Moss: A Call to Revive*
   *Section 18 Rulemaking at the FTC*,
   16 Harv. L. & Pol'y Rev. 519 (2022) ................................................21

Louis Kaplow, *Rules Versus Standards: An Economic Analysis*,
   42 Duke L. J. 557 (1992) ..................................................................12

Magnuson-Moss Warranty—Federal Trade Commission Improvement Act,
   Pub. L. No. 93-637, 88 Stat. 2183 (1975) .........................................21

Richard M. Steuer, *Incipiency*,
   31 Loy. Consumer L. Rev. 155 (2019) ...............................................10

William Kolasky, *George Rublee and the Origins of the Federal Trade*
   *Commission*,
   26 Antitrust 1 (Fall 2011) ...................................................................8

**Rules**

Non-Compete Clause Rule,
   89 Fed. Reg. 38,342 (May 7, 2024).................................. 5, 17, 20, 22, 25, 26, 27

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1419 (2024) ................14

## INTEREST OF AMICUS CURIAE[1]

The American Antitrust Institute (AAI) is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. See http://www.antitrustinstitute. org.[2]

## SUMMARY OF ARGUMENT

Congress promulgated the FTC Act in 1914 to supplement and bolster the Sherman Act. Section 5(a) of the FTC Act prohibits unfair methods of competition to prevent anticompetitive effects in their incipiency and fill gaps in the Sherman Act's coverage. The FTC's reading of section 6(g) of the Act as granting it

---

[1] All parties have consented to the filing of this brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—has contributed money that was intended to fund preparing or submitting this brief. Counsel to amicus curiae, Randy M. Stutz and David O. Fisher, are former employees of the Federal Trade Commission and each advised the Commission on aspects of the Noncompete Rule. Neither were involved in this litigation or any other litigation involving the Noncompete Rule before, during, or after their time at the Commission.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

substantive rulemaking authority to carry out section 5(a)—the authority "to make rules and regulations" defining what is an "unfair method of competition"—is consistent with the plain meaning of section 6(g) and with the Act's contextual whole. The text of section 6(g) is not ambiguous.

The FTC's statutory grant of substantive rulemaking authority is part of a Congressional plan to enable expert competition enforcers to prevent anticompetitive behavior *ex ante*, before it causes harm and damages, rather than to punish it *ex post*, after it inflicts injuries requiring redress. Rulemakings enforceable through adjudicative proceedings are a natural tool for fulfilling those functions. They are fully consistent with the design of the FTC Act, and the plain text of the Act should be read in accordance with its design.

The FTC's Noncompete Clause Rule ("the Rule") defines with specificity certain noncompete agreements that the FTC deems unfair methods of competition. In effect, the Rule declares that the FTC will pursue a cease-and-desist order in an adjudicative proceeding if an employer enters such an agreement. Although not all may agree with the underlying policy choices reflected in the FTC's declaration, its methods and conclusions in enacting the Rule are reasonable, evidence-based, plausibly explained, and within the boundaries of its delegated authority. The arbitrary-and-capricious standard under the Administrative Procedures Act ("APA") requires no more. In concluding otherwise, the district court erred.

**ARGUMENT**

Sections 5(a) and 5(b) of the FTC Act give the FTC the power to prevent unfair methods of competition by issuing cease-and-desist orders pursuant to adjudicative proceedings. 15 U.S.C § 45(a), (b). Section 6(g) of the Act gives the FTC additional powers to make rules and regulations for the purpose of carrying out section 5. 15 U.S.C. § 46(g). Rules and regulations are used to carry out section 5(a) when the FTC issues them to "define" or "declare" unfair methods of competition. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239 (1972) ("§ 5 empower[s] the Commission to define and proscribe an unfair competitive practice."); *FTC v. Cement Inst.*, 333 U.S. 683, 693 (1948) ("The Commission has jurisdiction to declare that conduct tending to restrain trade is an unfair method of competition . . . ."). Read plainly and objectively in context, the FTC's statutory grant of substantive rulemaking authority to carry out section 5(a) is unexceptional.

## I. THE COURT SHOULD ADOPT THE FTC'S INTERPRETATION OF SECTION 6(G) OF THE FTC ACT

The FTC Act is codified in subchapter I of Chapter 2 of Title 15 of the U.S. Code. Section 5 of the Act, codified at section 45 of the subchapter, directs the FTC to prevent unfair methods of competition ("UMCs") and unfair and deceptive acts or practices ("UDAPs") by issuing cease-and-desist orders pursuant to adjudicative proceedings. Section 6, codified at section 46 of the subchapter, grants the FTC "additional powers" to be used in aid of the Commission's "duties,"

3

including its section 5 duties. 15 U.S.C. § 46(g); *United States v. Morton's Salt Co.*, 338 U.S. 632, 649–50 (1950).

