No. 24-10951

# In the United States Court of Appeals for the Fifth Circuit

RYAN, L.L.C.,

*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS; LONGVIEW
CHAMBER OF COMMERCE,

*Intervenor Plaintiffs-Appellees,*

v.

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

On appeal from the United States District Court
for the Northern District of Texas

**BRIEF OF PROFESSOR EVAN STARR AS *AMICUS CURIAE*
IN SUPPORT OF APPELLANT**

Brendan Benedict
BENEDICT LAW GROUP PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for Amicus Curiae*

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES**

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following additional persons and entities have an interest in this amicus brief:

**Amicus Curiae**: Evan Starr

**Counsel for Amicus Curiae**: Brendan Benedict and Michael Altebrando of Benedict Law Group PLLC

*/s/ Brendan Benedict*
Brendan Benedict
BENEDICT LAW GROUP PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022
(212) 287-9501
*brendan@benedictlawgroup.com*

*Counsel for Amicus Curiae*

January 9, 2025

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ............................ i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

SUMMARY OF ARGUMENT .................................................................. 2

ARGUMENT ........................................................................................ 2

   I.  The District Court's Arbitrary and Capricious Review Erred. ........................ 2

      A. The Rule Cites 48 Papers Studying the Effects of Noncompetes. ............. 3

      B. It Was Reasonable to Extrapolate from Existing Studies. ......................... 4

      C. The Commission Properly Weighed Correlation Less Than Causation. ..... 7

      D. There Is Support in the Economics Literature for Complete Bans. ........... 8

  II.  Claims By *Amici* Supporting Appellees Below Contradict the Empirical Literature. ........................................................................................ 9

      A. Low-Wage Workers Are Routinely Subject to Noncompetes. ................... 9

      B. Noncompetes Lower Wages. .................................................................. 12

      C. Noncompetes Limit Entry and Stifle Innovation. .................................... 15

      D. Empirical Evidence Shows Coercion. ..................................................... 19

      E. Noncompetes Harm Consumers. ............................................................ 21

CONCLUSION .................................................................................... 23

APPENDIX ...................................................................................... 1A

# TABLE OF AUTHORITIES

**Regulations**

FTC Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024).. . 1, 3, 4, 5, 6, 7, 8, 9, 10, 14, 15, 16, 17

**Articles, Reports, and Working Papers**

Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees*, 45(12) Strat. Mgmt. J. 2519-2547 (May 20, 2024), https://onlinelibrary.wiley.com/doi/epdf/10.1002/smj.3634 .................... 3, 10, 12

Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349 (2022) 4, …………………….. ............................................................................................14

Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, Sept. 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191 ............................8

Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. of Fin. 2409-45 (2021) ..23

Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements* (Dec. 10, 2019), *available at*: https://files.epi.org/pdf/179414.pdf..10

Bo Cowgill, Brandon Freiberg, & Evan Starr, *Clause and Effect: Theory and Field Experimental Evidence on Noncompete Clauses* (Nov. 7, 2024), *available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5012370 ................... 19, 21

Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev. Econ. & Statistics 472 (2006) ..............................14

GAO, *Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility, and May Affect Wages* (May 2023), *available at* https://www.gao.gov/assets/gao-23-103785.pdf .................................................10

Brad N. Greenwood, Bruce Kobayashi, & Evan Starr, *Can You Keep A Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* (Mar. 24, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171 .... 4, 15, 18

Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021) ............................................................22

Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach*, Rev. of Econ. & Stats. (forthcoming, May 2024 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674 ..................... 6, 15

Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1-44 (2024).............. 17, 22

Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Nat'l Bureau of Econ. Research, Working Paper No. 31929, Dec. 2023) ...................................................... 5, 6, 15

Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation, Inventor Mobility, and the Enforceability of Noncompete Agreements* (Nat'l Bureau of Econ Research, Working Paper No. 31487, Dec. 2024 ed.), *available at* https://www.nber.org/system/files/working_papers/w31487/w31487.pdf...........16

Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From A Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663-85 (2020)......................................................................22

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022) ...............................4, 11, 14

Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers*, 16(4) Am. Econ. J. Microecon. 112-53 (2024) ...............................22

Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Socio. Rev. 695 (2011) ...................................20

Clemens Mueller, *How Reduced Labor Mobility Can Lead to Inefficient Reallocation of Human Capital* (working paper, Apr. 2022) *available at*: https://conference.iza.org/conference_files/LaborMarkets_2022/mueller_c32517.pdf...................................................................................................17

Kate Reinmuth & Emma Rockall, *Innovation Through Inventor Mobility: Evidence from Non-Compete Agreements* (working paper, Dec. 22, 2024 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683 ..........................16

Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997*, Bureau Lab. Statistics (June 2022), *available at*: https://www.bls.gov/opub/mlr/2022/article/noncompete-agreements-bargaining-and-wages-evidence-from-the-national-longitudinal-survey-of-youth-1997.htm 3, ……………………………………………………………………………..21

Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 Econometrica 425 (2023).....................................................................................................8

Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J. L. & Econ. 53 (2021)............................... 3, 7, 13, 20, 21

Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019) .................................................... 4, 14

Evan Starr, Econ. Innovation Grp., *Noncompete Clauses: A Policymaker's Guide Through the Key Questions and Evidence* (Oct. 31, 2023), *available at*: https://eig.org/wp-content/uploads/2023/10/Noncompete-Clauses-A-Policymakers-Guide.pdf .................................................................................10, 11

Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30(5) Organization Science 961-80 (2019) .........................................................15

Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552 (2018) ............................................17

Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence from A Natural Experiment*, 36 Strategic Mgmt. J. 686 (2015)......................................................................22

**Other Authorities**

Suzanne Lucas, *Warning: Your Internship May Come with A Non-Compete Agreement*, Inc. (July 5, 2019), *available at* https://www.inc.com/suzanne-lucas/warning-your-internship-may-come-with-a-non-compete-agreement.html ....................................................................................................................11

Small Business Majority, *Small Business Owners Support Banning Non-Compete Agreements* (Apr. 13, 2023), *available at*: https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf .......................................................................18

Kadhim Shubber, *Cushman v the Cleaner: The Fight Over Non-Competes*, Financial Times (Oct. 16, 2018), *available at* https://www.ft.com/content/bfb69d30-ce44-11e8-b276-b9069bde0956 .............11

Dissenting Statement of Comm'r Christine S. Wilson in re Notice of Proposed Rulemaking for the Non-Compete Clause Rule, 2023 FTC LEXIS 2 (Jan. 5, 2023) .................................................................................................................21

Spencer Woodman, *Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes*, The Verge (Mar. 26, 2015 11:44 am EDT), https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts. ......................................................................11

# INTEREST OF *AMICUS CURIAE*[1]

Evan Starr is an economist and Associate Professor of Management and Organization at the University of Maryland's Robert M. Smith School of Business.[2] He has studied noncompetes and related labor restraints for over a decade. Across more than a dozen published studies in leading economics and management journals, and several recent working papers, his research examines the use of noncompetes and other restrictive covenants, the contracting process, the effects of noncompetes and state noncompete laws, and litigation behavior related to restrictive covenants and trade secrets. He has helped develop and deploy at least five surveys of restrictive covenants, including of employees, employers, and employment attorneys, and he has worked with the Bureau of Labor Statistics to add a question on noncompetes to their long-running panel survey, the National Longitudinal Survey of Youth.

The FTC's Final Noncompete Rule names Professor Starr 115 times and cites 12 of his published or working papers. *See generally* FTC Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Rule"). Professor Starr

---

[1] All parties consented to the timely filing of this brief. No counsel for any party authored this brief in whole or part, and no person apart from Professor Starr or his counsel contributed money intended to fund the brief's preparation and submission.

[2] Professor Starr's views do not, here or otherwise, necessarily represent the views of the University of Maryland.

submitted comments to the FTC about the proposed rulemaking and joined an *amicus* brief below, *see* ROA.36, ECF No. 138. Both advocates and adversaries of the Rule cite Professor Starr's work, as do other *amici* here. He therefore has an interest in ensuring that his own work is understood and accurately represented.

## SUMMARY OF ARGUMENT

The district court's arbitrary and capricious review was unsound. In this brief, Professor Starr summarizes four categories of errors the district court made in considering the economic record before the FTC. *See* Part I. Then he rebuts five arguments advanced by the *amici* that joined the National Retail Federation ("NRF") brief below, which the economic literature casts doubt on. *See* Part II. The FTC's evaluation of the economic evidence followed the scientific standards of the field. The district court's discussion of the evidence before the FTC did not. While Professor Starr takes no position on whether the Rule was within the scope of the Commission's rulemaking authority, if the Court does reach the district court's arbitrary and capricious analysis, it should reverse.

## ARGUMENT

### I.    The District Court's Arbitrary and Capricious Review Erred.

The district court's arbitrary and capricious analysis reached the wrong conclusion by glossing over the economics literature that the Rule relied on. Its reasoning involved four categories of errors.

2

**A.      The Rule Cites 48 Papers Studying the Effects of Noncompetes.**

*First*, the district court's legal conclusion that the "record does not support the Rule" was based on its faulty count that the "Commission relied on *a handful* of studies that examined the economic effects of various state policies toward noncompetes." ROA.5635 (emphasis added). The Rule itself refutes that: it shows in footnotes that the Commission considered, as shown in the Appendix to this brief, *48* articles, reports, or working papers that examined the use and economic effects of noncompetes or various state policies towards them. Far from blindly citing these studies, the FTC used "five principles" to assess their credibility and weigh them. *Id.* at 38,372. For instance, and as explained further below, the Commission found studies associating non-compete use with earnings—including several that Professor Starr co-authored[3]—"less credible" than before-and-after studies with a control group, and so gave the former "minimal weight." *Id.* at 38,383.

---

[3] *See, e.g.*, Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees*, 45(12) Strat. Mgmt. J. 2519-2547 (May 20, 2024), https://onlinelibrary.wiley.com/doi/epdf/10.1002/smj.3634; Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997*, Bureau Lab. Statistics (June 2022), *available at*: https://www.bls.gov/opub/mlr/2022/article/noncompete-agreements-bargaining-and-wages-evidence-from-the-national-longitudinal-survey-of-youth-1997.htm; Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J. L. & Econ. 53 (2021).

