No. 24-10951

# In the United States Court of Appeals for the Fifth Circuit

RYAN, L.L.C.,

*Plaintiff-Appellee*,

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS; LONGVIEW CHAMBER OF COMMERCE,

*Intervenor-Plaintiffs-Appellees*,

v.

FEDERAL TRADE COMMISSION,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Northern District of Texas, Case No. 3:24-cv-986

**RESPONSE BRIEF OF PLAINTIFF-APPELLEE RYAN, LLC**

Eugene Scalia
  *Counsel of Record*
Amir C. Tayrani
Andrew G.I. Kilberg
Aaron Hauptman
Joshua R. Zuckerman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20001
Telephone: 202.955.8500
Facsimile: 202.467.0539
EScalia@gibsondunn.com

*Counsel for Ryan, LLC*

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Ryan, LLC is a private limited liability company. Its member holding companies are Ryan Direct Holdings, LLC, Ryan Tax Holdings, Inc., and Onex Ryan LLC. Ryan, LLC also identifies Onex Corporation (TXS:ONEX) and Ares Management Corporation (NYSE: ARES) as entities owning 10% or more of its stock. Additionally, Ryan, LLC has over 200 principals and a small number of other employees who are subject to non-competes affected by the rulemaking.

## A.    Plaintiff and Intervenors

1.    Ryan, LLC
2.    Chamber of Commerce of the United States of America
3.    Business Roundtable
4.    Longview Chamber of Commerce
5.    Texas Association of Business

## B.    Attorneys for Plaintiff and Intervenors

Eugene Scalia
Amir C. Tayrani
Andrew G.I. Kilberg
Aaron Hauptman
Joshua R. Zuckerman
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036

Allyson N. Ho
Elizabeth A. Kiernan
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201

Charles W. Fillmore
H. Dustin Fillmore III
The Fillmore Law Firm LLP
201 Main Street, Suite 700
Fort Worth, TX 76102

Jeffrey B. Wall
Judson O. Littleton
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006

Jordan L. Von Bokern
Tyler S. Badgley
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, D.C. 20062

Robert L. Sayles
Boyce Holleman
Bradley Arant Boult Cummings LLP
1445 Ross Avenue
Suite 3600
Dallas, TX 75202

Liz Dougherty
Business Roundtable
1000 Maine Avenue, S.W.
Washington, D.C. 20024

**C.    Defendant**

1.    Federal Trade Commission

**D.    Attorneys for Defendant**

Brian M. Boynton
Leigha Simonton
Michael S. Raab
Sean R. Janda
Urja Mittal
Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Taisa Goodnature
Lesley R. Farby
Arjun Mody
Rachel L. Westmoreland
U.S. Department of Justice
Civil Division, Federal Programs
1100 L Street, N.W.
Washington, D.C. 20005

**E.    Putative Intervenors (Motion Denied)**

1.    Small Business Majority
2.    John Roffino
3.    Daniella Emmer

## F.     Attorneys for Putative Intervenors (Motion Denied)

| | |
|---|---|
| Michael Lieberman | David H. Seligman |
| Jamie Crooks | Rachel Dempsey |
| Fairmark Partners, LLP | Towards Justice |
| 1001 G Street N.W., Suite 400 East | PO Box 371680, PMB 44465 |
| Washington, D.C. 20001 | Denver, CO 80237 |

## G.     Amici in District Court

1.    National Retail Federation
2.    National Federation of Independent Business Small Business
3.    Legal Center, Inc.
4.    International Franchise Association
5.    Associated Builders and Contractors, Inc.
6.    American Hotel & Lodging Association
7.    National Association of Wholesaler-Distributors
8.    Independent Electrical Contractors
9.    Consumer Technology Association
10.   United States Council for International Business
11.   The Home Care Association of America
12.   The Restaurant Law Center
13.   National Association of Manufacturers
14.   Securities Industry and Financial Markets Association
15.   Future Industry Association
16.   Managed Funds Association
17.   American Investment Council
18.   The Society For Human Resource Management
19.   Partnership for New York City
20.   Public Citizen
21.   National Employment Law Project
22.   William Araiza
23.   Jeffrey Lubbers
24.   Peter M. Shane
25.   Joshua Acevedo
26.   Adam Bazaldua
27.   Crystal Chism
28.   Teri Castillo

29.    Elias Diaz
30.    Vanessa Fuentes
31.    Alyssa Garza
32.    Tartisha Hill
33.    Jalen McKee-Rodriguez
34.    David Stout
35.    Zo Qadri
36.    Jose "Chito" Vela
37.    Texas AFL-CIO
38.    Lev Menand
39.    Tim Wu
40.    Ashraf Ahmed
41.    Rebecca Haw Allensworth
42.    Kate Andrias
43.    Bill Baer
44.    Lisa Shultz Bressman
45.    Richard Briffault
46.    Jessica Bulman-Pozen
47.    Harry First
48.    Eleanor Fox
49.    Luke Herrine
50.    Robert H. Lande
51.    Jonathan Masur
52.    Sanjukta Paul
53.    Morgan Ricks
54.    Noah Rosenblum
55.    Peter L. Strauss
56.    Rachel Arnow-Richman
57.    Jonathan D. Glater
58.    Jonathan F. Harris
59.    Dalie Jimenez
60.    Mark A. Lemley
61.    Orly Lobel
62.    Olav Sorenson
63.    Marshall Steinbaum
64.    Matt Gaetz
65.    American Academy of Emergency Medicine
66.    Small Business Majority

67. Evan Starr

68. NYU Langone Health

## H.    Attorneys for Amici in District Court

Edward J. Loya Jr.
Epstein, Becker & Green, P.C.
100 Crescent Court, Suite 700
Dallas, TX 75201

Carolyn O. Boucek
Epstein, Becker & Green, P.C.
227 W. Monroe Street
Suite 4500
Chicago, IL 60606

Erik W. Weibust
Katherine G. Rigby
Epstein, Becker & Green, P.C.
125 High Street, Suite 2114
Boston, MA 02100

A. Millie Warner
Epstein, Becker & Green, P.C.
875 Third Avenue
New York, NY 10022

Erica T. Klenicki
Michael A. Tilghman II
NAM Legal Center
733 10th Street NW, Suite 700
Washington, D.C. 20001

Michael D. Wexler
Marcus L. Mintz
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 2800
Chicago, IL 60606

Richard D. Salgado
McDermott Will & Emery LLP
2501 North Harwood Street
Suite 1900
Dallas, TX 75201

Paul W. Hughes
Andrew A. Lyons-Berg
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, D.C. 20006

Nicole A. Saharsky
Gail F. Levine
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006

Tricia W. Macaluso
Seyfarth Shaw LLP
2323 Ross Avenue, Suite 1660
Dallas, TX 75201

Eron F. Reid
Seyfarth Shaw LLP
700 Milam Street, Suite 1400
Houston, TX 77002

Joshua A. Rosenthal
Eushrah Hossain
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609

Arthur J. Burke
Christopher Lynch
Neal Mehrotra
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

John E. Wall, Jr.
Law Office of John E. Wall, Jr.
5728 Prospect Avenue, Suite 1003
Dallas, TX 75206

Wendy Liu
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009

Mark Samburg
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043

Darren P. Nicholson
Warren T. Burns
Kyle Oxford
Burns Charest, LLP
900 Jackson Street, Suite 500
Dallas, TX 75202

Amanda G. Lewis
Cuneo Gilbert & Laduca, LLP
4725 Wisconsin Avenue N.W.,
Suite 200
Washington, D.C.  20016

Eric A. Posner
1111 E. 60th Street
Chicago, IL 60637

David H. Seligman
Nina DiSalvo
Rachel W. Dempsey
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237

Ashley E. Tremain
Tremain Artaza PLLC
4925 Greenville Avenue, Ste. 200
Dallas, TX 75206

Darren P. Nicholson
Warren T. Burns
Kyle Oxford
Burns Charest, LLP
900 Jackson Street, Suite 500
Dallas, TX 75202

Mark A. Lemley
Phillip R. Malone
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 93405

Andrew Kloster
Office of Rep. Matt Gaetz
2021 Rayburn HOB
Washington, D.C. 20515

Jamie Crooks
Alexander Rose
Fairmark Partners LLP
1001 G Street, N.W.,
Suite 400E
Washington, D.C. 20001

Meagan Martin Powers
Martin Powers & Counsel, PLLC
1431 Greenway Drive, Suite 950
Irving, TX 75038

Jodyann Galvin
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street
Buffalo, NY 14202

## I.    Amici in the Fifth Circuit

1.    Public Citizen
2.    National Employment Law Project
3.    NYU Langone Health
4.    Constitutional Accountability Center
5.    California Public Employees' Retirement System
6.    California State Teachers' Reterirment System
7.    Brad Lander, Comptroller of the City of New York
8.    Zevin Asset Management
9.    The Interfaith Coalition on Corporate Responsibility
10.   Trillium Asset Management
11.   Open Markets Institute
12.   District of Columbia
13.   New Jersey
14.   Arizona
15.   California
16.   Colorado
17.   Delaware
18.   Illinois
19.   Maine
20.   Maryland
21.   Massachusetts
22.   Michigan
23.   Minnesota
24.   Nevada
25.   New Mexico
26.   New York
27.   Oregon
28.   Pennsylvania
29.   Rhode Island

30. Vermont
31. Washington
32. American Economic Liberties Project
33. Timothy Wu
34. Lev Menand
35. Lisa Schultz Bressman
36. Jessica Bulman-Pozen
37. Harry First
38. Ashraf Ahmed
39. Kate Andrias
40. Peter L. Strauss
41. Morgan Ricks
42. Jonathan S. Masur
43. Luke Herrine
44. Eleanor M. Fox
45. American Antitrust Institute
46. Evan Starr

## J.   Attorneys For Amici In The Fifth Circuit

Wendy Liu
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009

Martin Powers & Counsel, PLLC
Meagan Martin Powers
1431 Greenway Drive, Suite 950
Irving, TX 75038

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel
Constitutional Accountability
Center
1200 18th Street NW, Suite 501
Washington, D.C. 20036

Jodyann Galvin
Cynthia Giganti Ludwig
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202

Molly J. Bowen
Cohen Milstein Sellers
& Toll PLLC
1100 New York Avenue, NW,
Suite 500
Washington, D.C. 20005

Mark Vandenberg
Cohen Milstein Sellers & Toll
PLLC
88 Pine Street, 14th Floor
New York, NY 10005

Sandeep Vaheesan
Tara Pincock
Open Markets Institute
655 15th Street, N.W.
Suite 310
Washington, D.C. 20005

Kirk Cooper
Cooper Appeals, P.L.L.C.
10420 Montwood Drive
Suite N-405
El Paso, TX 79935

Matthew J. Platkin
Jeremy Feigenbaum
Nathaniel I. Levy
Bryce K. Hurst
Marcus D. Mitchell
25 Market Street
Trenton, NJ 08625

Brian L. Schwalb
Caroline S. Van Zile
Ashwin P. Phatak
Mark A. Rucci
400 6th Street, N.W., Suite 8100
Washington, D.C. 20001

Brendan Benedict
Benedict Law Group PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022

Lee A. Hepner
Laurel Kilgour
American Economic Liberties
Project
2001 Pennsylvania Avenue, N.W.,
Suite 540
Washington, D.C. 20006

Darren P. Nicholson
Warren T. Burns
Kyle Oxford
Burns Charest, LLP
900 Jackson Street, Suite 500
Dallas, TX 75202

David O. Fisher
Randy M. Stutz
American Antitrust Institute
1025 Connecticut Avenue, N.W.,
Suite 1000
Washington, D.C. 20036

Dated: February 3, 2025          Respectfully Submitted

                                 /s/ *Eugene Scalia*
                                 Eugene Scalia
                                 Attorney of record for Ryan, LLC

## STATEMENT REGARDING ORAL ARGUMENT

Ryan, LLC respectfully requests that the Court hold oral argument in this appeal. The appeal raises important statutory and constitutional questions about the scope of the Federal Trade Commission's rulemaking authority. And the Non-Compete Rule at issue would invalidate 30 million employment contracts and, by the Commission's own estimate, have billions of dollars of economic effects. Ryan respectfully suggests that the importance of the Rule and of the legal issues presented merits oral argument.

### TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................. i

Statement Regarding Oral Argument ..................................... x

Table of Authorities ........................................................... xiii

Introduction ....................................................................... 1

Statement of the Issues ....................................................... 3

Statement of the Case ......................................................... 3

    I.    The FTC Act ......................................................... 3

    II.   Non-Compete Agreements .................................... 7

    III.  The Non-Compete Rule ........................................ 9

    IV.  Ryan, LLC .......................................................... 12

    V.   Procedural History .............................................. 13

Summary of Argument ....................................................... 15

Argument .......................................................................... 19

    I.    The Commission Lacks Statutory Authority To Issue The Non-Compete Rule. .................................... 19

        A.   The Text, Structure, And History Of The FTC Act Show That Section 6(g) Does Not Authorize Substantive Rules. .................................. 20

        B.   The Major Questions Doctrine Confirms The Commission's Lack Of Statutory Authority. ............. 29

        C.   The Commission's Counterarguments Are Meritless. .................................................. 34

    II.   A Grant Of Rulemaking Authority To Define Unfair Methods Of Competition Would Violate The Constitution ...................................................... 45

    III.  The Rule Is Arbitrary And Capricious. ................. 51

        A.   The Commission Did Not Justify A Blanket Ban. ..... 52

TABLE OF CONTENTS
(continued)

Page

B.    The   Commission's   Cost-Benefit   Analysis   Is
Arbitrary And Capricious. ......................................... 59

IV.    The Commission Is Unconstitutionally Insulated From
The President. ..................................................................... 64

V.    The District Court Properly Vacated The Rule, With
Nationwide Effect................................................................ 65

A.    The APA Requires Nationwide Vacatur..................... 65

B.    The Equities Favor Nationwide Vacatur.................... 68

Conclusion ............................................................................................ 71

Certificate of Service ........................................................................... 72

Certificate of Compliance.................................................................... 72

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)............................................. 17, 20, 45, 46, 47, 48

*Airlines for Am. v. Dep't of Transp.*,
  2025 WL 313998 (5th Cir. Jan. 28, 2025).................................... 23, 48

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021)......................................................... 32

*Am. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991)............................................................ 36

*AMG Cap. Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021)......................................................... 21, 26

*Atl. Richfield Co. v. Christian*,
  140 S. Ct. 1335 (2020)......................................................... 42

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)..................................................... 22, 29

*BP Am., Inc. v. FERC*,
  52 F.4th 204 (5th Cir. 2022) ................................................ 66

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021).................................................. 37

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ..................................... 14, 65, 66, 67, 68

*Bus. Roundtable v. SEC*,
  647 F.3d 1144 (D.C. Cir. 2011)........................................... 56, 57

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ............................................. 67, 68

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) .................................................. 50, 51, 67

*CFTC v. Schor*,
   478 U.S. 833 (1986).............................................................. 39, 40, 41

*Chamber of Com. v. OSHA*,
   636 F.2d 464 (D.C. Cir. 1980) ...................................................... 25, 26

*Chamber of Com. of U.S.A. v. DOL*,
   885 F.3d 360 (5th Cir. 2018)............................................................... 58

*In re Clarke*,
   94 F.4th 502 (5th Cir. 2024) ...................................................... 67, 68

*Collins v. Mnuchin*,
   938 F.3d 553 (5th Cir. 2019)............................................................... 40

*Consumers' Research v. FCC*,
   109 F.4th 743 (5th Cir. 2024) ......................................... 46, 48, 49, 50

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024)........................................................................ 68

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ............................................................. 66

*Doleac ex rel. Doleac v. Michalson*,
   264 F.3d 470 (5th Cir. 2001).............................................................. 69

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ................................................................ 8

*Encino Motocars, LLC v. Navarro*,
   579 U.S. 211 (2016)............................................................................ 61

TABLE OF AUTHORITIES
(continued)

Page(s)

*Farmers Union Cent. Exch., Inc. v. FERC*,
   734 F.2d 1486 (D.C. Cir. 1984) ........................................................ 52

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................... 45

*FCC v. Nat'l Citizens Comm. for Broad.*,
   436 U.S. 775 (1978) ........................................................................... 36

*Franciscan All., Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ............................................................. 66

*FTC v. Bunte Bros.*,
   312 U.S. 349 (1941) ..................................................................... 26, 44

*FTC v. Motion Picture Advert. Serv. Co.*,
   344 U.S. 392 (1953) ........................................................................... 55

*FTC v. R.F. Keppel & Bro., Inc.*,
   291 U.S. 304 (1934) ........................................................................... 48

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ..................................................................... 46, 55

*Gundy v. United States*,
   588 U.S. 128 (2019) ..................................................................... 46, 50

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
   586 U.S. 123 (2019) ........................................................................... 39

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ............................................................... 59

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) ............................................................................. 4

# TABLE OF AUTHORITIES
(continued)

Page(s)

*ICC v. Cincinnati, N. O. & T. P. Ry. Co.*,
167 U.S. 479 (1897) ........................................................................... 30

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) ........................................................... 65

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) ........................................................................... 50

*JAMA v. ICE*,
543 U.S. 335 (2005) ........................................................................... 39

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ........................................................................... 55

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................. 19, 24, 38

*Mexican Gulf Fishing Co. v. Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ............................................................. 55

*Mistretta v. United States*,
488 U.S. 361 (1989) ..................................................................... 45, 49

*Mitchel v. Reynolds*,
24 Eng. Rep. 347 (Q.B. 1711) ............................................................. 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm
Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................. 51, 53, 56

*Mourning v. Family Publication Serv., Inc.*,
411 U.S. 356 (1973) ..................................................................... 35, 36

*Nat'l Ass'n of Private Fund Managers v. SEC*,
103 F.4th 1097 (5th Cir. 2024) ......................................................... 35

TABLE OF AUTHORITIES
(continued)

Page(s)

*Nat'l Petroleum Refiners Ass'n v. FTC,*
482 F.2d 672 (D.C. Cir. 1973) .............................................. 5, 6, 23, 38

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) ............................................................................ 33

*Ohio v. EPA,*
144 S. Ct. 2040 (2024) .......................................................... 51, 54, 55

*Paul v. United States,*
140 S. Ct. 342 (2019) ........................................................................ 46

*Rainwater v. United States,*
356 U.S. 590 (1958) .......................................................................... 44

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) ................................................................... 26, 28

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) .......................................................................... 64

*Snap-On Tools Corp. v. FTC,*
321 F.2d 825 (7th Cir. 1963) ........................................................ 9, 31

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army*
*Corps of Eng'rs,*
531 U.S. 159 (2001) ................................................................... 33, 40

*State of Louisiana, By & Through its Div. of Admin. v.*
*I3 Verticals Inc.,*
81 F.4th 483 (5th Cir. 2023) ............................................................ 35

*Tex. Med. Ass'n v. HHS,*
110 F.4th 762 (5th Cir. 2024) .................................................... 66, 69

TABLE OF AUTHORITIES
(continued)

Page(s)

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ............................................................. 70

*Texas v. United States*,
  2025 WL 227244 (5th Cir. Jan. 17, 2025)......................................... 67

*Thorpe v. Housing Auth. of the City of Durham*,
  393 U.S. 268 (1969)....................................................................... 35, 36

*UARG v. EPA*,
  573 U.S. 302 (2014)............................................................................. 29

*West Virginia v. EPA*,
  597 U.S. 697 (2022)....................................................... 29, 30, 31, 32

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)............................................................................. 20

**Constitutional Provisions**

U.S. Const. art. I, § 1................................................................................ 45

**Statutes**

5 U.S.C. § 706 .................................................................................... 45, 66

15 U.S.C. § 41 ...................................................................................... 4, 64

15 U.S.C. § 45 ...................................................................................... 4, 20

15 U.S.C. § 45(a)......................................................................................... 4

15 U.S.C. § 45(b)................................................................................... 4, 23

15 U.S.C. § 45(*l*)............................................................................ 4, 22, 23

15 U.S.C. § 45(m)............................................................................... 22, 64

## TABLE OF AUTHORITIES
(continued)

Page(s)

15 U.S.C. § 45(n) ..................................................................... 56

15 U.S.C. § 45a ................................................................... 7, 28

15 U.S.C. § 46 ......................................................................... 20

15 U.S.C. § 46(a) ...................................................................... 5

15 U.S.C. § 46(b) ...................................................................... 5

15 U.S.C. § 46(c) ...................................................................... 5

15 U.S.C. § 46(d) ...................................................................... 5

15 U.S.C. § 46(e) ...................................................................... 5

15 U.S.C. § 46(f) ...................................................................... 5

15 U.S.C. § 46(g) ......................................................... 5, 19, 41

15 U.S.C. § 46(h) ...................................................................... 5

15 U.S.C. § 46(i) ...................................................................... 5

15 U.S.C. § 46(j) ...................................................................... 5

15 U.S.C. § 46(k) ...................................................................... 5

15 U.S.C. § 53(b) ..................................................................... 65

15 U.S.C. § 57a(a)(1) ............................................................ 7, 27

15 U.S.C. § 57a(a)(2) ............................................................ 7, 41

15 U.S.C. § 57a(b) ................................................................ 7, 27

15 U.S.C. § 57a(c) ................................................................ 7, 27

15 U.S.C. § 57a(d) ................................................................ 7, 27

## TABLE OF AUTHORITIES
(continued)

Page(s)

15 U.S.C. § 57b-3(a)(1) ............................................................. 43

15 U.S.C. § 57b(a) ..................................................................... 65

15 U.S.C. § 1194(c) .............................................................. 6, 28

15 U.S.C. § 2302 ....................................................................... 27

15 U.S.C. § 2302(b) .................................................................... 7

15 U.S.C. § 2302(d) .................................................................... 7

15 U.S.C. § 2310(a) ............................................................... 7, 27

15 U.S.C. § 2310(b) ............................................................... 7, 27

15 U.S.C. § 7607 ....................................................................... 28

An Act to Amend the Flammable Fabrics Act,
    Pub. L. No. 90-189, 81 Stat. 568 (1967) ............................... 6

FTC Act Amendments of 1938, Pub. L. No. 75-447,
    52 Stat. 111-12 ...................................................................... 4

FTC Act, ch. 311, 38 Stat. 717 (1914) ...................... 3, 5, 21, 22

Ga. Code Ann. §§ 13-8-50–54 .................................................. 33

Magnuson-Moss Warranty-Federal Trade Commission
    Improvement Act, Pub. L. No. 93-637,
    88 Stat. 2183 (1975)......................................................... 6, 27

Minn. Stat. § 181.988 (2023)................................................... 33

## Regulatory Materials

16 C.F.R. § 910.1 ..................................................................... 10

# TABLE OF AUTHORITIES
(continued)

Page(s)

16 C.F.R. § 910.2(a) ................................................................ 10

16 C.F.R. § 910.2(b)(1) ............................................................ 11

16 C.F.R. § 910.3(a) ................................................................ 10

16 C.F.R. § 910.3(b) ................................................................ 10

16 C.F.R. § 910.4 .................................................................... 10

Federal Trade Commission, Deceptive Advertising and
Labeling of Previously Used Lubricating Oil,
29 Fed. Reg. 11,650 (Aug. 14, 1964) ...................................... 6

Federal Trade Commission, Misbranding and Deception as
to Leather Content of Waist Belts, 29 Fed. Reg. 8,166
(June 27, 1964) .................................................................... 25

Federal Trade Commission, Policy Statement Regarding the
Scope of Unfair Methods of Competition Under Section 5
of the Federal Trade Commission Act, Commission File
No. P221201 (Nov. 10, 2022) ............................................... 49

Federal Trade Commission, Posting of Minimum Octane
Numbers on Gasoline Dispensing Pump,
36 Fed. Reg. 23,871 (Dec. 16, 1971) ............................... 25, 26

Federal Trade Commission, Power Output Claims for
Amplifiers Utilized in Home Entertainment Products,
39 Fed. Reg. 15,387 (May 3, 1974) .................................... 25

## Other Authorities

120 Cong. Rec. 40,606 (1974) ................................................ 42

120 Cong. Rec. 41,386 (1974) ................................................ 42

TABLE OF AUTHORITIES
(continued)

Page(s)

Annual Report of the Federal Trade Commission (1922) .................. 5, 24

Alexander Castro, *Gov. McKee vetoes bills on kratom,
nursing homes and non-compete clauses*, Rhode Island
Current (June 27, 2024), https://tinyurl.com/35pu74xe .................... 33

Epstein Becker & Green, P.C., *50-State Noncompete Survey*
(2024), https://tinyurl.com/y9d3e53m.................................................... 8

