No. 24-10951

# In the United States Court of Appeals for the Fifth Circuit

RYAN, L.L.C.,
*Plaintiff-Appellee*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS; LONGVIEW
CHAMBER OF COMMERCE,
*Intervenor Plaintiffs-Appellees*

v.

FEDERAL TRADE COMMISSION,
*Defendant-Appellant*

On Appeal from the United States District Court for the
Northern District of Texas, No. 3:24-cv-00986-E

## BRIEF FOR INTERVENOR-APPELLEES

JENNIFER B. DICKEY
JORDAN L. VON BOKERN
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, D.C. 20062
(202) 463-5337

LIZ DOUGHERTY
BUSINESS ROUNDTABLE
1000 Maine Avenue S.W.
Washington, D.C. 20024
(202) 872-1260

JEFFREY B. WALL
JUDSON O. LITTLETON
DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Intervenor-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Members of this Court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that there are no corporations that are parents of any intervenor-appellee or that own stock in any intervenor-appellee.

## A.    Appellants

1.    Federal Trade Commission

## B.    Attorneys for Appellants

Brian M. Boynton  
Leigha Simonton  
Michael S. Raab  
Sean Janda  
Urja Mittal  
Appellate Staff, Civil Division  
U.S. Department of Justice  
950 Pennsylvania Avenue, N.W.  
Washington, D.C. 20530  

Taisa Goodnature  
Lesley R. Farby  
Arjun Mody  
Madeline M. McMahon  
U.S. Department of Justice  
Civil Division, Federal Programs  
1100 L Street, N.W.  
Washington, D.C. 20005  

## C.    Intervenor-Appellees

1.    Chamber of Commerce of the United States of America

2. Business Roundtable
3. Texas Association of Business
4. Longview Chamber of Commerce

**D.    Attorneys for Intervenor-Appellees**

Jeffrey B. Wall
Judson O. Littleton
Daniel J. Richardson
Sullivan & Cromwell LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H. Street, N.W.
Washington, D.C. 20062

Robert L. Sayles
Boyce Holleman
Bradley Arant Boult Cummings
LLP
1445 Ross Avenue, Suite 3600
Dallas, TX 75202

Liz Dougherty
Business Roundtable
1000 Maine Avenue, S.W.
Washington, D.C. 20024

**E.    Plaintiff-Appellee**

1. Ryan, LLC

**F.    Attorneys for Plaintiff-Appellee**

Eugene Scalia
Amir C. Tayrani
Andrew G.I. Kilberg
Aaron Hauptman
Joshua R. Zuckerman
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036

Allyson N. Ho
Elizabeth A. Kiernan
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201

Charles W. Fillmore
H. Dustin Fillmore III
The Fillmore Law Firm LLP
201 Main Street, Suite 700
Fort Worth, TX 76102

**G.    Putative Intervenors**

1.    Small Business Majority
2.    John Roffino
3.    Daniella Emmer

**H.    Attorneys for Putative Intervenors**

Michael Lieberman                     David H. Seligman
Jamie Crooks                          Rachel Dempsey
Fairmark Partners, LLP                Towards Justice
1001 G Street, N.W.                   PO Box 371680, PMB 44465
Suite 400 East                        Denver, CO 80237
Washington, D.C. 20001

**I.    Amici in District Court**

1.    National Retail Federation
2.    National Federation of Independent Business Small Business
      Legal Center, Inc.
3.    International Franchise Association
4.    Associated Builders and Contractors, Inc.
5.    American Hotel & Lodging Association
6.    National Association of Wholesaler-Distributors
7.    Independent Electrical Contractors
8.    Consumer Technology Association
9.    United States Council for International Business
10.   The Home Care Association of America
11.   The Restaurant Law Center
12.   National Association of Manufacturers
13.   Securities Industry and Financial Markets Association
14.   Future Industry Association
15.   Managed Funds Association

16. American Investment Council
17. The Society For Human Resource Management
18. Partnership for New York City
19. Public Citizen
20. National Employment Law Project
21. William Araiza
22. Jeffrey Lubbers
23. Peter M. Shane
24. Joshua Acevedo
25. Adam Bazaldua
26. Crystal Chism
27. Teri Castillo
28. Elias Diaz
29. Vanessa Fuentes
30. Alyssa Garza
31. Tartisha Hill
32. Jalen McKee-Rodriguez
33. David Stout
34. Zo Qadri
35. Jose "Chito" Vela
36. Texas AFL-CIO
37. Lev Menand
38. Tim Wu
39. Ashraf Ahmed
40. Rebecca Haw Allensworth
41. Kate Andrias
42. Bill Baer
43. Lisa Shultz Bressman
44. Richard Briffault
45. Jessica Bulman-Pozen
46. Harry First
47. Eleanor Fox
48. Luke Herrine
49. Robert H. Lande
50. Jonathan Masur
51. Sanjukta Paul
52. Morgan Ricks
53. Noah Rosenblum

54.   Peter L. Strauss
55.   Rachel Arnow-Richman
56.   Jonathan D. Glater
57.   Jonathan F. Harris
58.   Dalie Jimenez
59.   Mark A. Lemley
60.   Orly Lobel
61.   Olav Sorenson
62.   Marshall Steinbaum
63.   Matt Gaetz
64.   American Academy of Emergency Medicine
65.   Small Business Majority
66.   Evan Starr
67.   NYU Langone Health
68.   American Property Casualty Insurance Association
69.   American Hospital Association
70.   Federation of American Hospitals

**J.    Attorneys for Amici in District Court**

Edward J. Loya Jr.
Epstein, Becker & Green, P.C.
100 Crescent Court, Suite 700
Dallas, TX 75201

Carolyn O. Boucek
Epstein, Becker & Green, P.C.
227 W. Monroe Street Suite 4500
Chicago, IL 60606

Erik W. Weibust
Katherine G. Rigby
Epstein, Becker & Green, P.C.
125 High Street, Suite 2114
Boston, MA 02100

Richard D. Salgado
McDermott Will & Emery LLP
2501 North Harwood Street
Suite 1900
Dallas, TX 75201

Paul W. Hughes
Andrew A. Lyons-Berg
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, D.C. 20006

Nicole A. Saharsky
Gail F. Levine
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006

A. Millie Warner
Epstein, Becker & Green, P.C.
875 Third Avenue
New York, NY 10022

Erica T. Klenicki
Michael A. Tilghman II
NAM Legal Center
733 10th Street NW, Suite 700
Washington, D.C. 20001

Michael D. Wexler
Marcus L. Mintz
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 2800
Chicago, IL 60606

Arthur J. Burke
Christopher Lynch
Neal Mehrotra
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

John E. Wall, Jr.
Law Office of John E. Wall, Jr.
5728 Prospect Avenue, Suite
1003 Dallas, TX 75206

Wendy Liu
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009

Tricia W. Macaluso
Seyfarth Shaw LLP
2323 Ross Avenue, Suite 1660
Dallas, TX 75201

Eron F. Reid
Jesse M. Coleman
Seyfarth Shaw LLP
700 Milam Street, Suite 1400
Houston, TX 77002

Joshua A. Rosenthal
Eushrah Hossain
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609

David H. Seligman
Nina DiSalvo
Rachel W. Dempsey
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680

Ashley E. Tremain
Tremain Artaza PLLC 4925
Greenville Ave, Ste. 200
Dallas, TX 75206

Darren P. Nicholson
Warren T. Burns
Kyle Oxford
Burns Charest, LLP
900 Jackson St., Suite 500
Dallas, TX 75202

Mark Samburg
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043

Amanda G. Lewis
Cuneo Gilbert & Laduca, LLP
4725 Wisconsin Avenue N.W.,
Suite 200
Washington, D.C. 20016

Eric A. Posner
1111 E. 60th St.
Chicago, IL 60637

Meagan Martin Powers
Martin Powers & Counsel,
PLLC
1431 Greenway Drive, Suite 950
Irving, TX 75038

Paul A. Howard II
Howard Law & Policy Group,
PLLC
1701 K Street NW, Suite 225
Washington, D.C. 20006

Kelly Anne Carroll
Hooper Lundy & Bookman PC
401 9th Street NW, Suite 550
Washington, D.C. 20004

Mark A. Lemley
Phillip R. Malone
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 93405

Andrew Kloster
Office of Rep. Matt Gaetz
2021 Rayburn HOB
Washington, D.C. 20515

Jamie Crooks
Alexander Rose
Fairmark Partners LLP
1001 G Street, N.W., Ste. 400E
Washington, D.C. 20001

Jodyann Galvin
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street Buffalo, NY
14202

Katrina A. Pagonis
Hooper Lundy & Bookman PC
44 Montgomery Street
Suite 3500
San Francisco, CA 94104

**K.    Amici in the Fifth Circuit**

1.    Public Citizen
2.    National Employment Law Project
3.    NYU Langone Health
4.    Constitutional Accountability Center
5.    California Public Employees' Retirement System
6.    California State Teachers' Retirement System
7.    Brad Lander, Comptroller of the City of New York
8.    Zevin Asset Management
9.    The Interfaith Coalition on Corporate Responsibility
10.   Trillium Asset Management
11.   Open Markets Institute
12.   District of Columbia
13.   New Jersey
14.   Arizona
15.   California
16.   Colorado
17.   Delaware
18.   Illinois
19.   Maine
20.   Maryland
21.   Massachusetts
22.   Michigan
23.   Minnesota
24.   Nevada
25.   New Mexico
26.   New York
27.   Oregon
28.   Pennsylvania
29.   Rhode Island
30.   Vermont
31.   Washington
32.   American Economic Liberties Project
33.   Timothy Wu
34.   Lev Menand
35.   Lisa Schultz Bressman
36.   Jessica Bulman-Pozen

37.     Harry First
38.     Ashraf Ahmed
39.     Kate Andrias
40.     Peter L. Strauss
41.     Morgan Ricks
42.     Jonathan S. Masur
43.     Luke Herrine
44.     Eleanor M. Fox
45.     American Antitrust Institute
46.     Evan Starr

**L.     Attorneys for Amici in the Fifth Circuit**

Wendy Liu
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009

Jodyann Galvin
Cynthia Giganti Ludwig
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202

Meagan Martin Powers
Martin Powers & Counsel, PLLC
1431 Greenway Drive, Suite 950
Irving, TX 75038

Molly J. Bowen
Cohen Milstein Sellers & Toll
PLLC
1100 New York Avenue NW
Suite 500
Washington, D.C. 20005

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel
Constitutional Accountability
Center
200 18th Street NW, Suite 501
Washington, D.C. 20036

Mark Vandenberg Cohen
Milstein Sellers & Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005

Sandeep Vaheesan
Tara Pincock
Open Markets Institute
655 15th St NW
Suite 310
Washington, D.C. 20005

Brendan Benedict
Benedict Law Group PLLC
515 Madison Avenue, 31st Floor
New York, NY 10022

Kirk Cooper
Cooper Appeals, P.L.L.C.
10420 Montwood Drive
Suite N-405
El Paso, TX 79935

Lee A. Hepner
Laurel Kilgour
American Economic Liberties
Project
2001 Pennsylvania Avenue N.W.,
Suite 540
Washington, D.C. 20006

Matthew J. Platkin
Jeremy Feigenbaum
Nathaniel I. Levy
Bryce K. Hurst
Marcus D. Mitchell
25 Market Street
Trenton, NJ 08625

Darren P. Nicholson
Warren T. Burns
Kyle Oxford
Burns Charest, LLP
900 Jackson St., Suite 500
Dallas, TX 75202

Brian L. Schwalb
Caroline S. Van Zile
Ashwin P. Phatak
Mark A. Rucci
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

David O. Fisher
Randy M. Stutz
American Antitrust Institute
1025 Connecticut Avenue, N.W.,
Suite 1000
Washington, D.C. 20036

Dated:  February 3, 2025

/s/ *Jeffrey B. Wall*
_____
JEFFREY B. WALL

*Counsel for Intervenor-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves a challenge to the Federal Trade Commission's Noncompete Rule, which purports to outlaw millions of noncompete agreements nationwide and would affect virtually every sector of the American economy. Given the significance of the Rule and the important questions presented by this appeal, including the Commission's unprecedented claim of authority to issue binding regulations prohibiting unfair methods of competition, intervenor-appellees respectfully request oral argument.

