No. 24-10951

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Ryan, L.L.C.,

*Plaintiff-Appellee,*

Chamber of Commerce of the United States of America,
Business Roundtable, Texas Association of Business,
Longview Chamber of Commerce,

*Intervenor-Plaintiffs-Appellees,*

v.

Federal Trade Commission,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, CASE NO. 3:24-CV-986

### BRIEF OF THE SOCIETY FOR HUMAN RESOURCE
### MANAGEMENT AS *AMICUS CURIAE* IN SUPPORT OF
### PLAINTIFF-APPELLEE'S RESPONSE BRIEF FOR AFFIRMANCE

Jesse M. Coleman
Eron Reid
Seyfarth Shaw LLP
700 Milam Street, Ste 1400
Houston, TX 77002
(713) 225-2300
jmcoleman@seyfarth.com
ereid@seyfarth.com

Michael D. Wexler
Camille A. Olson
Richard Lapp (*pro hac vice*
forthcoming)
Seyfarth Shaw LLP
233 S. Wacker Drive, Ste 2800
Chicago, IL 60605
(312) 460-5000
mwexler@seyfarth.com
colson@seyfarth.com
rlapp@seyfarth.com

*Counsel for the Society for Human Resource Management - Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' and *amici*'s motion papers, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order for the judges of this court to evaluate possible disqualification or recusal.

***Amicus Curiae***: The Society for Human Resource Management

***Counsel for Amicus Curiae***: Michael Wexler, Camille Olson, Jesse Coleman, Eron Reid, Seyfarth Shaw LLP

*/s/ Michael Wexler*
Michael Wexler

*Counsel for The Society for Human Resource Management - Amicus Curiae*

## **TABLE OF CONTENTS**

STATEMENT OF *AMICUS CURIAE* ................................................................. 1

SUMMARY OF ARGUMENT.............................................................................. 4

ARGUMENT ....................................................................................................... 6

I.    THE COMMISSION'S FAILURE TO CONSIDER THE
BENEFITS OF NONCOMPETE AGREEMENTS AND
ALTERNATIVE SOLUTIONS RENDERS ITS ACTION
ARBITRARY AND CAPRICIOUS.......................................................... 6

II.   VACATUR IS THE ONLY APPROPRIATE REMEDY TO
ADDRESS THE UNLAWFUL NON-COMPETE BAN......................... 15

III.  VACATUR IS APPROPRIATE BECAUSE THE RULE IS NOT
SEVERABLE ...................................................................................... 20

IV.  EQUITY FAVORS NATIONWIDE RELIEF ........................................ 24

CONCLUSION.................................................................................................. 27

CERTIFICATE OF COMPLIANCE ............................................................... 29

CERTIFICATE OF SERVICE ........................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987) ...............21, 22

*Amoco Prod. Co. v. Horwell Energy, Inc.,*
    969 F.2d 146 (5th Cir. 1992) ............................................................... 6

*ATS Tree Servs., LLC v. FTC,*
    No. 24-1743 (E.D. Pa. Oct. 4, 2024) ................................................. 19

*Braidwood Mgmt., Inc. v. Becerra,*
    104 F.4th 930 (5th Cir. 2024), *cert. granted*, 2025 WL 65913
    (U.S. Jan. 10, 2025), *and cert. denied sub nom.* 2025 WL 76462
    (U.S. Jan. 13, 2025) ....................................................................17, 24

*Career Colls. & Schs. Of Tex. v. U.S. Dep't of Ed.,*
    98 F.4th 220 (5th Cir. 2024) ..........................................................17, 24

*Cargill v. Barr,*
    No. 1:19-cv-00349 (WD. Tex. Mar. 25, 2019) ................................... 16

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir.), *cert. granted*, 144 S. Ct. 374, 217 L. Ed.
    2d 202 (2023), *and aff'd*, 602 U.S. 406, 144 S. Ct. 1613, 219 L.
    Ed. 2d 151 (2024) ............................................................................. 16

*Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. Sbc,
L.L.C.,*
    93 F.4th 870 (5th Cir. 2024) ............................................................... 6

*Chamber of Commerce of U.S. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) ............................................................. 11

*In re Clarke,*
    94 F.4th 502 (5th Cir. 2024) ............................................................. 24

*Data Mktg. P'ship, LP v. United States Dep't of Labor*,
   45 F. 4th 846 (5th Cir. 2022) ........................................6, 7, 15

*Davis Cnty. Solid Waste Mgmt. v. EPA*,
   108 F.3d 1454 (D.C. Cir. 1997) ......................................... 22

*Exec. Benefits Ins. Agency v. Arkison*,
   134 S. Ct. 2165 (2014) ................................................. 8, 21

*Franciscan All., Inc. v. Becerra*,
   47 F.4th 368 (5th Cir. 2022) ............................................. 16

*FTC v. Exxon Corp.*,
   636 F.2d 1336 (D.C. Cir. 1980) .......................................... 11

*Immigr. & Naturalization Serv. v. Chadha*,
   462 U.S. 919 (1983) .................................................... 20

