No. 24-10951

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
―――――――――――

**RYAN, L.L.C.**,
Plaintiff-Appellee,

**CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA; BUSINESS ROUNDTABLE; TEXAS
ASSOCIATIONOF BUSINESS; and LONGVIEW CHAMBER OF
COMMERCE,**
Intervenor-Plaintiffs-Appellees,

**v.**

**FEDERAL TRADE COMMISSION**,
Defendant-Appellant.
_____

On Appeal from the United States District Court
for the Northern District of Texas
_____

**BRIEF OF AMICUS CURIAE NEW ENGLAND LEGAL
FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLEES
AND INTERVENOR-PLAINTIFFS-APPELLEES, AND
IN SUPPORT OF AFFIRMANCE**
_____

John Pagliaro, Staff Attorney
 JPagliaro@newenglandlegal.org
New England Legal Foundation
333 Washington St., Suite 850
Boston, MA  02108
Tel.: (617) 695-3660

February 10 , 2025

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to this Court's Rule 29.2, counsel for amicus curiae New England Legal Foundation submits this supplemental certificate of interested persons to fully disclose all those with an interest in the amicus brief and provide the required information as to corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in this amicus brief or the outcome of the case, in addition to those listed in briefs of the parties or of other amici. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. NELF was incorporated in Massachusetts in 1977 and is headquartered in Boston. NELF is a 26 U.S.C. § 501(c)(3) nonprofit, public interest law firm; it neither issues stock or any other form of securities nor has a parent corporation.

/s/ John Pagliaro
John Pagliaro
Counsel of Record for Amicus Curiae

i

# TABLE OF CONTENTS

Supplemental Certificate of Interested Persons .......................................................i

Table of Authorities ............................................................................................... iii

Interest of Amicus Curiae .......................................................................................1

Statement of the Issue ............................................................................................2

Argument..................................................................................................................2

    I.     The Text and Structure of the 1914 Act Contradict the FTC's
          Reading of §6(g).....................................................................................2

          A. The FTC's Dictionary Argument about the Word "Prevent"
             Is Wrong.............................................................................................3

          B. The FTC also Misconstrues §6(g)....................................................5

    II.    NELF's Reading of the Act Accurately Reflects its Origin
          in the Merger of Two Bills.................................................................12

    III.   *National Petroleum* Obscures the Concerns of the 63rd Congress.....17

    IV.   *National Petroleum* Should Not Be Followed; its Reading
          of the Act is Purpose-Driven and Unhistorical ..................................23

Conclusion .............................................................................................................27

Certificate of Service ............................................................................................28

Certificate of Compliance .....................................................................................28

## TABLE OF AUTHORITIES

### <u>Cases</u>

*A.L.A. Schechter Poultry Corporation v. United States,*
    295 U.S. 495 (1935)..................................................................6, 11

*AMG Capital Mgmt., LLC v. FTC,*
    593 U.S. 67, 75 (2021) ............................................................7, 17

*Maracich v. Spears,*
    570 U.S. 48 (2013).........................................................................9

*National Petroleum Refiners Assoc. v. F.T.C.,*
    482 F.2d 672 (D.C. Cir. 1973)......................................... 17, 22-27

*New Orleans Public Serv., Inc. v.* Council *of City of New Orleans,*
    491 U.S. 350 (1989).....................................................................18

*Prentis v. Atlantic Coast Line Company*, 211 U.S. 210 (1908).............. 17-19, 26-27

*University of Texas Southwestern Medical Center v. Nassar,*
    570 U.S. 338 (2013).......................................................................8

*U.S. v. Fla. East Coast Ry. Co*.,
    410 U.S. 224 (1973).....................................................................26

*West Virginia v. Environmental Protection Agency,*
    597 U.S. 697 (2022)...............................................................7, 9, 11

### <u>Statutes</u>

Federal Trade Commission Act,
    Pub. L. No. 63-203, 38 Stat. 717 (1914) .............................................2

    §5, 38 Stat. at 719
    (codified as amended in 15 U.S.C. §45)................... 3-7, 10-12, 14-16, 19, 25

    §6, 38 Stat. at 721 (codified as amended in 15 U.S.C. §46).................6-7, 15-17

§6(d), 38 Stat. at 721
(codified as amended in 15 U.S.C. §46(d)) ....................................................15

§6(g), 38 Stat. at 722
(codified as amended in 15 U.S.C. §46(g)) ........ 2, 5-11, 13, 16-17, 23, 25-26

Magnuson-Moss Warranty—Federal Trade Commission Improvement Act,
Pub. L. No. 93-637, 88 Stat. 2183 (1975) .............................................................8

§202(a), 88 Stat. 2193 (codified as 15 U.S.C. §57a(a)(2)) ..................................8

## Other Legislative Sources

51 Congressional Record (1914) ........................................... 4, 12-16, 18-22, 24-27

H.R. 15613, 63d Cong. (1914)............................................................. 12, 14-15, 25

H.R. Rep. No. 63-533 (1914)..........................................................................12

H.R. Conf. Rep. No. 63-1142 (1914)..........................................................21

S. 4160, 63d Cong. (1914) ........................................................................12, 14, 15

S. Rep. No. 63-573 (1914) ..............................................................................12, 15

## Executive Sources

Federal Trade Commission, *Annual Report of the Federal Trade Commission for the Fiscal Year Ended June 20, 1922* ......................................................11

*Final Report of the Attorney General's Committee on Administrative Procedure* (1941)..........................................................................................11

Wilson, Woodrow, Address to a Joint Session of Congress on Trusts and Monopolies, https://www.presidency.ucsb.edu/node/206428 ...............12

## Other Legal Sources

Black's Law Dictionary (2d ed. 1910)........................................................................3

Cascone Fauver, Jennifer, *Chair with No Legs? Legal Constraints on the
    Competition Rule-Making Authority of Lina Khan's FTC*,
    14 Wm. & Mary Bus. L. Rev. 243 (Feb. 2023).............................................23

Emery, James A., *A Handbook of the Federal Trade Commission Act* (1915).........9

Harlan, John Maynard and Lewis W. McCandless,
    *The Federal Trade Commission* 65 (1916) ..................................................10

Merrill, Thomas W. and Kathryn Tongue Watts,
    *Agency Rules with the Force of Law: The Original Convention*,
    116 Harv. L. Rev. 467, 549-57 (2002) ...........................................................8

Merrill, Thomas W., *Antitrust Rulemaking: The FTC's Delegation Deficit*,
    75 Admin. L. Rev. 277 (Spring 2023)........................................................8, 23

Ohlhausen, Maureen K. and Ben Rossen, *Dead End Road:* National Petroleum
    Refiners Association *and FTC 'Unfair Methods of Competition'
    Rulemaking*, Truth on the Market (July 13, 2022), https://truthonthemarket
    .com/2022/07/13/dead-end-road-national-petroleum-refiners-
    association-and-ftc-unfair-methods-of-competition-rulemaking/ .................23

Stevens, W.H.S., *The Trade Commission Act*,
    The American Econom. Rev. No. 4, 840 (1914)...........................................10

Szoka, Berin and Corbin Barthold, *The Constitutional Revolution That Wasn't:
    Why the FTC Isn't a Second Legislature*, https://techfreedom.org/wp-
    content/uploads/2022/06/FTC-UMC-Rulemaking-Authority-TF-
    Version.pdf ...................................................................................................23

Wright, J. Skelly, *Courts and the Rulemaking Process:
    The Limits of Judicial* Review, 59 Cornell L. Rev. 375 (1974) ...................23

## INTEREST OF AMICUS CURIAE[1]

The New England Legal Foundation (NELF) is a nonprofit, public-interest law firm incorporated in Massachusetts in 1977 and headquartered in Boston.  NELF's members and supporters include large and small businesses in New England, other business and non-profit organizations, law firms, and individuals, all of whom believe in NELF's mission of promoting balanced economic growth in New England, protecting the free enterprise system, and defending economic rights and property rights.