One such grant of additional powers, entitled "Regulations," is located at section 46(g) of the subchapter. With one clearly articulated exception, section 46(g) confers authority "to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C § 46(g). The exception is independently codified at section 57a(a)(2). 15 U.S.C. § 46(g) (excepting "section 57a(a)(2) of this title"). It states that the Commission "shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to [UDAPs]." 15 U.S.C. § 57a(a)(2).

A. **The Plain Text of Section 6(g) Authorizes Rules and Regulations to Prevent UMCs**

As this case comes before the court, nobody disputes that UMCs are within the scope of the subchapter. Likewise, nobody disputes that UMCs are outside the scope of the 57a(a)(2) exception. Indeed, section 57a(a)(2) expressly disclaims any application to UMCs in a savings clause. 15 U.S.C. § 57a(a)(2).

A threshold question, then, is whether the text authorizing the FTC to make rules and regulations for the purpose of carrying out the UMC provision is "plain and unambiguous." *Seago v. O'Malley*, 91 F.4th 386, 390 (5th Cir. 2024). If so, then this "first step," *id.*, is also the last step. The inquiry "begins and ends with the plain meaning" unless the plain meaning would "lead to an absurd result." *Tex.*

4

*Brine Co., L.L.C. v. Am. Arbitration Ass'n*, 955 F.3d 482, 486 (5th Cir. 2020); *Black v. Pan Am Labs., L.L.C.*, 646 F.3d 254, 280 (5th Cir. 2011).

It is far from absurd to read the plain meaning of section 6(g) as granting authority to make substantive rules for the purpose of carrying out section 5(a) of the FTC Act. The text of section 6(g)'s grant of rulemaking authority contains no scope-limiting adjectives, and two federal circuit courts have interpreted section 6(g) to include substantive 5(a) rules within its scope. *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 673–78 (D.C. Cir. 1973); *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983). Moreover, the FTC has successfully exercised its 6(g) authority to enact 25 substantive 5(a) rules, 20 of which relied on UMC authority. *See* Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,349–50 (May 7, 2024) (listing and describing 26 substantive rules enacted between 1963 and 1978, one of which applied to the Clayton Act). Those facts should be dispositive on the question of absurdity.

So why should this Court go beyond the first step? Why should it look past the plain meaning of the statutory text in determining the scope of the FTC's rulemaking authority under section 6(g)?

## B. The "Contextual Whole" of the FTC Act Accords with the Plain Meaning of Section 6(g)

Plaintiffs' answer is that the Court should set aside the plain meaning of the statutory text based on statutory and historical context. They argue that section 6(g)

grants the FTC authority to issue procedural rules to carry out section 5(b) but not substantive rules to carry out section 5(a). However, Plaintiffs provide a selective and misleading account of the statutory and historical context. They have not overcome the presumption of plain meaning, and they have not established ambiguity in the scope of section 6(g).

To be sure, context is essential in statutory interpretation. "[T]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation mark omitted); *Biden v. Nebraska*, 600 U.S. 477, 508, 511–15 (2023) (Barrett, J., concurring). In that important sense, "text *cannot be* divorced from context." *Vitol, Inc. v. United States*, 30 F.4th 248, 250 (5th Cir. 2022) (emphasis added).

But the cherry-picking exercise that Plaintiffs undertake is not assessing context. "Congress's words must be read as part of a contextual whole." *Vitol, Inc*., 30 F.4th at 250; *Vanderstok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023) ("We read the words … in their context and with a view to their place in the *overall statutory scheme*.") (emphasis added) (cleaned up). Context "is a tool for understanding the terms of the law, not an excuse for rewriting them." *Burwell*, 576 U.S. at 501 (Scalia, J., dissenting).

Viewing the statute holistically, the plain-meaning interpretation of section 6(g) accords with the overall statutory scheme and the whole of the statutory text.

Those are the appropriate touchstones when divining congressional intent. *QBE Syndicate 1036 v. Compass Minerals La., Inc.*, 95 F.4th 984, 992 (5th Cir. 2024) ("[W]hat the legislature says in the text of a statute is considered the best evidence of legislative intent."); *see F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 174 (2004) ("If the statute's language reasonably permits an interpretation consistent with [Congress's basic intent], we should adopt it.").