**B. It Was Reasonable to Extrapolate from Existing Studies.**

*Second*, after undercounting the literature that formed the rulemaking record, the district court discounted it further because, in its view, "no state has enacted a non-compete rule as broad as the FTC's Rule", leaving *all* studies of state policy "completely inapposite". ROA.5635. But that mischaracterizes the literature the Rule relied on. Studies examined in the empirical literature and by the FTC have focused on near-complete bans on noncompetes (as in California, Minnesota, Oklahoma, and North Dakota, *see* 89 FR 38,465), as well as bans among different categories of workers. Indeed, studies of long-standing near-total noncompete bans, low-wage bans, high-wage bans, and high-tech bans all yield similar results.[4] As for wage gains, while the magnitude varies by industry, "the effects are

---

[4] *See* 89 FR at 38,381 n.451 (citing Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022) (high tech)); 89 FR at 38,346 n.72 (citing Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022) (low-wage)); Brad N. Greenwood, Bruce Kobayashi, & Evan Starr, *Can You Keep A Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* 2 (Mar. 24, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171 (considering low-wage and high-wage bans and their effect on wages, mobility, and trade secret litigation); 89 FR at 38,381 n.455 (citing Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019) (longstanding near-complete bans)).

directionally and qualitatively similar across groups"—wages go up without noncompetes. 89 FR at 38,385.

Other studies support extrapolation from more modest changes in noncompete enforceability to complete bans. *See* Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2 (Nat'l Bureau of Econ. Research, Working Paper No. 31929, Dec. 2023). The Commission cited that paper's finding "that the effects of changes in non-compete enforceability are broadly linear", such that "the effect of a change in enforceability twice the size of another change results in a change in workers' earnings that is approximately twice as large." 89 FR at 38,385. In other words, if incremental or context-specific changes in noncompete enforceability yielded positive wage gains, broader changes would mean greater gains. With that insight from the literature in mind, it was reasonable to infer from studies of more limited changes to noncompetes that "larger changes" in the form of a complete ban "will lead to larger effects." *Id.* And at least one study cited by the Commission (also co-authored by Professor Starr) considered a State with an arguably broader and more aggressive ban. That study looked at Washington, which banned noncompetes retroactively for workers earning less than $100,000 annually and gave employees the right to seek damages from employers who break the rules. *See* 89 FR at

38,386 & n.502.[5] While Washington's prohibition does not cover all employees (as in some other States), this policy is retroactive like the FTC's but broader in that it gives workers the right to seek damages.

The district court also did not consider that variance across studies may have *underestimated* wage gains from noncompete bans. The district court was not on guard for "attenuation bias" like the FTC was in recognizing that workers not covered by partial noncompete bans but whose wages are recorded in studies would depress observed wage gains. 89 FR at 38,386. The district court made no mention of the Rule's finding from the empirical literature that even workers in States that make no changes to their noncompete policies see their wages increase if neighboring States limit noncompetes. *See* 89 FR at 38,476.[6] And while the district court made much of the differences between enforcement regimes, it did not consider how aggregating data, like measuring wage effects across multiple States, minimizes false positives from "an idiosyncratic factor unique to a particular State." 89 FR at 38,373. In short, the district court weighed every

---

[5] Citing Takuya Hiraiwa, Michael Lipsitz & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach*, Rev. of Econ. & Stats. 4 (forthcoming, May 2024 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674.

[6] Citing Johnson, Lavetti, & Lipsitz, *Labor Market Effects*, *supra* p.5.

limitation of the literature against the Rule, even though the balance of the literature pointed the other way.

### C. The Commission Properly Weighed Correlation Less Than Causation.

*Third*, while ignoring most of the literature that the Commission did rely on, the district court claimed that the FTC did not "consider the positive benefits" of noncompetes and "disregard[ed] the substantial body of evidence supporting these agreements." ROA.5635. That is doubly wrong. To start, the district court did not highlight any evidence or benefits from noncompetes that the FTC should have considered but failed to. And in any event, the FTC *did* consider studies showing potential benefits, including several that Professor Starr co-authored. *See, e.g.*, 89 FR at 38,430 & n.814 (citing Starr, Prescott, & Bishara, *U.S. Labor Force*, *supra* n.3 at 53). But the FTC rightly minimized the value of these benefits because the results of that study (and others) were *correlational*. *See* 89 FR at 38,430 ("In response, the Commission notes that the evidence is a correlation between early notice [of non-competes] and training, not a causal finding, so the Commission gives it minimal weight."). This follows the scientific norms of the field because, as explained further below, correlational results may not reveal anything about the causal effect of noncompetes and may in fact indicate the wrong relationship. This is especially true of the literature on noncompetes and earnings, where

correlational studies tend to find positive effects but causal studies find negative ones. See *Infra* Part II.B.

**D.     There Is Support in the Economics Literature for Complete Bans.**

*Fourth*, with the above mistakes in mind, the district court wrongly concluded that the Commission lacked evidence supporting "such a sweeping prohibition . . . instead of targeting specific, harmful non-competes". ROA.5635. While there is certainly disagreement among economists about any optimal policy, the FTC reviewed a vast amount of empirical evidence of how noncompetes affect the competitive conditions of labor and product markets. Not only does the evidence suggest that noncompetes lower wages and job mobility, it also shows how they negatively affect product markets by reducing new entry and innovation. Indeed, several empirical studies reviewed by the FTC do conclude that banning noncompetes—even for executives—is the optimal policy because the harms from the agreements outweigh the countervailing benefits. As one study of executives put it, "'imposing a complete ban on noncompete clauses would be close to implementing the social optimum.'" 89 FR at 38,408 (quoting Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 Econometrica 425, 427 (2023)).[7]

_____

[7] *See also* Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* 42 (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, Sept. 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191 ("On net, however, the positive effect dominates, and it is both growth- and

## II. Claims By *Amici* Supporting Appellees Below Contradict the Empirical Literature.

In the district court, the NRF-led *amici* raised several criticisms of the Rule without support in the economic literature. Although academic literature on a given research question always faces challenges and gaps—and the literature on noncompete clauses is no different—some studies deserve more weight than others. The balance of empirical evidence refutes the five points the retailer *amici* made below about the Rule. *Contra* ROA.27, ECF No. 53 §§ IV.A.1-5.