International Franchise Association, *International Franchise
Association Statement on Final FTC Noncompete Rule*
(Apr. 25, 2024), https://tinyurl.com/2mzn68b2 .................................. 13

Maysoon Khan, *New York governor vetoes bill that would
ban noncompete agreements*, Associated Press (Dec. 23,
2023), https://tinyurl.com/yne98v45.................................................... 33

Brian M. Malsberger, *Covenants Not to Compete*
(13th ed. 2021) ...................................................................................... 8

Alan J. Meese, *Don't Abolish Employee Noncompete
Agreements*, 57 Wake Forest L. Rev. 631 (2022)................................. 9

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules
with the Force of Law: The Original Convention*,
116 Harv. L. Rev. 467 (2002)............................................................. 21

Richard J. Pierce Jr., *Can the Federal Trade Commission
Use Rulemaking to Change Antitrust Law?*, GW Law
Faculty Publications & Other Works 1561 (2021)............................. 39

Prevent, Century Dictionary and Cyclopedia (1911)............................. 38

S. 986 92d Cong. (1971).......................................................................... 42

S. Conf. Rep. No. 93-1408 (1974) .......................................................... 43

# TABLE OF AUTHORITIES
(continued)

Page(s)

S. Rep. No. 93-151 (1973) ........................................................................ 42

S. Rep. No. 96-500 (1979) ........................................................................ 44

Mila Sohoni, *The Lost History of the Universal Injunction*,
    133 Harv. L. Rev. 920 (2020) .............................................................. 70

Mila Sohoni, *The Power to Vacate a Rule*,
    88 Geo. Wash. L. Rev. 1121 (2020) ...................................................... 70

Evan P. Starr, J.J. Prescott & Norman D. Bishara,
    *Noncompete Agreements in the US Labor Force*,
    64 J. L. & Econ. 53, 53 (2021) ............................................................. 59

## INTRODUCTION

The Federal Trade Commission by a 3-2 vote adopted an economically destabilizing, legally unprecedented rule outlawing the use of nearly all non-compete agreements by every employer, in every industry, across the entire United States ("Non-Compete Rule" or "Rule"). *See* ROA.4485-649. According to the Commission, the Rule is a lawful exercise of power because a provision of the Federal Trade Commission Act ("FTC Act") that permits *procedural* rules supposedly also authorizes a sweeping *substantive* prohibition of "unfair methods of competition"—and because, the Commission maintains, non-competes are nearly always "unfair."

If ever a federal agency attempted to pull an elephant out of a mousehole, this is it. The text, structure, and history of the FTC Act show the Commission cannot promulgate substantive rules defining unfair methods of competition. As does the major questions doctrine: Congress did not invest the Commission with authority to decide whether non-compete agreements are universally unfair and anticompetitive, a question with seismic consequences affecting tens of millions of workers,

1

thousands or millions of employers, and hundreds of billions of dollars in economic productivity.

Compounding its flaws, the Rule rests on an open-ended statutory phrase—"unfair methods of competition"—that provides no intelligible principle to guide the agency or constrain its policy preferences, in violation of the Constitution's restriction on the delegation of legislative powers. Perhaps unsurprisingly, this brazen power grab has been perpetrated by a politically unaccountable "independent" agency that is unconstitutionally insulated from the President's removal powers.

The Rule is also arbitrary and capricious. Employers and employees have negotiated mutually beneficial non-compete agreements for hundreds of years. Reasonably tailored non-competes are permitted by the vast majority of States—including Texas, where Plaintiff-Appellee Ryan is headquartered. Yet the Commission all but ignored the benefits non-competes engender and disregarded the harm that the Rule's blanket ban would inflict on consumers—twisting the evidence into new shapes to fit the agency's preconceived policy goal and ignoring less drastic regulatory alternatives.

The Rule contravenes the FTC Act, violates the Constitution, and is arbitrary, capricious, and otherwise unlawful under the Administrative Procedure Act ("APA"). The district court was correct to set it aside. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the Commission has statutory authority to issue the Non-Compete Rule.

2. Whether, if the FTC Act purports to grant such authority, it violates the non-delegation doctrine.

3. Whether the Non-Compete Rule is arbitrary and capricious.

4. Whether the Commission is unconstitutionally insulated from the President.

5. Whether vacatur, with universal effect, is the proper remedy for the Rule's unlawfulness.

## STATEMENT OF THE CASE

## I.    The FTC Act

Congress enacted the FTC Act in 1914, establishing the Commission as a multimember "independent" agency. *See* FTC Act, ch. 311, 38 Stat. 717 (1914) (codified as amended at 15 U.S.C. § 41 *et seq.*).

The President appoints the Commissioners, with the advice and consent of the Senate.  But the President can remove a Commissioner only "for inefficiency, neglect of duty, or malfeasance in office."  15 U.S.C. § 41; *see Humphrey's Executor v. United States*, 295 U.S. 602, 623 (1935).

Since the Commission's inception, Section 5 of the FTC Act has "empowered and directed" it "to prevent" the use of "unfair methods of competition."  15 U.S.C. § 45(a)(2).  In 1938, Congress amended Section 5 to give the Commission the additional power to prevent "unfair or deceptive acts or practices."   Federal Trade Commission Act Amendments of 1938, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111-12.

Section 5 of the Act creates a comprehensive scheme for the Commission to prevent unfair methods of competition through case-by-case adjudication.  *See* 15 U.S.C. § 45.  Congress empowered the Commission to hold a hearing and issue a cease-and-desist order if the hearing reveals the respondent is engaging in an unfair method of competition; the Act provides for penalties for violating such an order.  *Id.* § 45(b), (*l*).

Section 6 of the Act grants the Commission ancillary powers to support this adjudicatory framework.   Most of those powers are

investigatory. *See* 15 U.S.C. § 46(a)-(d), (h)-(j). Others are ministerial, such as the powers to make recommendations, *see id.* § 46(e), (k), and publish reports, *see id.* § 46(f). One provision, Section 6(g), which has been in place since the Commission's inception in 1914, grants the Commission the power to "classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id.* § 46(g); *see also* 38 Stat. at 722. The Act does not authorize penalties for violating rules promulgated under Section 6(g).

From 1914 until 1962, the Commission did not invoke Section 6(g) as a grant of substantive rulemaking authority. In fact, it expressly disclaimed such authority, telling Congress it could not "issue orders, rulings, or regulations unconnected with any proceeding before it." Annual Report of the Federal Trade Commission 36 (1922); *see Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 & n.27 (D.C. Cir. 1973) (recounting this history). In the 1960s and early 1970s, the Commission changed course and promulgated several rules declaring certain actions to be unfair or deceptive acts or practices, citing Section 6(g) as its authority. *See* ROA.4492-93 & nn.132-157 (listing rules). Some of these rules, as an afterthought, also declared the same

actions to be unfair methods of competition, largely with boilerplate language containing no analysis. *See, e.g.*, Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 Fed. Reg. 11,650 (Aug. 14, 1964). None of the rules promulgated in that time declared an action to be solely an unfair method of competition. *See* ROA.4492-93.

Meanwhile, Congress granted the Commission narrowly tailored rulemaking authority addressing specific subjects. *See, e.g.*, An Act to Amend the Flammable Fabrics Act, Pub. L. No. 90-189, § 4(a), 81 Stat. 568, 571 (1967) (codified at 15 U.S.C. § 1194(c)). Although these congressional grants of specific rulemaking authority would have been superfluous if Section 6(g) already granted substantive rulemaking authority, the D.C. Circuit in 1973 "liberally … construe[d]" Section 6(g) to grant the Commission substantive rulemaking authority. *See Nat'l Petroleum*, 482 F.2d at 678.

Congress's reaction was swift. Just two years later, Congress enacted the Magnuson-Moss Warranty–Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975), which empowered the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or

practices," 15 U.S.C. § 57a(a)(1)(B), while imposing tight constraints on the way such rules could be adopted, *id.* § 57a(b)-(d). Congress also empowered the Commission to prescribe rules regarding written warranties, *id.* §§ 2302(b), (d), 2310(a), and declared "fail[ure] to comply with … a rule" promulgated under the Magnuson-Moss Act to be a violation of Section 5, *id.* § 2310(b).

Conspicuously absent, however, was conferral of authority to adopt unfair-method-of-competition rules. Instead, Congress took a deliberately neutral position on whether Section 6(g) granted that authority, providing that the Magnuson-Moss Act "shall not affect any authority of the Commission" to issue unfair-method-of-competition rules. 15 U.S.C. § 57a(a)(2).

From 1978 until the Non-Compete Rule, the Commission did not promulgate a single rule under Section 6(g). And throughout that time, Congress continued to grant the Commission other targeted rulemaking powers. *See, e.g.*, 15 U.S.C. § 45a (rules related to labelling).

## II.    Non-Compete Agreements

For hundreds of years, firms and workers have freely negotiated mutually beneficial agreements providing that a worker will not compete

with his employer's core business during the employment relationship and for a time-limited period after it ends. The standard governing these agreements was first articulated in *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (Q.B. 1711), which held that "particular" restraints, limited to specific regions, times, or customers, were enforceable just like any other contract. *See* ROA.4735-36. That reasonableness test became the standard approach in "both English and American courts," ROA.4744-45, leading to a rich body of state law and application of the "rule of reason" under federal antitrust law, *see generally* Brian M. Malsberger, *Covenants Not to Compete* (13th ed. 2021); Epstein Becker & Green, P.C., *50-State Noncompete Survey* (2024), https://tinyurl.com/y9d3e53m; *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that covenants not to compete should be examined under the rule of reason."). When the Commission issued its Non-Compete Rule, reasonably scoped non-competes were legal under federal antitrust law and the laws of nearly all States (including Texas). *See* ROA.5616.

That is because workers, firms, and the economy all benefit from reasonable non-competes. *See* ROA.139-40. Non-competes promote training by solving a free-rider problem. *See* ROA.4932. And by

increasing training, they can increase workers' earnings.  *See* ROA.5097.

Non-competes also incentivize R&D investment and facilitate innovation

by helping firms protect their intellectual property.  *See* ROA.4938

(collecting papers).  And in industries where client relationships are

critical—such as tax consulting—non-competes can reduce prices.  *See*

ROA.4798-823.

Reasonably tailored non-competes are thus a mutually beneficial,

negotiated term of employment.  *See* Alan J. Meese, *Don't Abolish*

*Employee Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 677

(2022).  That may be why, until 2022, the Commission had only once

claimed a non-compete agreement was an unfair method of competition—

and it lost in court.  *See Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837

(7th Cir. 1963).

## III.   The Non-Compete Rule

On April 23, 2024, a bare majority of the Commission voted to

promulgate the Non-Compete Rule.  The Rule declares that "it is an

unfair method of competition for a person: (i) To enter into or attempt to

enter into a non-compete clause; (ii) To enforce or attempt to enforce a

non-compete clause; or (iii) To represent that the worker is subject to a

non-compete clause." 16 C.F.R. § 910.2(a)(1). "Non-compete clause" is defined to include "[a] term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from … [s]eeking or accepting work … with a different person." *Id.* § 910.1. "Worker" is defined to include anyone "who works or who previously worked, whether paid or unpaid," for anyone else, regardless of employee or independent contractor classification. *Id.* The Rule also purports to supersede state laws that would "permit or authorize" non-compete agreements. *Id.* § 910.4.

The Rule permits non-competes only when "entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets." 16 C.F.R. § 910.3(a). The Rule also allows employers to enforce existing non-competes—but not new ones—with "senior executives," defined to include CEOs, presidents, and other senior corporate officers who "control significant aspects of a business entity or common enterprise." *Id.* §§ 910.1, 910.2(a)(2)(ii). And causes of action that "accrued prior to the [Rule's] effective date" may be pursued. *Id.* § 910.3(b). Otherwise, any "non-compete clause" applicable to any

worker earning any salary in any industry is outlawed, and businesses must send a "clear and conspicuous notice" to all workers currently subject to a non-compete informing them that the "non-compete clause will not be, and cannot legally be, enforced against the worker." *Id.* § 910.2(b)(1).

In short, the Commission has declared that more than 99% of non-competes across the whole country, in all industries, in all circumstances—without any individualized consideration—"are exploitative and coercive" and must be eradicated. ROA.4508, 4585. The Commission did so without finding that non-competes are an unfair method of competition in any particular industry.