## TABLE OF CONTENTS

Page

Introduction ................................................................................1

Statement of the Issues ..............................................................3

Statement of the Case ................................................................4

    A.    Legal Background ..........................................................4

        1.    The FTC Act Of 1914 ......................................4

        2.    Subsequent Amendments ..................................7

    B.    The Noncompete Rule ...................................................9

        1.    Existing Regulation Of Noncompete Agreements .............10

        2.    The Proposed Noncompete Rule .........................11

        3.    The Final Noncompete Rule .................................13

    C.    Procedural Background ................................................14

Standard of Review ..................................................................17

Summary of Argument..............................................................17

Argument...................................................................................21

I.    The Commission Lacks The Authority To Issue The Noncompete Rule ...............................................................22

    A.    The FTC Act Does Not Authorize Substantive Competition Regulations ........................................22

        1.    The text, structure, and history of the FTC Act refute the Commission's claim of legislative rulemaking authority.............................................23

        2.    The Commission's counterarguments lack merit ..............30

3. The major-questions doctrine confirms the Commission's lack of rulemaking authority .......................38

B. The FTC Act Does Not Permit The Commission To Condemn All Noncompetes As Unfair Methods Of Competition........................................................................42

1. The Noncompete Rule exceeds the Commission's authority under Section 5 ......................................43

2. Under the Commission's interpretation, Section 5 would be unconstitutional ....................................47

C. The FTC Act Does Not Authorize Retroactive Rulemaking.......50

II. The Noncompete Rule Is The Product Of Flawed Decisionmaking...........................................................51

A. The Commission's Categorical Ban Is Not Supported By Evidence ....................................................52

B. The Rule Unjustifiably Brushes Aside Superior Alternatives......................................................58

III. The District Court Correctly Set Aside The Rule...................61

Conclusion................................................................65

# TABLE OF AUTHORITIES

Page(s)

<small>CASES:</small>

*A.L.A. Schechter Poultry Corp.* v. *United States*,
295 U.S. 495 (1935)................................................6, 49

*Airlines for America* v. *DOT*,
2025 WL 313998 (5th Cir. Jan. 28, 2025)....................32

*American Hosp. Ass'n* v. *NLRB*,
499 U.S. 606 (1991)...........................................32, 33

*Association of Am. Physicians & Surgeons, Inc.* v. *Texas
Med. Bd.*,
627 F.3d 547 (5th Cir. 2010)......................................63

*Baltimore & O.R. Co.* v. *Aberdeen & Rockfish R. Co.*,
393 U.S. 87 (1968)...................................................55

*Biden* v. *Nebraska*,
600 U.S. 477 (2023).........................................38, 39, 41

*Boise Cascade Corp.* v. *FTC*,
637 F.2d 573 (9th Cir. 1980)......................................45

*Bowen* v. *Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)..................................................50

*BP P.L.C.* v. *Mayor & City Council of Baltimore*,
593 U.S. 230 (2021)..................................................35

*Brackeen* v. *Haaland*,
994 F.3d 249 (5th Cir. 2021) (en banc) (per curiam) .....33

*Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)......................................................44

*Califano* v. *Yamasaki*,
442 U.S. 682 (1979)..................................................62

*California Dental Ass'n* v. *FTC*,
526 U.S. 756 (1999)...........................................................................45

*Campos* v. *Steves & Sons, Inc.*,
10 F.4th 515 (5th Cir. 2021) ............................................................43

*Career Colls. & Schs. of Tex.* v. *U.S. Dep't of Ed.*,
98 F.4th 220 (5th Cir. 2024) ............................................61, 62, 65

*Cargill* v. *Garland*,
57 F.4th 447 (5th Cir. 2023) (en banc) ...........................................61

*CFTC* v. *Schor*,
478 U.S. 833 (1986)......................................................................36, 37

*Chamber of Commerce of the U.S.* v. *SEC*,
88 F.4th 1115 (5th Cir. 2023) ..........................................................61

*Chrysler Corp.* v. *Brown*,
441 U.S. 281 (1979)......................................................................16, 24

*Copperweld Corp.* v. *Independence Tube Corp.*,
467 U.S. 752 (1984)...........................................................................44

*DeSantis* v. *Wackenhut Corp.*,
793 S.W.2d 670 (Tex. 1990) .............................................................10

*E.I. Du Pont de Nemours & Co.* v. *FTC*,
729 F.2d 128 (2d Cir. 1984) .............................................................43

*Eastern Enters.* v. *Apfel*,
524 U.S. 498 (1998)...........................................................................50

*FCC* v. *National Citizens Comm. for Broad.*,
436 U.S. 775 (1978)...........................................................................32

*FTC* v. *Actavis, Inc.*,
570 U.S. 136 (2013)...........................................................................44

*FTC* v. *Superior Ct. Trial Lawyer's Ass'n*,
493 U.S. 411 (1990)...........................................................................44

*Gundy* v. *United States*,
588 U.S. 128 (2019)..............................................................47

*Helsinn Healthcare S.A.* v. *Teva Pharm. USA, Inc.*,
586 U.S. 123 (2019)..............................................................37

*Humphrey's Executor* v. *United States*,
295 U.S. 602 (1935)..........................................................7, 28

*Impax Labs., Inc.* v. *FTC*,
994 F.3d 484 (5th Cir. 2021)...............................................43

*Inhance Techs., L.L.C.* v. *EPA*,
96 F.4th 888 (5th Cir. 2024) ..........................................34, 50

*International Ladies' Garment Workers' Union* v. *Donovan*,
722 F.3d 795 (D.C. Cir. 1983)..............................................58

*Jama* v. *ICE*,
543 U.S. 335 (2005)..............................................................35

*Kovac* v. *Wray*,
109 F.4th 331 (5th Cir. 2024) ..............................................25

*Lektro-Vend Corp.* v. *Vendo Co.*,
660 F.2d 255 (7th Cir. 1981)...........................................42, 55

*Louisiana* v. *Biden*,
55 F.4th 1017 (5th Cir. 2022) ..............................................40

*Martin* v. *Hadix*,
527 U.S. 343 (1999)..............................................................50

*Mexican Gulf Fishing Co.* v. *U.S. Dep't of Commerce*,
60 F.4th 956 (5th Cir. 2023) ................................................51

*Miles* v. *Apex Marine Corp.*,
498 U.S. 19 (1990)................................................................46

*Mourning* v. *Family Publ'ns. Serv., Inc.*,
411 U.S. 356 (1973)........................................................32, 33

*National Petroleum Refiners* v. *FTC*,
482 F.2d 672 (D.C. Cir. 1974) ........................................................... 35

*NFIB* v. *OSHA*,
595 U.S. 109 (2022) (per curiam) ............................................. 41, 47

*North Tex. Specialty Physicians* v. *FTC*,
528 F.3d 346 (5th Cir. 2008) ............................................................ 43

*Pan Am. World Airways, Inc.* v. *United States*,
371 U.S. 296 (1963) ............................................................................ 48

*Pierce* v. *Fuller*,
8 Mass. 223 (1811) ............................................................................. 10

*Seila Law LLC* v. *CFPB*,
591 U.S. 197 (2020) .............................................................................. 7

*Snap-On Tools Corp.* v. *FTC*,
321 F.2d 825 (7th Cir. 1963) ...................................................... 42, 46

*Southwestern Elec. Power Co.* v. *EPA*,
920 F.3d 999 (5th Cir. 2019) ...................................................... 52, 60

*Students for Fair Admissions, Inc.* v. *President and
Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ...................................................................... 63, 64

*Texas* v. *Biden*,
10 F.4th 538 (5th Cir. 2021) ............................................................ 64

*Texas Med. Ass'n* v. *HHS*,
110 F.4th 762 (5th Cir. 2024) ..................................................... 62, 65

*Thorpe* v. *Housing Auth. of the City of Durham*,
393 U.S. 268 (1969) ............................................................................ 32

*United States* v. *American Tobacco Co.*,
221 U.S. 106 (1911) ............................................................................ 42

*United States* v. *Lauderdale County*,
914 F.3d 960 (5th Cir. 2019) ............................................................ 23

*USFS* v. *Cowpasture River Preservation Ass'n,*
  590 U.S. 604 (2020)................................................................46

*Utility Air Reg. Grp.* v. *EPA,*
  573 U.S. 302 (2014)...........................................................38, 40

*W & T Offshore, Inc.* v. *Bernhardt,*
  946 F.3d 227 (5th Cir. 2019)................................................17

*West Virginia* v. *EPA,*
  597 U.S. 697 (2022)...............................................34, 39, 40, 41

*Whitman* v. *American Trucking Ass'ns.,*
  531 U.S. 457 (2001)...............................................................34

*Yakima Valley Cablevision, Inc.* v. *FCC,*
  794 F.2d 737 (D.C. Cir. 1986)..............................................58

STATUTES:

15 U.S.C.
  § 45..............................................................4, 5, 17, 24, 31, 47
  § 46..................................................................4, 5, 17, 23, 25
  § 57a.....................................................................9, 28, 29, 36
  § 57b-3...............................................................................37
  § 1604................................................................................33

25 U.S.C. § 1952 ....................................................................33

47 U.S.C. § 303(b)..................................................................33

52 U.S.C. § 30107 ..................................................................27

Act of Feb. 28, 1871, 16 Stat. 440 ........................................24

Act of July 22, 1813, 3 Stat. 22.............................................24

Act of Sept. 26, 1914, 38 Stat. 717 ......................................4, 5

Fur Products Labeling Act, Pub. L. 82-110
  Ch. 298, 65 Stat. 175 (1951).............................................8, 28

Longshoremen's and Harbor Workers' Compensation Act, ch. 509, Pub. L. 69-803 (1927) ...................................................................24

Magnuson-Moss Act, Pub. L. 93-637, 88 Stat. 2183 (1975) ...................9

Pub. L. 75-447, 52 Stat. 111 (1938) ...............................................7, 8

Pub. L. 89-92, 79 Stat. 282 (1965) ........................................................9

Pub. L. 90-189, 81 Stat. 571 (1967) ...............................................8, 28

Pub. L. 103-312, 108 Stat. 1691 (1994) .............................................29

## REGULATIONS:

Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products, 29 Fed. Reg. 11,261 (Aug. 5, 1964) ..................................................8

Non-Compete Clause Proposed Rule, 88 Fed. Reg. 3,499 (Jan. 19, 2023) .......................................12, 13, 56

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ...... 10, 13, 42, 45, 48, 51, 52, 53, 54, 56, 59

## OTHER AUTHORITIES:

120 Cong. Rec. 41,407 (1974) (Statement of Rep. Broyhill) ..........................................................36

Attorney General of the United States, *Report of the Att'y Gen.'s Comm. on Admin. Pro.* (Jan. 22, 1941) ...........................................26

Balasubramanian, et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349 (2022) ............................................53

FTC, *Annual Report of the Federal Trade Commission* (1938) .........................................................................7

FTC, *FTC Proposes Rule to Ban Noncompete Clauses* (Jan. 5, 2023) ...............................................12

FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 2022)...................................................12, 48

H.R. Rep. 103-138 .............................................................29

Lipsitz & Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022) ..............................................54

McAdams, *Non-Compete Agreements: A Review of the Literature*, FTC Bureau of Economics Research Paper (2019)....................10

Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467 (2002) .......................4, 6, 24, 25, 27

Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 109...............................................43

Phillips, *Against Antitrust Regulation*, American Enterprise Inst. (2022)......................................5

Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022) .........................................................11

S. Rep. 96-500....................................................................37

S. Rep. 103-130..................................................................29

*State Noncompete Law Tracker*, Economic Innovation Group (Oct. 11, 2024), https://eig.org/state-noncompete-map ............................39

The Attorney General's Committee on Administrative Procedure, *Monograph No. 6, The Federal Trade Commission* (1939)...................................6, 26

Workforce Mobility Act of 2023, S. 220, H.R. 731,
   118th Cong. (2023) ............................................................................11

## INTRODUCTION

The Federal Trade Commission's Noncompete Rule is a staggering assertion of regulatory power.  By a bare majority vote, the Commission has imposed a nationwide ban on a widespread business practice that dates back to the Founding, retroactively invalidated more than 30 million private contracts, and federalized a huge swath of state law.  It did so in the form of a legislative rule categorically proscribing "unfair methods of competition," despite having not once claimed the authority to issue substantive competition rules for the first five decades of the FTC's Act existence or the five decades since Congress overhauled the Act.  And it used that supposed authority to ban virtually all noncompete agreements, despite acknowledging that many noncompetes do not harm competition.