*K-Mart Corp. v. Cartier*,
   486 U.S. 281 (1988) .................................................... 21

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct 2244 (2024) .................................................. 22

*Louisiana by & through Murrill v. United States Dep't of Educ.*,
   No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) ...........26, 27

*In re M-I L.L.C.*,
   505 S.W.3d 569 (Tex. 2016) .............................................. 11

*Marsh USA Inc. v. Cook*,
   354 S.W.3d 764 (Tex. 2011) .............................................. 25

*MCR Oil Tools, L.L.C. v. United States Dep't of Transportation*,
   110 F.4th 677 (5th Cir. 2024) ........................................... 15

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   253 F.3d 732 (D.C. Cir. 2001) ........................................... 23

*New Jersey Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) (Thomas, J., concurring) ........................... 21

*Properties of the Vill., Inc. v. FTC,*
No. 24-13102 (11th Cir 2024.) ........................................................ 18

*Properties of the Vill., Inc. v. FTC,*
No. 5:24-cv-316 (M.D. Fla. Aug. 15, 2024) ..................................... 18

*Reno v. Am. C.L. Union,*
521 U.S. 844 (1997) ....................................................................... 22

*RSR Corp. v. E.P.A.,*
588 F. Supp. 1251 (N.D. Tex. 1984) ............................................... 14

*Tex. v. U.S.,*
945 F.3d 355 (5th Cir. 2019), as revised (Dec. 20, 2019), *as
revised* (Jan. 9, 2020), *rev'd and remanded sub nom. California
v. Tex.,* 593 U.S. 659, 141 S. Ct. 2104, 210 L. Ed. 2d 230 (2021) ...... 21

*Tex. v. U.S.,*
691 F. Supp. 3d 763 (S.D. Tex. 2023), *aff'd in part, modified in
part,* No. 23-40653, 2025 WL 227244 (5th Cir. Jan. 17, 2025) .......... 20

*Tex. v. Biden,*
10 F.4th 538 (5th Cir. 2021) ........................................................... 12

*Tex. v. Biden,*
20 F.4th 928 (5th Cir. 2021) ........................................................... 16

*United States v. Rainbow Fam.,*
695 F. Supp. 294 (E.D. Tex. 1988) ................................................. 20

*United States v. Texas,*
599 U.S. 670 (2023) (Gorsuch, J., joined by Thomas and
Barrett, JJ., concurring in the judgment) ..................................... 16

**Statutes**

820 ILCS 90 ....................................................................................... 14

26 MRSA § 599 ................................................................................... 13

5 U.S.C. § 706(2) .................................................................... 4, 6, 17, 24

5 U.S.C. § 706(2)(A) ............................................................................ 24

Conn. Gen. Stat. Ann. § 20-14p ......................................................... 13

Conn. Gen. Stat. Ann. § 31-50a ......................................................... 13

Conn. Gen. Stat. Ann. § 31-50b ......................................................... 13

Del. Code Ann. tit 6., § 2707 .............................................................. 13

Federal Trade Commission Act ............................................................ 6

Fla. Stat. Ann., § 542.335 .................................................................. 14

Freedom to Work Act ...................................................................14, 21

FTC Act § 6 ................................................................................... 3, 18

Ind. Code Ann. § 25- 22.5 .................................................................. 13

Iowa Code § 135Q.1-2 ....................................................................... 13

KRS § 216.724 ................................................................................... 13

Mass. Gen. Laws ch. 112, § 74D 135C ............................................... 13

Mass. Gen. Laws ch. 112, § 186 ......................................................... 13

NH RSA 329:31-a ............................................................................... 13

## Other Authorities

16 C.F.R. Part 910 .......................................................................*passim*

16 C.F.R. Part 912 .......................................................................*passim*

89 Fed. Reg. at 38,343..................................................................... 7, 26

89 Fed. Reg. at 38,455..................................................................... 23

89 Fed. Reg. at 38,466..................................................................... 26

Charles E. Carpenter, *Validity of Contracts Not to Compete*, 76 U.
     Pa. L. Rev. 244, 244–45 (1928)............................................................ 7

Evan P. Starr, et al., *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021) ................................................... 9

Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019) ........................................................................................................ 9

Federal Rules of Appellate Procedure 29(a) ............................................ 4

Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625 (1960) ............................................................................... 7

Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1, 28 (2024) ......................................................................................... 9

Johnathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. Chi. L. Rev. 953, 961 (2020) ............................... 8

## STATEMENT OF *AMICUS CURIAE*

As the trusted authority on all things work, the Society for Human Resource Management ("SHRM") is the foremost expert, researcher, advocate, and thought leader on issues and innovations impacting today's evolving workplaces. With nearly 340,000 members in 180 countries, SHRM touches the lives of more than 362 million workers and families globally. SHRM's membership of Human Resource ("HR") professionals and business executives sits at the intersection of all things work, workers, and the workplace, helping to set positive collaboration and workplace cultures where workers and employers thrive together. Our members are actively involved in hiring, benefits design, and legal compliance. As a result, SHRM seeks to offer valuable insights into how companies support their workforce while safeguarding proprietary information and intellectual property. On behalf of our members, we respectfully submit this amicus brief for the Court's consideration.