The issues raised in this case are of concern to NELF because, throughout its history, NELF has opposed agency overreach and defended freedom of contract. This case raises both issues in a dramatic way.

The power claimed by the Federal Trade Commission (FTC or Commission) in issuing its non-compete ban has lain quiescent for an implausibly long time in light of the great importance now attributed to it by the FTC.  Wielding it, the Commission would avoid about 30 million contracts by its own estimate; it would put at hazard the viability of businesses that depend on intellectual property, or rely on skilled labor, or enjoy valuable marketplace goodwill.  To say that the ban would unsettle

---

[1] No party or party's counsel nor any other individual or entity, aside from Amicus and its counsel, authored this brief in whole or in part, or made any monetary contribution to its preparation or submission.  Amicus has obtained the consent of the parties.

settled business expectations, destroy vested rights, and retroactively undercut reasonable reliance interests would be an understatement proportionate to the rulemaking power to which the Commission lays claim. Issuing from an executive agency with no responsibility for employment law and with only a highly dubious claim to rulemaking power, it is astonishing.

NELF has therefore filed this brief under Fed. R. App. P. 29, in order to assist the Court in reaching a just and sound decision on an issue of nationwide concern arising the Federal Trade Commission Act, Pub. L. No. 63-203, 38 Stat. 717 (1914) (Act).

## STATEMENT OF THE ISSUE

Does §6(g) of the Act grant the Commission the power to make substantive rules about unfair methods of competition?

## ARGUMENT[2]

### I.     The Text and Structure of the Act Contradict the FTC's Reading of §6(g).

The FTC's plain language defense of its rulemaking power is thin, decontextualized, and wrong.

---

[2] The FTC claims that the Act, *from its enactment*, authorized it to issue substantive rules. FTC Br. at 20-22. NELF holds the FTC to that claim and discusses the FTC's claim in terms of the 1914 text of the Act (*see* Addendum), except where the FTC relies on later versions or where they are otherwise relevant.

2

### A. The FTC's Dictionary Argument about the Word "Prevent" Is Wrong.

Section 5 of the Act (later codified as amended in 15 U.S.C. §45) says that the Commission is empowered "to prevent" any person "from using unfair methods of competition." Quoting dictionaries from 1911 and 1942, the FTC defends its claim to substantive rulemaking power by emphasizing a narrow meaning of "prevent" as the prevention of *future* actions from occurring; hence, the FTC concludes, the word "*necessarily* contemplates forward-looking, prophylactic rulemaking." FTC Br. at 21 (emphasis added). No, it doesn't.

Consider the following. If we were to say that a leg cramp prevented Jim from running, we could mean *either* that the cramp occurred before the run and prevented Jim running at all *or* that the cramp occurred at the start of a run and prevented Jim from running by cutting the run short. In other words, "prevent" applies equally well to stopping the performance of an existing action and thereby thwarting it from continuing. This was a usage known at the time the text was drafted.

> **PREVENT.** To hinder or preclude. To *stop* or *intercept* the approach, access or *performance of a thing*.

Black's Law Dictionary 937 (2d ed. 1910) (emphasis added). *See id.* at 908 ("poison" puts body "in such a state as to prevent the continuance of life").

How does the Act use the word in context? Solely as the latter examples suggest. After §5 says that the Commission is "empowered and directed to prevent" persons "from using unfair methods of competition," the 1914 version of the Act

3

immediately limits the circumstances under which the Commission is to discharge this duty:

> Whenever the commission shall have reason to believe that any such person, partnership, or corporation *has been or is using* any unfair method of competition in commerce . . . . [3]

(Emphasis added).  Note that the FTC's supposedly "necessarily forward-looking" prevention of unfair methods is actually portrayed in the Act as preventing only *actual recurring past and ongoing present conduct*.[4]  Neither in §5 nor anywhere else are *contingent future* actions mentioned as targets of FTC prevention; only unfair conduct actually undertaken by particular parties ("any such person," etc.) under particular circumstances is targeted by the text, and in §5 that conduct is explicitly marked for fact-specific case-by-case adjudication.  *See also infra* pp. 21-22.  That is why the Act authorizes the Commission to issue cease and desist orders and not "forward-looking" rules.

---

[3] The present text reads the same, with the interposition of material not relevant here.

[4] The goal of prevention was so understood during debate on the final bill.  *See*, e.g., 51 Cong. Rec. 14,929 (act deals with "practices of unfair trade *in their incipient stage*s which if left untrammeled and uncontrolled become acts which constitute in their culmination restraint of trade and monopoly") (emphasis added).

## B. The Commission also Misconstrues §6(g).

Focusing narrowly on sixteen words of §6(g) (codified as amended in 15 U.S.C. §46(g)), the rest of the FTC's plain language argument fails because it too ignores context.

Of all the sections of the Act, §5 alone declares the unlawfulness of unfair methods of competition: "Unfair methods of competition . . . are *hereby* declared unlawful." The word "hereby" signals the centrality of this declaration to the Act as a whole.

There follows immediately in the same section a second pointed use of the word: "The commission is *hereby* empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition" (emphasis added). This sentence is the Act's sole charge to the Commission of a duty to prevent the use of unfair methods of competition. Hence, we are "hereby" alerted to the centrality of this mandate too.

Finally, Congress added a third element, which, in the current version of §5, comes only after certain provisions irrelevant to this discussion, but which in the original enactment directly follows the charge to the Commission. In it Congress sets out the elaborate, "quasi-judicial" enforcement scheme in which the Commission is required to employ case-by-case administrative adjudication to

5

prevent the use of unfair methods of competition. *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 532-4 (1935).

Thus, in §5 Congress brought together (i.) a legal prohibition, (ii.) the identity of the agency charged with enforcement of the prohibition, and (iii.) the means to be used by the agency to enforce the prohibition. Considered in the context of the Act as whole, the text of §5 forms a distinct, self-contained unit of lawmaking.

Not so, according to the FTC, however. In its view, fully half — and indeed the better half — of the Commission's power of enforcement is not only absent from §5, but also is not even hinted at there. Instead, we are asked to believe that a highly consequential grant of substantive rulemaking power over anticompetitive practices is to be found forlornly buried at the end of another lengthy section, §6 (codified as amended in 15 U.S.C. §46), a section that says not a syllable about the FTC's preventing such practices. *See* FTC Br. at 20-21.

The FTC mentions context as a component of a proper statutory reading, but it adopts a rigidly literal, decontextualized reading of §6(g). *Id*. at 20-22. The remainder of its argument discusses everything *except* the context of that subsection as it appeared in 1914.

Section 6 begins with the words "[T]he commission shall *also* have the power" (emphasis added), and there follows a lengthy list of powers relating to the interrelated subjects of investigations, information gathering, reporting, etc. From

6

the plain language of the text, it appears clear that these "also" powers differ sharply *in kind* from the immediately preceding quasi-judicial power of enforcement given to the FTC.

Subsection (g) of §6 would therefore seem to be a highly inauspicious place to look for grant of a power supposedly crucial to the accomplishment of the duty already set out in §5 quite comprehensively as to duty, agent, and means. *See AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67, 75 (2021) (interpreting words "buried in a lengthy provision" in accord with that context and not as deriving meaning from other statutes). Indeed, the sixteen words that supposedly grant rulemaking power with the force and effect of law form the caboose even within §6(g) itself:

> From time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act.