### 1. The FTC Act Was Created to Interdict Harm to Competition in Its Incipiency and to Fill Gaps in the Sherman Act

Congress passed the FTC Act and the Clayton Act within a few months of each other in 1914. Both statutes grew out of public frustration with the first 20 years of Sherman Act enforcement, which had failed to resolve the "trust problem"—a Progressive Era public policy concern about large conglomerate businesses that amassed unprecedented economic and political power during the Industrial Revolution. In 1913, newly elected President Woodrow Wilson used his first address to Congress—and, a month later, a special address to a joint session of Congress—to urge legislation that would "prevent private monopoly more effectually than it has yet been prevented." Keynote Remarks of Commissioner Terrell McSweeny, *The Clayton and FTC Acts: 100 Years of Looking Ahead*, Clayton Act 100th Anniversary Symposium, ABA, Washington, D.C. (Dec. 4, 2014), at 2, *available at* https://perma.cc/HV5J-876Z (quoting State of the Union Address: President Woodrow Wilson, Dec. 2, 1913, *as quoted in* William Kolasky,

*George Rublee and the Origins of the Federal Trade Commission*, 26 Antitrust 1, at 106 (Fall 2011)).

Prevention was President Wilson's buzzword because, in the first two decades after its passage in 1890, one of the Sherman Act's principal shortcomings "was that it was effectively only backward-looking." *Id.* The Sherman Act employs a crime-tort model, which uses imprisonment and fines to punish conduct that has already caused harm or threatens imminent harm. It makes it a felony to restrain trade unreasonably or to monopolize or attempt to monopolize, and it tasks the Justice Department with prosecuting completed violations in federal court. 15 U.S.C. §§ 1, 2, 4. Section 4 of the Clayton Act also gives private plaintiffs a right to recover damages for antitrust injuries caused by Sherman Act violations. 15 U.S.C. § 15.

Consistent with this crime-tort model, the touchstone of a Sherman Act violation is an anticompetitive *effect*. *NCAA v. Alston*, 594 U.S. 69, 96 (2021) ("[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) ("The goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in

the consumer's best interest.") (cleaned up).[3] The hallmark of an anticompetitive effect is its capacity to injure and thereby give rise to a private cause of action. *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) ("Typical anticompetitive effects include increased prices and decreased output" and a private plaintiff's antitrust injury must "reflect the anticompetitive effect.") (cleaned up).

Because the Sherman Act conditions liability and damages on an effect, neither is available unless or until the effect has materialized in fact or will do so imminently. *See, e.g., Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) ("Unfair competition [is] actionable under the Sherman Act only where a defendant with significant market power utilized unfair competition to eliminate or cripple its competitors as organizations, thereby increasing its own market dominance and affecting competition.") (cleaned up); *Spectrum Sports v. McQuillan*, 506 U.S. 447, 459 (1993) (The attempt offense under section 2 of the Sherman Act requires a "dangerous probability of monopolization" and is "not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics."). Without proof of an anticompetitive effect or a dangerous probability of

---

[3] In per se cases, anticompetitive effects are conclusively presumed. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

an anticompetitive effect, unfair conduct does not violate the Sherman Act. *Nynex Corp. v. Discon*, 525 U.S. 128, 137 (1998).

President Wilson and the 63rd Congress attempted to address the Sherman Act's perceived shortcomings by "supplement[ing] and bolster[ing]" the Act. *FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 394 (1953). First, to supplement the Act, they targeted the root causes of anticompetitive effects. They outlawed "methods" of competition that have "tendencies" to produce harmful effects and instructed the FTC "to prevent" such methods before their harmful effects actually materialize in fact. 15 U.S.C. § 45(a); *FTC v. Texaco, Inc.*, 393 U.S. 223, 230 (1968); *see E. I. Du Pont de Nemours & Co. v. FTC* ["*Ethyl*"], 729 F.2d 128, 38 (2d Cir. 1984) ("Section 5 is aimed at conduct, not the result of such conduct.").