### A. Low-Wage Workers Are Routinely Subject to Noncompetes.

The NRF *amici* claimed below that the FTC had "no empirical evidence that the use of noncompetes with low wage workers is the norm, only anecdotes." *Id.* at 6. That is not correct. And all that *amici* cited for their proposition that "low wage workers are almost never subject to noncompetes" was their "collective experience" (*id.*)—anecdote without citation to evidence.

The empirical literature on the use of noncompetes is reviewed in detail in Part I.B.2 of the Rule. This evidence comes from several large surveys of employers and employees and several surveys of specific occupations. To summarize this evidence briefly: A 2017 national survey of 634 private-sector

---

welfare-enhancing to abolish non-compete enforcement."); 89 FR at 38,390 (discussing Baslandze (2022) and giving the study "somewhat less weight than" shorter-term before-and-after studies).

businesses found that 31.8% of private-sector respondents reported using

noncompetes for all employees, including 29.0% of businesses with an average

hourly wage of less than $13 per hour.[8] A different 2017 survey, co-authored by

Professor Starr, polled 1,500 businesses and found that 29.5% used noncompetes

for all employees, while 66.5% used them for some employees.[9]

And there is more outside the record. A 2023 U.S. Government

Accountability Office survey of employers in the Society of Human Resources

database found that, among responding employers that use noncompetes and

employ hourly workers, 55.3% of employers used noncompetes with all hourly

workers.[10] These surveys reveal a troubling reality: noncompetes are often not

tailored to specific roles, seniority, or compensation. They are applied against

---

[8] *See* 89 FR at 38,347 & n.93 (citing Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements* 13 (Dec. 10, 2019), *available at*: https://files.epi.org/pdf/179414.pdf); *see also* Colvin & Shierholz, *supra*, at 4, 7, 10 & Table 7.

[9] Evan Starr, Econ. Innovation Grp., *Noncompete Clauses: A Policymaker's Guide Through the Key Questions and Evidence* 3-4 (Oct. 31, 2023), *available at*: https://eig.org/wp-content/uploads/2023/10/Noncompete-Clauses-A-Policymakers-Guide.pdf (citing Balasubramanian, Starr & Yamaguchi, *Resource Transferability*, *supra* n.3); *see also* 89 FR at 38,346 & n.74 (citing *Resource Transferability*, *supra* n.3).

[10] GAO, *Noncompete Agreements: Use Is Widespread to Protect Business' Stated Interests, Restricts Job Mobility, and May Affect Wages* 8, Table 2 (May 2023), *available at* https://www.gao.gov/assets/gao-23-103785.pdf.

janitors,[11] unpaid interns,[12] temporary Amazon packers,[13] and volunteers at nonprofits.[14] What is more, a 2014 nationally representative survey found that the typical worker with a noncompete was paid hourly, making $14 per hour at the median.[15]

The NRF *amici* also argued that survey evidence on the use of noncompetes is inaccurate because respondents may not understand whether their agreements contain noncompete clauses, leading to false positives. *See* ROA.27, ECF No. 53 at 20. But researchers understand these concerns and have designed survey questions and answers to account for this by describing what each restrictive covenant does, distinguishing each covenant from other restrictions by asking about them

---

[11] Kadhim Shubber, *Cushman v the Cleaner: The Fight Over Non-Competes*, Financial Times (Oct. 16, 2018), *available at* https://www.ft.com/content/bfb69d30-ce44-11e8-b276-b9069bde0956.

[12] Suzanne Lucas, *Warning: Your Internship May Come with A Non-Compete Agreement*, Inc. (July 5, 2019), *available at* https://www.inc.com/suzanne-lucas/warning-your-internship-may-come-with-a-non-compete-agreement.html.

[13] Spencer Woodman, *Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes*, The Verge (Mar. 26, 2015 11:44 am EDT), https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts.

[14] Starr, *A Policymaker's Guide*, *supra* n.9, at 3 & n.5 (citing the online volunteer application form for Girls on the Run International).

[15] *See generally* Lipsitz & Starr, *Low-Wage Workers*, *supra* n.4 at 143.

simultaneously, and capturing uncertainty in the answer choices. As an example, the 2017 survey discussed in Balasubramanian et al. has intermediate responses from a drop-down menu for the respondent to mark "I'm not sure."[16] And, of course, uncertainty can cut the other way—employees may underreport noncompetes they do not recognize as such. Taken together, *amici*'s criticisms of the low-wage literature miss the mark. As many independent surveys show, noncompetes regularly bind low-wage workers.