By the Commission's own assessment, the Rule would massively rework the American economy. The Commission estimates— "conservative[ly]"—that the Rule would invalidate the contracts of "approximately 30 million workers." ROA.4486 & n.34. And given the immense breadth of the definition of "non-compete clause," the Rule would chill many other common employment terms, such as non-solicitation clauses and confidentiality agreements. *See* ROA.5491. The

Commission predicts the economic impact of the Rule would exceed *$400 billion*. *See, e.g.*, ROA.4613.

## IV. Ryan, LLC

Ryan is a global tax consulting firm headquartered in Dallas. It employs over 3,000 people in the United States and serves over 30,000 clients. Ryan's principals and other workers are sought-after tax experts who frequently join Ryan after years of experience in the tax industry.

Ryan's principals and some of its other workers agree to temporally limited non-compete clauses. Those covenants are one type of tool used to protect Ryan's confidential information, including Ryan's playbooks for advising clients, which are often developed through a collaborative process that can take years of research and trial and error to perfect. Ryan's non-competes also prevent departing workers from poaching Ryan's clients and workers.

The Non-Compete Rule would prohibit Ryan from enforcing the vast majority of its non-compete agreements and force Ryan to inform current and former workers that those agreements no longer apply to them. That would place Ryan's business secrets at serious risk of exposure and could lead to poaching of Ryan's clients and workers. And

like Ryan, countless other professional-services firms—as well as businesses that own intellectual property, rely on skilled labor, or have generated goodwill in the marketplace with existing and potential customers—would be impeded from protecting these legitimate business interests. *See, e.g.*, Int'l Franchise Ass'n, *International Franchise Association Statement on Final FTC Noncompete Rule* (Apr. 25, 2024), https://tinyurl.com/2mzn68b2 (condemning "the harm [the Rule] will bring to competition and intellectual property").

## V.    Procedural History

Within one hour of the Non-Compete Rule's promulgation, Ryan filed suit in the Northern District of Texas. ROA.47-68. In its operative Amended Complaint, Ryan alleged that the Non-Compete Rule violates the APA because it exceeds the Commission's statutory authority, defies the nondelegation doctrine, and is arbitrary and capricious. ROA.150-54, 155-59. Ryan further alleged that the Commissioners are unconstitutionally insulated from removal. ROA.154-55. On those bases, Ryan asked the district court to vacate the Non-Compete Rule, with nationwide effect. ROA.160.

The district court granted that relief.  ROA.5639.  The court first held that Section 6(g) is merely a "housekeeping statute" and does not vest the Commission with "the authority to create *substantive* rules regarding unfair methods of competition."  ROA.5627-28.  The court further determined that the Non-Compete Rule "is arbitrary and capricious because it is unreasonably overbroad without a reasonable explanation." ROA.5634-35.  It "imposes a one-size-fits-all approach with no end date" and lacks an "eviden[tiary] or reasoned basis."  ROA.5635.  Additionally, the Commission "failed to sufficiently address alternatives to issuing the Rule."  ROA.5636.  The court accordingly "set aside" the Rule, rejecting the Commission's argument "that relief should be limited to the named Plaintiffs."  ROA.5637.  Applying this Court's binding precedent, the district court reasoned that "setting aside agency action under § 706 has 'nationwide effect,' is 'not party-restricted,' and 'affects persons in all judicial districts equally.'"  ROA.5637 (citing *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024)).

Because the Commission's lack of statutory authority and arbitrary and capricious decisionmaking were sufficient to set aside the Rule, the

district court declined to address Ryan's other arguments.  ROA.5637.
The Commission appealed.  ROA.5640.

## SUMMARY OF ARGUMENT

**I.A.**  The Commission lacks statutory authority to issue the Non-Compete Rule.  The text, structure, and history of the FTC Act confirm the Commission's claimed authority—Section 6(g)—authorizes only procedural, not substantive, rules.  Congress does not hide elephants like the power to promulgate substantive rules that could upend the American economy in mouseholes like the latter half of the seventh subsection in a list of otherwise investigative and ministerial powers. Congress certainly would not have done so without creating penalties for violating the rules that provision supposedly authorizes.  Nor would Congress have gone out of its way to grant the Commission authority to promulgate tailored rules addressing specific topics if the agency already possessed general rulemaking authority.  The Commission itself recognized as much for the vast majority of its history, at many points affirmatively disclaiming the authority to issue rules defining unfair methods of competition.  Indeed, before this Rule, the Commission *never* promulgated a bona fide unfair-method-of-competition rule.

**B.** The major questions doctrine resolves whatever doubt might remain. Agencies cannot dramatically expand their regulatory authority by giving long-extant provisions novel constructions. The Commission's newly claimed power to issue an unfair-method-of-competition rule banning an ancient practice based on a 110-year-old statute is just that. Nor can agencies claim authority to regulate questions of deep economic and political significance, or questions that have historically been the subject of state regulation, absent clear congressional authorization. That describes the Non-Compete Rule to a T.

**C.** The Commission maintains that the plain statutory text, read literally, grants it expansive authority. But literalism is bad textualism; context matters, and here it illuminates the Commission's lack of authority. Perhaps tacitly recognizing as much, the Commission also argues that Congress ratified its authority in later enactments. But those statutes do not come close to meeting the high standard for ratification. If anything, the amendments to the FTC Act demonstrate that Congress expressly chose *not* to ratify the authority the Commission claims.

16

**II.** If the FTC Act did grant the Commission unfair-method-of-competition rulemaking authority, it would be an unconstitutional delegation of legislative power. The power to issue such rules is no different from the unbounded power to create codes of fair competition held unconstitutional in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). At minimum, this Court should interpret the FTC Act to avoid such constitutional problems.

**III.** In addition, the Rule is arbitrary and capricious. For hundreds of years, employers and employees have had the freedom to negotiate mutually beneficial non-compete agreements. Reasonably tailored non-competes are permitted by the vast majority of States, which apply state statutes and common law to determine on a case-by-case basis whether a non-compete is reasonable in duration, geographic scope, and other respects. The Commission nonetheless imposed a one-size-fits-all rule outlawing nearly all non-compete agreements, declaring them to be per se unfair methods of competition in violation of Section 5 of the FTC Act.

That decision is unsupported and unsupportable. The Commission inconsistently weighed the evidence, made logically incompatible findings, ignored comments pointing out these flaws and more limited

17

alternatives, and greatly exaggerated the Rule's purported benefits while downplaying or ignoring its costs. Each of those is a hallmark of arbitrary and capricious decisionmaking.

**IV.** The Commission is also unconstitutionally insulated from the President because the FTC Act restricts his ability to remove Commissioners. Though binding precedent forecloses this argument, Ryan respectfully preserves it for further review.

**V.** The Rule's numerous violations of the APA require universal vacatur. The APA directs courts to "set aside" unlawful agency action, which a court does by vacating it on a nationwide basis. This Court on numerous occasions has recognized that the APA's mandatory language requires courts to vacate unlawful regulations and that the remedy is not plaintiff-specific.

Incredibly, the Commission discusses *none* of those controlling cases. The Commission instead suggests the district court's decision to vacate the Rule was inequitable. Even if the equities were relevant, they starkly favor universal vacatur. The Commission cannot argue the Rule is necessary to establish uniform standards, while also urging that the Court undermine that uniformity by granting plaintiff-specific relief.

Nor can the Commission justify the flood of litigation that would inevitably result from such case-specific relief.

**ARGUMENT**

The Non-Compete Rule runs roughshod over the statutory and constitutional limits on government power.  It overrides the non-compete laws of nearly every State and, if reinstated, would massively and needlessly disrupt the business operations of Ryan and countless other U.S. employers—all without statutory authorization or reasoned justification.  Because the Rule violates the APA, this Court should affirm.

## I. The Commission Lacks Statutory Authority To Issue The Non-Compete Rule.

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  The Commission claims authority to adopt the Non-Compete Rule under Section 6(g) of the FTC Act, which says the agency may "[f]rom time to time classify corporations and … make rules and regulations for the purpose of carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).  That

language does not grant the substantive rulemaking authority the Commission claims.

**A.    The Text, Structure, And History Of The FTC Act Show That Section 6(g) Does Not Authorize Substantive Rules.**

**1.**    "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  But that is exactly what the Commission claims Congress did in the FTC Act.

The FTC Act created the Commission as a "a quasi judicial body," whose function was to "determin[e] in particular instances," based on "particular competitive conditions," whether a particular method of competition was "unfair."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935).  Section 5 of the Act accordingly creates a comprehensive scheme to prevent unfair methods of competition through case-by-case adjudication. *See* 15 U.S.C. § 45.  Section 6, in turn, lays out ancillary powers that generally aid in the administration of that adjudicatory scheme.  *See id.* § 46.   The Commission's claimed rulemaking authority is the latter half of the seventh such ancillary

power, a subsection captioned "classifying corporations." *See* FTC Act, 38 Stat. at 722.

That location is "suspect," to say the least, as the district court concluded. ROA.5629. It is unfathomable that Congress, in one half of one subsection of a provision addressing procedural matters and investigatory powers, provided the Commission—a fundamentally adjudicatory body—with the far-reaching power to issue substantive rules categorically condemning economic practices as unfair methods of competition on a nationwide basis. That "reading would allow a small statutory tail to wag a very large dog." *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021).

**2.** The lack of a statutory penalty for violating rules promulgated under Section 6(g) further demonstrates that it "encompasses only housekeeping rules—not substantive rulemaking power." ROA.5629. When Section 6(g) was enacted in 1914, Congress "follow[ed] a convention for indicating whether an agency had the power to promulgate legislative rules": "inclusion of a separate provision in the statute attaching 'sanctions' to the violation of rules and regulations promulgated under a particular rulemaking grant." Thomas W. Merrill

& Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 493 (2002). There is no penalty provision for Section 6(g) rules. By contrast, Congress specifically authorized penalties for violations of orders resulting from Section 5 *adjudications*. *See* 15 U.S.C. § 45(*l*)-(m); FTC Act, ch. 311 § 5, 38 Stat. at 720. The FTC Act's penalty structure reinforces its adjudicatory scheme. Section 6(g) thus is best interpreted as supplementary to the Commission's adjudicatory powers, not as authority to circumvent adjudication.

The Commission argues (at 31-32) that the district court erred by relying on this interpretive guidepost. But the Commission does not deny the convention was real. *See* FTC Br. 31-32 (arguing only that the Supreme Court in the 1940s and 1950s was unaware of the convention). The Commission also intimates that following this convention is atextualist. But recognizing Congress's longstanding practice is "a tool for discerning—not departing from—the text's most natural interpretation." *Biden v. Nebraska*, 143 S. Ct. 2355, 2376 (2023) (Barrett, J., concurring). Indeed, this Court recently held that the Department of Transportation has authority to make rules under 49 U.S.C. § 41712

precisely because another provision "sets forth civil penalties for violating 'a regulation prescribed' under" the relevant chapter. *Airlines for Am. v. Dep't of Transp.*, 2025 WL 313998, at *7 (5th Cir. Jan. 28, 2025).     The district court here was right to rely on Congress's contemporary drafting convention.

The Commission alternatively argues (at 32) that the FTC Act does provide for penalties for violating unfair-method-of-competition rules. But as the Commission acknowledges, the path to a penalty for violating an unfair-method-of-competition rule runs directly through a Section 5 *adjudication*:  the Commission would have to hold a Section 5 hearing and then issue a cease-and-desist order, violation of which would trigger penalties.  *See* 15 U.S.C. § 45(b), (*l*).  The pairing of the FTC Act's penalties with the Commission's *adjudicatory* authority confirms the agency's lack of *rulemaking* authority.

**3.**     The Commission's historical understanding of its powers likewise favors the district court's interpretation of Section 6(g).  For the first 48 years of its existence, the Commission explicitly disclaimed substantive rulemaking authority.  *See Nat'l Petroleum*, 482 F.2d at 693 & n.27.  In fact, less than a decade after the Act's passage, the

Commission told Congress that "[o]ne of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it." Annual Report of the Federal Trade Commission 36. That "Executive Branch interpretation … issued roughly contemporaneously with [the] enactment of the statute" carries weight. *Loper Bright*, 603 U.S. at 386.

As the district court recognized, the Commission did not assert the power to promulgate substantive rules under Section 6(g) until 1963 and last asserted that power in 1978, before exhuming it to adopt the Non-Compete Rule. *See* ROA.5630-31. Thus, the Commission historically has not understood Section 6(g) to grant substantive rulemaking authority, except for a brief 15-year period. The Commission never even attempts to explain this.