To justify this breathtaking power grab, one would expect the Commission to point to both clear statutory authority and a compelling justification for its policy choice.  As the district court correctly recognized in setting aside the Rule, the Commission has neither.

As legal authority for the Rule, the Commission does not point to any provision of the FTC Act that expressly authorizes competition rules, nor does it identify evidence showing that Congress in 1914 intended to vest the

Commission with then-unprecedented rulemaking power. Instead, it argues that an ancillary provision of the FTC Act, Section 6(g), empowers it to issue binding, legislative rules covering any topic within its jurisdiction. The text, structure, and history of the FTC Act say otherwise. And any doubt about the meaning of Section 6(g) is resolved by the major-questions doctrine, which stands between the Commission and its attempt to issue rules transforming the national economy.

The Rule's statutory deficiencies do not end there. Regardless of the Commission's authority to issue competition rules, the FTC Act does not empower the Commission to summarily condemn ordinary business practices as unfair competition. Nor does it give the Commission the power to retroactively unwind settled contracts, depriving parties of the benefit of their bargains. Each of these flaws provides an alternative ground for affirming the district court's decision setting the Rule aside.

The Commission's policy arguments fare no better. During the rulemaking process, the Commission was presented with overwhelming evidence confirming the benefits of reasonable noncompetes. Commenters also provided the agency with several alternatives that would have achieved the Commission's goals but inflicted far less harm. Yet the Commission still

opted for a one-size-fits-all ban, even though it had no evidence supporting that categorical approach. That is not reasoned decisionmaking. As a result, the district court correctly set aside the Noncompete Rule nationwide.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that the Commission lacks the authority to promulgate substantive competition regulations.

2.    Whether the Commission lacks the authority to categorically deem noncompete agreements per se unfair methods of competition.

3.    Whether the Commission lacks the authority to promulgate retroactive regulations.

4.    Whether the district court correctly determined that the Commission engaged in arbitrary and capricious decisionmaking by adopting the Noncompete Rule.

5.    Whether the district court correctly set aside the Noncompete Rule as the remedy for the Commission's Administrative Procedure Act violation.

## STATEMENT OF THE CASE

### A.    Legal Background

#### 1.    The FTC Act Of 1914

Congress established the Federal Trade Commission through the FTC Act of 1914.  *See* Act of Sept. 26, 1914, 38 Stat. 717.  The FTC Act reflected two different views in Congress about how the Commission should operate.  The House envisioned the Commission as a purely investigative body, which would gather information, produce reports, and make recommendations to the Attorney General regarding potential enforcement.  The Senate envisioned the Commission as a separate enforcement agency that would file its own complaints against alleged violators.  What emerged was a combination of the two: the Senate-proposed enforcement powers became Section 5, while the House-proposed investigative powers became Section 6.  *See* 38 Stat. 719-721 (codified at 15 U.S.C. §§ 45, 46); *see also* Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 505 (2002).

In Section 5, Congress "declared unlawful" "[u]nfair methods of competition."  38 Stat. 719 (codified at 15 U.S.C. § 45(a)(1)).  It then "empowered and directed" the Commission "to prevent" persons "from using unfair methods of competition."  *Id.* § 45(a)(2).  To carry out that responsibility, Section 5 authorized the Commission, upon determining that

proceeding against a person "would be to the interest of the public," to "serve upon" the alleged violator "a complaint stating its charges" and seek an "order" to "cease and desist" the unlawful conduct. *Id.* § 45(b). Section 5 guaranteed the defendant an opportunity to contest those charges and, if necessary, to seek review of the agency's final written decision in federal court. *Id.* § 45(c).

In Section 6, titled "Additional powers," Congress authorized the Commission to undertake various investigative activities, such as "gather[ing] and compil[ing] information" and "investigat[ing]" violations that could be referred to the Attorney General. 38 Stat. 721 (codified at 15 U.S.C. § 46). Relevant here, in Subsection 6(g)—titled "Classifying corporations"— Congress authorized the Commission to "[f]rom time to time classify corporations and . . . to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 38 Stat. 722; *see* Phillips, *Against Antitrust Regulation*, American Enterprise Inst. 3 (2022) (explaining that "classify[ing] corporations" was "an essential feature of the congressional plan for the fledgling agency to study and assess business practices").

No one ever suggested that Section 6(g), or any other provision of the Act, gave the Commission authority to issue legislative rules proscribing

unfair methods of competition—a power that would have been unprecedented in 1914. *See* Merrill & Watts, *supra*, at 495-503. And in the years following the Act's passage, the Executive Branch explained that the Commission lacked such authority. In 1922, the Commission wrote to Congress that "[o]ne of the most common mistakes is to suppose that the [C]ommission can issue orders, rulings, or regulations unconnected with any proceeding before it." *Id.* at 506 (quoting FTC, *Annual Report of the Federal Trade Commission* 36 (1922)). The Attorney General later echoed that view in his Final Report on the Administrative Procedure Act, which explained that "[n]othing in the statutes administered by the Commission makes any provision for the promulgation of rules applicable to whole industries." *Monograph No. 6, The Federal Trade Commission* 67 (1939).

The Supreme Court has had the same understanding. In *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 532-533 (1935) (citations omitted), the Court observed that "unfair methods of competition" must be "determined in particular instances, upon evidence, in the light of particular competitive conditions"—not by general rulemaking. That same year, the Court rejected a challenge to the constitutionality of the Commission by explaining that Section 6 authorized the Commission only to "mak[e]"

investigations and reports thereon for the information of Congress." *Humphrey's Executor* v. *United States*, 295 U.S. 602, 628 (1935). And most recently, in *Seila Law LLC* v. *CFPB*, 591 U.S. 197 (2020), the Court cited the Commission's lack of rulemaking authority to distinguish it from the Consumer Financial Protection Bureau. *Id.* at 218 ("Instead of making reports and recommendations to Congress, as the 1935 FTC did, the [CFPB] Director possesses the authority to promulgate binding rules.").

### 2.    Subsequent Amendments

Congress has revisited the FTC Act many times since 1914. Some of those amendments have granted the Commission limited authority to issue binding regulations over certain subjects, but none has given general rulemaking authority over any and all conduct proscribed by Section 5.

The first significant amendment came in 1938, when Congress amended Section 5 to also prohibit "unfair or deceptive acts or practices." Pub. L. 75-447, § 3, 52 Stat. 111. That provision allowed the Commission to prevent through enforcement "commercial practices," such as false advertising, "which primarily injured the public rather than competitors." FTC, *Annual Report of the Federal Trade Commission* 3, 153 (1938). The 1938 statute also enabled

the Commission to obtain civil penalties for violations of Section 5, rather than cease-and-desist orders alone.  52 Stat. 114.

Over the ensuing decades, Congress occasionally granted the Commission authority to issue binding regulation on narrow subjects.  For example, Congress in 1967 "authorized and directed" the Commission "to prescribe rules and regulations" related to flammable fabrics, and provided that "[t]he violation of such rules and regulations shall be unlawful and shall be an unfair method of competition and an unfair and deceptive act or practice."  Pub. L. 90-189, § 4, 81 Stat. 571; *see, e.g.*, Fur Products Labeling Act, Pub. L. 82-110, Ch. 298, § 8(b), 65 Stat. 175, 180 (1951).  Congress never provided the Commission with rulemaking powers outside those narrow topics.

Despite the absence of general rulemaking authority, the Commission began issuing so-called "trade regulation rules" in the 1960s.  Most of those rules condemned the same conduct as both an "unfair method of competition" and an "unfair and deceptive act or practice," without distinguishing between the two.  *See, e.g.*, Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products, 29 Fed. Reg. 11,261 (Aug. 5, 1964).  To justify these new rules, the Commission repudiated its longstanding interpretation of the FTC

Act, taking the position that the reference to "rules and regulations" in Section 6(g) authorized legislative rules over any subject in the Commission's jurisdiction.

Congress responded quickly. First, Congress overrode the Commission's most prominent trade regulation rule, which related to cigarette labeling. *See* Pub. L. 89-92, 79 Stat. 282 (1965). Then in 1975, Congress enacted the Magnuson-Moss Act, which for the first time authorized general rulemaking under Section 5—but only over "unfair or deceptive acts and practices," and only if the Commission satisfies detailed procedural requirements. *See* Pub. L. 93-637, 88 Stat. 2183 (1975). To remove any doubt about the Commission's limited rulemaking authority, Magnuson-Moss also stated that it "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition." *Id.* § 202 (codified at 15 U.S.C. § 57a).

## B.    The Noncompete Rule

For nearly five decades after Magnuson-Moss, the Commission never once tried to promulgate a binding competition regulation. That changed

in 2023, when the Commission issued a proposed rule seeking to ban noncompete agreements nationwide.

### 1.    Existing Regulation Of Noncompete Agreements

Noncompete agreements typically require that an employee agree, as a condition of employment or in exchange for compensation, that if he decides to leave the company, he will not work for the employer's competitors for a limited period of time thereafter.  By the Commission's own estimates, there are 30 million noncompetes in the United States.  *See* 89 Fed. Reg. 38,343. Reasonable noncompetes allow businesses to protect sensitive information and give employers increased flexibility in compensation.  They also benefit employees by incentivizing employers to provide specialized training and development opportunities.  *See* McAdams, *Non-Compete Agreements: A Review of the Literature,* FTC Bureau of Economics Research Paper 6 (2019).

Noncompetes pre-date the Founding and have been regulated exclusively by the States for centuries.  *See, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811).  States have developed varying approaches to ensuring that noncompetes do not unduly restrict workers.  In many States, a noncompete will be enforced so long as it is "limited appropriately as to time, territory, and type of activity."  *DeSantis* v. *Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex.

1990).　Some States have enacted statutes prohibiting certain kinds of noncompetes.　And four States—California, Oklahoma, North Dakota, and Minnesota—have enacted legislation treating noncompetes in the employment context as largely unenforceable.

No federal law addresses the enforceability of noncompetes.　In recent years, some Members of Congress have proposed such laws.　Those proposals have been premised on the Commission's lack of authority to deem noncompetes unfair methods of competition.　For example, the Workforce Mobility Act would give the Commission authority to treat worker noncompetes as "unfair or deceptive" acts, not as "unfair method[s] of competition."　Workforce Mobility Act of 2023, S. 220, H.R. 731, 118th Cong. §§ 3, 6 (2023).　Other bills provide no role for the Commission at all. *See, e.g.*, Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022).　Every one of those proposals has failed.　As a result, the U.S. Code remains silent on the enforceability of noncompetes.　And no federal court has ever held that a noncompete agreement violated federal antitrust law.

### 2.　The Proposed Noncompete Rule

Despite the lack of any federal precedent, the Commission sought to regulate noncompetes for the first time in January 2023.　On January 4, it

announced settlement agreements alleging that particular noncompete agreements were "unfair methods of competition" because they were "coercive and exploitative," *Complaint, In re Prudential Security Inc.*, at 5 (Jan. 4, 2023), or were employed in "highly concentrated" industries, *Complaint, In re O-I Glass, Inc.*, at 2 (Jan. 4, 2023). The next day, the Commission proposed the Noncompete Rule, which would ban virtually *all* noncompetes nationwide. *See* FTC, *FTC Proposes Rule to Ban Noncompete Clauses* (Jan. 5, 2023). That ban would not only apply prospectively; it would instantly rescind all *existing* noncompetes. The proposed rule applied to all categories of workers, regardless of their income or knowledge gained on the job, and to all noncompetes, regardless of duration or the training or compensation received by the employee. 88 Fed. Reg. 3,512.