HR professionals, including SHRM members, play a critical role in managing a wide range of employment agreements throughout the hiring and exit process. Their work ensures alignment with company policies and the fair implementation of agreements that balance the interests of

both employers and employees. These agreements may include provisions for education assistance, solicitation restrictions, and non-compete clauses. As such, our members have a unique perspective on the discord that a blanket ban on noncompete agreements will undoubtedly cause. Reasonable, narrowly tailored non-compete agreements allow employers to make investments in intellectual capital through providing job-related training, prioritizing upskilling, and fostering an environment where knowledge and trade secrets can be shared and developed freely. Indeed, SHRM members invest considerable resources in providing training and educational assistance to their employees as well as effectuating the employee hire and exit process. Allowing parties to negotiate reasonable non-compete agreements encourages and promotes innovation and the development of a well-trained, well-educated workforce to the benefit of businesses and workers alike.

As the District Court determined on summary judgment, the Federal Trade Commission's (the "Commission") blanket ban on non-compete agreements, 16 C.F.R. Parts 910 and 912 (the "Rule"), overlooked the benefits of well-structured, targeted non-compete agreements; ignored possible alternatives to such a broad prohibition;

and exceeded the rulemaking authority granted by Congress. (RE 52 (Dkt. No. 222)). It is SHRM's position that blanket bans stifle innovation, limit training opportunities, and harm businesses and workers alike. The Rule, which was set to take effect on September 4, 2024, failed to strike an equitable balance between the interests of the employer and the employee and upended the current system and longstanding practice. As a result, employers may have been forced to step away from providing employees access to confidential information, as well as valuable training and education programs to the detriment of workers and the American workforce as a whole.

SHRM agrees with Plaintiff-Appellee that Section 6 of the FTC Act does not authorize rulemaking in the manner undertaken by the agency and that the agency's promulgation of the Rule was arbitrary and capricious. Consequently, SHRM fully endorses the Plaintiff-Appellee's Brief and opposes Defendant-Appellant's appeal seeking to reinstate the Commission's Rule. SHRM files this brief to offer the unique perspective of SHRM and its members, whose industries represent a diverse cross-section of the American economy in support of Plaintiff-Appellee's argument. The rulemaking record reflects the testimonies of SHRM

members, representing organizations ranging from less than 25 employees to more than 25,000 employees. These members agree that the Rule would negatively impact their organizations and fails to protect work, workers, and the workplace. *See* Society for Human Resource Management (SHRM), Comment Letter, FTC-2023-0007-20903, at 6-8 (Apr. 19, 2023).

SHRM strongly encourages the Court to affirm the District Court's Order setting aside the Rule because failure to do so will disrupt the work of HR professionals who manage the recruitment, training, and exiting of employees, and who rely on certainty during the hiring process.[1]

## SUMMARY OF ARGUMENT

Recognizing the volume of briefing both from the parties and *amici* before the Court, SHRM focuses its brief on (1) the arbitrary and capricious basis for the blanket ban on noncompete agreements; and (2) Section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2),

---

[1] No party to this filing has a parent corporation, and no publicly-held corporation owns 10% or more of the stock of any of the parties to this filing. SHRM files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

which instructs courts reviewing agency actions to "set aside" regulations that are unlawful, thereby allowing nationwide, not party-specific, relief.

The Commission's near-total ban on noncompete agreements is unreasonable and lacks justifiable explanation because it ignores the strong empirical evidence undermining the Rule. As SHRM submitted by public comment, noncompete agreements—when applied to appropriate workers—serve employers' and employees' interests, by, among other things, enabling employees to benefit from free mentoring, programming, and education, in exchange for a longer-term work commitment with a sponsoring employer. In light of the benefits and protections afforded by noncompete agreements, SHRM and other commentators, drawing from state regulations, proposed several less restrictive alternatives that allow narrowly tailored noncompete agreements under appropriate circumstances. Failing to thoroughly consider these factors and alternatives renders the Commission's action arbitrary and capricious under the APA.

Given the nationwide impact the Rule would have, vacatur is the only appropriate remedy. Any lesser relief than vacatur is inappropriate, because it would create inconsistency across jurisdictions. Vacatur is

also appropriate because the Rule is not administratively severable. Equities further favor vacatur of the Rule to eliminate any confusion and unfairness that could arise if relief was limited to the parties to this action only. For these reasons, as detailed herein, the Court should affirm the District Court's universal vacatur.