As the Supreme Court remarked of a statute the EPA cited in support of its own claim to expansive rulemaking authority, "Congress certainly has not conferred a like authority upon EPA anywhere else . . . . The last place one would expect to find it is in the previously little-used backwater of Section 111(d)." *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 730 (2022).

The same could be said of the use the FTC seeks to make of §6(g). Unlike the unambiguous, detailed enforcement power found in §5, the sixteen-words of §6(g)

supposedly granting substantive rulemaking power are accompanied by zero elaboration, detail, qualification, or procedure in the 1914 text.[5]

Congress did not even deign to set out the penalties that would flow from a violation of a §6(g) rule supposedly having the force and effect of law, despite the fact that at that time it was Congress's practice to provide for penalties when it intended to grant such rulemaking power.  *See* Thomas W. Merrill and Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 549-57 (2002).

On countless occasions the Supreme Court has instructed that meaning is to be determined contextually.  "Text may not be divorced from context," *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 356 (2013); "[i]t is

---

[5] The FTC argues that Congress later acknowledged this power when it inserted into §6(g) a reference to a savings clause found §202(a) (codified as 15 U.S.C. §57a(a)(2)) of the Magnuson-Moss Warranty Act, Pub. L. No. 93-637, 88 Stat. 2183, 2193 (1975).  The clause is supposed to save the power from limitations placed by that act on a specially conferred power of deceptive practices rulemaking.  FTC Br. at 8, 26.  Significantly, the clause does not mention the unfair competition rulemaking it is supposed to save; strangely, it does take the time to save by name two other, weaker powers of rule and policy making.  A savings clause written like that makes no sense.  Understood in historical context, the clause's vague wording ("shall not affect any authority") was adopted to weasel around disagreements in Congress as to whether the "saved" rulemaking power exists at all.  *See* Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 309-15 (Spring 2023).  If named, it might have risked votes on Magnuson-Moss, and so too if it were clearly excluded.  "Any" plus silence permitted legislators to read into the clause whatever they wished, as the FTC does now.  The Commission sowed uncertainty then, *see id*. at 311, and seeks to reap certainty from it now.

necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning," *Maracich v. Spears*, 570 U.S. 48, 65 (2013*).

Here, where the FTC wishes to use the modest language of §6(g) to "reach" 30 million contracts and to abolish parts of the employment law of forty-six states, context becomes of paramount importance.  As the Supreme Court has cautioned, "[i]n extraordinary cases . . . there may be reason to hesitate" before accepting a reading of a statute that would, under more "ordinary" circumstances, be upheld. *West Virginia*, 597 U.S. at 721.  Yet, the FTC ignores the statutory context of §6(g), as well as its historical legislative context (*see infra* pp. 12-17), neither of which involve enforcement powers.  Instead, it arbitrarily portrays the sixteen bare words as implicitly providing a necessary complement to the well-developed case-by-case enforcement scheme found in the only section of the Act to make an express award of the power of prevention to the FTC.

From the first, that was not how well-informed observers understood the Act.  In 1915 James A. Emery, General Counsel of the National Council for Industrial Defense, prepared *A Handbook of the Federal Trade Commission Act*.  After summarizing the legislative history of the Act and the meaning of its provisions, he wrote, "Despite a certain prevalent notion to the contrary, the Act does not authorize

or direct the Commission . . . to draft a business code of forbidden or permissible conduct[.]" *Id*. at 17.

Of the phrase "unfair methods of competition," he observed, "Its broader meaning . . . must be gathered from the opinions of the Commission, as the term in question is applied to particular facts[.]" *Id*.  In other words, the FTC is confined to developing the scope of "unfair methods of competition" through case-by-case adjudication.  Emery discussed §6(g) under the heading "Power to Establish Procedure." *Id*. at 15.  Regarding §6(g) as concerned with internal housekeeping matters and such, he observed that its "general power 'to make rules and regulations'" means that "the Commission is free to fix its own forms and procedure, save in the enforcement of Section 5[.]" *Id*. at 18.  *See also* John Maynard Harlan and Lewis W. McCandless, *The Federal Trade Commission* 65 (1916).

So, too, in 1914 Professor W.H.S. Stevens of Columbia Law School, analyzing the FTC's powers under Act, wrote that §5 contains "[p]erhaps the most important power"; like the authors just cited, he made no mention whatsoever of any power of substantive rulemaking in §6(g).  *The Trade Commission Act*, The American Econom. Rev. No. 4, 840, 849-850 (1914).

Even the FTC itself wrote in 1922, "One of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected

with any proceeding before it." [6] *Annual Report of the Federal Trade Commission for the Fiscal Year Ended June 20, 1922* at 36.

In 1935 the Supreme Court itself noted that under the Act the scope of unfair methods of competition was determined "as controversies arose," i.e., through the Commission's §5 "quasi-judicial" procedure. *Schechter*, 295 U.S. at 532-4. The Court pointed out the twofold contrast between these features of the Act and the use of regulatory *codes* to define the meaning of *fair* competition under the National Industrial Recovery Act. *Id.* Since *Schechter* dealt with whether Congress, "in authorizing 'codes of fair competition,'" had improperly delegated "its essential legislative function," *id*. at 530, it is unlikely that the Court would have chosen to remain dead silent about an FTC rulemaking power that could easily extend to the creation of a code of *unfair* methods of competition — *had such a power existed* — for it would have raised a delegation issue similar to the one raised in *Schechter*.

This court, like the Supreme Court in the EPA case, faces "a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. This court should engage in its own form of rulemaking — it should rule against yet another instance of agency overreach.

---

[6] *See also Final Report of the Attorney General's Committee on Administrative Procedure* 98 n.19 (FTC may issue only procedural rules under §6(g)) (1941).

## II.    NELF's Reading of the Act Accurately Reflects its Origin in the Merger of Two Bills.

The difference in kind we find between the two sets of powers found in §§5 and 6 respectively arises from the way in which the Act was created.

On January 20, 1914 President Wilson addressed a joint session of Congress and urged passage of legislation to counter unfair business practices that lead to the creation of monopolies and other anti-competitive formations.[7]

In response, on April 13th Representative J. Harry Covington introduced H.R. 15613, 63d Cong. (1914), to create an "Interstate Trade Commission."  This bill reflected President Wilson's emphasis on investigation, information gathering and dissemination, etc.[8]  Significantly, although §8 of the bill contained the same text as that on which the FTC now bases its claim of substantive rulemaking power, Rep. Covington said nothing about such an important power when reporting the bill from committee and summarizing its main features.  *See* H.R. Rep. No. 63-533 (1914), at 1-8.

---

[7] *See* Address to a Joint Session of Congress on Trusts and Monopolies, available at https://www.presidency.ucsb.edu/node/206428 (last accessed December 3, 2024).

[8] Throughout this section we rely on S. Rep. No. 63-573 (1914), which sets out in comparative fashion the texts of original H.R. 15613, amended S. 4160, and amended H.R. 15613 (as described below).  The bills are printed separately in 51 Cong. Rec. 14,919-24.

Indeed, the committee report also included the separate dissenting criticisms of Reps. Stevens and Lafferty complaining that the "measly little committee" the bill would create "is given no powers whatsoever" of enforcement but "only the power of investigations and recommendation." *Id*. Parts 2 & 3. In subcommittee, Rep. Lafferty had advanced an amendment that would have granted the FTC the very prohibitory rulemaking power that it now sees in the words later transplanted into §6(g) of the Act from §8 of the House bill — the same bill Lafferty criticized for lacking that power![9] *Id*., Part 3, Appendix at 21.