This approach is often described as preventing anticompetitive harm in its "incipiency." *Motion Picture Adver.*, 344 U.S. at 394–95 (The FTC was designed "to stop in their incipiency acts and practices which, when full blown, would violate [the Sherman and Clayton Acts].")); *see* Richard M. Steuer, *Incipiency*, 31 Loy. Consumer L. Rev. 155, 171 (2019) (The "important concept behind the incipiency doctrine is its time horizon, which requires courts to assess …

tendencies toward creation of monopoly rather than fully ripened attempts to monopolize or the completed acquisition and exercise of monopoly power.").[4]

Second, Congress and President Wilson bolstered the Sherman Act by addressing conduct that fell between the Sherman Act's cracks—conduct that did cause anticompetitive effects but that did not meet all the other elements of a Sherman Act claim. This approach is often described as addressing conduct that violates the "spirit" or "policy" but not necessarily the letter of the Sherman Act. *Sperry & Hutchinson*, 405 U.S. at 243–44; *see Davis v. HSBC Bank*, 691 F.3d 1152, 1169 (9th Cir. 2012) ("'[U]nfair' means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law . . . .") (internal quotation marks omitted); *Ethyl*, 729 F.2d at 136 (The FTC under section 5 "may bar incipient violations of [the Sherman and Clayton Acts] and conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit.") (citations omitted); *see also FTC v. Brown*

---

[4] Section 7 of the Clayton Act also is an incipiency provision. It provides for pre-consummation merger review based on a merger's *ex ante* tendencies rather than its *ex post* effects. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977) ("Section 7 of the Act proscribes mergers whose effect '*may be* substantially to lessen competition, or to *tend to* create a monopoly.' It is, as we have observed many times, a prophylactic measure, intended primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil.") (emphasis in original) (cleaned up); *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967).

*Shoe Co.*, 384 U.S. 316, 321–22, (1966); *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 369–71 (1965); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 463 (1941); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 453–54 (1922).

### 2. UMC Rulemakings Fit Naturally with the FTC's Incipiency Mandate and the Overall Statutory Scheme

Section 5's incipiency mandate, which tasks the Commission with preventing conduct before any anticompetitive effects and private damages have materialized or are imminent, makes it well suited to rulemakings enforceable through cease-and-desist orders. *See* Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 Duke L. J. 557, 559–560 (1992). Unlike the statutory common law formed through case-by-case adjudication under the Sherman Act, which depends for its content on *ex post* legal and factual assessments of effects, determining the unfairness of a competitive method requires only an *ex ante* factual assessment of the method. *See* FTC Opening Br. 6–7 (discussing case law and policy statements explaining the unfairness standard). As Professor Kaplow explains, "a rule may entail an advance determination of what conduct is permissible, leaving only factual issues for the adjudicator," whereas "[a] standard may entail leaving both specification of what conduct is permissible and factual issues for the adjudicator." Kaplow, 42 Duke L.J. at 560. Whether rules or standards are most suitable and sensible turns on "the distinction between whether the law is given content *ex ante* or *ex post*" and "the extent to which efforts to give

content to the law are undertaken before or after individuals act." *Id*. (emphasis omitted).

Section 5 gives content to the unfairness of competitive methods *ex ante*— before individuals act. An invitation to collude, the "quintessential example" of a section 5 incipiency violation, is illustrative. Stephen Calkins, *Counterpoint: The Legal Foundation of the Commission's Use of Section 5 to Challenge Invitations to Collude is Secure*, Antitrust Spring 2000, at 69; *see also In re McWane, Inc.*, 2012 FTC LEXIS 283, *50–51 (F.T.C. Aug. 9, 2012). The invitation is unlawful before a collusive agreement is ever reached, such that a cease-and-desist order will serve to prevent the anticompetitive effects of illegal Sherman Act collusion from ever materializing in fact.[5]

Critically, an invitation to collude is barred by section 5 if it is uncovered before the invitation has been answered, and it is also barred even if the invitation has been rejected. *See*, *e.g.*, *In re Valassis Commc'ns*, 2006 FTC LEXIS 126, *7 n.5, 141 F.T.C. 247 (March 7, 2006) (collecting cases); *In re Step N Grip, LLC*,

---

[5] As Professor Calkins notes, an invitation to collude can also be a "spirit" or "policy" violation in addition to an incipiency violation, because the invitation itself may cause actual anticompetitive effects. Calkins, Antitrust Spring 2000, at 69. Section 1 of the Sherman Act requires a contract, combination or conspiracy, but attempted collusion sometimes helps facilitate oligopolistic coordination without an agreement, causing the same anticompetitive effects that collusion causes. *In re Valassis Commc'ns*, 2006 FTC LEXIS 126, *8, 141 F.T.C. 247 (March 7, 2006).