### B.    Noncompetes Lower Wages.

The NRF *amici* also accused the FTC of giving too little weight to studies that document positive *correlations* between noncompetes and earnings (several of which Professor Starr has authored), while giving too much weight to studies examining the causal effect of banning noncompetes. *See* ROA.27, ECF No. 53, § IV.A.2. But that cuts against the conclusions of those studies, which all caution against interpreting the results as causal when they are correlational, as well as the norms of economics. If the goal is to estimate the effect of banning noncompetes, then the best evidence is from studies that estimate the causal effect of changing policy to ban noncompetes—and correlational results should count less, as the FTC recognized. That is because correlational studies can indicate relationships that are opposite of the true causal relationship.

---

[16] Balasubramanian et al., *Employment Restrictions*, *supra* n.3, at App'x A.

To illustrate, suppose that an economist were interested in the effect of hospital visits on individual health. To study this relationship, we might compare the health of individuals who visited the hospital and the health of individuals who did not. We would likely find that those who went to the hospital are less healthy than those who did not. But that does not mean that hospitals *caused* the individuals to be less healthy. This particular finding is much more likely to be driven by underlying differences in the two groups rather than the effect of the hospital on health—because those who go to the hospital are sick already. Thus, even if the true effect of a hospital stay is improved health, the correlation based on this comparison would suggest the opposite.

The hospital example may seem extreme, but studies documenting positive correlations between noncompetes and earnings often compare workers with and without noncompetes. In the same way, the positive correlations between wages and noncompetes do not, on their own, prove causation. For example, employees with noncompetes are more educated and more likely to work in technical jobs that pay better and have other postemployment restrictions. *See* Starr, Prescott, & Bishara, *U.S. Labor Force*, *supra* n.3, Abstract ("Noncompetes are more likely to be found in high-skill, high-paying jobs".). Thus, it is plausible that other characteristics of these workers, or the firms that hire them, associate noncompetes with higher earnings, even if noncompetes actually depress earnings all else equal.

What the academic literature has done to improve upon these correlational designs is to study "policy shocks"—changes in law at the state level—related to noncompetes or otherwise find control groups less likely to be affected by state noncompete laws. These policy shocks deliver more plausibly causal effects of the relationship between banning noncompetes and earnings because researchers can compare data from before and after the policy change, as well as to data from other States that did not change policy. These studies include comparisons that exploit long-standing bans (e.g., Hawaii,[17] Oregon,[18] California,[19]), studies that exploit recent bans for high-wage,[20] low-wage, and high-tech workers, and studies that

---

[17] *See* 89 FR at 38,381 & n.451 (citing Balasubramanian et al., *Locked In?*, *supra* n.4); *Locked In?* at Abstract (Hawaii noncompete ban for technology workers increased "new-hire wages by 4 percent").

[18] *See* 89 FR at 38,346 & n.72 (citing Lipsitz & Starr, *Low-Wage Workers*, *supra* n.4); *Low-Wage Workers* at Abstract (Oregon noncompete ban for hourly workers "increased hourly wages by 2-3% on average").

[19] *See* Starr, *Consider This*, *supra* n.4, at Abstract (finding that "an increase from non-enforcement to mean enforceability is associated with a 4% decrease in hourly wages"); *see also* 89 FR at 38,425 & n.770 (citing Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster*, 88 Rev. Econ. & Statistics 472, 477 (2006) (finding greater high-tech employee mobility without noncompetes).

[20] For a study of high-wage noncompete bans, *see* Hiraiwa, Lipsitz, & Starr, *supra* n.5, at 25 ("We find that the Washington ban increased earnings for workers in high-[noncompete]-use industries by 4%.").

exploit more subtle changes to noncompete policies.[21] In contrast to the positive noncompete-earnings correlations, all of these studies have found that banning noncompetes causes earnings to rise, typically by 2-5%.

Finally, workers need not be bound by noncompetes to be harmed by them. The empirical literature finds that where enforceable noncompetes are common, the whole labor market in an industry in a State is less dynamic: fewer workers change jobs and wages are lower, even for workers not bound by a noncompete.[22] Similarly, when courts in a State more vigorously enforce noncompetes, wages fall not only for workers in that State, but also for workers in neighboring States who share a local labor market.[23] The proliferation of noncompetes diminishes the dynamism of labor markets broadly, even for workers not subject to them.

## C. Noncompetes Limit Entry and Stifle Innovation.

The NRF *amici* also posited that "noncompetes do not stifle innovation" and suggested that new firms would be hurt by a ban on noncompetes because they

---

[21] For a study that aggregates across all low- and high-wage noncompete bans, *see* Greenwood, Kobayashi, & Starr, *Can You Keep A Secret?*, *supra* n.4, at 12 (2.7% increase in log earnings).

[22] *See* 89 FR at 38,383 & nn.469-70 (citing Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30(5) Organization Science 961-80 (2019)).

[23] *See generally* Johnson, Lavetti, & Lipsitz, *Labor Market Effects*, *supra* p.5.

would be at risk of poaching by "well-heeled large companies." ROA.27, ECF No. 53 at 10-11. Neither the district court nor the *amici* substantiated this claim below with literature. Indeed, literature points the other way: noncompetes (1) suppress innovation and (2) hurt new businesses (3) and are unnecessary for protecting company secrets.