Even in the short period when the Commission did promulgate Section 6(g) rules, it never promulgated a bona fide unfair-method-of-competition rule. The Commission (at 7) claims that it "routinely invoked its Section 6(g) rulemaking authority to issue legislative rules to prevent unfair methods of competition and unfair or deceptive acts or practices." That is misleading, to put it mildly. The rules promulgated during that

time defined unfair or deceptive acts or practices—most commonly deceptive advertising. *See, e.g.*, 29 Fed. Reg. 8,166 (June 27, 1964) ("Misbranding and Deception as to Leather Content of Waist Belts"); 39 Fed. Reg. 15,387 (May 3, 1974) ("Power Output Claims for Amplifiers Utilized in Home Entertainment Products"). To be sure, the Commission sometimes as an afterthought added that those unfair or deceptive acts or practices were also unfair methods of competition, but that boilerplate language does not make these measures unfair-method-of-competition rules "just because the agency says" so. *Chamber of Com. v. OSHA*, 636 F.2d 464, 468 (D.C. Cir. 1980). "Instead, it is the substance of what the agency" did "which is decisive," and none of the rules promulgated under Section 6(g) was substantively directed at unfair methods of competition. *Id.* (cleaned up).

The Octane Rule at issue in *National Petroleum* is representative. The Commission filled seven pages of the Federal Register discussing its conclusion that failure to display gasoline's octane rating deceived consumers into purchasing unnecessary higher-octane gasoline and, thus, was an unfair or deceptive practice. Posting of Minimum Octane Numbers on Gasoline Dispensing Pump, 36 Fed. Reg. 23,871, 23,873-80

(Dec. 16, 1971).   With no additional analysis, the Commission then pronounced that "failure … to affirmatively disclose the research octane rating of the gasoline … constitutes an unfair method of competition and an unfair trade practice."  *Id.* at 23,880.  Like all the other Section 6(g) rules issued from 1962-1978, the Octane Rule was in "substance" an unfair-or-deceptive-act-or-practice rule.  *Chamber of Commerce*, 636 F.2d at 468.

Until the Non-Compete Rule, the Commission *never* asserted that Section 6(g) allowed it to promulgate a bona fide unfair-method-of-competition rule.  This "want of assertion of power by" the Commission, which "presumably would be alert to exercise it," is "significant in determining whether such power was actually conferred."  *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941); *see also AMG Cap. Mgmt*, 593 U.S. at 72 (courts construe the FTC Act in light of "how the Commission's authority (and its interpretation of that authority) has evolved over time").

**4.**   Subsequent amendments to the FTC Act would be wholly superfluous if Section 6(g) granted substantive rulemaking authority.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress

used."). Most importantly, the Magnuson-Moss Act (which added Section 18 of the FTC Act) authorized the Commission to promulgate "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 57a(a)(1)(B), subject to strict procedures that exceed the APA baseline, *id.* § 57a(b)-(d). Section 18 would serve no purpose if Section 6(g) already provided substantive rulemaking power.

The Magnuson-Moss Act also authorizes the Commission to promulgate rules regarding warranties without complying with the procedures of Section 18, *see* Magnuson-Moss §§ 102, 110(a), 88 Stat. at 2186, 2190 (codified at 15 U.S.C. §§ 2302, 2310(a)), and provides that failing to comply with those rules violates Section 5 of the FTC Act, *id.* § 110(b) (codified at 15 U.S.C. § 2310(b)). Again, under the Commission's interpretation of Section 6(g), Congress's express authorization to promulgate rules regarding warranties was superfluous.

Similarly, as the district court recognized, both before and after the Magnuson-Moss Act, Congress granted the Commission other specific rulemaking authorities that "would be superfluous" if "Section 6(g) had already given the Commission … substantive rulemaking power."

27

ROA.5631; *see* 15 U.S.C. § 1194(c) ("The Commission is authorized and directed to prescribe" flammability rules) (enacted in 1967); *id.* § 45a ("The Commission … may … issue [Made in America labeling] rules") (enacted in 1994).

The Commission notes (at 34) that some of those provisions both authorize and direct rulemaking, arguing that Congress's direction distinguishes those provisions from Section 6(g), which merely authorizes rulemaking. But courts must give effect to "every word" Congress uses, not just every section. *Reiter*, 442 U.S. at 339. Statutes that *both* authorize and direct the Commission to make rules specifying certain practices as unfair methods of competition demonstrate that there is no general power to issue unfair-method-of-competition rules. Moreover, the Commission ignores that a different provision directs the agency to "prescribe rules" concerning a particular subject (contact lenses) "pursuant to section 18 of the Federal Trade Commission Act," demonstrating that Congress knows how to direct the Commission to exercise already-extant authority when intended. 15 U.S.C. § 7607. That Congress elsewhere *granted* authority demonstrates that Section 6(g) grants none.

### B.    The Major Questions Doctrine Confirms The Commission's Lack Of Statutory Authority.

If any doubt remains, the major questions doctrine resolves it.  *See West Virginia v. EPA*, 597 U.S. 697, 716 (2022).  That doctrine embodies the "'common sense'" principle that Congress does not delegate massive powers in "'vague terms.'"  *Id.* at 722, 723 (citations omitted).  Agencies cannot regulate "a question of deep economic and political significance" absent "clear" authority from Congress.  *Nebraska*, 143 S. Ct. at 2375 (quotation omitted).    Whether the Commission has authority to promulgate an unfair-method-of-competition rule banning non-competes is a quintessential major question.[1]

**1.**  The major questions doctrine applies when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'"  *West Virginia*, 597 U.S. at 724 (quoting *UARG v. EPA*, 573 U.S. 302, 324 (2014)).

That includes newfound rulemaking authority, which must be conferred in a manner that is "open to no misconstruction, but clear and

---

[1] Contrary to the Commission's assertion (at 35), the district court did not "declin[e]" to invoke the major questions doctrine.  The court merely had no cause to invoke it because Section 6(g) clearly does not authorize unfair-method-of-competition rulemaking.

direct," even when the agency indisputably has case-by-case enforcement authority. *ICC v. Cincinnati, N. O. & T. P. Ry. Co.*, 167 U.S. 479, 505 (1897); *see West Virginia*, 597 U.S. at 740 (Gorsuch, J., concurring) (discussing *Cincinnati*). That is because the "legislat[ive]" power to ban a practice categorically is orders of magnitude broader than the power to "enforce" the statute against a practice under the specific facts of a particular case. *Cincinnati*, 167 U.S. at 501. The Commission's observation (at 38) that an agency with both rulemaking and adjudicatory authority may choose which to use is irrelevant—the question is whether the Commission has rulemaking authority in the first place.

The Non-Compete Rule is the first bona fide unfair-method-of-competition rule in the Commission's 110-year history. Until now, the Commission has enforced the FTC Act's prohibition of unfair methods of competition on a case-by-case basis, as Congress intended. Other than a brief 15-year interlude ended by enactment of the Magnuson-Moss Act, the Commission has not claimed that Section 6(g) confers substantive rulemaking authority at all. And in that short period, the Commission promulgated only unfair-or-deceptive-act-or-practice rules. *See supra* 24-

26.   The Commission's interpretation of Section 6(g) thus represents a "transformative expansion" of its authority, presenting a classic major question.  *West Virginia*, 597 U.S. at 724.

**2.**   Similarly, courts regularly invoke the major questions doctrine when an agency seeks to effectuate a "fundamental revision of [a] statute, changing it from one sort of scheme of regulation into an entirely different kind."  *West Virginia*, 597 U.S. at 728 (brackets and ellipsis omitted).  By transforming the FTC Act's prohibition of unfair methods of competition from an adjudication-centric scheme into a rule-based one, the Commission has fundamentally changed the regulatory scheme.

Likewise, the Non-Compete Rule transforms the FTC Act from a trade-regulation statute into a worker-protection statute.  But the Commission is not an employment regulator, and its suggestion that it has a history of regulating non-compete agreements is risible.  *See* ROA.4496.  Excepting one failed adjudication, *see Snap-On Tools*, 321 F.2d at 837, the Commission had never addressed non-competes until it "rushed out" a handful of consent agreements in the days before

31

proposing the Rule in a transparent attempt to create a paper trail.  *See* ROA.4710.[2]

**3.**   Further, the Non-Compete Rule indisputably has enormous economic significance.  The Commission itself estimates that the Rule would render approximately 30 million contracts unenforceable, affect "one in five American workers," and have an economic impact in the hundreds of billions of dollars.  ROA.4486, 4613.  The "economic and political significance" of the Rule "provide[s] a reason to hesitate before concluding that Congress … confer[ed] such authority."  *West Virginia*, 597 U.S. at 721 (quotation omitted).

**4.**   Finally, Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power.'"  *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (citation omitted).  The Rule purposefully "intrudes into an area that is the particular domain of state law."  *Id.*; *see* ROA.4596 (touting the

---

[2]  The Commission suggests (at 37-38) that Ryan has not disputed that the Commission could initiate enforcement actions against non-competes.  As Ryan previously made clear, it does not concede that the Commission could properly determine that any non-compete is an unfair method of competition.  *See* ROA.4316. Ryan has focused on the Commission's authority to issue a blanket ban because that is what the Rule does.

supposed "[b]enefits of [p]reemption"). Non-competes have been regulated by the States since the Founding. *See supra* 8-9. And the proper way to regulate them at the state level remains a question of deep political significance vigorously debated today. For example, Minnesota recently banned non-compete agreements, Minn. Stat. § 181.988 (2023), while the governors of New York and Rhode Island vetoed similar bans, *see* Maysoon Khan, *New York governor vetoes bill that would ban noncompete agreements*, Associated Press (Dec. 23, 2023), https://tinyurl.com/yne98v45; Alexander Castro, *Gov. McKee vetoes bills on kratom, nursing homes and non-compete clauses*, Rhode Island Current (June 27, 2024), https://tinyurl.com/35pu74xe. Other States, such as Georgia, have made non-competes easier to enforce. *See* Ga. Code Ann. §§ 13-8-50–54. If Congress had intended to permit the Commission to terminate those "economic experiments," it would have clearly said so. *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-74 (2001) ("*SWANCC*").

* * *

In sum, the Commission has, for the first time in its history, invoked the latter half of the seventh subsection of a provision otherwise authorizing investigatory and ministerial powers to promulgate an unfair-method-of-competition rule. Far from a "targeted regulatory effort," FTC Br. 37, the Non-Compete Rule is perhaps the most controversial employment regulation in history. It would invalidate 30 million employment contracts, preempt the laws of nearly every State, and engender hundreds of billions of dollars of economic effects. The Commission without irony maintains (at 36-37) that the major questions doctrine is not implicated because it applies only in cases where agencies have relied on "little-used backwater" provisions to "assert[] authority of … unusual 'history' and 'breadth' and 'significance.'" But that is precisely this case.

### C.    The Commission's Counterarguments Are Meritless.

The Commission offers two principal justifications for dismissing the FTC Act's context, structure, and history and the major questions doctrine. First, the Commission insists that Section 6(g)'s plain text authorizes rules to prevent unfair methods of competition. Second, the Commission argues that, regardless of whether the original FTC Act

granted unfair-method-of-competition rulemaking authority, Congress ratified the Commission's authority in subsequent enactments. Neither argument is correct.

**1.** The Commission's plain-text argument fails. The Commission contends (at 20-21) that Section 6(g) must authorize legislative rules because "[n]othing in [the subsection] cabins the Commission's authority." But "hyper-literalism is bad textualism." *State of Louisiana, By & Through its Div. of Admin. v. I3 Verticals Inc.*, 81 F.4th 483, 493 (5th Cir. 2023). Even in circumstances where statutory language "at first blush … seemingly grants the Commission the power" it claims, those words "cannot be construed in a vacuum"; rather, they "must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Private Fund Managers v. SEC*, 103 F.4th 1097, 1110-11 (5th Cir. 2024). The FTC Act's context makes clear that Section 6(g) does not grant substantive rulemaking authority. *See supra* 20-28.

The cases the Commission cites (at 22-24) are not to the contrary. The Commission contends that in *Mourning v. Family Publication Service, Inc.*, 411 U.S. 356 (1973), *Thorpe v. Housing Authority of the City*

*of Durham*, 393 U.S. 268 (1969), and a few other cases, the Supreme Court held that language like that in Section 6(g) confers substantive rulemaking authority.  But those cases did not analyze whether the agencies had rulemaking authority because nobody had argued they did not.  Instead, the Court considered whether the rules at issue conflicted with other provisions of the statutes that concededly granted at least some rulemaking authority.