As authority for the proposed rule, the Commission relied on Sections 5 and 6 of the FTC Act. With respect to Section 5, the Commission invoked its own "policy statement," adopted on party lines in 2022, which asserted that the Commission can declare unlawful any conduct it believes "violates the spirit of the antitrust laws" and is "coercive" or "abusive." FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* 7, 9 (Nov. 10, 2022) (2022

Policy Statement).  As for Section 6, the Commission resurrected its argument from the 1960s that Section 6(g)'s passing reference to "rules and regulations" empowers it to issue substantive regulations categorically defining unfair methods of competition.  *See* 88 Fed. Reg. 3,499.

### 3.    The Final Noncompete Rule

On April 23, 2024, the Commission issued the final Noncompete Rule, which is nearly identical to its proposed rule.  *See* 89 Fed. Reg. 38,502-38,503.[1] The Commission dismissed comments explaining that reasonable noncompetes promote competition and benefit employees, reasoning that the only way to address the supposed harms of noncompetes is to condemn them all "in the aggregate."  *Id.* at 38,393, 38,396, 38,409.  It also rejected comments explaining the serious costs that a nationwide noncompete ban would impose on businesses and workers, concluding that parties had other means to protect their investments.  *Id.* at 38,424-38,426.  And it spurned numerous narrower

---

[1]    The main substantive change in the final rule was a carve-out for existing noncompetes with "senior executives," defined as workers making over $151,164 per year who hold a "policy-making position."  *Id.* at 38,502.  Under the final rule, existing noncompete agreements negotiated by senior executives need not be rescinded, but future noncompetes with those same executives are still prohibited.

alternatives, such as a rule targeting only low-wage workers or requiring case-specific analysis. *Id.* at 38,458-38,466.

Commissioners Ferguson and Holyoak dissented. *See Dissenting Statement of Commissioner Andrew N. Ferguson*, In the Matter of the Non-Compete Clause Rule (June 28, 2024) (Ferguson Dissent); *Dissenting Statement of Commissioner Melissa Holyoak*, In the Matter of the Non-Compete Clause Rule (June 28, 2024) (Holyoak Dissent). Both explained that the final rule is unlawful because the Commission is not empowered to issue substantive competition regulations. *See* Ferguson Dissent, at 8; Holyoak Dissent, at 3-16. Commissioner Ferguson also explained that the Noncompete Rule departed from the Commission's longstanding interpretation of Section 5. *See* Ferguson Dissent, at 5-6. And Commissioner Holyoak explained that, even if the Commission had the legal authority to adopt it, the Noncompete Rule would still run afoul of the APA because neither economic theory nor available empirical evidence justifies its broad reach. *See* Holyoak Dissent, at 16-18.

## C.    Procedural Background

On April 24, 2024, intervenor-appellees sued the Commission in the Eastern District of Texas, alleging that the Noncompete Rule was unlawful

and should be set aside. *See U.S. Chamber of Commerce et al.* v. *FTC*, No. 6:24-cv-148 (E.D. Tex.).[2] Shortly thereafter, the district court stayed that litigation under the "first to file rule," and allowed intervenor-appellees to seek to intervene in the pending case brought by Ryan, L.L.C. in the Northern District of Texas. That court granted intervenor-appellees' intervention motion on May 9, 2024. ROA.842-43.

Both Ryan and intervenor-appellees moved for a preliminary injunction and an order postponing the Rule's effective date. ROA.734, 939. On July 3, 2024, the district court granted those motions, concluding that plaintiffs were likely to succeed on their claims that the Noncompete Rule exceeded the Commission's statutory authority and reflected arbitrary-and-capricious decisionmaking. ROA.3496-3528.

After further briefing, the district court granted summary judgment for plaintiffs. ROA.5612-38. The court agreed that the FTC Act does not authorize the Commission to issue binding competition regulations. The text

---

[2] Two other suits challenging the Noncompete Rule were filed outside this Circuit. *See Properties of the Vills., Inc.* v. *FTC*, No. 5:24-cv-316 (M.D. Fla. Jun. 21, 2024); *ATS Tree Servs., LLC* v. *FTC*, No. 2:24-cv-1743 (E.D. Pa. Apr. 25, 2024). *Properties of the Villages* is currently on appeal to the Eleventh Circuit, *see* No. 24-13102 (11th Cir.), while the plaintiff in *ATS Tree Services* voluntarily dismissed its suit.

and structure of the Act, the court explained, demonstrate that Section 6(g) is "a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization and procedure or practice,' as opposed to 'substantive rules.'" ROA.5628 (quoting *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 310 (1979)). The court rejected the Commission's reliance on subsequent amendments to the FTC Act as a "piecemeal attempt to confer rulemaking authority that Congress has not affirmatively granted." ROA.5632-33.

The district court also held that the Noncompete Rule is arbitrary and capricious because it "imposes a one-size-fits-all approach with no end date, which fails to establish a 'rational connection between the facts found and the choice made.'" ROA.5635 (citation omitted). The court observed that "no state has enacted a non-compete rule as broad as the FTC's rule," and concluded that the Commission's analysis was "based on inconsistent and flawed empirical evidence, fail[ed] to consider the benefits of non-compete agreements, and disregard[ed] the substantial body of evidence supporting these agreements." ROA.5635 As the remedy, the court concluded that the APA required it to "hold unlawful" and "set aside" the Noncompete Rule, and rejected the Commission's argument that "party-specific relief" was appropriate. ROA.5637-38.

## STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment de novo. *See W & T Offshore, Inc.* v. *Bernhardt*, 946 F.3d 227, 233 (5th Cir. 2019).

## SUMMARY OF ARGUMENT

I.    The Noncompete Rule exceeds the Commission's statutory authority in three separate ways.

A.    The FTC Act does not authorize the Commission to issue legislative rules respecting unfair methods of competition.  As support for the Noncompete Rule, the Commission relies on Section 6(g), which permits the Commission to "from time to time" issue "rules and regulations."  The text, structure, and history of the FTC Act demonstrate that Section 6(g) authorizes only procedural housekeeping rules, not substantive competition regulations.  Congress's subsequent amendments to the Act—which have authorized rules addressing certain subjects but not unfair competition—only confirm that Section 6(g) does not provide the Commission with freestanding authority to issue the Noncompete Rule.

The Commission defends its reliance on Section 6(g) by pointing to language in the FTC Act authorizing it to "prevent" violations of Section 5, amendments to the FTC Act that are silent on the Commission's authority

under Section 6(g), and a series of cases holding that other agencies have rulemaking authority under different statutes. None of those arguments overcomes the text and structure of the FTC Act. Nor has the Commission explained why Congress would require it to follow detailed rulemaking provisions for unfair and deceptive acts while allowing it to circumvent those limits by issuing rules related to unfair methods of competition.

If there were any doubt about the Commission's authority under Section 6(g), the major-questions doctrine resolves it. Under the Commission's view, a bare majority of Commissioners has the power to impose rules proscribing ordinary business conduct, fundamentally reshaping the American economy in the process. Congress has never authorized such an extraordinary claim of authority, let alone with the clarity required by the major-questions doctrine.

B.      Regardless of its authority to issue legislative rules under Section 6, Section 5 does not empower the Commission to declare all noncompete agreements unlawful. Under the longstanding judicial interpretation of Section 5, that provision requires the Commission to demonstrate that the challenged conduct harms competition more than it helps it. The Commission effectively admits that it cannot make that showing with respect to all noncompete agreements covered by its rule. The Commission instead points

-18-

to a 2022 Policy Statement which purportedly authorizes the agency to condemn entire categories of conduct in the aggregate. That approach is at odds with case law and decades of bipartisan consensus. And if the Commission's interpretation were correct, Section 5 would reflect an unconstitutional delegation of legislative power.

C. Third, the Noncompete Rule is unlawfully retroactive. The FTC Act does not authorize the Commission to take actions that impose new consequences for past conduct. Yet that is precisely what the Noncompete Rule does, preventing parties from enforcing preexisting contracts, even in circumstances where they already paid valuable consideration or gave up important benefits in exchange for the protection of a noncompete agreement.

II. Even if the Commission had statutory authority to issue a rule regulating noncompete agreements, the Noncompete Rule does not satisfy the APA's requirement that agency rules must be reasonable and reasonably explained.

A. First, the Commission did not identify any concrete support for its sweeping, nationwide ban. To defend its categorical policy, the Commission pointed to a handful of state-level studies assessing the effect on noncompete agreements on certain industries or for certain classes of workers. Those

studies say nothing about the wisdom of a rule that applies to all workers in all industries throughout the United States. Without those studies, the Commission's only justification for a nationwide ban is its own supposed expertise involving noncompete agreements. But the Commission had no enforcement record of any kind related to noncompetes until its negotiated settlements announced the day before it proposed the Noncompete Rule.

B.    Second, the Commission did not adequately explain its decision to reject narrower alternatives. Throughout the rulemaking process, commenters proposed more targeted restrictions that would have allowed the Commission to address the perceived harms of noncompetes without also sweeping in beneficial and procompetitive agreements. The Commission never engaged with those alternatives, instead asserting (without explanation) that a nationwide ban was necessary because noncompetes *always* harm competition and businesses *always* have other ways of protecting their interests. Such conclusory assertions are not reasoned decisionmaking.

III.    If this Court holds the Noncompete Rule is unlawful, the appropriate remedy under the APA is vacatur. As this Court has explained multiple times, that remedy by definition is not party-restricted. The Commission nonetheless asks this Court to limit vacatur to only the parties

and their identified members, arguing that those limitations are compelled by "traditional equitable principles" and are necessary to prevent intervenor-appellees' unidentified members from benefitting from the Court's judgment. The Commission has not identified a single decision embracing its preferred remedy. And its identified-members test would undermine the entire point of associational standing, which allows associations to sue without requiring participation by individual members.

## ARGUMENT

The Noncompete Rule is an unprecedented and unlawful exercise of agency power. Congress has never authorized the Commission to issue binding regulations proscribing unfair methods of competition. Even if the Commission had such power, Section 5 does not permit the Commission to broadly condemn a common and longstanding business practice as unfair competition, let alone do so in a manner that retroactively unwinds millions of settled contracts. Apart from these statutory defects, the Noncompete Rule also fails to meet the APA's standard for reasoned decisionmaking, pronouncing a categorical ban on noncompetes that lacks support in the evidence and overlooks better and more targeted alternatives. For each of these reasons, the Noncompete Rule is unlawful and must be set aside.

# I.    The Commission Lacks The Authority To Issue The Noncompete Rule.

The FTC Act does not authorize the Noncompete Rule for three independent reasons.  First, no provision of the FTC Act empowers the Commission to issue substantive unfair-competition rules.  Second, Section 5 of the FTC Act cannot be read to allow the Commission to categorically outlaw all noncompete agreements.  Third, at a minimum, the FTC Act does not authorize the Commission to retroactively invalidate millions of existing noncompetes.

## A.    The FTC Act Does Not Authorize Substantive Competition Regulations.

The Commission claims to have found general rulemaking authority in a single clause tucked in the back half of a provision setting forth its investigative powers.  But the text, structure, and history of the FTC Act demonstrate that Section 6(g) does not grant the Commission freestanding authority to issue binding legislative regulations.  In resisting that conclusion, the Commission has little to say about the text of Section 6(g).  Instead, it advances arguments based on a separate provision of the FTC Act, subsequent amendments to the statute, and judicial decisions involving other agencies.  None of those arguments overcomes the clear text limiting the Commission's

authority.  If there were any doubt about the Commission's power to issue competition regulations, it is resolved by the major-questions doctrine, which requires Congress to clearly authorize actions as significant as the Noncompete Rule.

### 1.     The text, structure, and history of the FTC Act refute the Commission's claim of legislative rulemaking authority.