## ARGUMENT[2]

### I. THE COMMISSION'S FAILURE TO CONSIDER THE BENEFITS OF NONCOMPETE AGREEMENTS AND ALTERNATIVE SOLUTIONS RENDERS ITS ACTION ARBITRARY AND CAPRICIOUS

The APA's arbitrary-and-capricious standard requires agency action to be "reasonable and reasonably explained", which the Commission did not satisfy. *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F. 4th 846, 855 (5th Cir. 2022) (citation omitted). An agency

---

[2] This Court reviews "grants of summary judgment *de novo*, applying the same standard as the district court." *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. Sbc, L.L.C.*, 93 F.4th 870, 874 (5th Cir. 2024). That is, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citation omitted). Summary judgment is appropriate "if the record discloses that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147–48 (5th Cir. 1992). And, "[i]f the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* There are no genuine issues as to any material facts here, with the questions presented turning on the Court's application of the governing law, namely, the Federal Trade Commission Act (the "FTC Act") and Administrative Procedures Act (the "A PA").

is responsible for acting "within a zone of reasonableness" such that it "reasonably considered the relevant issues and reasonably explained the decision." *Id.* In reviewing an agency's action, a court may consider only the reasoning "articulated by the agency itself" and any post hoc rationalizations will be treated as evidence the action is arbitrary and capricious. *Id.*

The Commission maintains the Rule emerged because of a growing concern about the harmful effects of non-compete agreements. According to the Commission, empirical research has shown that the use of non-compete agreements by employers "tends to negatively affect competition in labor markets, suppressing earnings for workers across the labor force—including even workers not subject to non-competes." Non-Compete Clause Rule, 89 Fed. Reg. at 38,343 (May 7, 2024). However, the Commission looked at the collected data aggregately instead of distinguishing between industries, states, and other factors that would have shed light on discrepancies across such variables to better tailor proposed relief (assuming *arguendo* the Commission has authority to issue a rule governing noncompete agreements). The Commission also focused on studies examining the changes in the enforcement of non-

compete agreements, rather than considering the impact of full bans like the Commission seeks to impose.[3]  For each study that highlighted the potential benefits of noncompete agreements, the Commission acknowledged the positive effects on worker training and investment but then dismissed the findings based on a point of error, without offering substantial context or counterevidence to support its position.  Because of these gaps in the Commission's analysis, SHRM joins Plaintiff-Appellee in its criticisms of the Commission's decision-making.

In developing the Final Rule, the Commission also failed to consider or explain its basis for rejecting qualitative data presented by SHRM and other commentators opposing the Proposed Rule. For example, employers invest significant time and costs into training and education programs to compete in the marketplace, attract top talent, and support employees in career advancement. Employers make such investments with the expectation and upon the condition of, obtaining a return on such investments. Workers, in turn, receive higher wages and opportunities for job training and education.  Studies of the American labor market

---

[3] Of note, between 2014 and 2020, state legislatures enacted "[n]ineteen changes [that] reduced [noncompete] enforceability", but "six [that] enhanced it …." Johnathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. Chi. L. Rev. 953, 961 (2020).

show this to be true, and that workers presented with noncompete agreements before accepting job offers receive higher wages and more training than those who are not bound by noncompete agreements. Evan P. Starr, et al., *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021). Empirical studies also show that the use of noncompete agreements is positively correlated with increases in employer-sponsored training,[4] investment in capital equipment,[5] and research and development (R&D) expenditures.[6]

The Rule ignores these studies, burdening employers and HR professionals to develop training-repayment agreements or other "penalty" policy—in a way that will not be construed as a noncompete restriction—in order to recover such costs from an employee (assuming the employee will even comply with such terms). The Rule forces employers to consider eliminating these costly training and education

---

[4] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783, 796-97 (2019) (finding that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7& in occupations that use non-competes at a high rate).

[5] Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1, 28 (2024) (noting a 34%-39% increases in capital investments at knowledge-intensive firms).

[6] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non- Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36.

benefits altogether because they run the risk of employees taking advantage of such programs only to apply those resources at a competitor.  Even if companies attempted to recover the costs associated with this training and programming, any such recovery would at best be only partial, because the costs of so much of onboarding and employee development are not quantifiable or redeemable.  Such unrecoverable time and costs include those attributable to the HR employees facilitating those programs and the time or expenses of other employees responsible for mentoring or otherwise contributing to such programs.  Ultimately, doing away with such training and advance education would shift the cost to employees, effectively stifling growth.

As another example, the Commission's research does not account for the protections afforded by noncompete agreements.  Among HR professionals' responsibilities is the obligation to protect intellectual property and proprietary assets to prevent unfair competition—and at minimum, have the paperwork and training in place for new hires to understand these conditions of employment.  HR professionals, together with legal counsel, have carefully crafted noncompete language in employment and confidentiality agreements to address these concerns

and adhere to the varying compliance obligations across different states. Under the Rule, however, the majority of workers would be free to jump ship to a competitor (or start a competing business) upon immediate receipt of such proprietary assets, where they can support the development or sale of the same product or service without recourse, placing intellectual property at risk.[7]

The Commission also failed to consider alternative methods to address the noncompete issues it identified in its research. The arbitrary-and-capricious standard "requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Commerce of U.S. v. SEC*, 85 F.4th 760, 744 (5th Cir. 2023). As this Court warned, "[n]odding to concerns raised by commentors only to dismiss them in a conclusory

---

[7] The Commission cannot expect employers to rely on Confidentiality/Non-Disclosure Agreements alone to protect their proprietary information because, although that may insulate *tangible* property from unfair competition, what an employee learns and knows cannot be undone. Nor can employees be reasonably expected to bifurcate in their minds what they know about their former employers' confidential business methods when placed in a directly competing role when such information necessarily informs the employees' efforts in their new job. *See, e.g.*, *In re M-I L.L.C.*, 505 S.W.3d 569, 576 (Tex. 2016) (when a person is exposed to a company's trade secrets and is placed in a position of a competitive decision-maker, that person, "even when acting in good faith, . . . could not resist acting on what he may learn."); *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980) ("[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.").

manner is a hallmark of unreasoned decision making." *Tex. v. Biden,* 10 F.4th 538, 555 (5th Cir. 2021) (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)).