During House debate on the bill, three other members criticized the lack of enforcement powers. Rep. Murdoch proposed an amendment adding a list of prohibited practices which the commission would be "empowered" to prevent. 51 Cong. Rec. 9050. The list concluded with the open-ended residual clause: "(h) Any other business practices involving unfair or oppressive competition," which is virtually an invitation to ad hoc rulemaking. *Id*. Rep. Dillon proposed that the commission be "empowered" to make "all necessary rules . . . for the enforcement of the powers herein granted." *Id*. 9056. Rep. Morgan drew the wording of his amendment from his own failed House bill. *Id*. 9047 ("empowered to make and

---

[9] Lafferty's amendment reads: "Sec. 22. That the commission is empowered to make, alter, or repeal regulations further defining more particularly unfair trade practices or unfair or oppressive competition made unlawful by this or any other Act."

establish rules . . . to aid in the administration and enforcement of the provisions of this act and may . . . prohibit corporations . . . from engaging in any practice . . . that constitutes unfair competition").  All such bills and amendments were voted down.

After passing the House and being transmitted to the Senate, H.R. 15613 encountered a rival in S. 4160, 63d Cong. (1914), which the Senate amended to make a complete substitute for the House bill.  Unlike the latter, §5 of the Senate bill granted the Commission the power of enforcement against "unfair competition," limited, however, to case-by-case adjudication.

Section 5 of the Senate bill stirred numerous debates over the supposed vagueness of the phrase "unfair competition."  This undefined term, "so vague, indefinite and uncertain," was denounced as "no guide, no criterion" at all, and as leading to an "indescribable confusion," so that "[t]he whole thing is at sea and is left to the determination of this commission after the act is committed." 51 Cong. Rec. 13,230, 12,814, 12,983, 13058.  Senator Sunderland, one of its most vigorous critics, found a serious constitutional problem with it, arguing that in it "we . . . have laid down no primary standard, and therefore we have devolved upon the commission legislative power, because if they are not restricted to settled legal rules in ascertaining the meaning of it, then they are upon a sea of uncertainty." *Id*. 12,651.  Sen. Sunderland was not alone in his concerns.  At least three statutory definitions or clarifications of

the phrase were proposed (*id.* 13,224, 13,231, 13,303); all met the same fate as the House amendments.  Like the House, the Senate chose not to be more specific.

As the House was dissatisfied in turn when it received the Senate bill, the two houses agreed to a conference, and the bill that emerged (adopting the denomination H.R. 15613) combined features of both the original House bill and S. 4160.  Like the latter, its §5 contained the power of enforcement limited to case-by-case adjudication.  That section was followed by a §6, which, as a result of a "logical" "rearrangement," *id*. 14,769, gathered in one place many of the two bills' investigatory, informational, reporting, etc., provisions, thereby recreating a context like that of the original House bill.[10]

In particular, as we noted, *supra* pp. 12-13, from §8 of the House bill the conference committee transplanted into subsection (g) of §6 of the conference bill the following sentence, with minor stylistic tweaks: "That the commission may from time to time make rules and regulations and classifications of corporations for the purpose of carrying out the provisions of this Act."  These words appear in the Act

---

[10] The comparative print of the three bills (S. Rep. No. 63-573) understates how much of the original House bill wound up in §6.  For example, it fails to pair §10 of the original House bill dealing with certain investigations with §6(d) of the conference bill, despite the fact that, with the exception of seven words (only two of which are substantive), all of the latter's twenty-nine words derive verbatim from the former.  *See also* 51 Cong. Rec. 14,925 (Rep. Covington remarking, other than in §5, conference bill shows "substantial and, in many instances, precise adherence" to original House bill).

in a section devoted, as just noted, not to enforcement-related powers, but to powers relating to investigations, information gathering, reporting, etc., just as they had appeared in the original House bill.

Significantly, at no time in the debates on the final bill did any conferee or other member note that the same text of §6(g) which was toothless in the original House bill emerged from conference miraculously repurposed into a powerful tool complementary to §5. *See infra* pp. 20-22, 25-26. When the conference managers identified the most notable features of the final bill, they made no mention of the addition of substantive rulemaking, despite the fact that such an important feature was absent from both the House and the Senate bills and so would have been received as a highly controversial innovation because of the delegation issue it would have raised. *See* 51 Cong. Rec. 14,768 (Sen. Cummins, emphasizing §5), 14,769 (Sens. Newlands and Pomerene, emphasizing commission's powers); 14,925-26 (Rep. Covington, mentioning §6 but not §6(g)). *See also id*. 14,769 (nothing in bill outside scope of conference), 14921 (same).

Thus, the contrasting readings we have given to §5 versus §6 (in particular, §6(g)) are amply borne out by their history. The sixteen words in question originated within a House bill that did not allow for Commission enforcement; in the conference bill and in the Act today, these few bare-bone words are still found in a context in §6 that reproduces that of the original House bill. They should be understood

16

accordingly. *See AMG*, 593 U.S. at 75. En route to passage of the Act, every attempt to grant enforcement rulemaking or to specify unfair methods of competition was voted down in both houses. *See also supra* pp. 13-15 and *infra* pp. 21-22.

In 1914, when Congress chose to give the FTC enforcement power, it said so unambiguously in its choice of terms and in the way it structured the Act; it did not do so separately, a second time, in the "little-used backwater" of subsection §6(g).

### III.   *National Petroleum* **Obscures the Concerns of the 63d Congress.**

In order to understand the choices Congress made in the Act, an important distinction must be borne in mind. Unfortunately, it is one of several congressional concerns that the FTC's principal case law support (Br. at 7, 17, 24), *National Petroleum Refiners Assoc. v. F.T.C.*, egregiously misrepresents in its appendix. 482 F.2d 672, 698-709 (D.C. Cir. 1973).

The 63d Congress scrupulously distinguished adjudicative rulemaking from legislative rulemaking. Legislative rulemaking makes a change in existing legal relations; it prescribes conduct going forward; it is "forward looking," in the FTC's parlance. Adjudicative rulemaking applies an existing rule to past or present conduct of a party for purposes of determining liability.

In *Prentis v. Atlantic Coast Line Company*, 211 U.S. 210 (1908), the Supreme Court had to decide whether a Virginia commission had acted in a legislative or judicial capacity in setting railroad rates. The commission had the power both to

establish rates and to enforce compliance with them. *Id*. at 225. Justice Holmes,

writing for the Court, deemed it "plain that the proceedings drawn in question here

are legislative in their nature." *Id*. at 226.

> A judicial inquiry investigates, declares, and enforces liabilities as they
> stand on present or past facts and under laws supposed already to exist. . . .
> Legislation, on the other hand, looks to the future and changes existing
> conditions by making a new rule, to be applied thereafter to all or some
> part of those subject to its power.

*Id*. *See New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S.

350, 370 (1989) ("We have since reaffirmed . . . the general mode of analysis of

*Prentis*[.]").[11]

In 1914 Congress resolutely refused to grant the FTC legislative rulemaking

power, in particular for the purpose of enumerating prohibited methods of

competition, i.e., the "forward looking" rulemaking the FTC claims to have received

then. Indeed, we have seen that Congress even refused to take upon itself the task

of creating a statutory list or to otherwise define the term. *See supra* pp. 13, 15.