2015 FTC LEXIS 259, *3 (Oct. 27, 2015) (reporting invitation to authorities); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1419 (2024). Thus, it makes no difference whether any given invitation to collude will ever actually lead to collusion or anticompetitive effects. Because section 5's incipiency mandate focuses on conduct and tendencies rather than effects, the FTC may issue a cease-and-desist order regardless.

The FTC has pursued invitations to collude through case-by-case adjudication, but it easily could have (and arguably should have) issued a rule barring them. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 292 (1974) (Powell, J.) ("The function of filling in the interstices of the [Securities] Act" should be performed, as much as possible, through this quasi-legislative promulgation of rules") (alteration in original) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). What has emerged from case-by-case adjudication is functionally indistinguishable from a rule—it is a common law bar on invitations to collude. The only question presented to the Commission in invitation-to-collude cases is a factual one—whether the defendant in fact offered to enter a collusive agreement.

Because the FTC Act clearly grants the FTC substantive authority to bar incipient anticompetitive conduct in adjudicative proceedings, what is at stake in this case is simply an alternative mechanism for imposing the same bar. *See, e.g.,*

*Ethyl*, 729 F.2d at 136 (FTC "may bar incipient violations"); *accord FTC v. Qualcomm Inc.*, 411 F. Supp. 3d 658, 680 (N.D. Cal. May 21, 2019), *rev'd on other grounds*, 969 F.3d 974 (2020) ("may bar"); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 903 (E.D. Pa. 2012) ("may bar"); *see also FTC v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934) (unfair methods may be "banned").

Substantive rulemaking authority under section 6(g) thus is not a "claim to extravagant statutory power." *Biden v. Nebraska*, 600 U.S. at 516 (Barrett, J., concurring) (internal quotation marks omitted). It is a claim that the statute permits the FTC to achieve by APA rule what it will otherwise achieve in case-by-case adjudication, mindful that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Bell Aerospace*, 416 U.S. at 293 (quoting *Chenery Corp.*, 332 U.S. at 203); *see also id.* at 290, n.21 (quoting NLRA substantive rulemaking provision, which uses substantially the same "rules and regulations" language as section 6(g)). That Congress would have wanted the FTC, where appropriate, to consider barring incipient anticompetitive conduct through rulemakings rather than case-by-case adjudication is not only unremarkable but sensible. *Id.* at 293 ("An administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the

exclusion of the other is to exalt form over necessity.") (cleaned up; emphasis omitted; quotation omitted).

Given the complexity of market competition, there will be plenty of instances where "the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule," or "the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." *Id.* But in appropriate circumstances, APA rulemakings can and should be used to achieve the same results as common law unfairness rules because they offer marked efficiencies in administration. *See* FTC Opening Br. 30–31 (noting that rulemaking allowed FTC to address questions and evaluate relevant evidence on a class-wide basis, resolve issues of general applicability, weigh substantial public input, provide clear notice to parties, and ensure even-handed application); *see also* Marina L. Lao, *Competition Rulemaking: The Case for Boldness* 1-29, in Rulemaking Authority of the US Federal Trade Commission (Daniel A. Crane, ed., 2022).

The Noncompete Clause Rule ("the Rule") is a case in point. The FTC reviewed economic studies released over the last eighteen years, examining the competitive effects of non-compete clauses in employment contracts ("noncompetes"). Based on those studies, it found that noncompetes tend to

undermine the competitive process in both labor and product markets. It then issued a detailed rulemaking defining most noncompetes as an unfair method of competition, meaning they can be stopped using a cease-and-desist order in an administrative proceeding before they cause anticompetitive effects and private damages. Consistent with Congress's intent as reflected in the text as a whole, the Rule is focused on preventing conduct with anticompetitive tendencies before its anticompetitive effects materialize.

Noncompetes are well suited to rulemaking because the FTC found that they have anticompetitive tendencies in the aggregate even if each individual noncompete does not always tend toward anticompetitive effects in isolation. 89 Fed. Reg. at 38,379–80. Without a rulemaking, neither the FTC's findings nor its declaration that noncompetes are UMCs will change. The only consequence will be inefficiency. The agency's bar on noncompetes will emerge piecemeal as a common law rule, with its voluminous evidence of aggregate effects having to be reintroduced in individual actions. *Cf. Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 155 (1982) ("Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class," because it "saves the resources of both the courts and the parties by permitting an issue potentially

affecting every class member to be litigated in an economical fashion.") (cleaned up).