*First*, with regard to innovation, both Johnson, Lipsitz, & Pei (2024) and Reinmuth & Rockall (2023) study the effects of dozens of policy changes between the 1990s and mid-2010s on innovation. They both find that higher noncompete enforceability decreases innovation (as measured by patenting) by 14-18%.[24] That reduction in innovation is not offset by increases in innovation in other States and does not simply reflect substitution towards trade secrecy. Other evidence suggests that the decline in innovation results from a misallocation of inventive labor across industries.[25] There is some evidence in these studies that enforcing noncompetes

---

[24] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation, Inventor Mobility, and the Enforceability of Noncompete Agreements* 2 (Nat'l Bureau of Econ Research, Working Paper No. 31487, Dec. 2024 ed.), *available at* https://www.nber.org/system/files/working_papers/w31487/w31487.pdf; Kate Reinmuth & Emma Rockall, *Innovation Through Inventor Mobility: Evidence from Non-Compete Agreements* 3 (working paper, Dec. 22, 2024 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683 (14% reduction in patents). The Rule cites both of these papers. *See* 89 FR at 38,394.

[25] *See generally* Clemens Mueller, *How Reduced Labor Mobility Can Lead to Inefficient Reallocation of Human Capital* (working paper, Apr. 2022) *available at*:

increases firm investment, but the fact that innovation falls in the aggregate suggests that the costs to innovation outweigh the benefits.

*Second*, as to new entrants, studies suggest that banning noncompetes would increase the incidence, growth, and innovativeness of new firms.[26] For example, Johnson, Lipsitz, and Pei (*supra* n.24 at 25), show that enforcing noncompetes not only reduces new firm entry but also reduces the job creation rate. A recent survey of 312 small business owners bolsters the core ideas that noncompetes hinder both the entry and growth of small businesses: 44% of small business owners report that they have been subject to a noncompete that prevented them from starting or expanding their own businesses, while 35% report that they have been prevented from hiring an employee because of a noncompete.[27] While this sample may not be

---

https://conference.iza.org/conference_files/LaborMarkets_2022/mueller_c32517.pdf.

[26] *See* 89 FR at 38,381 (discussing Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1-44 (2024)); *see also* 89 FR at 38,390 (discussing Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552 (2018)).

[27] *See* Small Business Majority, *Small Business Owners Support Banning Non-Compete Agreements* 2 (Apr. 13, 2023), *available at*: https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf.

representative of all small business owners, it provides specific evidence that underlies the core mechanisms identified in the empirical literature.

*Third*, the concern that companies will lose "critical information" without noncompetes is similarly unsupported in the literature. *Contra* ROA.27, ECF No. 53 at 11. Greenwood, Kobayashi, and Professor Starr (2024) studied what happens to trade secret litigation when noncompetes are banned.[28] If the criticisms from the NRF *amici* were correct, then we should see more secrets being shared and more trade secret litigation in jurisdictions that banned noncompetes. But Greenwood et al. (2024) found no evidence that trade secret litigation rises after noncompetes are banned, even for high-wage workers. Just the opposite: it falls.[29] Perhaps more directly, in a field experiment, Cowgill et al. (2024) (including Professor Starr as a co-author) studied whether noncompetes are better at protecting company secrets from falling into customer hands relative to nondisclosure agreements ("NDAs"). They find that while noncompetes prevent mobility between competitors, noncompetes offer no greater protection than NDAs

---

[28] *See generally* Greenwood, Kobayashi, & Starr, *Can You Keep A Secret?*, *supra* n.4.

[29] *Id.* at 1 ("We find that the number of trade secret claims filed falls in the long run after NCAs are banned, even as mobility rises.").

do because NDAs are independently effective in limiting the sharing of company secrets.[30]

### D. Empirical Evidence Shows Coercion.

The NRF *amici* also claimed that employers "do not regularly coerce workers into signing noncompetes." ROA.27, ECF No. 53 at 11. They provided no evidence supporting this claim.

It is hard to measure "coercion" directly. Even so, the existing literature has, through surveys of employees and employers, studied when individuals first find out that they will be asked to sign a noncompete. Some companies defer asking workers to sign noncompetes until the worker has fewer labor market options and thus may be more likely to sign—such as after they have already accepted the job or during the initial onboarding process. Several surveys indicate that this practice of "late" notice noncompetes is common. A GAO survey of employers finds that 46.9% of companies that deploy noncompetes first inform workers of those terms after they accept the job offer or when the workers are starting the job (such as during the on-boarding process).[31] These numbers echo surveys of individual

---

[30] Bo Cowgill, Brandon Freiberg, & Evan Starr, *Clause and Effect: Theory and Field Experimental Evidence on Noncompete Clauses* at 2-3 (Nov. 7, 2024), *available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5012370.

[31] *See* GAO, *supra* n.10, at 58 & Table 16.

workers, which find that 29-47% of workers were first notified about the noncompete after accepting their job.[32]

Another element that might suggest "coercion" is the extent to which employees negotiate over the terms of their noncompetes or for other benefits in exchange for signing. The existing literature suggests negotiation over noncompetes is rare. In a large-scale survey, only 10% of noncompete signers reported negotiating over the terms of their noncompetes or for other benefits in exchange for signing.[33] When asked what their employer promised, either implicitly or explicitly, for signing the noncompete, 86% of noncompete signers reported "Nothing."[34] Moreover, both correlational and causal evidence suggests that workers with noncompetes are not more likely to negotiate over wages.[35]

---

[32] *See* Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Socio. Rev. 695, 706 & Table 4 (2011) (finding that 24.4% of workers were asked to sign an NDA on the first day at the company, and 22.9% after that); *see also* Starr, Prescott, & Bishara, *U.S. Labor Force*, *supra* n.3, at 34, Table 7 (29.3%).