For example, in *Mourning*, the party challenging the rule conceded that the Board had rulemaking authority but contended that the rule at issue "must be abrogated since it is inconsistent with portions of the enabling statute."  411 U.S. at 372 (quotation omitted).  And in *Thorpe*, "[t]he Housing Authority argue[d] that" the agency's rulemaking authority was "limited by the Act's express policy of 'vesting in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program.'"  393 U.S. at 277.  The other cases the Commission cites are similar.[3]

---

[3] *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 608 (1991) (summarizing party's argument that National Labor Relations Act "requires the Board to make a separate bargaining unit determination 'in each case,'" prohibiting the use of a "general rul[e] to define bargaining units"); *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 794 (1978) (summarizing party's argument that statute authorizing regulation of

None of those cases purported to hold that the phrase "rules and regulations as may be necessary to carry out the provisions of this Act" necessarily grants substantive rulemaking authority, regardless of the statutory context. And none of the statutes at issue in those cases related to a quasi-adjudicatory agency that had historically disclaimed rulemaking authority or that was relying on supposed rulemaking authority buried in the latter half of a subsection devoted to "classifying corporations."

The Commission also argues (at 21) that its Section 5 mandate to "prevent" unfair methods of competition necessarily contemplates prospective rulemaking authority.  But if the Commission could "prevent" unfair methods of competition only by promulgating rules, it would make little sense for Congress to have granted it adjudicatory authority.  Yet for over a century, the Commission has used its adjudicatory authority to issue cease-and-desist orders that "'keep [unfair methods of competition] from existing or occurring'"—and thus

---

"'communication by wire or radio,'" precluded the Commission from "us[ing] its licensing authority … to promote diversity in" communications markets outside "the broadcasting industry."). The Commission also cites *Brackeen v. Haaland*, but the relevant portion of the opinion relied on *Chevron* deference.  *See* 994 F.3d 249, 353-54 (5th Cir. 2021) (en banc) (per curiam).

*prevent* them—through their threat of monetary penalties and precedential effect. FTC Br. 21 (quoting Prevent, Century Dictionary and Cyclopedia (1911)).

The Commission's arguments concerning the original meaning of the FTC Act ultimately boil down to a form of *Chevron* deference in disguise: the agency's broad reading of its authority should be given the benefit of the doubt to avoid "undermin[ing]" the strong arm of the administrative state. FTC Br. 21; *accord Nat'l Petroleum*, 482 F.2d at 678 (concluding that Section 6(g) should be "liberally … construe[d]"). But courts must use the "full interpretive toolkit." *Loper Bright*, 603 U.S. at 409. As shown above, the "traditional tools of statutory construction" demonstrate that Section 6(g) does not grant the Commission authority to issue substantive rules defining unfair methods of competition. *Id.* at 403.

**2.** Perhaps recognizing that Section 6(g) is an awfully slim reed, the Commission also argues that later enactments—the Magnuson-Moss Act and the FTC Improvements Act—ratified the Commission's purported practice of issuing rules under Section 6(g), as upheld in *National Petroleum*. But those statutes did no such thing.

38

Magnuson-Moss did not ratify the result that *National Petroleum* reached through its long-since-discredited mode of statutory construction. *See* Richard J. Pierce Jr., *Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?*, GW Law Faculty Publications & Other Works 1561, at 9 (2021) (*National Petroleum*'s "method of statutory interpretation … has not been used by any court in decades"). As the Commission points out, courts presume "that when Congress reenact[s] the same language," it adopts a widespread judicial "construction of that phrase." *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131, (2019). But Congress never "reenact[ed]" Section 6(g) after *National Petroleum*. *Id.* And even if it had, courts only apply that presumption to "broad and unquestioned" "judicial consensus," not to a single circuit-court opinion. *JAMA v. ICE*, 543 U.S. 335, 349 (2005).

Magnuson-Moss did not ratify the Commission's supposed practice of issuing rules under Section 6(g) either. Although the Supreme Court once observed that Congress's revisiting a statute without making "pertinent change" is evidence that a "longstanding administrative interpretation" is correct, *CFTC v. Schor*, 478 U.S. 833, 846 (1986), it has

39

since cautioned that "congressional acquiescence" should be recognized "with extreme care" and only if there is "overwhelming evidence of acquiescence." *SWANCC*, 531 U.S. at 160, 169 n.5; *see also Collins v. Mnuchin*, 938 F.3d 553, 572 (5th Cir. 2019) (same). There is no evidence of any acquiescence, let alone overwhelming evidence.

The Commission ignores *SWANCC*'s "overwhelming evidence" standard. But even under *Schor*, there has been no ratification. There was no "longstanding administrative interpretation" allowing unfair-method-of-competition rulemaking for Congress to ratify. *Schor*, 478 U.S. at 846. As discussed, the Commission interpreted Section 6(g) to grant no rulemaking authority at all for most of its history; in the brief period before Magnuson-Moss when the Commission asserted authority under Section 6(g), it promulgated only unfair-or-deceptive-act-or-practice rules. *See supra* 24-26. The Commission's assertion (at 27) that it "routinely exercised its Section 6(g) authority to promulgate binding legislative rules defining … unfair methods of competition" is simply false.

Even if there were a practice to ratify, Magnuson-Moss made "pertinent change[s]" to the FTC Act that demonstrate the *absence* of

ratification—granting the Commission authority to promulgate unfair-or-deceptive-act-or-practice rules, but not unfair-method-of-competition rules. *Schor*, 478 U.S. at 846. That new statutory authorization *rebuts* the Commission's position that Section 6(g) *already* provided power to issue substantive rules.

The Commission (at 26) emphasizes that Magnuson-Moss provided that the grant of rulemaking authority with respect to unfair or deceptive acts or practices, and procedural restrictions on exercising it, "shall not affect any authority of the Commission to prescribe rules … with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2). But if Congress aimed to ratify existing authority, it would have said Magnuson-Moss "shall not affect *the* authority of the Commission to prescribe unfair-method-of-competition rules." Indeed, the Commission has never explained why Congress would have saddled the Commission with heightened procedural hurdles to issue rules defining unfair or deceptive acts or practices, while giving the agency free rein with respect to rules defining unfair methods of competition.[4]

---

[4] Magnuson-Moss also included language to ensure that unfair-or-deceptive-act-or-practice rules would be issued only under Section 18. *See* 15 U.S.C. § 46(g) ("except as provided in section 57a(a)(2)"); *id.* § 57a(a)(2) (clarifying the Commission can

41

As Ryan explained exhaustively below, *see* ROA.3635-36, 4314-15, the legislative history strongly indicates that Congress deliberately chose to remain neutral on whether Section 6(g) granted authority to promulgate substantive rules defining unfair methods of competition. That question divided legislators. *Compare* 120 Cong. Rec. 40,606, 40,713 (1974) (statement of Sen. Hart) (suggesting the Commission had unfair-method-of-competition rulemaking authority), *with* 120 Cong. Rec. 41,386, 41,407 (1974) (statement of Rep. Broyhill) (suggesting the Commission did not have "any such authority"). The Senate bill conferred no rulemaking authority, removing a section from an earlier bill that had granted unfair-or-deceptive-act-or-practice rulemaking authority only. *See* S. Rep. No. 93-151, at 32 (1973) (discussing S. 986, § 206, 92d Cong. (1971)). The House bill expressly barred unfair-method-of-competition rules, while granting unfair-or-deceptive-act-or-practice

---

promulgate unfair-or-deceptive-acts-or-practices rules only under Section 18). The Commission previously contended those clauses would be superfluous unless Section 6(g) encompassed substantive rulemaking authority, but has wisely abandoned that argument on appeal. Those clauses reflect "a belt and suspenders approach" to ensure that the Commission cannot avoid Section 18's heightened procedures. *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1350 n.5 (2020).

rulemaking authority.  At no point had either the House or the Senate proposed granting authority for unfair-method-of-competition rules.

The conference between the houses split the difference between the two bills.  The Commission was granted authority to issues unfair-or-deceptive-act-or-practice rules—consistent with the House's approach—while the Senate's neutrality toward unfair competition authority was adopted, leaving the 1914 status quo in place.  *See* S. Conf. Rep. No. 93-1408 § 202 (1974).  The Commission studiously ignores the full legislative history, instead cherry-picking the views of a single senator.

The FTC Improvements Act of 1980 similarly provides no support for the Commission's interpretation of Section 6(g).   The FTC Improvements Act subjected rules promulgated under Section 6 and Section 18 to enhanced procedural requirements (beyond those imposed by Magnuson-Moss).  15 U.S.C. § 57b-3(a)(1).  The Commission contends (at 28-29) that the reference to Section 6 implicitly ratifies authority to issue unfair-method-of-competition rules.  Not so.  The Act's reference to Section 6 merely ensured that the new enhanced procedures would apply to amendments to *unfair-or-deceptive-act-or-practice rules* promulgated before  Magnuson-Moss.    The  legislative  history  supports  that

understanding: "[S]ection 18 is specifically limited to authority to issue rules to prohibit unfair or deceptive acts or practices. The clear intent of Congress in granting this authority was ... *not to provide new rulemaking authority over antitrust violations*." S. Rep. No. 96-500, at 19 n.6 (1979) (emphasis added). In any event, "[a]t most, the [1980] amendment is merely an expression of how the [1980] Congress interpreted a statute passed by another Congress more than a half century before," which "has very little, if any, significance." *Rainwater v. United States*, 356 U.S. 590, 593 (1958).

Finally, the Commission's practice demonstrates that neither Magnuson-Moss nor the FTC Improvements Act ratified its rulemaking authority. The Commission claims Section 6(g) rulemaking authority was ratified in 1975 and 1980, yet did not promulgate a Section 6(g) rule until this one. That absence of an "assertion of power" is "significant" evidence that no "such power was actually conferred." *Bunte Bros.*, 312 U.S. at 351-52.

\* \* \*

In short, Section 6(g) does not grant the Commission substantive rulemaking authority. If there were any doubt, the major questions

doctrine resolves it.  And the Commission's reliance on later enactments is unavailing, because those later enactments neither granted nor ratified unfair-method-of-competition rulemaking authority.  The Non-Compete Rule is therefore "in excess of statutory … authority" and must be "set aside."  5 U.S.C. § 706(2)(C).

## II.    A Grant Of Rulemaking Authority To Define Unfair Methods Of Competition Would Violate The Constitution.

If Section 6(g) did grant the Commission authority to issue substantive unfair-method-of-competition rules, it would be an unconstitutional delegation of legislative power.  This is further reason to reject the Commission's expansive reading of the statute.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[A]mbiguous statutory language [must] be construed to avoid serious constitutional doubts.").

The Constitution vests "[a]ll [the] legislative Powers" it grants in "Congress."  U.S. Const. art. I, § 1.  Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *Schechter*, 295 U.S. at 529.  Rather, Congress may delegate power to an agency only if it provides an "intelligible principle" by which the agency can exercise that power. *Mistretta v. United States*, 488 U.S.

45

361, 372 (1989).  More precisely, Congress may authorize agencies only to "fill[] up details and find[] facts." *Gundy v. United States*, 588 U.S. 128, 179 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *see also Paul v. United States*, 140 S. Ct. 342 (2019) (Kavanaugh, J., respecting denial of certiorari).  Without the non-delegation doctrine, "unelected bureaucrats—rather than elected representatives—[would have] the final say over matters that affect the lives, liberty, and property of Americans." *Consumers' Research v. FCC*, 109 F.4th 743, 759 (5th Cir. 2024) (en banc), *cert. granted* 2024 WL 4864037 (Nov. 22, 2024).

The FTC Act does not provide an intelligible principle to guide unfair-method-of-competition rulemaking.  Section 6(g) states only that the Commission can make "rules and regulations for the purpose of carrying out the provisions of this subchapter."  And Section 5, the subchapter's primary substantive provision, prohibits "unfair methods of competition"—a phrase that "does not admit of precise definition," *Schechter*, 295 U.S. at 532, but instead allows the Commission to "measur[e] a practice against the elusive … standard of fairness," *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  That sort of

46

subjective, value-laden phrase does not provide an intelligible principle to guide Commission rulemaking.