Section 6(g) authorizes the Commission to "[f]rom time to time classify corporations and . . . make rules and regulations for the purpose of carrying out the provisions of [the Act]."  15 U.S.C. § 46(g).  Basic tools of statutory construction confirm that this provision authorizes only procedural housekeeping rules, not substantive binding regulations.

a.     "The task of statutory interpretation begins and, if possible, ends with the language of the statute."  *United States* v. *Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019) (citation and internal quotation marks omitted).  By its terms, Section 6(g) is a housekeeping statute, ROA.5628, empowering the Commission to issue rules only "for the purpose of carrying out" its other duties.  15 U.S.C. § 46(g).  That provision does not refer to Section 5 or any other substantive authority of the Commission.  Nor does it provide any other indication that rules issued under Section 6(g) might bind private parties, let alone a standard to guide the Commission like the "interest

of the public" standard the Commission must consider when pursuing enforcement under Section 5. *Id.* § 45(b).

In these ways, Section 6(g) is markedly different from other early statutes that provide agencies with the power to issue binding legislative regulations. For centuries, Congress has expressly conferred substantive rulemaking authority by stating that the agency may "establish regulations" that "shall be binding." Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26; *see* Act of Feb. 28, 1871, ch. 100, § 23, 16 Stat. 440, 449 (stating that regulations have the "force of law"). Throughout the early part of the twentieth century, Congress also conferred substantive rulemaking authority by prescribing sanctions that attached to violations of an agency's rules. *See, e.g.*, Longshoremen's and Harbor Workers' Compensation Act, ch. 509, Pub. L. 69-803, 44 Stat. 1424 (1927); *see also* Merrill & Watts, *supra*, at 494-495. By contrast, rulemaking provisions like Section 6(g)—which neither expressly mention substantive authority nor prescribe sanctions—are "simply a grant of authority to the agency to regulate its own affairs," as the district court recognized. ROA.5628 (quoting *Chrysler Corp.*, 441 U.S. at 309).

The "context and structure of the overall statutory scheme" confirm the conclusion that Section 6(g) does not confer substantive rulemaking authority.

*Kovac* v. *Wray*, 109 F.4th 331, 335 (5th Cir. 2024). Section 6(g) is the seventh in a list of twelve lettered subsections setting forth "[a]dditional powers" of the Commission, which largely consist of investigative powers to request information and produce reports. *See, e.g.*, 15 U.S.C. § 46(c) and (h). The provision starts by conferring the authority to "from time to time classify corporations"—a mundane power that has nothing to do with regulating private parties' conduct—before mentioning "rules and regulations" in the second half of the provision. This would be an incredibly oblique way for the 1914 Congress to have given the Commission the power to issue legislative rules binding the entire national economy, but it was an entirely sensible way to confer only the power to issue procedural housekeeping rules governing the Commission's own operations.

The Commission dismisses the district court's analysis as "rel[ying] on a 2002 law article proposing a new canon of construction." Br. 31 (discussing Merrill & Watts, *supra*). That criticism ignores the many pages of the court's opinion walking through the text, structure, and history of the FTC Act, *see* ROA.5625-33, as well as the Attorney General's 1941 statement that "the striking characteristic of the legislation [authorizing] substantive regulations . . . is that it attaches sanctions to compel observance of the

regulations," *Report of the Att'y Gen.'s Comm. on Admin. Pro.* 27 (Jan. 22, 1941); *see* Monograph No. 6, *supra*, at 68 (explaining that "non-observance of [Commission] rules does not, per se, constitute a violation of law").

The Commission alternatively argues (at 32) that Section 6(g) "does provide a penalty for a rule violation" because Section 5 authorizes enforcement actions. That is a non sequitur. To claim substantive rulemaking authority, the Commission needs to identify some reason that *Section 6(g)* would empower it to bind private parties. A separate provision of the Act, which contains its own enforcement mechanism, does not do that.

The Commission caricatures the district court's structural analysis as relying on the fact that Section 6(g) falls "in the same section as other powers" rather than "in an independent section." Br. 32. But the Commission cannot point to a single authority suggesting that Congress in 1914 would have imagined that, by placing a lone reference to "rules and regulations" in the second clause of a provision about classifying corporations, it would be authorizing limitless substantive rulemaking over any subject within the Commission's jurisdiction—a power that would have been unprecedented two decades before the New Deal. By contrast, the authorities the Commission cites (at 33) only demonstrate that Congress knows how to convey substantive

authority when it wants to. *See, e.g.*, 52 U.S.C. § 30107 (authorizing rules "pursuant to the provisions of" the APA alongside other substantive powers).

b.   The history of the FTC Act further confirms this understanding of Section 6(g). Section 6 emerged from an agreement between those in Congress who wanted the new Commission to pursue its own enforcement actions (ultimately reflected in Section 5) and those who wanted the Commission to serve as a purely investigative body (reflected in Section 6). *See supra*, pp. 4-5. Throughout Congress's deliberations on the FTC Act, neither camp even suggested giving the Commission the power to issue substantive *rules* governing private conduct.

In fact, both during and after the Act's passage, all three branches expressed their view that the Commission *lacked* such rulemaking authority. Representative Covington advocated for the FTC Act by arguing that the Commission would "not be exercising power of a legislative nature." Merrill & Watts, *supra*, at 506 (quoting 51 Cong. Rec. 14,932 (1914)). After the Act's enactment, both the Commission and the Attorney General affirmatively stated that the law did not confer substantive rulemaking authority. *See supra*, pp. 5-7. And the Supreme Court expressly relied on the Commission's lack of rulemaking power when rejecting a constitutional

challenge to the structure of the agency. *See Humphrey's Executor*, 295 U.S. at 628. In short, the longstanding consensus across every branch of government has held that Section 6(g) does not authorize substantive rules.

c. More recent history is equally damning for the FTC. Congress has repeatedly amended the FTC Act in ways that confirm the Commission's lack of freestanding authority to issue legislative rules under Section 6(g).

First, Congress has enacted targeted amendments that expressly authorize rulemaking over specific subjects, such as dangerous items in the marketplace. *See, e.g.*, Pub. L. 90-189, § 4. Those amendments would be superfluous if Section 6(g) already gave the Commission rulemaking authority over any subject under its jurisdiction. The Commission tries to dodge that conclusion (at 34) on the ground that these statutes "direct" the Commission to act, rather than merely giving it discretion. But that is no explanation for why the text of these statutes expressly "authorizes" new rulemakings the Commission believes were authorized in 1914. *See, e.g.*, 65 Stat. 180.

Second, in the Magnuson-Moss Act of 1975, Congress granted the Commission new authority to make rules related to "unfair or deceptive acts and practices"—but *not* "unfair methods of competition." 15 U.S.C. § 57a(a)(1)(A). Congress then imposed procedural requirements before the

Commission could exercise this new rulemaking authority.  *See, e.g.*, *id.* § 57a(b)(2) (requiring "advance notice" of proposed rules to Congress).  It is implausible that Congress would have expressly granted substantive rulemaking authority subject to procedural hurdles for "unfair and deceptive acts or practices," while implicitly allowing the Commission to issue legislative "unfair methods of competition" rules with no constraints.  *See* Holyoak Dissent, at 12-13.  Notably, at no point between 1975 and the Noncompete Rule did the Commission attempt to issue *any* kind of substantive regulations under Section 6(g).

Third, Congress revisited the Commission's rulemaking authority in 1994, codifying the substantive analysis the agency must undertake when defining "unfair or deceptive acts and practices."  *See* Pub. L. 103-312, § 9, 108 Stat. 1691, 1695; S. Rep. 103-130 at 12.  Again, Congress gave no indication that it believed the Commission retained some other, entirely unconstrained authority to issue rules defining unfair methods of competition.  *See* H.R. Rep. 103-138, at 4 (explaining that the Commission's authority related to "unfair methods of competition" is "limited . . . to case-by-case adjudication").

### 2.     The Commission's counterarguments lack merit.

In seeking to defend its assertion of rulemaking authority, the Commission does not advance any argument about what Section 6(g) meant at the time of its enactment, nor does it explain how a freestanding grant of substantive rulemaking power in Section 6(g) can be reconciled with Congress's decision to subsequently authorize legislative rules covering narrow contexts. Instead, the Commission argues its interpretation is supported by the use of the word "prevent" in Section 5, a string of decisions interpreting different statutes, and Congress's decision *not* to address Section 6(g) in subsequent amendments to the FTC Act. None of these arguments has merit, let alone justifies the Commission's departure from a decades-long consensus.

a.     According to the Commission (at 21), Section 6(g) must be understood to confer rulemaking authority because Section 5 directs the Commission to "prevent" unfair methods of competition. The premise of this argument is that the only way to "prevent" unfair competition is to issue rules. But that logic is most obviously refuted by Section 5 itself, which empowers the Commission to pursue enforcement actions against alleged violators and to obtain "an order requiring such person . . . to *cease and desist* from the

violation of the law so charged in the complaint." 15 U.S.C. § 45(b) (emphasis added). In other words, Section 5 itself tells the Commission how to "prevent" unlawful conduct: by obtaining cease-and-desist orders that put an end to ongoing violations of the law.

The Commission's argument that it can "prevent" violations of the law only by promulgating substantive regulations also defies common sense. The Commission does not explain why Section 5 enforcement actions fail to "prevent" unlawful conduct. Indeed, if it were true that issuing legislative rules is the only way to "prevent" unfair methods of competition, then the Commission has been neglecting its statutory mandate for virtually its entire existence.

b.    The Commission next argues (at 22-24) that the Supreme Court and this Court have presumed that any grant of authority to issue "rules and regulations" authorizes legislative rulemaking, unless Congress indicates otherwise. That argument is based on a misreading of the cases the Commission cites and overlooks the differences between the FTC Act and statutes that *do* authorize substantive rulemaking.

As for the Supreme Court decisions cited by the Commission, the agency's power to issue substantive regulations was not contested in any of

them.  Instead, the only question was whether the specific regulation at issue was "reasonably related to the purposes of the enabling legislation." *Mourning* v. *Family Publ'ns. Serv., Inc.*, 411 U.S. 356, 369 (1973) (Federal Reserve regulation was sufficiently related to the Truth in Lending Act); *see American Hosp. Ass'n* v. *NLRB*, 499 U.S. 606, 608 (1991) (provision of the National Labor Relations Act did not "prohibit[] the Board from using general rules to define bargaining units"); *FCC* v. *National Citizens Comm. for Broad.*, 436 U.S. 775, 794 (1978) (FCC rule was consistent with its Federal Communications Act authority "to regulate broadcasting in the 'public interest'"); *Thorpe* v. *Housing Auth. of the City of Durham*, 393 U.S. 268, 277-278 (1969) (circular issued by the Department of Housing and Urban Development was sufficiently related to the United States Housing Act of 1937).[3]  These cases thus did not even address the key question here:  whether the agency has any power to promulgate legislative rules.

On top of that, the relevant provisions of the New-Deal era statutes at issue in these decisions looked nothing like Section 6(g) of the 1914 FTC Act. In all of those statutes, the rulemaking authority was granted in a standalone

---

[3]  *See Airlines for America* v. *DOT*, 2025 WL 313998 (5th Cir. Jan. 28, 2025) (provision of the Airline Deregulation Act did not curtail agency's uncontested general substantive rulemaking authority).

provision as part of the primary section outlining the principal powers of the agency.[4] That plainly does not describe the second clause of Section 6(g).

And the differences do not stop there. The Truth in Lending Act expressly stated that the agency could issue regulations to "prevent circumvention or evasion" of its policies. *See Mourning*, 411 U.S. at 361-362 (interpreting 15 U.S.C. § 1604). The National Labor Relations Act includes a cross-reference to the APA, which establishes procedures for issuing binding regulations. *See American Hosp. Ass'n*, 499 U.S. at 609 (citing 29 U.S.C. § 156). And the Communications Act of 1934 lists rulemaking authority alongside the FCC's other regulatory powers over private parties. *See, e.g.*, 47 U.S.C. § 303(b) (authorizing the FCC to "[p]rescribe the nature of the service to be rendered by each class of licensed stations"). In stark contrast to these statutes, the text, structure, and subsequent amendments to the FTC Act all cut *against* reading Section 6(g) to confer substantive rulemaking

---

[4] The same is true of the relevant provision of the Indian and Child Welfare Act at issue in *Brackeen* v. *Haaland*, 994 F.3d 249, 354 (5th Cir. 2021) (en banc) (per curiam), *aff'd in part*, 599 U.S. 255 (2023). *See* Br. 23-24. That provision gave the agency authority to make rules in a standalone section titled "Rules and regulations," 25 U.S.C. § 1952, rather than a clause of an ancillary provision in a section having nothing to do with binding private parties.

authority to bind private parties—an authority that would have been unprecedented when Congress enacted that provision in 1914.