SHRM and other commentators to the Proposed Rule identified a number of alternatives that the Commission rejected without adequate explanation. For starters, the Commission could have imposed a minimum compensation threshold, such that individuals with lower wages are not affected by noncompete agreements whereas those with higher salaries may be subject to one. Instead, the Commission established a confusing threshold under the definition "senior executive", which seeks to combine a qualitative and quantitative component—someone who was in a "policy-making position" and who made at least $151,164. This definition excludes higher paid employees who have significant roles without a "policy-making position" from being subject to a noncompete. Take for example a software engineer who works for a small start-up and who makes more than $151,164. An HR professional now faces a challenge in developing any insulation for the employer to protect that engineer from going to a competitor and simply picking up where the engineer left off. Consequently, it gives the employee's new

employer, perhaps a leading technology company, a head start on whatever cutting edge product or service the new employee was working on at his rivalry employer—potentially putting them out of business. Expounding on this issue, the Commission could have, but did not, consider an alternative solution that limits non-compete agreements to employees with material access to competitively sensitive information and development. Such a limitation would focus beyond the ambiguous "policy-making" threshold, addressing the pragmatic factors related to employees leaving for competitors—the concern surrounding unfair competition and trade secret protection. The Commission further did not consider making the Rule industry specific, as some states have implemented.[8]   Another consideration is creating presumptions of enforceability and unenforceability within the rule, relevant to duration, geographic scope or other restrictions. Some states, either through statute or common law, have created presumptions of enforceability based on the specific terms of the restraint, which encourages employers

---

[8] *See, e.g.*, Conn. Gen. Stat. Ann. §§ 20-14p, 31-50a, 31-50b (physicians); Del. Code Ann. tit 6., § 2707 (physicans); Ind. Code Ann. § 25- 22.5 (physicians); Iowa Code § 135Q.1-2 (health care agency workers providing direct services or nursing services to health care entity consumers); KRS § 216.724(direct care workers); 26 MRSA § 599 (employees earning wages at or below 400% of the federal poverty level); Mass. Gen. Laws ch. 112, §§ 74D 135C, 186 (registered nurses); NH RSA 329:31-a (physicians).

to draft narrow restraints to fit within the statutory presumptions. *See, e.g.*, Fla. Stat. Ann., § 542.335. Last, the Rule could have limited noncompete agreements on the precondition that material compensation or other benefits be provided to the employee. As an example, Illinois, through bipartisan legislation, amended its Freedom to Work Act to explicitly require minimum consideration to enforce a noncompete agreement, including two years of continuous employment or some combination of employment and other financial or professional benefits. *See* 820 ILCS 90.

The foregoing alternative measures or potential exemptions— namely, altering the scope of the Rule and permitting noncompete agreements where appropriate—could have more effectively addressed the Commission's concerns, instead of the blanket ban presented. The Commission's Rule dismisses the potential benefits of noncompete agreements and alternative solutions for balancing the interests of both employers and employees. Failing to consider these concerns and alternatives further evidences the arbitrary and capricious action of the Commission. *See, e.g., RSR Corp. v. E.P.A.*, 588 F. Supp. 1251, 1256 (N.D. Tex. 1984) (finding the agency action arbitrary and capricious

where the administrative record did not show that EPA's decision "(1) considered and examined all relevant factors and alternatives or (2) adequately explained the evidence regarding these relevant factors and alternatives").

## II.    VACATUR IS THE ONLY APPROPRIATE REMEDY TO ADDRESS THE UNLAWFUL NON-COMPETE BAN

The APA "*requires* [the Court] to "set aside' agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *MCR Oil Tools, L.L.C. v. United States Dep't of Transportation,* 110 F.4th 677, 685–86 (5th Cir. 2024) (emphasis added). Agency action that is "premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment *must be* set aside as arbitrary and capricious." *Id.* (citation omitted) (emphasis added). Setting aside, also commonly adjudicated as vacatur, under Section 706 is therefore recognized as the "default" remedy for unlawful agency action.[9] *Data Mktg.*, 45 F. 4th at 859 ("The default rule is that vacatur is