Instead, Congress made the policy decision to award the Commission only the quasi-

judicial power of adjudicative rulemaking, i.e., case-by-case decision-making. *See*

*Schechter*, 295 U.S. at 532-4.

---

[11] *Prentis* was known to both sides of the debate, and both accepted the
legislative/adjudicative distinction as an established principle. *See*, e.g., 51 Cong.
Rec. 12,815 (Sen. Sunderland, opposing bill) and 14,932 (Sen. Cummins, favoring
bill).

Cited as a model for this choice was the *pre-1906* Interstate Commerce Commission, which possessed only the power to adjudicate whether rates charged by carriers met the statutory standard of being reasonable. Cited as the anti-model was the *post-1906* ICC, for in that year Congress granted the ICC limited legislative power to establish reasonable future rates by regulation, *à la Prentis*.

Repeatedly in the debates the adjudicative proceedings of §5 of the Act were likened to pre-1906 ICC fact-finding proceedings and sharply contrasted with the post-1906 ICC's legislative rulemaking power. *See*, e.g., 51 Cong. Rec. 12,815 (Sens. Sunderland and Cummins), 12,916, 13,052, 13,110, 14,932, 14,938.

Here is Senator Walsh making the same point during debate on the Senate bill:

> [T]here is an essential difference between an order made by the proposed trade commission condemning certain acts already done as unlawful and prohibiting the continuance of those acts and the declaration of a rule to guide future conduct, such as commonly emanates from the commission whose work is so well known and commended [i.e., post-1906 ICC]. . . . [U]nder this bill we are not going to undertake to regulate corporations and lay down rules under which they can conduct their business in the future. We have not yet determined to enter that domain.

*Id*. 13,052. *See also id*. 12,916-17 (Sen. Cummins: "trade commission does just exactly what the Interstate Commerce Commission did prior to 1906").

Responding to Senator Sunderland's criticism, Senator Cummins stated:

> The bill does not propose to invest the committee with any legislative power. The commission will not exercise any quasi-legislative authority; it will not under any circumstances or any conditions prescribe what a person or a corporation shall in the future do; . . . .

> I agree with him that under the law of 1906, when the Interstate Commerce Commission comes to prescribe a rate which shall be charged by common carriers in the future it is exercising a legislative function . . . . The commission proposed in this bill does not perform any such office.

*Id*. 12,916.

In the debate on the final bill, the distinction was summed up in this colloquy between Rep. Stevens, a conference manager, and another member.

> Mr. SHERLEY. If the gentleman will permit, the Federal trade commission differs from the [post-1906] Interstate Commerce Commission in that it has no affirmative power to say what shall be done in the future?
>
> Mr. STEVENS of Minnesota. Certainly.
>
> Mr. SHERLEY. In other words, it exercises in no sense a legislative function such as is exercised by the Interstate Commerce Commission?
>
> Mr. STEVENS of Minnesota. Yes. The gentleman is entirely right. We desired clearly to exclude that authority from the power of the commission.

*Id*. 14,938.

At that time Rep. Covington summarized the history of why the bill itself never contained a provision defining unfair methods of competition.

> In fact, "unfair methods of competition" is a subject simply avoided entirely at the time the House bill was passed, because . . . there was pending before the Committee on the Judiciary, and subsequently passed, a bill [later the Clayton Act] which, among its other provisions contained a series of definitions against certain unfair methods of competition . . . . When the trade commission bill came to the floor of the Senate that body, after more than a month of most informing debate, voted quite decisively for the insertion in the bill of the provision of law now embodied in section 5 . . . .
>
> ****

The House [conference] managers gave a good deal of consideration to this section. . . . It embraced within its broad and elastic scope all the specific practices against which there had been prohibitions in the Clayton bill. After careful consideration, however, it seemed the wise thing to accept the section.

****

It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition it would undertake an endless task. . . . Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case.

*Id.* 14,927. *See id.* 14,924 (inserting H.R. Conf. Rep. No. 63-1142 (1914): "to apply the rule enacted by Congress to particular business situations" "best" way to prevent unfair competition).

This impracticality of identifying the forms of unfair competition also was a recurrent theme in the debate of both houses. *See*, e.g., *id.* 12,980 (Sen. Newlands), 13,047 (Sen. Cummins: "No country ever did it. . . . There are hundreds of phrases in our law of that indefinite character which it would be utterly futile to attempt to define."), 13,108 (Sen. White).

The decision to eschew such rulemaking and to develop the "broad and elastic" law of unfair competition by administrative adjudications reviewable by courts was likened by Rep. Covington and the other House conference manager, Rep. Stevens, to the evolution of the common law. *See id.* 13,049 (compared to development of

21

law of fraud), 14,928 (compared to development of law of negligence), 13108 (same), 14,937.  This view was neatly summed up by Senator Thomas:

> [C]ompetition is to be made lawful by a process of elimination. The things which are within the statute and the things which are without the statute are to be determined as a result of individual instances of investigation; and out of the statute, therefore, we are going to establish a sort of common law of competition, if I may use that term in connection with decisions based on a statute. . . . I concede . . . that to provide for the prevention of unfair competition in terms is perhaps as definite as a statute upon that subject ought to be.

*Id*. 12,979.  *See also* 12,871 (words "unfair competition" will "mold" to "meet circumstances as they arise"), 12,915 ("rule of reason"), 12,917 ("pliability of the rule of reason"), 13,000 (Sen. Hollis), 13,234 (Sen. Clarke).

Contrary to *National Petroleum*, 482 F.2d at 698, 709, then, there is nothing "ambiguous[]" or "cryptic" about what legislative history tells us; the obscurity lies in the account of it appended to that case.  *See also infra* pp. 25-27.  Every attempt to include a statutory definition or list of unfair methods of competition, every attempt to grant the FTC substantive rulemaking power, to include the power to specify prohibited forms of competition, was voted down.  *See supra* pp. 13-15.  The legislators heard ample reasons for doing so, as we have seen.  Mind-reading is not required here, however.  It is an objective fact that Congress decided that the scope of unfair methods of competition should be worked out over time, through case-by-case adjudication, for that was the only method left standing once the contentious debates stopped and the final votes were cast.

## IV.   *National* Petroleum Should Not Be Followed; its Reading of the Act is Purpose-Driven and Unhistorical.

*National Petroleum*, written by Judge J. Skelly Wright, is a relentlessly purpose-driven decision.[12]  This profoundly wrongheaded opinion does not so much construe the Act as seek to improve it.[13]  It should not be followed.

The decision opens modestly, declaring that the court's "duty" is not to make a "policy judgment as to what mode of procedure . . . best accommodates the need for effective enforcement."   482 F.2d at 674.   Soon, however, it is buttressing its decontextualized reading of §6(g) with rationales that rely on its own judgment about how to remedy what it deems to be the FTC's perennial enforcement "problems."

---

[12] *See* Berin Szoka and Corbin Barthold, *The Constitutional Revolution That Wasn't: Why the FTC Isn't a Second Legislature* at 3-4, 11-12, 26-28, available at https://techfreedom.org/wp-content/uploads/2022/06/FTC-UMC-Rulemaking-Auth ority-TF-Version.pdf (last accessed Jan. 14, 2025); Jennifer Cascone Fauver, *Chair with No Legs? Legal Constraints on the Competition Rule-Making Authority of Lina Khan's FTC*, 14 Wm. & Mary Bus. L. Rev. 243, 262-66 (Feb. 2023); Merrill, *supra* n.8, at 302-05; Maureen K. Ohlhausen and Ben Rossen, *Dead End Road:* National Petroleum Refiners Association *and FTC 'Unfair Methods of Competition' Rulemaking*, Truth on the Market (July 13, 2022), available at https://truthonthemarket.com/2022/07/13/dead-end-road-national-petroleum-refin ers-association-and-ftc-unfair-methods-of-competition-rulemaking/ (last accessed Jan. 14, 2025).