### 3. The District Court's Holding and the Plaintiffs' Arguments Are Belied by the Contextual Whole of the FTC Act

Plaintiffs' arguments contravene Congress's basic intent as reflected in the enacted text and the overall statutory scheme. The district court erred in crediting them. Plaintiffs did not meet their burden to defeat the presumption that Congress meant what it said in section 6(g).

Plaintiffs' weakest effort to manufacture ambiguity in the plain text of section 6(g) is their suggestion that Congress would not have granted substantive rulemaking authority without providing a remedy for rule violations.[6] The argument is baffling because, as the FTC points out, the Act provides a statutory remedy for section 5(a) violations, namely a cease-and-desist order pursuant to section 5(b). Appellant's Opening Br. 32. The absence of a distinct, discrete remedy for rules violations might seem meaningful if section 6(g) were untethered to other provisions of the FTC Act, but section 6(g) grants rulemaking authority "for the purpose of carrying out" section 5. 15 U.S.C. § 46(g). It goes without

---

[6] In so arguing, Plaintiffs are implicitly asking the Court to adopt a new strong-form canon, which is at odds with honest textualism. Appellant's Opening Br. 31–32.

saying that the remedy for rules violations is the remedy for section 5 violations because the rules carry out section 5.

Contrary to Plaintiffs' claims, the penalty provisions of the FTC Act affirmatively support rulemaking authority. Considered holistically, they confirm that unfairness is an *ex ante* determination, consistent with the FTC Act's unique incipiency mandate. The provisions all contemplate conduct that has not yet caused actual anticompetitive effects, which suggests they are susceptible and well suited to rulemaking. *See, e.g.,* 15 U.S.C. § 45(b) (providing for a preventative cease-and-desist order); 15 US.C. § 53(b) (providing for a temporary restraining order or preliminary injunction when a defendant "is violating or is about to violate" a competition law); *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67, 76 (2021) ("Taken as a whole, the provision focuses upon relief that is prospective, not retrospective.").

Moreover, the FTC Act does not provide for a private right of action or any other monetary relief, whereas Sherman Act violations are heavily deterred by stringent penalties, including not only treble damages but, in some instances, prison sentences and criminal fines.[7] That Congress created such starkly discordant remedial regimes only helps clarify that the former was designed with preventative

---

[7] The Commission may impose monetary penalties when a defendant violates a cease-and-desist order, but not before. *See AMG Capital Mgmt.*, 593 U.S. at 77 (discussing sections 5(l) and 19 of the FTC Act).

remedies for *ex ante* conduct and the latter was designed with punitive remedies for *ex post* effects. It thus makes perfect sense that the penalty for violating an FTC Act rule would be a preventative cease-and-desist order—the same penalty available in adjudicative proceedings. What would be strange is if the FTC Act had what plaintiffs say it should: punitive, Sherman-Act-like penalty provisions for rules violations and only preventative cease-and-desist relief for adjudicative proceedings (that lead ultimately to common law rules). Plaintiffs' argument is thus exactly backwards.

Plaintiffs' claim that section 6(g) confers authority to issue only procedural rules is similarly infirm. They offer no explanation as to why Congress left scope-limiting adjectives out of the phrase "make rules and regulations," and why it left long-established—and already long-since exercised—UMC rulemaking authority out of the 57a(a)(2) exception. Indeed, Congress not only failed to omit UMC rulemaking authority from the 57a(a)(2) exception but affirmatively added a savings clause. Why? To preserve "housekeeping" rules that Congress defined as having "an annual effect on the national economy of $100,000,000 or more," causing "a substantial change in the cost or price of goods or services," or having "a significant impact upon" persons and consumers? 89 Fed. Reg. at 38,351; FTC Opening Br. 28. It is not plausible that Congress would have described non-substantive rules covered by the savings clause that way.