[33] *See* Starr, Prescott, & Bishara, *U.S. Labor Force*, *supra* n.3 at 34, Table 7 (10.1%).

[34] *See* Starr, Prescott, & Bishara, *U.S. Labor Force*, *supra* n.3 at 34, Table OB8 (0.86).

[35] *See* Rothstein and Starr, *Noncompete Agreements, Bargaining, and Wages*, *supra* n.3, at Table 4; *see also* Cowgill, Freiberg, & Starr, *Clause and Effect, supra* n.30, at 24 & Table 4.

The existing empirical evidence suggests that noncompetes are rarely negotiated and that many companies first alert workers about noncompetes when they are already locked into their new jobs, so that more individuals take those jobs at lower wages than they otherwise could enjoy had their employer been up front.

### E.    Noncompetes Harm Consumers.

Finally, the NRF *amici* below argued that if banning noncompetes raises wages, that must also increase the prices consumers pay because companies will pass along those cost increases, making consumers worse off. ROA.27, ECF No. 53 at 12-13. They offer no independent empirical basis for this claim, except to reference a dissenting comment from former Commissioner Wilson.[36] That statement, in turn, cites a study by Gurun et al. (2021)[37] that finds that brokers charge their clients more when a broker is allowed "to take client lists and contact information to their new employer without fear of legal action."[38] These comments are misleading given the prior literature.

---

[36] ROA.27, ECF No. 53 at 12-13 (quoting Dissenting Statement of Comm'r Christine S. Wilson in re Notice of Proposed Rulemaking for the Non-Compete Clause Rule, 2023 FTC LEXIS 2, *21 (Jan. 5, 2023)).

[37] Wilson, Dissenting Statement at *21 & n.36 (discussing Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021)).

[38] *See* Gurun, *supra* n.37, *available at*: https://www.sciencedirect.com/science/article/abs/pii/S0304405X21001562.

*First*, as discussed above, even if noncompetes did not affect wages, consumers can still be worse off simply because noncompetes reduce entrepreneurship and innovation and in turn, product quality and variety. Moreover, enforcing noncompetes can lead to higher prices paid by consumers because noncompete enforceability fosters product market concentration by reducing new firm formation and increasing M&A activity.[39]

*Second*, as it relates to the Gurun et al. (2021) study, there are two important caveats. First, a simultaneous study by Clifford and Gerken (2021) of the same data and phenomenon shows that allowing brokers to move and reach out to former clients improves client satisfaction[40]—such that observed price increases may result from higher demand because quality is increasing. Second, neither of these studies is necessarily informative about noncompetes because they reflect the relaxation of noncompete, nonsolicit, and nondisclosure restrictions together, while the Rule leaves nonsolicits and NDAs undisturbed. In light of the literature, it is

---

[39] *See generally, e.g.*, Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers*, 16(4) Am. Econ. J. Microecon. 112-53 (2024), https://www.aeaweb.org/articles?id=10.1257/mic.20210426; Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From A Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663-85 (2020); Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence from A Natural Experiment*, 36 Strategic Mgmt. J. 686 (2015); Jeffers, *Impact*, *supra* n.26.

[40] *See* Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. of Fin. 2409-45 (2021).

likely that consumers are harmed by noncompetes—if not from higher prices, then from worse product quality and fewer choices.

## CONCLUSION

If the Court reaches arbitrary and capricious review, it should reverse.

January 9, 2025                     Respectfully submitted,

                                    */s/ Brendan Benedict*
                                    Brendan Benedict
                                    BENEDICT LAW GROUP PLLC
                                    515 Madison Avenue, 31st Floor
                                    New York, NY 10022
                                    (212) 287-9501
                                    *brendan@benedictlawgroup.com*

                                    *Counsel for Amicus Curiae*

# APPENDIX

## Articles, Reports, and Working Papers Measuring Effects of Noncompetes Cited in Noncompete Rule

| # | FN | Article, Report, or Working Paper Cited |
|---|----|-----------------------------------------|
| 1 | 65 | Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements* (Dec. 10, 2019), *available at*: https://files.epi.org/pdf/179414.pdf) |
| 2 | 68 | Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53 (2021) |
| 3 | 72 | Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022) |
| 4 | 73 | Tyler Boesch, Jacob Lockwood, Ryan Nunn, & Mike Zabek, *New Data on Non-Compete Contracts and What They Mean for Workers* (June 21, 2023), https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers |
| 5 | 74 | Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees*, 45(12) Strat. Mgmt. J. 2519-2547 (Jan. 18, 2024 ed.) |
| 6 | 77 | Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997*, Bureau Lab. Statistics (June 2022), *available at*: https://www.bls.gov/opub/mlr/2022/article/noncompete-agreements-bargaining-and-wages-evidence-from-the-national-longitudinal-survey-of-youth-1997.htm |
| 7 | 80 | Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689 (2022) |
| 8 | 81 | Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Socio. Rev. 695 (2011) |