The Supreme Court's decision in *Schechter* powerfully demonstrates that point. In *Schechter*, the Court held that the National Industrial Recovery Act unconstitutionally authorized the President to adopt "codes of fair competition." 295 U.S. at 521-23. The FTC Act was different, the Court explained, precisely because the authority it gave the Commission over "unfair methods of competition" was to be exercised only "in particular instances" after "formal complaint," "notice and hearing," "findings of fact," and "judicial review." *Id.* at 533. The Recovery Act, on the other hand, "dispense[d] with th[at] administrative procedure," authorizing the promulgation of a "legislative code." *Id.* at 533, 539. That "code-making authority … [was] an unconstitutional delegation of legislative power." *Id.* at 542.

The Commission's claimed authority to promulgate rules defining "unfair methods of competition" is virtually identical to the authority to issue "codes of fair competition" held unconstitutional in *Schechter*. The phrases "fair competition" (in the Recovery Act) and "unfair methods of competition" (in the FTC Act) both extend beyond mere "unfair

competition." *Schechter*, 295 U.S. at 532 (addressing Recovery Act); *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 310-11 (1934) (addressing FTC Act). Neither provides an intelligible principle to constrain agency decisionmaking.[5]

The Commission's attempt to put some meat on the bones that Congress left bare only reinforces the elusiveness of Section 5's standards. The preamble to the Rule asserts that "indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature." ROA.4501. "That is a lot of words, but they amount to a concept … so amorphous" that the FTC can do whatever it "thinks is good." *Consumers' Research*, 109 F.4th at 760.

Indeed, this list of value-laden adjectives is copied verbatim from the Commission's November 2022 Policy Statement Regarding the Scope

---

[5] In *Airlines for America*, this Court stated that Congress could constitutionally delegate to the Department of Transportation authority to promulgate rules regarding unfair or deceptive practices or unfair methods of competition in airline commerce. 2025 WL 313998, at *11. But that conclusion respecting unfair methods of competition is *dicta* because the case concerned an unfair-or-deceptive-practice rule. *Id.* at *2, *9. In any event, the Court's reasoning relied on the rulemaking authority being limited to "rules that are 'appropriate' and 'necessary'" to regulation of "airline commerce," not "the entire economy," *id.*; the FTC Act lacks comparable restrictions.

of Unfair Methods of Competition, which jettisoned the century-old rule of reason and claimed that Section 5 allows the Commission to regulate conduct that "is not facially unfair" according to an indeterminate "sliding scale," as long as the conduct has some "tendency to negatively affect competitive conditions." Commission File No. P221201, at 9 (Nov. 10, 2022). Regardless, the fact that the Commission feels the need to provide (illusory) guardrails demonstrates that Congress itself provided none.

The highly subjective nature of Section 5 distinguishes it from the "more technical" delegations of power that the Supreme Court has upheld. *Mistretta*, 488 U.S. at 372. "[T]he Court has deemed it constitutionally sufficient for Congress to make a policy judgment and then direct an agency to give that judgment effect through the application of technical knowledge" or "scientific expertise." *Consumers' Research*, 109 F.4th at 763. These delegations, such as "a congressional directive to EPA to set ambient air quality standards for certain pollutants," are permissible because the agencies have "superior technical knowledge," *id.* at 764, or because the agencies may have to "vary" quantitative

regulatory components "according to changing conditions," *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

But the Commission's decision to ban contracts that have been legal in nearly every State for centuries "involves policy judgments, not technical ones." *Consumers' Research*, 109 F.4th at 764. The Commission could have chosen to leverage its expertise by promulgating a narrowly tailored ban on non-competes in specific industries, for workers below certain income thresholds, for workers with specified job duties, or in local markets with certain economic conditions. It did not. Instead, three unelected Commissioners simply decided that non-compete agreements everywhere, for nearly everyone, are categorically and forever inequitable. There were no "intricate calculations" here. *Gundy*, 588 U.S. at 163 (Gorsuch, J., dissenting).

At minimum, the Commission's boundless interpretation of the FTC Act urges caution. The canon of constitutional avoidance instructs that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023)

(en banc) (quotation omitted), *aff'd*, 602 U.S. 406 (2024). Because "the question of … delegating legislative power … raises serious constitutional concerns," *id.* at 472, the Court should construe Section 6(g) not to provide authority to promulgate rules defining unfair methods of competition.

## III.   The Rule Is Arbitrary And Capricious.

As the district court correctly concluded, the Rule is also arbitrary and capricious. ROA.5633-37. The Commission's decision to categorically ban non-competes is neither "'reasonable'" nor "'reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (citation omitted). The numerous instances of unreasoned decisionmaking throughout the Rule indicate that, rather than developing "a rational connection between the facts found and the choice made," the Commission made a choice and then distorted the evidence to find facts to support it. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For similar reasons, the Commission's blinkered cost-benefit analysis is fatally flawed.

## A.    The Commission Did Not Justify A Blanket Ban.

The Commission's justifications for imposing a nationwide, blanket ban on non-competes do not withstand scrutiny.  At bottom, the Commission justifies the Rule by asserting that non-competes satisfy the criteria laid out in its non-binding and legally flawed Policy Statement Regarding the Scope of Unfair Methods of Competition, and thus are nearly always and everywhere an unfair method of competition.  *See* FTC Br. 39-41 (summarizing preamble reasoning).  Even assuming that non-competes meet the criteria laid out in the Policy Statement—and they do not—the Commission cannot fulfill the APA's requirement of reasoned decisionmaking by checking self-created, self-serving boxes.  It still had to consider reasonable alternatives and congressionally mandated factors, and rationally and consistently weigh the evidence before it.  In at least five ways, the Commission failed to do so.

**1.**  The Commission's decision to impose an industry-wide ban was unreasoned in two related, but distinct ways.  First, the Commission did not meaningfully consider the alternative of imposing industry-specific bans.  "[A]n agency has a duty to consider responsible alternatives to its chosen policy." *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486,

1511 (D.C. Cir. 1984). Many of the Commission's findings were based on studies of particular industries, especially the healthcare and technology sectors. *See, e.g.*, ROA.4576 (discussing prices and concentration in the healthcare market); ROA.4525-26, 4532-33 (discussing the technology industry). Commenters explained that the Commission's evidence did not support banning non-competes in all industries and urged consideration of narrower, industry-specific alternatives.[6] But the Commission demurred, and thus "failed to sufficiently address alternatives." ROA.5636.

Second, and relatedly, the Commission entirely failed to examine whether non-competes are unfair methods of competition in *all* industries. *See* ROA.4600-09. The Commission never established a "rational connection" between the industry-specific "facts found" and the economy-wide "choice made." *State Farm*, 463 U.S. at 43. Indeed, the Rule bars a centuries-old practice based on a nascent academic literature examining only a smattering of American industries and locales. *See*

---

[6] *See, e.g.*, ROA.5489-91 (arguing the consulting industry should be excluded from the rule); ROA.5442-52 (same for manufacturing); ROA.5204 (small business owner suggesting that "if statistically valid industry by industry studies suggest a need in some instances for a national rule within the agency's authority," the Commission should "tailor it to industries the study identifies").

ROA.5522-23 (explaining recency and shallowness of the economic studies on non-competes).

**2.** The Commission also did not adequately consider whether to exclude from the Rule non-compete agreements among partners in a business. Indeed, it "offered no reasoned response" to comments pointing out the flaws in applying the Rule to business partners. *Ohio*, 144 S. Ct. at 2054. Numerous commenters, including Ryan, explained that partners in businesses such as consulting firms are often core to the business and, therefore, have considerable bargaining power when negotiating non-competes. *See* ROA.5517. That consideration supports allowing non-competes for personnel who hold equity in a business.

Instead of engaging with that aspect of the problem, the Commission merely stated that "proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving." ROA.4564. But in many cases, the proposed exception for partners would *not* be covered by that exception because the Commission made clear that the Rule bans agreements that reduce the value of an equity-holding employee's shares if she leaves and competes with her former employer.

ROA.4582.  The Commission's response is thus an evasion of Ryan's comment, not a "reasoned response" to it.  *Ohio*, 144 S. Ct. at 2044; *see also, e.g.*, *Mexican Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (failing to respond to "significant points … raised by the public comments" indicates a failure to "consider[] the relevant factors").

**3.**  Nor did the Commission adequately consider how non-competes affect consumer welfare, a key factor in determining whether they universally are an unfair method of competition.  The FTC Act "was designed to supplement and bolster the Sherman Act and the Clayton Act."  *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394 (1953).  Though the Commission may be permitted to "consider[] public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws," *Sperry & Hutchinson Co.*, 405 U.S. at 241, 244, it cannot jettison the core policies encompassed by the antitrust laws.  Whether a policy is "harmful to the consumer" or "in the consumer's best interest" is the core consideration under the antitrust laws.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  And Congress could not have been clearer that this consideration remains central to the FTC Act:  "The Commission shall have no authority … to

declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to *consumers* which is … not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). "[E]stablished public policies" may be considered but "may not serve as a primary basis for such determination." *Id.*

Accordingly, especially in an inflationary era, the Commission was required to consider whether and to what extent the Rule would raise consumer prices. The Commission said it "does not expect that prices will rise because of the rule," ROA.4610, but that assertion was based on a single study of the healthcare market and directly contradicts the Commission's own finding that the projected "increases in worker earnings from restricting non-competes may increase consumer prices because of higher firms' costs," ROA.4622. In rushing to minimize the Rule's obvious economic effects, the Commission gave inadequate consideration to this "important aspect of the problem." *State Farm*, 463 U.S. at 43.

**4.** Additionally, "the Commission relied upon insufficient empirical data" to support its conclusions. *Bus. Roundtable v. SEC*, 647 F.3d 1144,

1150 (D.C. Cir. 2011). Although the Commission cited some empirical studies, the Commission's own economist recognized that those studies could not determine "the likely effects of broad prohibitions of non-compete agreements." ROA.4923. The economist's analysis recognized that, among other problems with the literature, "the paucity of changes in [non-compete] enforceability" makes it "far from clear whether the estimated effects are likely to extend to other states[,] … industries[,] … or occupations." ROA.4930; *see also* ROA.4931-32 (discussing flaws with studies). Perhaps because of that inconvenient conclusion, the Commission did not cite its own economist's analysis once, even though it was raised in numerous comments. *See, e.g.*, ROA.5521.

As the district court held and the FTC's economist recognized, none of the State-specific empirical evidence the Commission cited could measure the effects of the Rule because no State has gone nearly as far as the Rule does. ROA.5635. It was arbitrary and capricious to base the Rule on these studies of very different and far narrower state-level initiatives, none of which could predict the "economic consequences of [the] rule." *Business Roundtable*, 647 F.3d at 1151.

**5.** Finally, the Commission relied on inconsistent and contradictory reasoning regarding the Rule's effect on information-sharing, which is a significant part of its basis for finding that non-competes negatively affect competition. The Commission claimed that eliminating non-competes would increase innovation by eliminating obstacles to information-sharing, including by corporate executives. ROA.4552-53. But the Commission simultaneously claimed that employers can use "alternatives to non-competes," such as non-disclosure agreements and trade-secret law to prevent information-sharing. ROA.4567-69. The Commission did not explain how both can be true. If non-disclosure agreements and trade-secret law were sufficient to prevent sharing of valuable information, abolishing non-competes would not increase innovation because employers would simply replace the non-competes with comprehensive non-disclosure agreements and vigorous (and costly) enforcement of trade-secret law. Such "[i]llogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *Chamber of Com. of U.S.A. v. DOL*, 885 F.3d 360, 382 (5th Cir. 2018).

## B.     The Commission's Cost-Benefit Analysis Is Arbitrary And Capricious.

An agency's cost-benefit analysis "can render the rule unreasonable if the analysis rests on a serious flaw." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (quotation omitted).  The Commission's cost-benefit analysis here was fatally flawed:  the benefits are overstated, the identified costs are understated, and a host of other costs are simply ignored.  A proper cost-benefit analysis would show that the economic costs of banning non-competes far outweigh the benefits.

**1.** The Commission exaggerated the Non-Compete Rule's purported benefits.  Citing a single study based on a decade-old survey of workers, the Commission concluded that 20% of American workers are bound by non-competes.  ROA.4489.  But that study conceded that its "data" may not be "representative."  Evan P. Starr, J.J. Prescott & Norman D. Bishara, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 82-83 (2021).  Further, the number of workers who supposedly would benefit from the Rule has fallen since the study was released, as several States have restricted the use of non-competes in the last few years.  *See* ROA.4608 n.1050.