The Commission's argument thus ignores all relevant context—including the fact that Congress enacted Section 6(g) decades earlier. And it is directly contrary to more recent Supreme Court precedent explaining that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022) (quoting *Whitman* v. *American Trucking Ass'ns.*, 531 U.S. 457, 468 (2001)); *see Inhance Techs., L.L.C.* v. *EPA*, 96 F.4th 888, 893 (5th Cir. 2024). The Commission cannot rely on half of an ancillary provision in the FTC Act as affording it "unlimited power to accomplish [its] policy preferences." ROA.5633.

c.     The Commission also argues that Congress's subsequent amendments to the FTC Act bless its claim of rulemaking authority. But the Commission's arguments only confirm that Congress never empowered it to issue legislative competition regulations.

First, the Commission argues that Congress "ratified" its interpretation of Section 6(g) when enacting Magnuson-Moss because the Commission had promulgated "trade regulation rules" in the preceding decade and one court

of appeals had embraced its reading of the FTC Act.   Br. 24-28 (citing *National Petroleum Refiners Ass'n* v. *FTC*, 482 F.2d 672, 674 (D.C. Cir. 1973)).   That argument misstates the ratification standard and ignores the clear text of Magnuson-Moss, which reflects Congress's decision to grant rulemaking authority for unfair and deceptive acts, but not unfair methods of competition.

The Commission wisely does not defend *National Petroleum's* actual reasoning, which represents an "approach to statutory interpretation" that was "never adopted by the Supreme Court and fell out of favor decades ago." Holyoak Dissent, at 15.   But even as a question of ratification, that lone decision comes nowhere close to establishing a "judicial consensus so broad and unquestioned that [courts] must presume Congress knew of and endorsed it."   *Jama* v. *ICE*, 543 U.S. 335, 349 (2005); *see BP P.L.C.* v. *Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) (holding "that a smattering of lower court opinions" does not meet the ratification standard).

To overcome that hurdle, the Commission points to portions of the legislative history showing that Congress was aware of *National Petroleum* when it enacted Magnuson-Moss.   Br. 27 (citing 120 Cong. Rec. 40,713 (1974)). But all that shows is that legislators knew of *National Petroleum*—it does

nothing to suggest that Congress endorsed it. In fact, the legislative record is clear that some Members *disagreed* with *National Petroleum*'s reading of Section 6(g). *See* 120 Cong. Rec. 41,407 (1974) (Statement of Rep. Broyhill).

That disagreement explains why Magnuson-Moss expressly *declined* to address the Commission's rulemaking authority under Section 6(g). In granting rulemaking authority relating to unfair and deceptive acts and practices, Congress specified that the statute "shall not affect *any authority* of the Commission to prescribe rules . . . with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2) (emphasis added). Had Congress understood Section 6(g) to authorize legislative rulemaking or intended to endorse the Commission's assertion of regulatory power, it obviously would have referenced "*the* authority of Commission." It referred to "any" such authority to avoid endorsing the notion that the Commission may make unfair-competition rules.

Second, the Commission suggests that Congress ratified the Commission's administrative interpretations of Section 6(g). Br. 27 (citing *CFTC* v. *Schor*, 478 U.S. 833, 846 (1986)). But this case is nothing like *Schor*. Magnuson-Moss did not "revisit" the FTC Act "without pertinent change," 478 U.S. at 846; it granted new authority and expressly declined to apply it to

unfair methods of competition. Nor was the Commission's claim of rulemaking authority "longstanding," given that the Commission never invoked it for the first five decades of its existence. *Id.* And of course, unlike in *Schor*, Congress has never "explicitly reaffirmed" the relevant interpretation in "positive legislation."[5]

Third, the Commission contends (at 28) that the 1980 amendments to FTC Act "confirm" its position. The Commission rightly does not contend that the 1980 amendments themselves confer any substantive power on the Commission, so they cannot create authority that earlier Congresses never gave. But even the Commission's more limited argument overreads the statute. The 1980 amendments created uniform procedures that the Commission must follow when issuing or amending substantive rules, including rules that were (mistakenly) promulgated under Section 6(g) prior to Magnuson-Moss. *See* 15 U.S.C. § 57b-3(a)(1); S. Rep. 96-500, at 6 (discussing amendments to "rule[s] issued under section 6"). Far from

---

[5] The same analysis disposes of *Helsinn Healthcare S.A.* v. *Teva Pharm. USA, Inc.*, 586 U.S. 123 (2019), where the Supreme Court only "presume[d]" that Congress "adopt[ed]" a judicial construction of the statute because (i) Congress readopted the relevant text without change and (ii) the relevant interpretation was reflected in Supreme Court decisions going back to 1887. *See id.* at 130-131. Neither condition is present here.

endorsing the Commission's reading, the amendments instead ensure that the Commission's short-lived reliance on Section 6(g) was not a permanent way to evade Magnuson-Moss's procedural requirements.

### 3. The major-questions doctrine confirms the Commission's lack of rulemaking authority.

Any doubt about the meaning of Section 6(g) is resolved by the major-questions doctrine. It is hard to imagine a more major question than whether an agency has the power to adopt substantive rules defining what constitutes fair competition throughout "a significant portion of the American economy—indeed, nearly the entire economy." Ferguson Dissent, at 12. The Commission cannot identify clear congressional authorization for its ban on noncompetes.

a.    This case has every hallmark of a major question. First, despite the Commission's description of the Rule as a "targeted regulatory effort" (at 37), "[t]here is no serious dispute that" the Commission has "claim[ed] the authority to exercise control over 'a significant portion of the American economy.'" *Biden* v. *Nebraska*, 600 U.S. 477, 503 (2023) (quoting *Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)). The Commission's Rule will invalidate tens of millions of agreements and disrupt every industry in the country. The rule applies to all categories of workers and all noncompete

agreements within the Commission's jurisdiction, regardless of the consideration received by the employee in exchange for the noncompete. And this is just one of countless rules the Commission could promulgate if the Court blesses its interpretation of Section 6(g). If the Commission may outlaw a practice that dates back to the Founding and has always been governed by state law, then no corner of the economy is safe from the Commission's heavy hand.

Second, whether and how to regulate noncompetes is "the subject of earnest and profound debates across the country." *West Virginia*, 597 U.S. at 732 (Gorsuch, J., concurring) (quoting *Gonzalez* v. *Oregon*, 546 U.S. 243, 267 (2006)). Over a dozen States have considered new noncompete legislation in the last two years, *see State Noncompete Law Tracker*, Economic Innovation Group (Oct. 11, 2024), https://eig.org/state-noncompete-map, and Congress has already "considered and rejected" legislation similar to the Noncompete Rule, *West Virginia*, 597 U.S. at 731. The Rule would put an end to that debate by bureaucratic fiat, and "enact a program that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (quotation omitted). And if the Commission has general rulemaking authority under Section 6(g), nothing will stop it from short-circuiting the political process in other areas too.

Third, the Noncompete Rule clearly "intrude[s] into an area that is the particular domain of state law." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). Noncompetes have been regulated by state law since the Founding, and in most states, they are considered on a case-by-case basis and readily enforced. *See supra*, pp. 10-11. But by a vote of 3-2, the Commission has now overridden the laws of all 50 States and federalized an area of law over which state courts have centuries of experience and federal courts have none.

If more were needed, this case is on all fours with others that triggered the major-questions doctrine. As in *Louisiana* v. *Biden*, the Commission has "claim[ed] to discover" a "unheralded power" in a "long-extant statute." 55 F.4th 1017, 1033 (5th Cir. 2022) (quoting *Utility Air Reg. Grp.*, 573 U.S. at 324). And like *West Virginia*, the Commission has "located that newfound power in the vague language of an ancillary provision" of the FTC Act. 597 U.S. at 725. The major-questions doctrine fits this case like a glove.

b. The Commission does not claim that Section 6(g) clearly authorizes a noncompete ban. Instead, it tries to sidestep the major-questions doctrine by arguing (at 34-38) that clear congressional authorization is not required any time an agency acts within its area of expertise. That argument is both wrong and irrelevant.

First, the Supreme Court has frequently invoked the major-questions doctrine where an agency is acting within its usual field. *See West Virginia*, 597 U.S. at 724 (EPA regulation of air pollutants); *Nebraska*, 600 U.S. at 504-506 (Department of Education administration of student loans); *see also id.* at 521 (Barrett, J., concurring) (explaining that the Department of Education was not "operating entirely outside its usual domain"). Although an agency's decision to act outside its usual area is an *additional* reason to apply the doctrine, *see NFIB* v. *OSHA*, 595 U.S. 109, 117-119 (2022) (per curiam) (striking down OSHA's attempt to mandate COVID-19 vaccines), the Court has never said such a condition is necessary—and decisions like *West Virginia* and *Nebraska* confirm it is not. Agencies do not have carte blanche to resolve questions of tremendous political and economic significance simply because those questions relate to an agency's field.

Second, the Commission has no relevant experience with noncompete agreements. Until the day before it announced the Noncompete Rule, the Commission had never successfully pursued any claim involving noncompetes. Prior attempts to challenge noncompetes under the federal antitrust laws had uniformly failed. *See, e.g.*, *Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825, 837 (7th Cir. 1963); *Lektro-Vend Corp.* v. *Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981).

In fact, the only federal decision cited in the Commission's brief that mentions noncompetes clarified that it was "not considering" the "legality" of those agreements on their own. *United States* v. *American Tobacco Co.*, 221 U.S. 106, 183 (1911).

Rather than defend its record on noncompetes, the Commission argues (at 37-38) that the Rule falls within its expertise because it involves unfair competition. But the Commission cannot evade the major-questions doctrine by simply slapping an unfair-competition label on conduct that has never before been challenged under Section 5.

## B.    The FTC Act Does Not Permit The Commission To Condemn All Noncompetes As Unfair Methods Of Competition.

The Noncompete Rule exceeds the Commission's statutory authority in a second, independent way. It has long been settled that conduct constitutes an "unfair method of competition" under Section 5 of the FTC Act only when it causes more harm to competition than good. Some individual noncompete agreements may impose harms that are not outweighed by procompetitive benefits, but plainly not *all* of them do—as the Commission itself recognizes. *See* 89 Fed. Reg. 38,464. Accordingly, the Commission cannot declare all noncompetes *per se* unlawful under Section 5 without even attempting to make the evidentiary showing that could support a *per se* rule. If the Commission's

boundless interpretation of Section 5 were correct, the statute would reflect an unconstitutional delegation of legislative power to the agency. Although the district court did not need to reach this issue, it was preserved below and offers an independent ground to affirm. *See Campos* v. *Steves & Sons, Inc.*, 10 F.4th 515, 520 (5th Cir. 2021).

### 1. The Noncompete Rule exceeds the Commission's authority under Section 5.

a.    When Congress enacted Section 5 in 1914 to "declare[] unlawful" "unfair methods of competition," it made it "the function of the court[s] to determine the scope" of that phrase. *E.I. Du Pont de Nemours & Co.* v. *FTC*, 729 F.2d 128, 136 (2d Cir. 1984). To distinguish "anticompetitive" from "legitimate conduct," *id.*, courts have consistently required the Commission to prove in each case that the challenged conduct (i) produces anticompetitive effects, *see, e.g.*, *North Tex. Specialty Physicians* v. *FTC*, 528 F.3d 346, 362-363 (5th Cir. 2008); that (ii) are not offset by procompetitive justifications, *see, e.g.*, *Impax Labs., Inc.* v. *FTC*, 994 F.3d 484, 497 (5th Cir. 2021); *see also* Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 109, 114 (at the time of the FTC Act's passage, the phrase "unfair methods of competition" meant "actions that

appeared to inflict losses on rivals or impede their entry into a market without any offsetting justification").