---

[9] The parties appear to be in agreement that this Court treats "vacatur" and "set aside" as different terms to describe the same relief. *See* Appellant's Brief at 50; Appellee's Brief at 66. SHRM recognizes Justice Gorsuch raised questions as to a federal court's authority to vacate a rule under the APA, but there is no precedent barring a court from exercising such relief, nor is it distinguishable from "setting aside" agency action. *See United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment)

the appropriate remedy"); *Tex. v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), as revised (Dec. 21, 2021) (*rev'd on other grounds*) ("[B]y default, remand *with* vacatur is the appropriate remedy."); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").  Indeed, in *Cargill v. Garland*, which the Commission cites to in support of the proposition that vacatur is a "discretionary equitable remedy", the Fifth Circuit acknowledged "vacatur of an agency action is the default rule in this Circuit." 57 F.4th 447, 472 (5th Cir.), *cert. granted*, 144 S. Ct. 374, 217 L. Ed. 2d 202 (2023), *and aff'd*, 602 U.S. 406, 144 S. Ct. 1613, 219 L. Ed. 2d 151 (2024).[10]

Vacatur under Section 706(2) is understood to be a remedy that affects individuals "beyond those who are parties to the immediate

---

(discussing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

[10] The plaintiff in *Cargill* challenged the validity of a regulation extending the federal prohibition on machineguns to bump stocks, after he turned over bump stocks he owned to the Government under a new regulation.  *Id.* at 450.  The plaintiff sued to "set aside" the new regulation and also sought declaratory and injunctive relief that would restrain the Government from enforcing the final rule against him and others, namely, bump stock owners.  *See* Complaint, *Cargill v. Barr*, No. 1:19-cv-00349 (WD. Tex. Mar. 25, 2019), Docket Entry No. 1, at 37-38.  On appeal, the Fifth Circuit noted in dicta that "it may be the case that a more limited remedy is appropriate in these circumstances," but expressed no opinion on the issue, especially provided the parties had not briefed the remedial-scope question. *Cargill v. Garland*, 57 F. 4th at 472.

dispute." *Braidwood Mgmt., Inc. v. Becerra,* 104 F.4th 930, 951 (5th Cir. 2024), *cert. granted,* 2025 WL 65913 (U.S. Jan. 10, 2025), *and cert. denied sub nom.* 2025 WL 76462 (U.S. Jan. 13, 2025); *see also Career Colls. & Schs. Of Tex. v. U.S. Dep't of Ed.*, 98 F.4th 220, 255 (5th Cir. 2024) ("When a reviewing court determines the agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (citing *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989)). That is, under prevailing precedent, the Court has acknowledged, "[Section] 706 extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to set aside—i.e., formally nullify and revoke—an unlawful agency action." *Braidwood*, 104 F.4th at 951. Put another way, setting aside agency action under Section 706 has "nationwide effect, is not party-restricted, and affects persons in all judicial districts equally." *Id.* This is so because "vacatur operates on the status of agency action in the abstract", as opposed to an injunction, which operates *in personam.* *Id.*

Vacatur of the Rule is especially appropriate provided affected parties raised the same issues about the Rule in lawsuits in other

jurisdictions.   On August 14, 2024, Judge Timothy Corrigan of the Federal District Court for the Middle District of Florida issued a preliminary injunction enjoining the Commission from implementing or enforcing the Rule against the named plaintiff, Properties of the Villages, Inc., a real estate firm ("Properties of the Villages"). The Court found the sweeping and consequential reach of the ban, pursued under the rather dormant Section 6, fell short in establishing grounds for the Commission to promulgate the Rule.[11]   The Commission moved for a stay of the preliminary injunction, which the District Court denied. On September 24, 2024, the Commission filed an appeal.[12]   While Properties of the Villages moved to hold the appeal in abeyance pending a decision in the instant action, the Court of Appeals for the Eleventh Circuit denied that request.  The appeal is now fully briefed and pending before the Eleventh Circuit.  In addition to *Properties of the Villages*, a third case was pending in the Eastern District of Pennsylvania, brought by Plaintiff ATS Tree Services, LLC ("ATS") against the Commission.   After the Northern

---

[11] *See* Order on Preliminary Injunction, *Properties of the Vill., Inc. v. FTC*, No. 5:24-cv-316 (M.D. Fla. Aug. 15, 2024), Docket Entry No. 59.

[12] *See Properties of the Vill., Inc. v. FTC*, No. 24-13102, (11th Cir. 2024).

District of Texas entered its summary judgment decision vacating the Rule, ATS voluntarily withdrew its lawsuit.[13]

In the event this Court does not affirm the District Court's ruling, it would reignite litigation across the country and open the potential for inconsistency across jurisdictions. The Rule is potentially destined for a circuit split, with different rulings imposing inconsistent obligations across jurisdictions. Without nationwide relief, SHRM members will be tasked with implementing potentially disparate hiring plans geographically—including the possible suspension or invalidation of existing noncompete agreements—while the Rule awaits further judicial review, including in the Eleventh Circuit.

The result of disparate, party-specific relief will leave HR professionals scrambling to implement a patchwork of contradictory programs in an effort to adhere to different court rulings. It would create inequality across the workforce with some individuals subject to non-competes while other similarly situated individuals are not. This will negatively impact employment, intellectual capital protection, and customer relationships with damages that cannot be fully calculated.

---

[13] *ATS Tree Servs., LLC v. FTC*, No. 24-1743 (E.D. Pa. Oct. 4, 2024).