[13] *See* J. Skelly Wright, *Courts and the Rulemaking Process: The Limits of Judicial Review*, 59 Cornell L. Rev. 375, 375 (1974):

> Agencies which once generated policy in a piecemeal fashion through adjudication are now adopting prospective standards of action valid in a number of different settings and against a wide variety of 'parties.' . . . These are healthy and welcome developments.

*Id*. at 690.  A substantive rulemaking power would go far to remedy them, in the

court's view.  *Id*.  However, the court cautioned, "[w]e must also relate the

interpretation we provide to the felt and openly articulated concerns motivating the

law's framers."  *Id*.

> But the important point here is not that rule-making is assuredly going to
> solve the Commission's problems. It is rather that recognition and use of
> rule-making by the Commission is convincingly linked to the goals of
> agency expedition, efficiency, and certainty of regulatory standards that
> loomed in the background of the 1914 passage of the Federal Trade
> Commission Act.

*Id*. at 691.  Those goals must have been very much in the background.  Any fair

reading of "the felt and openly articulated concerns" of the Act's framers, as well as

of its opponents, reveals Congress's overriding preoccupation with the *extent and*

*kind of power* to be given to the agency.  *National Petroleum* leaves unclear why it

is "background" concerns for efficiency, etc., that should determine the question of

the FTC's power, rather than "openly articulated" concerns about — the FTC's

power!  *See supra* pp. 13-15, 17-22.[14]

---

[14] *See also* 51 Cong. Rec. 13,047 (Sen. Reed: "I would not vest this arbitrary power
in a court any more than I would in a commission."); *id*. 13,058 (Sen. Shields:
"language so vague . . . nothing more than a general purpose . . . to declare what
shall be the law," "a most serious objection to this law"); *id*. 13,102 (Sen. Pomerene:
"surrender [of] legislative power . . . surrender [of] judicial power"); *id*. 13,144 (Sen.
Kenyon); *id*. 13,145 (Sen. McCumber); *id*. 13,207 (Sen. Lippitt: "enormous and
unparalleled powers"); *id*. 14,927 (Rep. Covington: "powers . . . ought to be
circumscribed"); *id*. 14,930-31 (unconstitutional delegation of power); *id*. 14,931-
32 (judicial review of FTC powers), etc., etc.

It impossible to believe that a rulemaking power over unfair methods of competition which Congress itself refused to exercise and which it repeatedly voted down for the Commission somehow silently migrated into the Act through sixteen words that were adopted from the toothless original House bill and that are buried in an equally toothless portion of the Act now.

*National Petroleum* tries to surmount this difficulty by declaring that the meek rulemaking power of §8 of the House bill spontaneously *scaled up* in §6(g) of the final bill in order to become "commensurate" with the enforcement power of §5. 482 F.2d at 704. Yet, no one in Congress remarked on this scaling up of power, despite its sudden appearance and the highly controversial nature of such a delegation of power. *National Petroleum's* reasoning amounts to asserting that the 63d Congress, after numerous intense wrangles not only over the kind of power to be given the FTC but also over the specific question of whether *anyone* should make legal rules prohibiting particular business practices, nonetheless granted the FTC substantive rulemaking power in §6(g) as a means by which to define such practices, and did so implicitly, without a word of open debate or acknowledgement, in a fit of absentmindedness.

In fact, during the final debate, Senator Burton announced that he "look[ed] with apprehension upon the passage" of the bill because it would create "a tribunal which will have almost despotic authority over the business of this country." 51 Cong.

Rec. 14,791. Comparing it unfavorably to the original House bill, he read out parts of the latter, including the *exact words* which, in §8 of that bill, gave the Commission the power to "make rules and regulations." *Id*. 14,791-92. Significantly, in his harsh criticism of the final bill he did not denounce the fact that those formerly innocuous words had undergone a "despotic" transformation when they reappeared ensconced in §6(g) of the final bill. *Id*. 14,791-93. He did not note the fact in his tirade because, of course, no such "commensurate" transformation had occurred.

In short, the word "commensurate" is a verbal contrivance; it is result-driven and directly contrary to the text, structure, and legislative history of the Act.

Similarly unhistorical and contrived is the court's description of any prohibitory rules that might be promulgated under §6(g) as not truly "legislative" but remaining "merely preliminary guidelines" until facts are found, liability is established, and an order issues. 482 F.2 at 709. Much the same, of course, might be said of laws against homicide, but no one considers them to be "merely preliminary guidelines."

The court then brushed aside the distinction, scrupulously observed by Congress, between legislation and adjudication, disparaging it as "technical." *Id*. Adopting a "broader conception" of legislative activity than the "technical" one employed, for example, by the Supreme Court only months earlier in *U.S. v. Fla. East Coast Ry. Co*., 410 U.S. 224, 246 (1973) (*Prentis* distinction, again), the court purported to show that Rep. Stevens' "utterly unhelpful" comments (51 Cong. Rec. 14,939) could

26

be transformed into "support for substantive rule-making of the kind asserted by the agency" — by simply ignoring what Rep. Stevens actually said and meant.[15]  482 F.2d at 709.

## CONCLUSION

The Court should affirm that the FTC lacks the rulemaking power it claims.

NEW ENGLAND LEGAL FOUNDATION,

By its attorneys,

/s/ John Pagliaro
John Pagliaro, Staff Attorney
  JPagliaro@newenglandlegal.org
New England Legal Foundation
333 Washington St., Suite 850
Boston, MA  02108
Dated: February 10 , 2025     Tel.: (617) 695-3660

---

[15] Here is what Rep. Stevens meant when he used the word "legislative" of the FTC: "The legislative function of this commission is . . . [that] it performs the function of a committee of Congress in the line of *investigation* and *compilation* and *recommendation*."  51 Cong. Rec. 14,935 (distinguishing commission's legislative function from judicial function, in agreement with Rep. Covington's description of this distinction, *see id*. 14,930-33 (quoting *Prentis*, again)) (emphasis added).

## CERTIFICATE OF SERVICE

I certify that, on February 10, 2025, a true and correct copy of this brief was served via CM/ECF on all counsel of record.

/s/ John Pagliaro
John Pagliaro

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), it contains **6,457** words, which is less than one half of the maximum number of words allowed for a party's principal brief.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was composed on Microsoft Word 2016 in 14-point Times New Roman.

Dated: February 10, 2025                    /s/ John Pagliaro
John Pagliaro

**ADDENDUM**

September 26, 1914.
[H. R. 15613.]
[Public, No. 203.]

**CHAP. 311.—An Act To create a Federal Trade Commission, to define its powers and duties, and for other purposes.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That a commission is hereby created and established, to be known as the Federal Trade Commission (hereinafter referred to as the commission). which shall be composed of five commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate. Not more than three of the commissioners shall be members of the same political party. The first commissioners appointed shall continue in office for terms of three, four, five, six, and seven years, respectively, from the date of the taking effect of this Act, the term of each to be designated by the President, but their successors shall be appointed for terms of seven years, except that any person chosen to fill a vacancy shall be appointed only for the unexpired term of the commissioner whom he shall succeed. The commission shall choose a chairman from its own membership. No commissioner shall engage in any other business, vocation, or employment. Any commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office. A vacancy in the commission shall not impair the right of the remaining commissioners to exercise all the powers of the commission.