Plaintiffs also argue that procedural amendments to UDAP rulemakings in 1975 and 1980 suggest section 6(g) does not confer substantive UMC rulemaking authority, but they badly misread the context. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975); Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, §§ 7-12, 15, 21, 94 Stat. 374, 376-80, 388-90, 393-96 (1980). The amendments introduced onerous new procedural hurdles based on a perception that the FTC had grown overzealous in its UDAP rulemakings during that time, but they were just that: procedural hurdles. *See* Kurt Walters, *Reassessing the Mythology of Magnuson-Moss: A Call to Revive Section 18 Rulemaking at the FTC*, 16 Harv. L. & Pol'y Rev. 519, 531–32 (2022) (noting that Congress stepped in "to slow the agency's rate of regulation" after it had embarked on "perhaps the most expansive suite of rulemakings ever pursued at once by a single agency"). None of the amendments in any way limited the FTC's substantive rulemaking authority; they reaffirmed it. Congress expressly reauthorized the FTC's substantive authority to define UDAPs in section 57a(d)(3) ("When any rule … takes effect a subsequent violation thereof shall constitute an unfair or deceptive act or practice in violation of section 45(a)(1) of this title."), and it preserved the FTC's existing substantive authority to define UMCs in the 57a(a)(2) savings clause.

Plaintiffs' counterintuitive argument that Congress used a savings clause in Magnuson-Moss to alter the status quo for UMC rulemakings is implausible. When Magnuson-Moss was enacted, nobody could describe the FTC as having been overzealous in its substantive UMC rulemakings under section 6(g). It had been exceedingly judicious. Of the 23 substantive rules the FTC enacted using 6(g) authority from 1963 to 1974—the year before the Magnuson-Moss amendments— the FTC relied jointly on its combined UDAP and UMC authority for 18 rules and on its UDAP authority alone for four rules. 89 Fed. Reg. at 38,349–50. The lone remaining rule was a Clayton Act rule; the FTC did not rely exclusively on UMC authority for a single rule. *Id*. It is therefore unsurprising that Magnuson-Moss included a savings clause preserving the status quo for the FTC's firmly-established but very cautiously deployed substantive UMC rulemaking authority under section 6(g).

The burden is on Plaintiffs to explain how the court can overlook the presence of both the savings clause and the prior-established use of 6(g) authority in 20 substantive UMC rules between 1963–1978. They offer nothing that would overcome the presumption of plain meaning to establish ambiguity in the plain text of section 6(g).

## II.    THE RULE SATISFIES THE APA'S ARBITRARY-AND-CAPRICIOUS STANDARD

The question remains whether the Noncompete Rule itself is lawful. The APA directs courts to "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U. S.C. § 706(2)(A). In *Loper Bright*, the Supreme Court overturned *Chevron* and held that the APA "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). At the same time, it recognized that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id*. at 2263. "[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," while "[o]thers empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id*. (internal quotation marks and citations omitted). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id*. (alterations adopted) (internal quotation marks and citations omitted).

As explained in Part I, the plain and ordinary reading of the Act is the best reading because it supports the Act's "basic intent," *Empagran*, 542 U.S. at 174, consistent with the contextual whole of the enacted statutory text. The Rule fits within the boundaries of the Agency's section 5 authority because it addresses anticompetitive conduct in its incipiency, before it causes actual anticompetitive effects. What remains, then, is to ensure that the Agency "has engaged in reasoned decisionmaking" within the boundaries set forth in the Act. *Loper Bright*, 144 S. Ct. at 2263 (internal quotation marks omitted); *see also Texas v. United States EPA*, 91 F.4th 280, 291 (5th Cir. 2024) ("[A]n agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (internal quotation marks omitted).

The analysis is not a rigorous one. Although *Loper Bright* represents a watershed change, it does not alter the deference courts give to the agency's discretionary decisionmaking within the bounds of its statutory authority. *See, e.g.*, *Tex. Med. Ass'n v. United States HHS*, 120 F.4th 494, 503–07 (5th Cir. Oct. 30, 2024) (discussing *Loper Bright* and reversing district court opinion finding HHS billing regulation to be arbitrary and capricious). Since *Loper Bright*, this Court has recognized that "judicial review under [the reasoned-decisionmaking] standard is deferential, and a court may not substitute its own policy judgment for that of the

agency." *Id.* at 504 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423,

(2021)). "A court simply ensures that the agency has acted within a zone of

reasonableness and, in particular, has reasonably considered the relevant issues and

reasonably explained the decision." *Id.* (quoting *Prometheus Radio*, 592 U.S. at

423). "So long as the agency's reasons and policy choices conform to minimal

standards of rationality, then its actions are reasonable and must be upheld." *Baylor*

*Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 264 (5th Cir. 2017) (internal quotation

marks omitted).