| # | FN | Article, Report, or Working Paper Cited |
|---|----|------------------------------------------|
| 9 | 82 | Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians*, 55 J. Hum. Res. 1025 (2020) |
| 10 | 83 | Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation*, 34 Rev. Fin. Stud. 4701 (2021) |
| 11 | 84 | Liyan Shi, *Optimal Regulation of Noncompete Contracts*, 91 Econometrica 425 (2023) |
| 12 | 88 | Kristopher J. Brown, Stephen R. Flora, & Mary K. Brown, *Noncompete Clauses in Applied Behavior Analysis: A Prevalence and Practice Impact Survey*, 13 Behavioral Analysis Practice 924 (2020) |
| 13 | 90 | William C. Cirocco, *Restrictive Covenants in Physician Contracts: An American Society of Colon and Rectal Surgeons' Survey*, 54 Diseases of the Colon and Rectum 482 (2011) |
| 14 | 388 | Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Nat'l Bureau of Econ. Research, Working Paper No. 31929, Dec. 2023) |
| 15 | 413 | J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability*, J. L. Stud. (forthcoming, 2022) |
| 16 | 445 | Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019) |
| 17 | 446 | Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts*, 36 J. L., Econ. & Org. 633 (2020) |
| 18 | 450 | Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1 (2024) |

| # | FN | Article, Report, or Working Paper Cited |
|---|-----|------------------------------------------|
| 19 | 451 | Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349 (2022) |
| 20 | 469 | Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961 (2019) |
| 21 | 502 | Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach*, Rev. of Econ. & Stats. 4 (forthcoming, 2023 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674 |
| 22 | 518 | Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552 (2018) |
| 23 | 526 | Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation, Inventor Mobility, and the Enforceability of Noncompete Agreements* 2 (Nat'l Bureau of Econ Research, Working Paper No. 31487, 2023 ed.), *available at* https://www.nber.org/system/files/working_papers/w31487/w31487.pdf |
| 24 | 527 | Ege Can & Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub. Pol. 223 (2022) |
| 25 | 528 | Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, Econ. Innovation Grp. White Paper (2023), https://eig.org/noncompetes-research-note/ |

| # | FN | Article, Report, or Working Paper Cited |
|---|-----|------------------------------------------|
| 26 | 528 | Toby E. Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175 (2003) |
| 27 | 533 | Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, Sept. 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191 |
| 28 | 534 | Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425 (2011) |
| 29 | 535 | Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, (Fed. Res. Bank of Phila. Working Paper No. 21-26, 2021) |
| 30 | 536 | Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663 (2020) |
| 31 | 546 | Felicien Goudou, *The Employment Effects of Non-compete Contracts: Job Retention versus Job Creation* (2023), https://www.jesugogoudou.me/uploads/JMP_Felicien_G.pdf |
| 32 | 560 | Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* (working paper, 2023), https://ssrn.com/abstract=3846964 |
| 33 | 564 | Kate Reinmuth & Emma Rockall, *Innovation Through Inventor Mobility: Evidence from Non-Compete Agreements* (working paper, 2023 ed.), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683 |
| 34 | 569 | Clemens Mueller, *Non-Compete Agreements and Labor Allocation Across Product Markets*, Proceedings of the EUROFIDAI-ESSEC Paris December Finance Meeting 2023 (2023) |

| # | FN | Article, Report, or Working Paper Cited |
|---|-----|------------------------------------------|
| 35 | 570 | Porcher L. Taylor, III & Joseph E. Coombs, *Non-Competition Agreements and Research Productivity in the Biotechnology Industry*, 26 Frontiers of Entrepreneurship Research 1 (2006) |
| 36 | 571 | Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Risky R&D Strategies?*, 35 Strategic Mgmt. J. 1230 (2014) |
| 37 | 572 | Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices*, 51 Research Pol'y 1 (2022) |
| 38 | 590 | Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021) |
| 39 | 591 | Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864 |
| 40 | 595 | Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment*, 36 Strategic Mgmt. J. 686 (2015) |
| 41 | 603 | William F. Sherman et al., *The Impact of a Non-Compete Clause on Patient Care and Orthopaedic Surgeons in the State of Louisiana: Afraid of a Little Competition?*, 14 Orthopedic Revs. (Oct. 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9569414/ |
| 42 | 636 | Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?*, 63 Wash. & Lee L. Rev. 231 (2006) |
| 43 | 755 | Kenneth A. Younge & Matt Marx, *The Value of Employee Retention: Evidence from a Natural Experiment*, 25 J. Econ. & Mgmt. Strategy 652 (2016) |

| # | FN | Article, Report, or Working Paper Cited |
|---|---|---|
| 44 | 757 | Brad N. Greenwood, Bruce Kobayashi, & Evan Starr, *Can You Keep A Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* (Mar. 24, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171 (but noting that the FTC "does not rely on this study to support the findings") |
| 45 | 770 | Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of A High-Technology Cluster*, 88 Rev. Econ. & Statistics 472 (2006) |
| 46 | 920 | Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. of Fin. Econ. 1218-43 (2021) |
| 47 | 921 | Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. of Fin. 2409-45 (2021) |
| 48 | 922 | Gjergji Cici, Mario Hendriock, & Alexander Kempf, *The Impact of Labor Mobility Restrictions on Managerial Actions: Evidence from the Mutual Fund Industry*, 122 J. of Banking & Fin. 105994 (2021) |

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(A)(5) because, including the Appendix but excluding the parts of the document exempted by Rule 32(f), this document contains 6,360 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced serif typeface (14-point Century Schoolbook and Times New Roman) using Microsoft Word for Office 365.

*/s/ Brendan Benedict*
Brendan Benedict


## CERTIFICATE OF SERVICE

I certify that on January 9, 2025, I served this brief on all parties or their counsel of record through the CM/ECF system.

*/s/ Brendan Benedict*
Brendan Benedict