Moreover, the purported benefit to workers is negligible—except for certain high earners. The proposed rule projected that CEOs and physicians would be among the principal beneficiaries of projected wage gains under the Rule. ROA.4691-92. The preamble to the final Rule attempted to minimize that conclusion, but nevertheless conceded that "college-educated workers … experience relatively larger adverse effects on their earnings from non-compete enforceability." ROA.4528. In any event, the Commission found the Rule would increase wages a paltry 0.86% overall—wages grew that much in the fourth quarter of 2024 alone. *See* ROA.4617; Employment Cost Index – December 2024 at 2, Bureau of Labor Statistics. The Commission also conceded that "[i]t is difficult to determine the extent to which [these] earnings effects represent transfers versus benefits." ROA.4618. Despite all this, the Commission placed enormous weight on the Rule's negligible wage gains. *See, e.g.*, ROA.4617-19.

**2.** At the same time, the Commission ignored several substantial costs to businesses. Firms that use non-competes have structured their personnel and logistical decisions in reliance on the centuries of precedent finding reasonable non-competes valid. Those firms'

compliance with the Rule is not as simple as the acknowledged (but understated) costs of rewriting contracts and obtaining legal advice discussed below.  Rather, they will have to develop whole new policies, agreements, and terms for potentially thousands of employees to protect intellectual property in lieu of non-compete agreements—the Commission entirely failed to consider these costs.

Even more troublingly, many firms would have to revamp entire business models, especially models centered around selling highly educated and specialized experts' professional services.  *See, e.g.*, ROA.5438-349; ROA.5441.  These firms would also face greater hiring, training, and human-resources expenses from increased worker turnover.  *See, e.g.*, ROA.5463; ROA.5356.  The Rule does not meaningfully grapple with these business disruptions, which arise from firms' legitimate reliance on the status quo.  *See Encino Motocars, LLC v. Navarro*, 579 U.S. 211, 223-24 (2016).  Nor does the Commission's brief seriously address these concerns.  Even if "the adverse consequences of taking no action outweighed settled expectations and reliance interests," FTC Br. 45, the Commission still had to—and did not—consider the costs of undermining these interests when issuing the Rule.

The Commission similarly failed to consider costs the Rule would inflict upon the broader economy.  Most obviously, the Commission ignored inflation resulting from increased production costs due to reduced training and limited worker access to information, confining its analysis of inflation to a single study of the healthcare market and dubiously extrapolating data from that idiosyncratic market to the entire economy.  ROA.4622.  The Commission also ignored that firms might outsource jobs to highly industrialized countries where non-competes are legal, including Canada, France, or Japan.  *See* ROA.5534.

**3.**  The Commission downplayed the costs it did acknowledge.  The Commission admitted that the Rule might cause firms to reduce "human capital investment," for instance, ROA.4566, but brushed aside this loss with an indifference reflecting how out-of-depth the Commission is in its newfound role of employment regulator.  Workers suffer most from reduced training, since training yields "higher pay, greater likelihood of promotion, and more job security."  ROA.5532 (citation omitted).  A bipartisan consensus recognizes that employer-provided training has become particularly important today, as employers—through apprenticeship and the like—provide skills and know-how that four-year

colleges do not. *See* ROA.5511-13. Reduced worker training also harms firms and consumers because better trained workers are more productive, knowledgeable, and innovative. *See* ROA.5532. The Rule, then, would harm the very people it purports to help—workers and consumers.

The Commission also underestimated the costs of modifying workers' contracts. The Commission estimated that each firm would need only one hour of a lawyer's time to modify contracts for incoming workers, and four to eight hours for current workers. ROA.4625. That is a massive underestimate. Large companies with thousands of employees have many different documents, including handbooks and severance agreements, that would need to be analyzed for non-competes and any other covenant that may fall under the Commission's broad "non-compete" definition. And small businesses may need more attorney time per employee, as they are less likely to consistently use form contracts. *See* ROA.5528; ROA.5477.

The Commission similarly minimized the Rule's effect on litigation costs. While the Rule would decrease non-compete litigation, litigation involving other restrictive covenants and trade-secret laws would

increase.  Trade-secret and non-disclosure litigation are especially costly because enforcement requires discovery into information outside plaintiffs' possession.  The Commission acknowledged this "may be costly," but then claimed—without evidence—that the "decrease in non-compete litigation would likely offset" those costs.  ROA.4612.

In short, the Commission's cost-benefit analysis is selective, incomplete, and thus arbitrary and capricious.

## IV.  The Commission Is Unconstitutionally Insulated From The President.

Because the Constitution vests the executive power in the President, "lesser officers" within the Executive Branch "must remain accountable to the President" through his "unrestricted removal power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213, 215 (2020).  The FTC Act restricts that power.  *See* 15 U.S.C. § 41.

Although the Supreme Court upheld the FTC Act in *Humphrey's Executor*, its decision rested on the premise that "the FTC (as it existed in 1935) exercis[ed] 'no part of the executive power.'"  *Seila Law*, 591 U.S. at 215 (citation omitted).  That conclusion "has not withstood the test of time."  *Id.* at 216 n.2.  Congress has since given the Commission expanded enforcement powers that are plainly executive in nature.  *See* 15 U.S.C.

§§ 45(m), 53(b), 57b(a).  Because Commissioners' removal protections are therefore unconstitutional even under *Humphrey's Executor*, the Rule should be vacated so the Commission can consider anew—with proper presidential oversight—whether to adopt the Rule.

Ryan recognizes that this Court recently held that *Humphrey's* continuing force "is for the Supreme Court … to answer." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023).  Ryan respectfully preserves this argument for further review.

## V.   The District Court Properly Vacated The Rule, With Nationwide Effect

This Court has held that "vacatur under § 706 is … the 'default' remedy for unlawful agency action," that it should be granted without "consideration of the various equities at stake," and that it has "nationwide effect."  *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024), *cert. granted*, 2025 WL 65913 (Jan. 10, 2025).  The Commission completely ignores this controlling precedent.  Regardless, the equities favor nationwide vacatur.

### A.   The APA Requires Nationwide Vacatur.

Under the APA, courts "*shall* … hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction" or "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (emphasis added). This language is mandatory: The Court is "required" to set aside unlawful agency actions. *BP Am., Inc. v. FERC*, 52 F.4th 204, 213 (5th Cir. 2022). And, as the Commission recognizes (at 50), a court sets aside a regulation by vacating it. That is why this Court has declared that "[v]acatur is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) (emphasis added). Because vacatur is the statutorily mandated remedy, there is no need to "consider[] … the various equities at stake before determining whether a party is entitled to vacatur." *Braidwood*, 104 F.4th at 952.[7]

Vacatur "extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to set aside—i.e., formally nullify and revoke—an unlawful agency action." *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (quotation marks and citation omitted). It

---

[7] The sole exception is "remand without vacatur," which is to be used "only rarely" and which the Commission (correctly) does not suggest would be appropriate here. *Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024).

follows that "relief under Section 706 … is not party-restricted."  *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted*, 2025 WL 65914 (Jan. 10, 2025).  Rather, when "plaintiffs prevail on [an] APA challenge, [a] court *must* 'set aside'" the agency action "with nationwide effect."  *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) (emphasis added); *see also Braidwood*, 104 F.4th at 951 ("vacatur under § 706(2) [is] a remedy that affects individuals beyond those who are parties to the immediate dispute").[8]

The Commission fails to acknowledge any of this controlling precedent.  ROA.5637-38 & n.13.  The Commission instead claims (at 48) that this Court "has understood universal vacatur … to be a discretionary equitable remedy," pointing to the plurality decision in *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc).  But *Braidwood* rejected that exact argument, explaining that the *Cargill* plurality

---

[8] The Court recently limited the scope of relief in *Texas v. United States*, 2025 WL 227244 (5th Cir. Jan. 17, 2025).  However, the Court's analysis focused on whether a nationwide *injunction* was appropriate; the Court's discussion of vacatur was just two sentences, reaffirmed that "the APA empowers and commands courts to 'set aside' unlawful agency actions," and did not discuss whether vacatur can be party-restricted.  *Id.* at *16 (quotation omitted).  In any event, *Texas* cannot displace or supersede prior panel decisions specifically addressing the scope of vacatur under the APA.  *See, e.g.*, *id.* at *5 (noting that "'one panel … may not overturn another panel's decision'" (citation omitted)).

reaffirmed that "vacatur … is the default rule" and remanded for consideration of the remedy's scope only "because the parties had not briefed the remedial-scope question."    104 F.4th at 952 n.102; *see* ROA.4327. Multiple other post-*Cargill* decisions confirm that nationwide vacatur is required under the APA. *Career Colls.*, 98 F.4th at 255; *In re Clarke*, 94 F.4th at 512.

Based on this Court's precedent and the APA's text, the district court was correct to vacate (or equivalently, set aside) the Rule on a nationwide basis.    ROA.5638; *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring) ("When a federal court sets aside an agency action, the federal court vacates that order.").

## B.    The Equities Favor Nationwide Vacatur.

Nor has the Commission carried its burden to demonstrate that the equities—even if relevant—override the "'default' remedy" of nationwide vacatur. *Braidwood*, 104 F.4th at 952 (citation omitted).

"The  [Commission's]  protests  against  nationwide  relief  are incoherent in light of its use of the Rule to prescribe uniform federal standards." *Career Colls.*, 98 F.4th at 255.  The Commission found that

it was "important to provide a readily understandable, *uniform* Federal approach" to non-competes, because a "uniform rule" provides "certainty for both workers and employers." ROA.4524-25, 4585 (emphasis added). It is "inconsisten[t]" and inequitable for the Commission to premise the Rule on the (purported) benefits of uniformity yet to resist uniform, nationwide relief, leaving employers and employees to speculate about the legal status of their non-compete agreements and the validity of the Rule. *Tex. Med.*, 110 F.4th at 780.

Furthermore, declining to grant universal relief will inevitably invite a flood of litigation. *See Doleac ex rel. Doleac v. Michalson*, 264 F.3d 470, 474 (5th Cir. 2001) (recognizing that "the interest in judicial economy" bears "on the equities"). That two other challenges were filed to the Rule (one of which is still pending) demonstrates that many suits will follow if this case does not definitively settle the Rule's validity— thousands or millions of affected businesses are plainly waiting to see this case's outcome. Thousands of duplicative suits would massively (and needlessly) drain judicial resources.

The Commission offers little against those weighty considerations. The Commission contends (at 51) that Article III and equitable principles

counsel toward limiting vacatur to the named plaintiffs. But there is no Article III standing problem with extending relief beyond a named plaintiff, nor does the Commission even attempt to identify one. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1180-81 (2020). Courts have issued universal relief by enjoining the enforcement of unconstitutional state and federal laws for centuries. *See* Mila Sohoni, *The Lost History of the Universal Injunction*, 133 Harv. L. Rev. 920, 928 (2020). The Commission also argues (at 54) that nationwide vacatur harms the Commission and the public. But there is "no public interest in the perpetuation of unlawful agency action," *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021), and the Rule's purported benefits are far outweighed by its costs. *See supra* 59-64.

*     *     *

There are few, if any, rules in American history that represent a more audacious administrative power grab than the Non-Compete Rule's attempted invalidation of 30 million contracts, preemption of 46 States' laws, and evisceration of a centuries' old case-by-case approach to assessing the validity of non-compete agreements. Because the Rule transgresses the FTC's statutory authority, exceeds Congress's power to

70

delegate rulemaking to administrative agencies, and rests on a flimsy and one-sided evidentiary record, the Court should affirm nationwide vacatur.

## CONCLUSION

The district court's judgment should be affirmed.

Dated:   February 3, 2025

Respectfully submitted,

 /s/ *Eugene Scalia*
Eugene Scalia
   *Counsel of Record*
Amir C. Tayrani
Andrew G.I. Kilberg
Aaron Hauptman
Joshua R. Zuckerman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20001
Telephone:  202.955.8500
Facsimile:  202.467.0539
EScalia@gibsondunn.com

*Counsel for Ryan, LLC*

## CERTIFICATE OF SERVICE

I certify that, on February 3, 2025, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

*/s/ Eugene Scalia*
Eugene Scalia

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6), *see* Fed. R. App. P. 27(d)(1)(E), because it was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2019. This response complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,993 words, excluding the parts exempted by Rule 32(f).

*/s/ Eugene Scalia*
Eugene Scalia