By categorically banning all noncompetes, the Commission effectively deemed them *per se* unlawful. But because Section 5 only outlaws unjustified competitive harm, business practices can only be declared *per se* unlawful when "every" instance of that conduct "poses some threat to the free market." *FTC* v. *Superior Ct. Trial Lawyer's Ass'n*, 493 U.S. 411, 434 (1990); *see Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (*per se* treatment is reserved for practices that "always or almost always tend to restrict competition and decrease output"). To avoid penalizing beneficial conduct, courts decline to recognize new *per se* rules without extensive experience and evidence showing that the specific practice at issue *always* harms competition. *See FTC* v. *Actavis, Inc.*, 570 U.S. 136, 159 (2013) (rejecting a *per se* rule where the "likelihood of . . . anticompetitive effects" caused by certain conduct "depends upon" a number of factors). As a result, courts have recognized only a limited class of horizontal agreements as *per se* violations of the antitrust laws. *See Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

The Noncompete Rule flouts these constraints.  The Commission did not even try to make the showing that would be necessary to recognize a new *per se* rule.  It did not show that all noncompetes harm competition, nor did it point to a well-developed body of law that would support *per se* condemnation.  89 Fed. Reg. 38,422.   Instead, the Commission concluded only that noncompetes harm competition in the *aggregate*—even if some of those agreements indisputably are not anticompetitive.  *See id.* at 38,379-38,380.

The Commission's "aggregation" approach is unlawful, because it outlaws legitimate business conduct.  Put differently, "to allow a finding of a section 5 violation on the theory that the mere widespread use of [a] practice makes it [unlawful] would be to blur the distinction between guilty and innocent commercial behavior."  *Boise Cascade Corp.* v. *FTC*, 637 F.2d 573, 582 (9th Cir. 1980).  Upholding this use of Section 5 would also empower the Commission to create new *per se* rules that expressly do not meet the demanding showing required by Supreme Court precedent.  *See California Dental Ass'n* v. *FTC*, 526 U.S. 756, 772 (1999) (*per se* treatment is inappropriate whenever an agreement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition").

Simply put, under Section 5, if some noncompetes harm competition and others do not, only the former are "unfair methods of competition." *See Snap-On Tools Corp.*, 321 F.2d at 837. Because the Noncompete Rule violates that principle, it contravenes Section 5.

b. Several canons of construction further undermine the Commission's attempt to deem noncompetes *per se* unlawful under Section 5.

First, courts "assume that Congress is aware of existing law" when it enacts a statute. *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Noncompete agreements date back to the Founding, and have been generally enforceable in most States, even if subject to exceptions. There is no indication that the 1914 Congress intended to empower a majority of Commissioners to deem a common, well-accepted business practice as an "unfair method of competition."

Second, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *USFS* v. *Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020). As explained above, States have regulated noncompete agreements for centuries while federal law has had nothing to say on the subject. *See supra*, pp. 10-11.

Third, the Commission's interpretation of Section 5 creates another major-questions problem. By establishing a new *per se* rule for noncompetes, the Commission is claiming the authority to penalize any company that uses noncompetes, without affording the defendant an opportunity to establish legitimate justifications for its agreements (as Congress expressly envisioned in the course of any enforcement action, *see* 15 U.S.C. § 45(b)). Even without rulemaking power, that unbounded view of Section 5 would have tremendous economic and political significance and would expand the Commission's enforcement authority beyond its historical limits. *See NFIB*, 595 U.S. at 117 (holding that OSHA's general authority to set "occupational safety and health standards" could not support the agency's effort to resolve a public health debate).

### 2.    Under the Commission's interpretation, Section 5 would be unconstitutional.

If the Commission were right that Section 5 authorizes it to categorically prohibit all noncompetes without any need to show that they are actually anticompetitive, the statute would amount to an unconstitutional delegation of legislative power. When Congress delegates authority to an agency, it must provide an "intelligible principle" to guide the Executive's discretion. *Gundy* v. *United States*, 588 U.S. 128, 135-136 (2019). The Commission's

interpretation of Section 5—which allows it to broadly outlaw conduct "ex ante[,] without regard for the distinguishing features of individual circumstances"—lacks any such principle. Ferguson Dissent, at 28-32.

To defend the Noncompete Rule, the Commission relies (at 6, 39) on its 2022 Policy Statement, which states that conduct violates Section 5 any time it (i) is "undertaken by an actor in the marketplace," (ii) is "coercive, exploitative, collusive, abusive, deceptive, [or] predatory," and (iii) "tend[s] to negatively affect competitive conditions." Policy Statement, *supra*, at 8-9; *see* 89 Fed. Reg. 38,358. The Policy Statement also states that lawful conduct may become unlawful when "examined in the aggregate along with the conduct of others." Policy Statement, at 10.

That reading of Section 5 lacks any guardrails for the agency. Armed with such an interpretation, the Commission could proscribe conduct under Section 5 without showing that it actually harmed competition in any way. *See* Dissenting Statement of Christine S. Wilson, 2022 Policy Statement, *supra*, at 9-12. And allowing the Commission to condemn entire categories of conduct as a class, as it has done here, would contravene the Supreme Court's instruction that Section 5 takes its "meaning from the facts of each case." *Pan Am. World Airways, Inc.* v. *United States*, 371 U.S. 296, 307 (1963).

This approach has tremendous implications. If the Commission can condemn conduct any time it determines that conduct may "impair the opportunities" of a competitor or may affect competition in the "aggregate," nothing would stop the Commission from outlawing all mergers and acquisitions, multi-product discounts, or other ordinary business activities that only rarely harm competition. The Commission has already started down that path, challenging a company's "no-hire" agreement with its customer based on nothing more than the majority's view that no-hire agreements are *categorically* unlawful. *See Dissenting Statement of Commissioner Andrew N. Ferguson*, In the Matter of Guardian Services Industries, Inc. (Dec. 4, 2024) (explaining that the Commission had "allege[d] nothing" about the competitive effects of the specific agreement).

Notably, the Commission's interpretation of Section 5 ignores the very limits the Supreme Court relied on in rejecting a nondelegation challenge to the Commission. In the seminal case of *Schechter Poultry*, the Supreme Court explained that Section 5 was a lawful delegation of power precisely because each of the "unfair methods of competition" prohibited by the statute would be "determined in particular instances, upon evidence, in the light of particular competitive conditions." 295 U.S. at 532-533 (citations omitted). The

Commission's Policy Statement dispenses with that requirement.
*See* Ferguson Dissent, at 28-32 ("*Schechter Poultry* confirms the
unconstitutionality of *rulemaking authority* under Section 5."). These
"serious constitutional doubts" created by the Commission's reading provide
yet one more reason to reject it here. *See Inhance Techs.*, 96 F.4th at 893.

### C.     The FTC Act Does Not Authorize Retroactive Rulemaking.

At a minimum, the Commission's attempt to invalidate all existing
noncompetes exceeds its authority. "Retroactivity is generally disfavored in
the law, in accordance with fundamental notions of justice that have been
recognized throughout history." *Eastern Enters.* v. *Apfel*, 524 U.S. 498, 532
(1998) (internal quotations omitted). In light of that core principle, "a
statutory grant of legislative rulemaking authority will not, as a general
matter, be understood to encompass the power to promulgate retroactive
rules." *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Agencies
seeking to issue rules with retroactive effect must point to clear congressional
authorization to do so. *Id.* And the question whether a regulation "operates
retroactively demands a commonsense, functional judgment." *Martin* v.
*Hadix*, 527 U.S. 343, 357-358 (1999).

The Commission has not identified clear congressional authorization to engage in retroactive rulemaking. The Rule voids nearly all existing noncompetes, even if the parties bargained for that protection in return for valuable consideration. *See* 89 Fed. Reg. 38,439. For instance, a small business that shared vital proprietary information with or provided specialized training to an employee in exchange for a noncompete would be deprived of its bargained-for ability to stop the employee from taking those secrets or training to a competitor. Even if Section 6(g) somehow authorized the Commission to issue unfair-competition regulations, nothing in that provision blesses the Commission's attempt to retroactively unwind private contracts.

## II.  The Noncompete Rule Is The Product Of Flawed Decisionmaking.

In addition to lacking statutory authority for the Noncompete Rule, the Commission violated the APA in adopting it. To satisfy the APA, an agency must "articulate[] a rational connection between the facts found and the decision made." *Mexican Gulf Fishing Co.* v. *United States Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (citation omitted). The Commission fell short of that standard in two ways. First, it adopted a sweeping nationwide ban on noncompetes that is entirely unsupported by the record. Second, it discarded a series of targeted and more effective alternatives.

**A.    The Commission's Categorical Ban Is Not Supported By Evidence.**

The APA requires the Commission to demonstrate that the Noncompete Rule is supported by the "evidence before the agency." *Southwestern Elec. Power Co.* v. *EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). The Commission cannot meet that standard here. As the district court recognized, the Noncompete Rule imposes an "unreasonably overbroad," "one-size-fits-all approach" on businesses throughout the United States. ROA.5634-35. No evidence in the record supports that blunderbuss approach. On the contrary, much of the evidence before the agency showed that its Rule was certain to sweep in many agreements that benefit workers and businesses.

1.    To defend its categorical ban, the Commission principally relied on a handful of studies that examine the economic effects of various state policies toward noncompetes. *See* 89 Fed. Reg. 38,372-38,373. Those studies provide no support for the Commission's nationwide ban for three reasons.

First, none of the studies sheds any light on the wisdom of the Commission's policy because "no state has [ever] enacted a non-compete rule as broad as the" Commission's ban. ROA.5635. Even California, which the Commission relied on extensively in its Rule, *see, e.g.*, 89 Fed. Reg. 38,393,

defines noncompetes more narrowly than the Commission, *id.* at 38,502 (adopting an unprecedented functional test for noncompetes).

Second, many of the studies relied on by the Commission focus on the effects of policies that target specific industries (*e.g.*, physician or technology workers) or workers at certain income levels (*e.g.*, low-wage workers). *See* 89 Fed. Reg. 38,380-38,390.[6]   But the Commission did not adopt a regulation that applies to only hourly workers, the technology sector, or physicians—it adopted a total ban that applies to low-wage workers and CEOs alike.  Accordingly, these studies say nothing whatsoever about the wisdom of a total ban, just as studies showing the benefits of lower speed limits provide no support for a rule banning all cars from the road.

Third, the Commission never explained why it decided to extrapolate findings from studies of particular States to the entire national economy—and the studies themselves warn against doing so.  One study extensively cited by the Commission acknowledged the difficulty of drawing general conclusions from its state-specific findings.  *See* Balasubramanian, *supra*, at 11-12 (noting that "Hawaii's labor market is geographically isolated, which raises concerns

---

[6] *See, e.g.*, Balasubramanian, et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (2022) (examining Hawaii law for technology workers).

about the potential generalizability of the findings").  Another acknowledged the "empirical and inferential challenges" of state-specific analyses of noncompetes, attributable to the limited data available to compare States to one another.  Lipsitz & Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 163 n.16 (2022).

The Commission defends (at 42) its reliance on these studies by claiming that they are "highly probative" of "the effects of changes in state law" and noting that it "reviewed meta-analysis of these studies" showing the effects of "all legal changes . . . from 1991 to 2014."  That argument misses the point.  No one criticizes the Commission for considering these studies.  The problem is that the Commission relied on them as support for a nationwide ban, when even the studies themselves warn against precisely that sort of extrapolation.

Without any adequate studies, the Commission has no reasoned basis for imposing a sweeping ban on noncompetes.  The Commission mentions its supposed "experience and expertise in competition matters," 89 Fed. Reg. 38,346, but the Commission had no enforcement record whatsoever related to noncompetes before 2023, *see* Ferguson Dissent, at 31 (discussing "the three enforcement actions the Commission ginned up the day before this rulemaking began").  And the Commission's conclusory assertions of agency expertise

cannot justify an unprecedented policy involving a subject the Commission knows little about. *See Baltimore & O.R. Co.* v. *Aberdeen & Rockfish R. Co.*, 393 U.S. 87, 92 (1968) (warning against judicial review becoming "lost in the haze of so-called expertise").

2.      Not only did the Commission provide no affirmative support for its categorical ban, but it also failed to refute the extensive evidence showing that reasonable noncompetes promote competition.