The APA plainly provides the appropriate remedy to avoid this tumultuous outcome is vacatur. In setting aside the Rule *universally*, not limited to Plaintiff, the District Court considered the reach of the Rule and understood its obligation under the APA.

## III. VACATUR IS APPROPRIATE BECAUSE THE RULE IS NOT SEVERABLE

Further, the Rule must be vacated because it is not administratively severable. Administrative regulations should be preserved as written. *See Tex. v. U.S.*, 691 F. Supp. 3d 763, 788 (S.D. Tex. 2023), *aff'd in part, modified in part*, No. 23-40653, 2025 WL 227244 (5th Cir. Jan. 17, 2025) (explaining the APA allows courts to set aside the offending parts of the rule while keeping the remaining parts of the rule intact). But, when a portion is found unconstitutional, it "may be severable" only if the unconstitutional portion can be stricken (i.e., severed) without disrupting the remainder of the regulation. *United States v. Rainbow Fam.*, 695 F. Supp. 294, 312 (E.D. Tex. 1988) (citing *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 683, 107 S. Ct. 1476, 1479, 94 L. Ed. 2d 661 (1987)); *see also Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 934 (1983) ("A provision is further presumed

severable if what remains after severance is fully operative as a law.") (internal quotations omitted).

The Fifth Circuit cautions against engaging in the "legislative guesswork" involved with severability analysis. *Tex. v. U.S.*, 945 F.3d 355, 400 (5th Cir. 2019), as revised (Dec. 20, 2019), *as revised* (Jan. 9, 2020), *rev'd and remanded sub nom. California v. Tex.*, 593 U.S. 659, 141 S. Ct. 2104, 210 L. Ed. 2d 230 (2021). Severability analysis, here, requires the Court to wade into the agency's hypothetical intent in promulgating the Rule (and necessarily, Congress's intent for the FTC Act), implicating the vital separation-of-powers principle. *New Jersey Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 491 (2018) (Thomas, J., concurring). As Justice Thomas pointed out, severability analysis forces courts to "weigh in on statutory provisions that no party has standing to challenge, bringing courts dangerously close to issuing advisory opinions." *Id.*

Notwithstanding the Fifth Circuit's warning, to determine the severability of administrative rules, federal courts typically apply the statutory severability test articulated in *Alaska Airlines. See, e.g., Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014); *K-Mart*

*Corp. v. Cartier*, 486 U.S. 281, 286-93 (1988); *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1460 (D.C. Cir. 1997). *Alaska Airlines* and its progeny hold that courts should consider two questions: (1) whether severance would "impair the function of the [rule as a whole]" (the "workability question") and (2) whether there is any "indication that the regulation would not have been passed but for [the] inclusion of the [invalid provision]" (the "intent question").[14] *Davis Cnty.*, 108 F.3d at 1460. As a part of this inquiry, courts are not required to give federal agencies deference to an administrative severability clause within the challenged regulation. *See Reno v. Am. C.L. Union*, 521 U.S. 844, 885, n 49 (1997) (observing "a severability clause is an aid merely; not an inexorable command"). Following the Supreme Court's recent holding in *Loper Bright Enters. v. Raimondo*, 144 S. Ct 2244 (2024), no deference should be given to the Rule's severability clause, and this Court should perform any severability analysis *de novo*.

The Rule is not severable because the Rule cannot be limited in a way that would serve the Commission's stated purpose: a comprehensive

---

[14] Typically, courts have deferred to an agency's inclusion of a severability clause as indicia supporting the intent question; however, as discussed above, severability analysis should be conducted *de novo*.

ban on new noncompete agreements with *all* workers, including senior executives. A court may not leave in place a severed regulation that is inadequately supported by the original rule's statement of basis and purpose. *MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 736 (D.C. Cir. 2001). Here, if this Court finds that **any** part of the Rule is invalid, the entire Rule must be invalidated because, by the Commission's own admission, the Rule stands or falls as a whole. *See* Final Rule, 89 Fed. Reg. at 38,455 ("[A]ny smaller reduction in enforceability resulting from circumstances in which a court stays or invalidates some application of the final rule would not impair the function of the remaining parts of the final rule nor would it undermine the justification or necessity for the final rule . . .").  Indeed, if any portion of the Rule is invalidated or held inapplicable to a particular category of workers or circumstances—for example, only workers who are not senior executives or for workers with pre-existing non-compete agreements— then any rational connection between the purpose and the Commission's actions disappears.  The Court is not in a position to rewrite the Rule, even to incorporate the suggested alternatives discussed *supra*, because creating a rule by severance that the agency did not consider and does

not accomplish the agency's own stated goals is *de facto* arbitrary and capricious. *Id;* 5 U.S.C. § 706(2)(A).