The commission shall have an official seal, which shall be judicially noticed.

SEC. 2. That each commissioner shall receive a salary of $10,000 a year, payable in the same manner as the salaries of the judges of the courts of the United States. The commission shall appoint a secretary, who shall receive a salary of $5,000 a year, payable in like manner, and it shall have authority to employ and fix the compensation of such attorneys, special experts, examiners, clerks, and other employees as it may from time to time find necessary for the proper performance of its duties and as may be from time to time appropriated for by Congress.

With the exception of the secretary, a clerk to each commissioner, the attorneys, and such special experts and examiners as the commission may from time to time find necessary for the conduct of its work, all employees of the commission shall be a part of the classified civil service, and shall enter the service under such rules and regulations as may be prescribed by the commission and by the Civil Service Commission.

All of the expenses of the commission, including all necessary expenses for transportation incurred by the commissioners or by their employees under their orders, in making any investigation, or upon official business in any other places than in the city of Washington, shall be allowed and paid on the presentation of itemized vouchers therefor approved by the commission.

Until otherwise provided by law, the commission may rent suitable offices for its use.

The Auditor for the State and Other Departments shall receive and examine all accounts of expenditures of the commission.

SEC. 3. That upon the organization of the commission and election of its chairman, the Bureau of Corporations and the offices of Commissioner and Deputy Commissioner of Corporations shall cease to exist; and all pending investigations and proceedings of the Bureau of Corporations shall be continued by the commission.

All clerks and employees of the said bureau shall be transferred to and become clerks and employees of the commission at their present grades and salaries. All records, papers, and property of the said bureau shall become records, papers, and property of the commission, and all unexpended funds and appropriations for the use and maintenance of the said bureau, including any allotment already made to it by the Secretary of Commerce from the contingent appropriation for the Department of Commerce for the fiscal year nineteen hundred and fifteen, or from the departmental printing fund for the fiscal year nineteen hundred and fifteen, shall become funds and appropriations available to be expended by the commission in the exercise of the powers, authority, and duties conferred on it by this Act.

*Side notes:*
- Federal Trade Commission. Created; composition and appointment.
- Tenure of office, etc.
- Restriction.
- Removal; vacancies.
- Seal.
- Salaries.
- Secretary.
- Attorneys, experts, etc.
- Application of civil service laws.
- Payment of expenses.
- Rent.
- Auditing accounts.
- Bureau of Corporations abolished. Vol. 32, p. 827.
- Authority vested in commission.
- Transfer of employees, records, appropriations, etc. *Post,* p. 840.

The principal office of the commission shall be in the city of Washington, but it may meet and exercise all its powers at any other place. The commission may, by one or more of its members, or by such examiners as it may designate, prosecute any inquiry necessary to its duties in any part of the United States. *(Principal office at Washington. Inquiries elsewhere.)*

SEC. 4. That the words defined in this section shall have the following meaning when found in this Act, to wit: *(Meaning of terms used.)*

"Commerce" means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation. *("Commerce.")*

"Corporation" means any company or association incorporated or unincorporated, which is organized to carry on business for profit and has shares of capital or capital stock, and any company or association, incorporated or unincorporated, without shares of capital or capital stock, except partnerships, which is organized to carry on business for its own profit or that of its members. *("Corporation.")*

"Documentary evidence" means all documents, papers, and correspondence in existence at and after the passage of this Act. *("Documentary evidence.")*

"Acts to regulate commerce" means the Act entitled "An Act to regulate commerce," approved February fourteenth, eighteen hundred and eighty-seven, and all Acts amendatory thereof and supplementary thereto. *("Acts to regulate commerce." Vol. 24, p. 379; Vol. 34, p. 584; Vol. 36, p. 544; Vol. 37, p. 566.)*

"Antitrust acts" means the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," approved July second, eighteen hundred and ninety; also the sections seventy-three to seventy-seven, inclusive, of an Act entitled "An Act to reduce taxation, to provide revenue for the Government, and for other purposes," approved August twenty-seventh, eighteen hundred and ninety-four; and also the Act entitled "An Act to amend sections seventy-three and seventy-six of the Act of August twenty-seventh, eighteen hundred and ninety-four, entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes,'" approved February twelfth, nineteen hundred and thirteen. *("Antitrust Acts." Vol. 26, p. 209. Vol. 28, p. 570. Vol. 37, p. 667.)*

SEC. 5. That unfair methods of competition in commerce are hereby declared unlawful. *(Unfair methods of competition unlawful.)*

The commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the Acts to regulate commerce, from using unfair methods of competition in commerce. *(Prevention by Commission.)*

Whenever the commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition in commerce, and if it shall appear to the commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect, and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. *(Service of charges.)* The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. *(Appearance of accused.)* Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the commission, to intervene and appear in said proceeding by counsel or in person. *(Other parties may intervene.)* The testimony in any such proceeding shall be reduced to writing and filed in the office of the commission. *(Preservation of testimony.)* If upon such hearing the commission shall *(Issue of order to desist.)*

be of the opinion that the method of competition in question is prohibited by this Act, it shall make a report in writing in which it shall state its findings as to the facts, and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition. Until a transcript of the record in such hearing shall have been filed in a circuit court of appeals of the United States, as hereinafter provided, the commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section.

*Modification, etc.*

If such person, partnership, or corporation fails or neglects to obey such order of the commission while the same is in effect, the commission may apply to the circuit court of appeals of the United States, within any circuit where the method of competition in question was used or where such person, partnership, or corporation resides or carries on business, for the enforcement of its order, and shall certify and file with its application a transcript of the entire record in the proceeding, including all the testimony taken and the report and order of the commission. Upon such filing of the application and transcript the court shall cause notice thereof to be served upon such person, partnership, or corporation and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, testimony, and proceedings set forth in such transcript a decree affirming, modifying, or setting aside the order of the commission. The findings of the commission as to the facts, if supported by testimony, shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the commission, the court may order such additional evidence to be taken before the commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by testimony, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari as provided in section two hundred and forty of the Judicial Code.

*Enforcement.*
*Application to circuit court of appeals.*

*Jurisdiction, etc.*

*Findings conclusive of facts.*
*Additional evidence.*

*Modification, etc., by Commission.*

*Decree final.*
*Review by Supreme Court.*
*Vol. 36, p. 1157.*

Any party required by such order of the commission to cease and desist from using such method of competition may obtain a review of such order in said circuit court of appeals by filing in the court a written petition praying that the order of the commission be set aside. A copy of such petition shall be forthwith served upon the commission, and thereupon the commission forthwith shall certify and file in the court a transcript of the record as hereinbefore provided. Upon the filing of the transcript the court shall have the same jurisdiction to affirm, set aside, or modify the order of the commission as in the case of an application by the commission for the enforcement of its order, and the findings of the commission as to the facts, if supported by testimony, shall in like manner be conclusive.

*Applications to set aside orders.*

*Procedure, etc.*

The jurisdiction of the circuit court of appeals of the United States to enforce, set aside, or modify orders of the commission shall be exclusive.