The Rule makes clear that the Agency "examine[d] the relevant data." *Texas*

*v.* EPA, 91 F.4th at 291. It reviewed forty-eight economic studies and made rational

and evidence-based findings based on that review. In labor markets, the Agency

found that noncompetes tend to decrease labor mobility and prevent firms from

competing for workers' services, creating frictions that inhibit the formation of

optimal and efficient matches, which diminishes productivity and distorts wages.

89 Fed. Reg. at 38,379–84. In product and services markets, it found that

noncompetes tend to raise barriers to new business formation and entrepreneurship,

distort access to labor, and thwart product innovation by artificially limiting the

spread and recombination of novel ideas through employee mobility. *Id.* at 38,388–

91, 38,394–95. Based on these findings, the Agency concluded that noncompetes

tend to undermine the competitive process in both labor and product markets. *Id.* at

38,379–421; *see* FTC Opening Br. 39–41. This conclusion is evidence-based and not unreasonable.

The Agency also "reasonably considered the relevant issues." *Tex. Med. Ass'n*, 120 F.4th at 504. The Rule addresses employers' reliance costs and the legitimate business justifications for noncompetes, including that they reduce turnover, help protect trade secrets, and promote investments in employee training. 89 Fed. Reg. at 38,403; 38,412; 38,421–24; 38,462; 38,465; FTC Opening Br. 41, 45–46. It explains the agency's conclusion that employers can reasonably achieve those goals through less restrictive alternatives and that, to the extent noncompetes are more effective than those alternatives, their residual benefits are outweighed by the harm they tend to cause to competition. 89 Fed. Reg. at 38,424–34; FTC Opening Br. 44–45. *See Motion Picture Adver.*, 344 U.S. at 396, ("The precise impact of a particular practice on the trade is for the Commission, not the courts, to determine.").

Finally, there is a "rational connection between the facts found and the choice made." *Texas v*. EPA, 91 F.4th at 291. The Agency considered every alternative to an outright ban on noncompetes—including the "no-action" alternative—and provided reasonable explanations for its policy choices. 89 Fed. Reg. at 38,447–466; FTC Opening Br. 44–45. The Agency explained, based on evidence, that noncompetes have *in terrorem* effects which keep workers bound by

them even when they are not enforceable in court, meaning that adjudication is unlikely to address their tendency to harm competition. 89 Fed. Reg. at 38,372; 38,381; 38,458; 38,463–64. The Agency also considered and rejected disclosure and reporting requirements and restrictions limited to certain industries, income levels, job titles, duration, and geographic reach, explaining that none of these variables can satisfactorily ameliorate the competitive harm noncompetes tend to cause in relation to their claimed justifications. 89 Fed. Reg. at 38,459–62; *see* FTC Opening. Br. 44–45. Lastly, the Agency explained how state regulation has proven insufficient: although four states have banned noncompetes outright and 33 (plus Washington, D.C.) have limited their use, choice-of-law rules mean that many workers remain subject to noncompetes that would be void under their home state's laws. 89 Fed. Reg. at 38,465–66. And the competitive effects of noncompetes spill across state lines such that noncompetes in one state harm workers and consumers in others. *Id.*; *see* FTC Opening Br. 40–41. Each of these "reasons and policy choices conform to minimal standards of rationality." *Baylor Cnty. Hospital Dist.*, 850 F.3d at 264.

## CONCLUSION

By declaring noncompetes to be unfair methods of competition in a rulemaking under section 6(g), the Agency complied with the plain text of the FTC Act and with its basic purpose of preventing harm to competition in its incipiency. Although some may disagree with the policy choices the Agency made, it is not the role of the court to "substitute its own policy judgment for that of the agency." *Tex. Med. Ass'n*, 120 F.4th at 504. The Rule demonstrates that the Agency examined the relevant data, reasonably considered the relevant issues, and made policy choices which conform to minimal standards of rationality. The law requires no more. The opinion of the district court should be reversed.

Respectfully submitted,

/s/ David O. Fisher
DAVID O. FISHER
SENIOR COUNSEL
 *Counsel of Record*
RANDY M. STUTZ
PRESIDENT
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 905-5420

Dated: January 9, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that the foregoing brief complies with the volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,459 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and that it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14 point Times New Roman type.


s/ David O. Fisher

Dated: January 9, 2025

**CERTIFICATE OF SERVICE**

I certify that on January 9, 2025, I served the foregoing brief through the Court's ECF system on counsel for all parties required to be served on January 9, 2025.


<u>s/ David O. Fisher</u>

Dated: January 9, 2025