Start with judicial decisions. The Commission has not identified a single federal case suggesting that a noncompete is an unfair method of competition or violates federal antitrust laws. On the contrary, many decisions have rejected challenges to noncompete agreements because of their procompetitive benefits. *See Lektro-Vend Corp.*, 660 F.2d at 265 ("The recognized benefits of reasonably enforced noncompetition covenants are by now beyond question."). If the Commission believes that uniform body of law is misguided, it must explain why.

The Commission also failed to genuinely grapple with the extensive body of literature finding that reasonable noncompetes benefit the economy. For example, one study found that the absence of post-employment restrictions led to higher rates of misconduct among financial brokers and higher prices for

consumers. *See* 89 Fed. Reg. 38,445. Another found that noncompetes lead to more efficient allocation of patients among physicians. *See id.* at 38,398. Yet the Commission disregarded this evidence, without offering any sound basis for doing so. Instead, it "cherry-picked evidence that conform[ed] to [its] narrative" by emphasizing findings that supported its policy while dismissing findings that did not. 88 Fed. Reg. 3,543 (Commissioner Wilson, dissenting). Incredibly, the Commission displayed this confirmation bias with regard to a *single study*: it repeatedly cited a 2014 survey to support its claim that employers try to use unenforceable noncompetes, but then dismissed other portions of that same study finding that employees offered noncompetes received higher pay and increased training opportunities. *Compare* 89 Fed. Reg. 38,466 *with id.* at 38,430.

According to the Commission (at 44), it was enough to have acknowledged the benefits of noncompetes before dismissing them out of hand. But the Commission's brief repeats (at 41) the very same false assumptions that motivated the Noncompete Rule, including its assertion that employers can rely on alternatives to noncompetes (like expensive trade-secret suits) "to protect [their] interests" or can simply "compete on the merits by offering better jobs." The flaws in those assertions were explained to the

Commission throughout the rulemaking process, and the Commission was required to grapple with them.

3.    The Commission's remaining arguments in defense of its decisionmaking process are also misguided.

First, the Commission wrongly claims (at 42-43) that the district court required it to identify a study showing the effects of categorical ban and to "identify an identical state law." That is a straw man. Under the APA, the Commission was obligated to offer some reasoned basis for selecting a categorical ban over alternative policies. Because the Commission relied almost exclusively on state-law studies to meet that burden, the district court considered those studies and found that they did not justify the categorical ban. The Commission cannot rely on state-law research and then fault the district court for analyzing it.

Second, the Commission argues (at 43) that the "district court offered no support for its assertion that the Rule is 'based on inconsistent and flawed empirical research.'" Again, the court explained that the Commission's "evidence," which consisted of "different states' approaches to enforcing non-competes based on specific factual situations," was "completely inapposite to the Rule's imposition of a categorical ban." ROA.5635. It is the *Commission's*

obligation to support its policy choice. The district court correctly concluded that the Commission failed to establish a "rational connection between the facts found and the choice made." ROA.5635.

### B.    The Rule Unjustifiably Brushes Aside Superior Alternatives.

Under the APA, an agency must give serious consideration to alternatives to its proposed policy, especially when those alternatives are "obvious[ly] respons[ive] to the concerns expressed by the" agency during the rulemaking process. *International Ladies' Garment Workers' Union* v. *Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983). The Commission flunked that requirement here, failing to explain why it adopted a categorical ban over "obvious and less drastic alternative[s]." *Yakima Valley Cablevision, Inc.* v. *FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986).

During the comment period, many commenters advocated replacing the Rule's categorical ban with a case-by-case approach. That proposal was consistent with state courts' longstanding framework for assessing noncompetes and the economic literature showing that reasonable noncompetes are often procompetitive, and it also mapped onto the Commission's own historical practice in enforcing Section 5 violations. But the Commission rejected that alternative, arguing that a case-by-case approach

would not allow enforcers to address the use of noncompetes "in the aggregate." 89 Fed. Reg. 38,463. Tellingly, that argument effectively concedes that many agreements would be enforceable under a case-by-case test. *Id.* at 38,464. Yet the Commission made no attempt to explain why it was sensible to wipe out potentially millions of agreements that even the Commission acknowledges would not harm competition.

Commenters also proposed a host of other alternatives that would have limited the harmful effects of the Rule. For example, intervenor-appellee U.S. Chamber of Commerce proposed amending the Rule to exclude independent contractors and severance agreements. *See* U.S. Chamber of Commerce Comment Letter on Non-Compete Clause Rule 44-45 (Apr. 17, 2023). And healthcare organizations requested exemptions for healthcare professionals, doctors, and senior hospital executives. *See* Stamford Health Comment Letter on the Non-Compete Clause Rule 5 (Apr. 1, 2023).

Here again, the Commission summarily rejected these proposals based on little more than *ipse dixit*—merely "concluding," often in a single sentence, "that either the pro-competitive justifications outweighed the harms, or that employers had other avenues to protect their interests." ROA.5636. Given the breadth and staggering impact of the Noncompete Rule, the Commission's

summary dismissal of these reasonable alternatives does not pass muster. *See Southwestern Elec. Power Co.*, 920 F.3d at 1030.

The Commission does not offer a serious defense of that analysis on appeal. The Commission asserts (at 45) that "various alternatives would introduce complexity and uncertainty," but once again fails to explain *why* that is the case—particularly for alternatives that would exempt entire categories of workers (like hospital executives). It also claims that any variation from a blanket ban would "inhibit efficient matching between workers and employers." *Id.* But there are many situations where the ability to negotiate a noncompete would promote efficient matching; for instance, where an employer is worried that the best candidate for the job may compete for its customers in the future. In any event, the Commission's reasoning is also vastly overbroad. Even if noncompetes "inhibit efficient matching" on the back end, the relevant question is whether that inefficiency is outweighed by benefits on the front end, such as competition among employers to offer better training opportunities. The Commission never tried to answer that question.

Perhaps recognizing the gaps in its analysis, the Commission also argues (at 46) that it was not required to consider the reliance interests of businesses and workers because "the Commission had not previously taken a contrary

position on the question of whether noncompetes are unfair methods of competition." To say it differently, the Commission's view is that reliance interests are irrelevant when an agency enters an entirely new field because no one should expect agencies to operate within historic limits. To state that position is to refute it.

## III. The District Court Correctly Set Aside The Rule.

A. "[V]acatur of an agency action is the default rule in this Circuit" following a successful APA challenge. *Cargill* v. *Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024); *see Chamber of Commerce of the U.S.* v. *SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). By definition, vacatur "is not party-restricted"—when an agency rule is "set aside" or deemed "invalid," "it may not be applied to anyone." *Career Colls. & Schs. of Tex.* v. *United States Dep't of Ed.*, 98 F.4th 220, 255 (5th Cir. 2024) (quoting Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1173 (2020)). Accordingly, if this Court agrees that the Noncompete Rule is unlawful, it should affirm the district court's decision setting it aside nationwide.

To avoid that precedent, the Commission suggests that vacatur is "merely . . . an available remedy," and that any relief entered in this case should be "limit[ed] to the named plaintiffs." Br. 47, 50. The Commission has

not identified a single decision of this Court embracing that view, which conflicts with binding precedent to the contrary. *See, e.g.*, *Career Colls.*, 98 F.4th at 255. Instead, the Commission relies on decisions addressing the separate question whether an agency decision should be remanded without vacatur, Br. 50 (citing *Texas Med. Ass'n* v. *HHS*, 110 F.4th 762, 779 (5th Cir. 2024)), which is a form of relief the Commission has not sought here. Accordingly, the Commission has no support for its request to depart from the "default" remedy of vacatur in this case.

     B.    Even if "limited vacatur" were available, none of the Commission's arguments shows that it is warranted here.

     1.    The Commission first argues (at 51) that party-specific relief is necessary because of "Article III and equitable principles." But this Court has already considered and rejected that exact argument in other cases, where the government relied on the very same authorities. *See, e.g.*, *Career Colls.*, 98 F.4th at 255 (rejecting the government's reliance on *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979)); *see* Brief for the United States, *Career Colls.*, *supra*, 2023 WL 6543249, at *52-53. The Commission has not offered any basis to distinguish that precedent here.

2.     The Commission also contends (at 51-52) that intervenor-appellees should be able to obtain relief for only those members that have submitted declarations in this case.  That is a radical argument at odds with the entire doctrine of associational standing.  It is well established that associations can pursue claims on behalf of their members and, when those claims are successful, obtain a remedy for their membership.  *See Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard Coll.*, 600 U.S. 181, 198-201 (2023) (*SFFA*); *Association of Am. Physicians & Surgeons, Inc.* v. *Texas Med. Bd.*, 627 F.3d 547, 550-551 (5th Cir. 2010).  Intervenor-appellees have established standing to pursue their claims in this case (a fact the Commission does not contest).  Accordingly, their full membership should receive the benefits of a favorable judgment.

In arguing otherwise, the Commission suggests (at 52) that relief must be limited because intervenor-appellees are not "bona fide membership organization[s]."  That assertion is likewise entirely baseless.  Only two years ago the Supreme Court permitted an association to pursue claims on behalf of its membership because it "ha[d] identified members and represent[ed] them in good faith."  *SFFA*, 600 U.S. at 198-201.  In doing so, the Court held that "a voluntary membership organization with identifiable members" need not

establish the "indicia of membership" analysis that the Commission presses here. *Id.* at 201. The Commission suggests that *SFFA* distinguishes between an association's identified and unidentified members, and permits an association plaintiff to obtain relief only for the former. Br. 53. But nothing in the decision draws that line; instead, the Court distinguished between "voluntary membership organizations" (like intervenor-appellees) and plaintiffs that "concededly ha[ve] no members." *SFFA*, 600 U.S. at 201.

The Commission also argues (at 53) that "relief extending to unidentified members" would be "inappropriate" because intervenor-appellees "did not show that their unidentified members use enforceable non-competes, oppose the Rule, or would benefit from vacatur." Here again, the Commission cites no authority for its novel approach to remedies. Indeed, that approach would defeat the entire purpose of associational standing, which is available only when "the participation of individual members" is *not* required. *SFFA*, 600 U.S. at 199.

3.     As a last resort, the Commission urges (at 54) that the "public's substantial interest[] in the Rule underscore[s] the need to limit vacatur." But this Court has explained that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Texas* v. *Biden*, 10 F.4th 538, 560

(5th Cir. 2021) (citation omitted).   Moreover, the Commission's "protests against nationwide relief are incoherent in light of its use of the Rule to prescribe [a] uniform" nationwide ban.   *Career Colleges*, 98 F.4th at 255; *see Tex. Med. Ass'n*, 110 F.4th at 780.  The Commission cannot simultaneously claim that a patchwork of state laws harms the economy while asking this Court to embrace a patchwork of judicial remedies.

## CONCLUSION

The district court's decision should be affirmed.

Dated:  February 3, 2025

Respectfully submitted,

*/s/ Jeffrey B. Wall*

| | |
|---|---|
| JENNIFER B. DICKEY | JEFFREY B. WALL |
| JORDAN L. VON BOKERN | JUDSON O. LITTLETON |
| U.S. CHAMBER LITIGATION CENTER | DANIEL J. RICHARDSON |
| 1615 H Street N.W. | SULLIVAN & CROMWELL LLP |
| Washington, D.C.  20062 | 1700 New York Ave., N.W. |
| (202) 463-5337 | Suite 700 |
| | Washington, D.C.  20006 |
| LIZ DOUGHERTY | (202) 956-7500 |
| BUSINESS ROUNDTABLE | wallj@sullcrom.com |
| 1000 Maine Avenue S.W. | |
| Washington, D.C. 20024 | *Counsel for Intervenor-Appellees* |
| (202) 872-1260 | |

## CERTIFICATE OF SERVICE

I certify that on February 3, 2025, the foregoing brief was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

Dated:  February 3, 2025

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL

*Counsel for Intervenor-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, it contains 12,967 words.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Expanded BT.

I further certify that (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:  February 3, 2025       /s/ *Jeffrey B. Wall*
                                    JEFFREY B. WALL

                                  *Counsel for Intervenor-Appellees*