## IV.   EQUITY FAVORS NATIONWIDE RELIEF

Fifth Circuit precedent establishes that a reviewing court is not required to consider the "various equities at stake" before determining whether a party is entitled to vacatur. *Braidwood*, 104 F.4th at 952. Nor is relief under Section 706 party specific. *Career Colls.*, 98 4th at 255. When "plaintiffs prevail on [an] APA challenge, [a] court must 'set aside'" the agency action "with nationwide effect." *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024); *see also Braidwood*, 104 F. 4th at 951 ("[V]acatur under § 706(2) [is] a remedy that affects individuals beyond those who are parties to the immediate dispute"). Nevertheless, if this Court determines that universal vacatur is not "automatic or compelled" as characterized by the Commission (Appellant's Brief at 48) and instead a discretionary remedy, a balance of the equities tips in favor of upholding nationwide relief.

Consideration of the equities favors nationwide relief because party-specific relief would be cumbersome and unworkable. SHRM's members, who are human resource professionals responsible for

managing and implementing an organization's human capital policies, will face significant disruption if the Rule is not enforced equally. Among other tasks, immediately, HR professionals would be required to issue notices to existing employees subject to noncompete agreements, rewrite employment contracts, reevaluate offers and job postings, and reassess policies that account for training, education, programming, compensation or other costly employee benefits contingent on an employee *staying* with the employer longer term—all while the constitutionality of the Rule continues to be in limbo awaiting its final fate by the courts. In short, employers and workers would be faced with uncertainty, without clear direction and comity, while this issue likely heads to the Supreme Court or percolates through related litigation in other jurisdictions.

Meanwhile, noncompete agreements have historically been regulated by the states through statutes and the common law for more than a century, and there has never been a comprehensive federal policy governing noncompete agreements. *See, e.g.*, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 771 (Tex. 2011) ("[R]easonable noncompete clauses in contracts pertaining to employment are not considered to be contrary to public policy as constituting an invalid restraint of trade[.] Texas courts

have enforced reasonable covenants not to compete dating back at least to 1899."). Absent the Rule, states are still in the same position to regulate noncompete agreements within their jurisdictions. Indeed, as the Commission recognizes, "[s]tates have been experimenting with noncompete regulation for more than a century, with laws ranging from full bans to notice requirements, compensation thresholds, bans for specific professions, reasonableness tests, and more." Final Rule, 89 Fed. Reg. at 38,466.

Likewise, the Commission is not being denied any authority or abridgment of its powers while the Rule is set aside. Nor is it being deprived of its existing tools and resources to combat unfair competition. *See, e.g., Louisiana by & through Murrill v. United States Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *3 (5th Cir. July 17, 2024) (finding that an injunction pending appeal did not prevent the government from enforcing existing or longstanding regulations to prevent the conduct covered by the agency's enjoined rule). As the Commission recognizes, as "'contract[s] . . . in restraint of trade,'" non-competes have always been subject to our nation's antitrust laws." Final Rule, 89 Fed. Reg. at 38,343 (citing in support *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057,

1082 (2d Cir. 1977)).  Accordingly, in the interim, the Commission would simply have to resort to its incumbent individualized enforcement abilities and laws to curtail and address any unfair competition. *See Louisiana*, 2024 WL 3452887, at *3 (concluding that the government "can hardly be said to be injured by putting off the enforcement of a Rule it took three years to promulgate after multiple delays").  There is therefore no true inequity to the Commission or the public it serves by setting aside the Rule.

## CONCLUSION

According to the bounds of the FTC Act and APA, the Commission did not have the authority to enact the Rule and, accordingly, the District Court was required to "set aside" the Rule on the basis it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Commission's failure to thoroughly consider the benefits of noncompete agreements and alternative restrictions on such agreements further renders the Rule arbitrary and capricious. Vacatur is the only appropriate remedy provided the Rule is not administratively severable and the equities weigh in favor of a universal vacatur.  For all the foregoing reasons, this Court should affirm the

District Court's vacatur of the Rule and deny Appellant's request for relief.

Dated:  February 10, 2025          Respectfully submitted,

                                  _/s/ Michael Wexler_
                                  Michael D. Wexler
                                  Camille A. Olson
                                  Richard Lapp( *pro hac vice*
                                  forthcoming)
                                  Seyfarth Shaw LLP
                                  233 S. Wacker Drive, Ste 2800
                                  Chicago, IL 60605
                                  (312) 460-5000
                                  mwexler@seyfarth.com
                                  colson@seyfarth.com
                                  rlapp@seyfarth.com

                                  Jesse M. Coleman
                                  Eron Reid
                                  Seyfarth Shaw LLP
                                  700 Milam Street, Ste 1400
                                  Houston, TX 77002
                                  (713) 225-2300
                                  jmcoleman@seyfarth.com
                                  ereid@seyfarth.com

                                  *Counsel for the Society for*
                                  *Human Resource Management*
                                  *– Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) and includes 4,743 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, size 14 font. Pursuant to 5th Cir. R. 32.1, the footnotes have been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, size 12 font.

Dated: February 10, 2025          Respectfully,

*/s/ Michael Wexler*
Michael Wexler

## **CERTIFICATE OF SERVICE**

I hereby certify that I e-filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on February 10, 2025. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  February 10, 2025

>          */s/ Michael Wexler*
> Michael Wexler
>
> *Counsel for the Society for Human Resource Management – Amicus Curiae*