*Exclusive jurisdiction of circuit court of appeals.*

Such proceedings in the circuit court of appeals shall be given precedence over other cases pending therein, and shall be in every

*Precedence, etc.*

A-3

way expedited. No order of the commission or judgment of the court to enforce the same shall in any wise relieve or absolve any person, partnership, or corporation from any liability under the anti-trust acts. *[Antitrust liabilities not affected.]*

Complaints, orders, and other processes of the commission under this section may be served by anyone duly authorized by the commission, either (a) by delivering a copy thereof to the person to be served, or to a member of the partnership to be served, or to the president, secretary, or other executive officer or a director of the corporation to be served; or (b) by leaving a copy thereof at the principal office or place of business of such person, partnership, or corporation; or (c) by registering and mailing a copy thereof addressed to such person, partnership, or corporation at his or its principal office or place of business. The verified return by the person so serving said complaint, order, or other process setting forth the manner of said service shall be proof of the same, and the return post-office receipt for said complaint, order, or other process registered and mailed as aforesaid shall be proof of the service of the same. *[Service of process. Personal delivery. At place of business. By registered mail. Proof of return.]*

Sec. 6. That the commission shall also have power— *[Additional powers.]*

(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships. *[Investigating business operations, etc., of corporations.]*

(b) To require, by general or special orders, corporations engaged in commerce, excepting banks, and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, repectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission. *[Requiring detailed reports, etc., from corporations.]*

(c) Whenever a final decree has been entered against any defendant corporation in any suit brought by the United States to prevent and restrain any violation of the antitrust Acts, to make investigation, upon its own initiative, of the manner in which the decree has been or is being carried out, and upon the application of the Attorney General it shall be its duty to make such investigation. It shall transmit to the Attorney General a report embodying its findings and recommendations as a result of any such investigation, and the report suall be made public in the discretion of the commission. *[Investigating compliance with antitrust decrees. Transmittal of findings, etc.]*

(d) Upon the direction of the President or either House of Congress to investigate and report the facts relating to any alleged violations of the antitrust Acts by any corporation. *[Investigations for President or Congress.]*

(e) Upon the application of the Attorney General to investigate and make recommendations for the readjustment of the business of any corporation alleged to be violating the antitrust Acts in order that the corporation may thereafter maintain its organization, management, and conduct of business in accordance with law. *[Recommend business adjustments to comply with law.]*

(f) To make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith *[To make public information obtained. Report to Congress.]*

91006°—VOL 38—PT 1——46

Publishing reports, etc.
recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

Classifying corporations.
(g) From time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act.

Investigating conditions abroad affecting foreign trade.
(h) To investigate, from time to time, trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States, and to report to Congress thereon, with such recommendations as it deems advisable.

Formulation of decrees in antitrust suits.
SEC. 7. That in any suit in equity brought by or under the direction of the Attorney General as provided in the antitrust Acts, the court may, upon the conclusion of the testimony therein, if it shall be then of opinion that the complainant is entitled to relief, refer said suit to Proceedings to determine. the commission, as a master in chancery, to ascertain and report an appropriate form of decree therein. The commission shall proceed upon such notice to the parties and under such rules of procedure as the court may prescribe, and upon the coming in of such report such exceptions may be filed and such proceedings had in relation thereto Action of court. as upon the report of a master in other equity causes, but the court may adopt or reject such report, in whole or in part, and enter such decree as the nature of the case may in its judgment require.

Departments and offices to cooperate.
SEC. 8. That the several departments and bureaus of the Government when directed by the President shall furnish the commission, upon its request, all records, papers, and information in their possession relating to any corporation subject to any of the provisions of this Details. Act, and shall detail from time to time such officials and employees to the commission as he may direct.

Power to secure testimony.
SEC. 9. That for the purposes of this Act the commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against; and the commission shall have power to require by subpœna the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter Issue of subpœnas, etc. under investigation. Any member of the commission may sign subpœnas, and members and examiners of the commission may administer oaths and affirmations, examine witnesses, and receive evidence.

Attendance of witnesses.
Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpœna the commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

District courts to enforce compliance.
Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpœna issued to any corporation or other person, issue an order requiring such corporation or other person to appear before the commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; Punishment for contempt. and any failure to obey such order of the court may be punished by such court as a contempt thereof.

Writs of mandamus to compel compliance with Act.
Upon the application of the Attorney General of the United States, at the request of the commission, the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the commission made in pursuance thereof.

Testimony by deposition.
The commission may order testimony to be taken by deposition in any proceeding or investigation pending under this Act at any

A-5

stage of such proceeding or investigation. Such depositions may be taken before any person designated by the commission and having power to administer oaths. Such testimony shall be reduced to writing by the person taking the deposition, or under his direction, and shall then be subscribed by the deponent. Any person may be compelled to appear and depose and to produce documentary evidence in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the commission as hereinbefore provided. *Compulsory appearance, etc.*

Witnesses summoned before the commission shall be paid the same fees and mileage that are paid witnesses in the courts of the United States, and witnesses whose depositions are taken and the persons taking the same shall severally be entitled to the same fees as are paid for like services in the courts of the United States. *Fees, etc., of witnesses.*

No person shall be excused from attending and testifying or from producing documentary evidence before the commission or in obedience to the subpœna of the commission on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture. But no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify, or produce evidence, documentary or otherwise, before the commission in obedience to a subpœna issued by it: *Provided*, That no natural person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying. *No person excused from testifying, etc.* *Personal immunity.* *Proviso. Perjury excepted.*

SEC. 10. That any person who shall neglect or refuse to attend and testify, or to answer any lawful inquiry, or to produce documentary evidence, if in his power to do so, in obedience to the subpœna or lawful requirement of the commission, shall be guilty of an offense and upon conviction thereof by a court of competent jurisdiction shall be punished by a fine of not less than $1,000 nor more than $5,000, or by imprisonment for not more than one year, or by both such fine and imprisonment. *Punishment for disobeying subpœna, etc.*

Any person who shall willfully make, or cause to be made, any false entry or statement of fact in any report required to be made under this Act, or who shall willfully make, or cause to be made, any false entry in any account, record, or memorandum kept by any corporation subject to this Act, or who shall willfully neglect or fail to make, or to cause to be made, full, true, and correct entries in such accounts, records, or memoranda of all facts and transactions appertaining to the business of such corporation, or who shall willfully remove out of the jurisdiction of the United States, or willfully mutilate, alter, or by any other means falsify any documentary evidence of such corporation, or who shall willfully refuse to submit to the commission or to any of its authorized agents, for the purpose of inspection and taking copies, any documentary evidence of such corporation in his possession or within his control, shall be deemed guilty of an offense against the United States, and shall be subject, upon conviction in any court of the United States of competent jurisdiction, to a fine of not less than $1,000 nor more than $5,000, or to imprisonment for a term of not more than three years, or to both such fine and imprisonment. *Punishment for false entries, destroying records, refusing inspection, etc.*

If any corporation required by this Act to file any annual or special report shall fail so to do within the time fixed by the commission for filing the same, and such failure shall continue for thirty days after notice of such default, the corporation shall forfeit to the United States the sum of $100 for each and every day of the continuance of such failure, which forfeiture shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States brought in the district where the corporation has its principal office or in any district in which it shall do business. It *Penalty for not filing reports.* *Recovery, etc.*

shall be the duty of the various district attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures. The costs and expenses of such prosecution shall be paid out of the appropriation for the expenses of the courts of the United States.

*Punishment for un-authorized divulging of information.* Any officer or employee of the commission who shall make public any information obtained by the commission without its authority, unless directed by a court, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by fine and imprisonment, in the discretion of the court.

*Antitrust, and inter-state commerce, laws not interfered with.* SEC. 11. Nothing contained in this Act shall be construed to prevent or interfere with the enforcement of the provisions of the antitrust Acts or the Acts to regulate commerce, nor shall anything contained in the Act be construed to alter, modify, or repeal the said antitrust Acts or the Acts to regulate commerce or any part or parts thereof.

Approved, September 26, 1914.