No. 24-10951

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RYAN LLC,

*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,

*Intervenor Plaintiffs-Appellees,*

v.

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

On appeal from the United States District Court for the
Northern District of Texas, Case No. 3:24-cv-00986-E

**BRIEF OF THE SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION, THE FUTURES INDUSTRY
ASSOCIATION, THE MANAGED FUNDS ASSOCIATION, AND THE
AMERICAN INVESTMENT COUNCIL AS *AMICI CURIAE* IN
SUPPORT OF APPELLEES AND AFFIRMANCE**

Nicole A. Saharsky
Minh Nguyen-Dang
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3052
nsaharsky@mayerbrown.com

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 – in addition to the persons listed on the certificates of interested persons submitted by the parties and the various *amici* – have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amici Curiae:*

1.    Securities Industry and Financial Markets Association
2.    The Futures Industry Association
3.    The Managed Funds Association
4.    The American Investment Council

Counsel for *Amici Curiae:*

Nicole A. Saharsky
Gail F. Levine
Minh Nguyen-Dang
Mayer Brown LLP

No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any of the parties to this filing.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

**TABLE OF CONTENTS**

**Page**

INTEREST OF THE *AMICI CURIAE* ..................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................4

ARGUMENT ....................................................................................6

I.     The Rule Would Hurt Competition And Employees In The
       Financial-Services Industry ...................................................6

       A.     The Rule Would Eviscerate The Significant Competitive
              Benefits Of Noncompete Agreements ........................................7

              1.     Noncompete Agreements Incentivize Employee
                     Training .................................................................7

              2.     Noncompete Agreements Protect Companies'
                     Confidential Information .........................................9

       B.     The Rule Would Harm Employees ...............................13

              1.     The Rule Would Deprive Employees Of The
                     Benefits Of Noncompete Agreements ...........................14

              2.     Substitutes For Noncompete Agreements Generally
                     Are Worse For Employees ...............................17

II.    The Rule Exceeds The FTC's Statutory Authority ...........................18

       A.     Section 6(g) Does Not Authorize The FTC To Make
              Substantive Competition Rules ...............................19

       B.     Section 5 Does Not Authorize The FTC To Declare That
              A Practice Harms Competition In The Aggregate ..................22

       C.     Any Doubts About The FTC's Power To Promulgate The
              Rule Should Be Resolved Against The FTC ...........................24

       D.     The FTC Lacks Authority To Enact Retroactive Rules ...........27

CONCLUSION ...............................................................................30

CERTIFICATE OF COMPLIANCE ...............................................31

CERTIFICATIONS UNDER ECF FILING STANDARDS .......................32

CERTIFICATE OF SERVICE .......................................................33

# TABLE OF AUTHORITIES

**Cases**                                                        **Pages(s)**

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021) ...........................................................................25, 26

*ATS Tree Servs., LLC v. FTC*,
    No. 21-cv-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024) ...................5

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) .............................................................................25

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) .................................................................................28

*Cantor Fitzgerald, L.P. v. Ainslie*,
    312 A.3d 674 (Del. 2024) .........................................................................15

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ...................................................................................21

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) .................................................................................19

*First Tower Loan, LLC v. Broussard*,
    No. 15-cv-385, 2015 WL 13942412 (S.D. Miss. July 7, 2015) ...................8

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .................................................................................28

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...........................................................................27, 28

*Lindh v. Murphy*,
    521 U.S. 320 (1997) .................................................................................28

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) .................................................................................21

*Morris v. Schroder Cap. Mgmt. Int'l*,
    859 N.E. 2d 503 (N.Y. 2006) ...................................................................15

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                              **Pages(s)**

*N. Tex. Specialty Physicians v. FTC,*
  528 F.3d 346 (5th Cir. 2008) ................................................................23

*National Petroleum Refiners Ass'n v. FTC,*
  482 F.2d 672 (D.C. Cir. 1973) ..............................................................22

*Pierce v. Fuller,*
  8 Mass. 223 (1811) ..............................................................................26

*Props. of the Villages, Inc. v. FTC,*
  No. 24-cv-316, 2024 WL 3870380
  (M.D. Fla. Aug. 15, 2024) ...................................... 5, 18, 25, 26

*Ryan, LLC v. FTC,*
  No. 24-cv-986, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) ..........*passim*

*Snap-On Tools Corp. v. FTC,*
  321 F.2d 825 (7th Cir. 1963) ................................................................24

*United States v. Addyston Pipe & Steel Co.,*
  85 F. 271 (6th Cir. 1898) .....................................................................11

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .............................................................................26

*Whitman v. Am. Trucking Assocs.,*
  531 U.S. 457 (2001) .........................................................................20, 22

**Statutes, Regulations, and Rule**

5 U.S.C. § 706(2) ......................................................................................29

5 U.S.C. § 706(2)(C) ................................................................................18

Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.* ....................................23

Sherman Act, 15 U.S.C. § 1 *et seq.* ..........................................................11

## TABLE OF AUTHORITIES
### (continued)

**Statutes, Regulations, and Rule (continued)**                    **Pages(s)**

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*:

    15 U.S.C. § 45.............................................................................*passim*

    15 U.S.C. § 45(a)(1).........................................................................21

    15 U.S.C. § 45(a)(2).........................................................................23

    15 U.S.C. § 45(b) ............................................................................23

    15 U.S.C. § 46.................................................................................20

    15 U.S.C. § 46(a).............................................................................20

    15 U.S.C. § 46(b).............................................................................20

    15 U.S.C. § 46(c).............................................................................20

    15 U.S.C. § 46(d).............................................................................20

    15 U.S.C. § 46(e).............................................................................20

    15 U.S.C. § 46(f)..............................................................................20

    15 U.S.C. § 46(g) ...................................................................*passim*

    15 U.S.C. § 46(h).............................................................................20

    15 U.S.C. § 46(i)..............................................................................20

    15 U.S.C. § 46(j)..............................................................................20

    15 U.S.C. § 57a................................................................................21

Fed. R. App. P. 29(a)(4)(E) ...............................................................1

FTC, Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024)...................................*passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Other Authorities (continued)**                    **Pages(s)**

AIC, *Comment on Proposed Non-Compete Rule* (Apr. 19, 2023) .........*passim*

Katherine Doherty, *'I Smuggled Code': An Executive's Admission in Heated Brokerage Feud*, Yahoo Finance (Nov. 19, 2024) ................................................................10

Chris Dolmetsch, *Jane Street's 'Secret' Strategy Concerns Options in India*, Bloomberg (Apr. 19, 2024)..........................................13

FIA, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ................................................................3

FIA PTG, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ................................................................3, 10

FINRA Rule 2040(b) (2022) ..........................................................16

FTC, *Annual Report* (1922)..........................................................21

FTC, *Dissenting Statement of Commissioner Andrew N. Ferguson* (June 28, 2024). ...................................... 8, 25, 26, 27

FTC, *Oral Statement of Commissioner Andrew N. Ferguson* (Apr. 23, 2024). ................................................21, 22, 25

FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022) ................................................23

MFA, *Comment on Proposed Non-Compete Rule* (Apr. 19, 2023) .......*passim*

SIFMA, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ................................................................*passim*

## INTEREST OF THE *AMICI CURIAE*

*Amici* are leading trade associations in the financial-services industry.[1] The Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the U.S. and global capital markets. SIFMA serves as an industry-coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. On behalf of the securities industry's one million workers, SIFMA advocates on legislation and regulation affecting the industry.

The Futures Industry Association (FIA) is the leading global trade organization for the futures, options, and centrally cleared derivatives markets, with offices in Brussels, London, Singapore, and Washington, D.C. FIA's membership includes clearing firms, exchanges, clearinghouses, and commodities specialists from more than 48 countries, as well as technology vendors, lawyers, and other professionals serving the industry. FIA's membership also includes the FIA Principal Traders Group (FIA PTG), an

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund its preparation or submission. All parties have consented to the filing of this brief.

affiliate group of FIA members that trade their own proprietary capital in a principal capacity on exchanges in equities, options, and futures markets worldwide.

Managed Funds Association (MFA), based in Washington, D.C., New York City, Brussels, and London, represents the global alternative asset management industry. MFA's mission is to advance the ability of alternative asset managers to raise capital, invest it, and generate returns for their beneficiaries. MFA advocates on behalf of its membership and convenes stakeholders to address global regulatory, operational, and business issues. MFA has more than 180 fund manager members, including traditional hedge funds, private credit funds, and hybrid funds, that employ a diverse set of investment strategies. Member firms help pension plans, university endowments, charitable foundations, and other institutional investors diversify their investments, manage risk, and generate attractive returns throughout the economic cycle.

The American Investment Council (AIC) is the leading trade association for the private investment industry. Its members include the world's leading private equity and growth capital firms. AIC is committed to advancing access to capital, job creation, retirement security, innovation, and economic growth in the United States by promoting responsible long-term

investment. AIC advocates for sound public policies in matters affecting the private investment industry.

Plaintiff and Intervenors challenge the validity of the FTC's Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the Rule). The Rule seeks to ban nearly all noncompete agreements in the United States. *Amici* have a substantial interest in this case. Many of their members have noncompete agreements in place with current and former employees. Those agreements are critical to protecting the members' investments in their employees and safeguarding the members' confidential information. Each *amicus* filed a comment during the rulemaking process for the noncompete rule, urging the FTC not to promulgate the proposed rule.[2]

If it goes into effect, the Rule would ban most noncompete agreements in the financial-services industry going forward and invalidate many existing agreements. That would harm competition in the industry; harm employees by reducing their opportunities, compensation, and training; and

---

[2] *See* SIFMA, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023), bit.ly/4akss6Q (SIFMA Comment); FIA, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023), bit.ly/3WFMVzM; FIA PTG, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023), bit.ly/4bDr93X (FIA PTG Comment); MFA, *Comment on Proposed Non-Compete Rule* (Apr. 19, 2023), bit.ly/3WBBb1n (MFA Comment); AIC, *Comment on Proposed Non-Compete Rule* (Apr. 19, 2023), bit.ly/3UX0J7M (AIC Comment).

endanger many companies' confidential information. *Amici* file this brief to provide the Court with their unique perspective on how the Rule would affect the financial-services industry and on the shortcomings of the Rule from the industry's perspective.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The FTC's Rule would impose a near-total ban on new noncompete agreements across the Nation and would invalidate the vast majority of existing noncompete agreements.

Many companies in the financial-services industry rely on noncompete agreements to protect their investment in their employees and to safeguard the confidential information that gives them a competitive edge, such as their proprietary investment strategies. Those protections help competition, because they ensure that companies in the industry can invest time and money to develop their people, products, and processes to better serve their customers, investors, and shareholders without fearing that competitors will free-ride on their efforts. The Rule thus would significantly harm competition in the industry. Further, in response to the Rule, employers in the industry likely would change their business practices to account for the Rule in ways that would reduce productivity and harm the industry.

The Rule also would harm employees in the financial-services industry. Employers share information with employees more readily when they can rely on noncompete agreements. Employers in the industry also typically pay employees for not competing during their noncompete period, even if those individuals work for other companies or organizations that do not compete with the employers. The Rule would deprive employees of those benefits – in fact, it would deny employees the choice to enter into noncompete agreements altogether. Further, the Rule likely would force employers to re-negotiate existing agreements to include new provisions to safeguard confidential information, which could leave employees worse off than they were before.

The Rule not only is bad policy, but it also is unlawful. First, as two district courts have recognized, the FTC simply does not have the authority to promulgate nationwide rules regulating unfair methods of competition. *See Ryan, LLC v. FTC*, No. 24-cv-986, 2024 WL 3879954, at *12 (N.D. Tex. Aug. 20, 2024); *Props. of the Villages, Inc. v. FTC*, No. 24-cv-316, 2024 WL 3870380, at *9 (M.D. Fla. Aug. 15, 2024), *appeal docketed*, No. 24-13102 (11th Cir. Sept. 24, 2024); *but see ATS Tree Servs., LLC v. FTC*, No. 21-cv-1743, 2024 WL 3511630, at *8-19 (E.D. Pa. July 23, 2024).

The FTC cites Sections 5 and 6(g) of the FTC Act, 15 U.S.C. §§ 45 and 46(g), but neither provides the FTC with the authority to promulgate the Rule.  Section 6(g) is a housekeeping provision that allows the FTC to issue procedural rules, not a sweeping grant of authority to regulate the entire national economy.  Section 5 gives the FTC authority to investigate methods of unfair competition on a case-by-case basis, not to promulgate blanket rules.  And neither provision gives the FTC power to promulgate rules with retroactive effect.

The district court correctly held that the Rule is unlawful because it exceeds the FTC's authority, and the court appropriately issued a permanent injunction setting aside the Rule nationwide.  *Ryan*, 2024 WL 3879954, at *9, 14.  This Court should affirm.

## ARGUMENT

### I.   The Rule Would Hurt Competition And Employees In The Financial-Services Industry

Noncompete agreements provide significant benefits both to competition and to employees in the financial-services industry – benefits that would be lost if the Rule were to go into effect.  Further, the Rule would impose additional costs on businesses that would ultimately undermine businesses' productivity and effectiveness, harm employees, and impose new costs that would be passed on to consumers.

6

### A.     The Rule Would Eviscerate The Significant Competitive Benefits Of Noncompete Agreements

Noncompete agreements have important pro-competitive effects, especially in the financial-services industry.  In particular, noncompete agreements encourage companies to invest in their employees' development and to share confidential information broadly with employees and across teams.  As the district court explained, the FTC failed to give adequate consideration to these important "positive benefits" in promulgating the Rule.  2024 WL 3879954, at *13.

### 1.     Noncompete Agreements Incentivize Employee Training

Noncompete agreements "increase an employer's incentive to make productive investments" – such as "training its workers" – "because employers may be more likely to make such investments if they know workers are not going to depart for or establish a competing firm."  SIFMA Comment 5-6 (internal quotation marks omitted).  As the FTC acknowledges, multiple studies have shown that noncompete agreements "increase employee human capital investment."  89 Fed. Reg. at 38,423.  That is common sense: Companies are more likely to invest in employee training when they can ensure that their competitors cannot free-ride off those investments.  *See id.*  Conversely, if noncompete agreements no longer are enforceable,

employers are likely to "make fewer similar training investments." FTC, *Dissenting Statement of Commissioner Andrew N. Ferguson* 42 (June 28, 2024), bit.ly/4h8uXNQ (Ferguson Dissent).

More employee training is better for competition. Training and other similar investments in employee development improve employee productivity, which allows their employers to compete more effectively in the marketplace. It also is good for the employees who receive that increased investment, because they develop skills that they can put to use after they leave their employers (so long as they do not directly compete with the employers right away) or use to bargain for higher wages with their employers.

The FTC asserts that there are viable alternatives to noncompete agreements to protect employee training and development. *See* 89 Fed. Reg. at 38,426. Yet the FTC proposes only two supposed alternatives – "fixed duration contracts" and "competing on the merits." *Id.* Neither is an adequate substitute for noncompete agreements. The FTC contends that employers could use fixed-duration contracts to retain employees for the length of time needed for the employers to recoup their investments in training and development. *Id.* at 38,426. But at-will employment is the norm in 49 states, *First Tower Loan, LLC v. Broussard*, No. 15-cv-385, 2015 WL 13942412, at *2 n.6 (S.D. Miss. July 7, 2015); it simply is unrealistic to

8

propose that companies "forgo[] at-will employment" and enter into fixed-duration contracts every time they provide employees with training, 89 Fed. Reg. at 38,403. Further, fixed-duration contracts are much riskier for employers, because employers cannot easily terminate the contracts during the employment period. *See* AIC Comment 22. If forced to choose between not providing training or providing training *and* bearing the risks of a fixed-duration contract, many employers would choose the former.

The FTC also contends that employers could "compete on the merits" to protect their investments in their employees – meaning offer high wages to retain their newly trained employees. 89 Fed. Reg. at 38,426. But that would just add to the costs of training employees. And the employer providing the training would be at a disadvantage in seeking to retain an employee, because a competitor could offer higher wages without also bearing the costs of the training in the first place. *See* AIC Comment 22. In other words, it always would cost less for the competitor that did not provide the training. The inescapable conclusion is that banning noncompete agreements would reduce employers' incentives to invest in their employees.

### 2. Noncompete Agreements Protect Companies' Confidential Information

A second key benefit of noncompete agreements is that they protect companies' confidential information, including their trade secrets,

9

intellectual property, and other know-how. As a result, companies are more likely to share information with employees and across teams, which increases productivity and helps foster innovation.

Companies, particularly in the financial-services industry, spend significant resources developing proprietary strategies, tools, and other information to gain competitive advantages. *See, e.g.*, AIC Comment 19-20; MFA Comment 4-5; FIA PTG Comment 1-2. For example, investment funds often create new funds that are centered around specific portfolio managers and that use proprietary investment strategies to identify investment options, manage risk, and generate attractive returns. MFA Comment 4. It takes a considerable investment of time, effort, and resources to develop and refine a strategy and then to build a sufficient track record and reputation to market that strategy to potential investors. *Id.* Financial-services companies also make substantial investments in proprietary software, such as sophisticated automated-trading tools. *See, e.g.*, Katherine Doherty, *'I Smuggled Code': An Executive's Admission in Heated Brokerage Feud*, Yahoo Finance (Nov. 19, 2024), https://bit.ly/4ari6DQ. Companies in the industry need to ensure that they can protect those strategies, software, and other proprietary information, or they will not invest in developing them.

10

Noncompete agreements are critical to protecting those investments. They ensure that companies can share confidential information with executives and other employees without the danger that competitors will recruit those employees and thereby gain access to the companies' most important secrets. AIC Comment 19. Even when employees do not intend to misappropriate trade secrets, they retain opinions, insight, and other information learned from their former employer that subconsciously influence their behavior and decision-making – and in the financial-services industry, even remembering the slightest detail of, for example, a trading strategy can make all the difference. *Id.* at 20. Noncompete agreements act as a "prophylactic measure" to ensure that executives and employees cannot use confidential information to benefit competitors. *Id.*

The FTC does not dispute that by protecting confidential information, noncompete agreements can benefit competition. *See* 89 Fed. Reg. at 38,422. Indeed, courts have upheld noncompete agreements under the Sherman Act, 15 U.S.C. § 1 *et seq.*, on this basis for over a century. *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281-82 (6th Cir. 1898).

The FTC asserts that trade-secret law and non-disclosure agreements (NDAs) can provide adequate protection. 89 Fed. Reg. at 38,424. That is wrong: Trade-secret law and NDAs are not as effective as noncompete

11

agreements, because compliance is much harder to determine. SIFMA Comment 9; AIC Comment 21. It is easy to determine whether a former employee is working for a competitor in violation of a noncompete agreement. In contrast, once a former employee has started with a competitor, a former employer does not have insight into what the employee is working on and whether the employee is using or disclosing information in violation of trade-secret law or an NDA. SIFMA Comment 9.

Even if the former employer has a reasonable basis for bringing a lawsuit for trade-secret appropriation or to enforce an NDA, that lawsuit does not protect confidential information as well as a noncompete agreement. To begin with, litigation necessarily is after the fact. Even if the former employer ultimately prevails, the harm has been done because the information has been shared. MFA Comment 5. Litigation also is expensive and time-consuming. The median time for a trade-secret case to go to trial is over 26 months – longer than the typical noncompete agreement in the financial-services industry. AIC Comment 21. Finally, litigation may not be successful. Direct evidence of misappropriation or wrongful disclosure often is difficult to obtain because sophisticated employees know to cover their tracks, and it often can be difficult to quantify damages with any certainty. And, perversely, the former employer may need to disclose the very information

it seeks to protect to prove its claim in litigation, MFA Comment 5 – or that information may be leaked during the course of litigation, *see, e.g.*, Chris Dolmetsch, *Jane Street's 'Secret' Strategy Concerns Options in India*, Bloomberg (Apr. 19, 2024).

Thus, if the Rule were to go into effect, companies would have to take additional measures to safeguard their confidential information. Companies likely would restructure their organizations or change their business practices to severely curtail the number of employees receiving confidential information. AIC Comment 15-16; MFA Comment 2-3. Siloing information in that way would make businesses less efficient, ultimately harming productivity and increasing costs – all of which would hurt competition. MFA Comment 3. Companies also would innovate less because they would face an increased risk that investing in new products or services would benefit their competitors. That would be bad for the industry, bad for employees, bad for investors, and bad for the economy.

## B.   The Rule Would Harm Employees

Noncompete agreements benefit employees in the financial-services industry. In particular, many employees receive additional compensation and job opportunities in return for entering into those agreements. Further, noncompete agreements often are part of deferred compensation and

retirement arrangements, which allow employees to receive more money when they leave their employers. The FTC failed to meaningfully consider how noncompete agreements operate in different industries, instead opting to "impose[] a one-size-fits-all approach" across the entire economy. *Ryan*, 2024 WL 3879954, at *13-14.

### 1. The Rule Would Deprive Employees Of The Benefits Of Noncompete Agreements

Employees in the financial-services industry are highly skilled and many are very well compensated. *See* AIC Comment 15. Many employees specifically negotiate their compensation packages with the advice of counsel. *Id.* at 15-16. A significant number of those employees choose to enter into noncompete agreements because those agreements come with certain benefits. *See* MFA Comment 3.

Many employees subject to noncompete agreements receive higher compensation. AIC Comment 6. That compensation can come in the form of increased salaries, additional bonuses, noncompete payments, grants of equity, or severance guarantees. *Id.*; *see* MFA Comment 3 (employees in the investment-management industry typically are compensated during noncompete periods). During noncompete periods, the employees are precluded only from working for competitors, but still can work for non-competing companies and organizations. And employers in the industry often

agree to make noncompete payments even when the employees continue working for non-competitors. Thus, for example, a departing employee could work for a nonprofit organization while continuing to receive noncompete payments, which benefits both the employee and society at large.

Further, under many noncompete agreements in the financial-services industry (known as forfeiture-for-competition agreements), employees can make fully informed choices between competing and receiving extra bargained-for benefits. SIFMA Comment 6. Under those agreements, employees forgo those benefits only if they choose to work for competitors. *Id.* As courts have recognized, these types of voluntary noncompete agreements benefit employees and help competition. *See, e.g.*, *Morris v. Schroder Cap. Mgmt. Int'l*, 859 N.E. 2d 503, 620-21 (N.Y. 2006). Indeed, many courts do not consider these agreements to be noncompete agreements for state-law purposes at all, because they "do not deprive the public of the employee's services." *E.g.*, *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 691 (Del. 2024).

Finally, many employees enter into noncompete agreements as part of their retirement packages. For example, the Financial Industry Regulatory Authority (FINRA) has issued a rule, Rule 2040, which requires its members to enter into noncompete agreements with their retiring

investment advisors in order to continue paying commissions to the advisors.  SIFMA Comment 11 (citing FINRA Rule 2040(b) (2022)).  Under this rule, FINRA members have paid millions of dollars to retiring advisors on the condition that the advisors transition their clients to other advisors and leave the securities industry.  *Id.* at 11-12.  The rule benefits investors by promoting the continuity of client services.  *See id.* at 12.  Notably, the Securities and Exchange Commission has recognized the validity of these agreements.  *See id.* (citing SEC No. 34-73954; File No. SR-FINRA-2014-037, at 9-10 (Dec. 30, 2014)).

The Rule would upend those retirement arrangements.  It would invalidate all existing noncompete agreements except those for a narrowly defined category of "senior executives" who occupy "policy-making position[s]."  89 Fed. Reg. at 38,413.  The Rule thus would invalidate the noncompete provisions of many retired advisors' retirement packages – even though their former employers have paid them significant amounts under those packages and may be required to continue paying them even without the noncompete provisions.

The bottom line is that noncompete agreements in the financial-services industry can significantly benefit employees and are neither

exploitative nor coercive. The Rule would not only deprive all employees of those benefits, but also would deprive them of the choice to receive those benefits.

### 2. Substitutes For Noncompete Agreements Generally Are Worse For Employees

The Rule also likely would lead employers to take steps to protect their confidential information that would be detrimental to employees.

If the Rule goes into effect, employers likely would be much more restrictive in sharing their confidential information internally. MFA Comment 3, 5. Many employees would be relegated to working on discrete projects, without understanding the broader implications of their work. *Id.* at 3. Some companies may turn to outside contractors instead of employees for some proprietary functions, because the companies can enter into contractual safeguards with the contractors to protect confidential information. These actions will hurt employees, because they will have less access to information that could help them better do their jobs, and will cause them to miss out on career-advancing learning opportunities that often lead to increased compensation. *Id.*

Employers also likely would restructure compensation agreements to protect confidential information in ways that are less beneficial to employees. For example, rather than providing deferred compensation that

17

employees would forfeit if they competed, employers may provide deferred compensation that employees forfeit if they leave for any reason regardless of whether they compete. *See* MFA Comment 4-5. This could cause employees to stay at their jobs even if they would like to move elsewhere and engage in work for a non-competitor – or cause employees to forfeit the compensation altogether. *Id.* at 5.

Thus, the Rule not only would deprive employees of the many benefits of the agreements, but likely would lead to additional costs and restrictions that ultimately would harm the very employees the Rule claims to protect.

## II. The Rule Exceeds The FTC's Statutory Authority

The FTC invokes two bases for the Rule – Sections 5 and 6(g) of FTC Act. Opening Br. 4-5; *see* 89 Fed. Reg. at 38,346. Neither provides the FTC statutory authority to promulgate substantive unfair-competition rules like the Rule. Any doubts on that score should be resolved against the FTC under the major-questions doctrine, *see Props. of the Villages*, 2024 WL 3870380, at \*6-10 – particularly since the Rule has retroactive effect. Because the FTC does not have the authority to promulgate the Rule, it is contrary to law under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(C).

## A.   Section 6(g) Does Not Authorize The FTC To Make Substantive Competition Rules

The FTC argues that Section 6(g) of the FTC Act, 15 U.S.C. § 46(g), gives it the authority to promulgate binding rules to regulate unfair methods of competition.  Opening Br. 17; *see* 89 Fed. Reg. at 38,349.  As the district court explained, the FTC is wrong.  2024 WL 3879954, at *9-11.

The text of Section 6(g) has a limited scope.  Section 6(g) has been in the FTC Act since Congress first enacted the Act in 1914.   It provides that the FTC may "[f]rom time to time classify corporations and . . . make rules and regulations for the purpose of carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).

By its plain text, Section 6(g) "does not expressly grant the Commission authority to promulgate substantive rules regarding unfair methods of competition"; any rules and regulations issued under Section 6(g) must be to carry out another provision of the FTC Act.  *Ryan*, 2024 WL 3879954, at *9.  Section 6(g) is a "housekeeping" provision that allows the FTC to regulate its own affairs, not an authorization to issue regulations that bind private parties.  *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979)).

The statutory context confirms Section 6(g)'s limited scope.  In Section 5 of the Act, Congress set out a comprehensive statutory scheme for the FTC

19

to address unfair methods of competition through case-by-case adjudication. 15 U.S.C. § 45; *see* p. 22, *infra*.  Then, in Section 6, Congress set out twelve ancillary "[a]dditional powers of [the] Commission."  15 U.S.C. § 46 (title). Those principally are the FTC's investigatory powers and powers to publish reports.  *See id.* § 46(a)-(f), (h)-(j).

Section 6(g) is seventh on the list and starts with the purely procedural power to "[f]rom time to time classify corporations" before including, in its second half, the language on which the FTC now relies.  15 U.S.C. § 46(g).  "[T]he structure and the location of Section 6(g) indicate that Congress did not explicitly give the Commission substantive rulemaking authority under Section 6(g)."  *Ryan*, 2024 WL 3879954, at *10.  It is impossible to believe that Congress intended to grant the FTC the authority to issue substantive rules regulating unfair methods of competition nationwide – or substantive rules governing employment relationships nationwide – in the back half of a provision about classifying corporations.  That is far too big an elephant for that mousehole.  *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001).

Notably, the FTC itself initially disclaimed any authority to issue substantive rules.  *Ryan*, 2024 WL 3879954, at *11.  In 1922, just eight years after the passage of the FTC Act, the Commission told Congress that it

would be a "mistake" to "suppose" that the FTC could "issue orders, rulings, or *regulations* unconnected with any proceedings before it." FTC, *Annual Report* 36 (1922) (emphasis added); *see* FTC, *Oral Statement of Commissioner Andrew N. Ferguson* 2 (Apr. 23, 2024), bit.ly/4jClMXO (Ferguson Oral Statement) (Section 6(g) was originally understood to "confer the power to make procedural rules only").

Subsequent amendments to the FTC Act reflect that understanding. In 1938, Congress amended Section 5 to allow the FTC to regulate "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1). Then in 1975, Congress enacted Section 18, which expressly authorized the FTC to issue binding regulations related to those acts and practices if it followed certain procedural requirements. *See* 15 U.S.C. § 57a. That Congress expressly granted the FTC the power to promulgate rules with respect to unfair or deceptive practices, but not with respect to unfair methods of competition, shows that it intended to exclude the latter. *Ryan*, 2024 WL 3879954, at *9; *see Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002). Further, interpreting Section 6(g) as a broad grant of substantive rulemaking authority would make Section 18 (and its procedural requirements) superfluous. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

The FTC relies on a fifty-year-old D.C. Circuit decision, *National Petroleum Refiners Association v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), to support its view of Section 6(g). Opening Br. 24; *see* 89 Fed. Reg. at 38,350. That decision is not binding on this Court and is out of step with modern jurisprudence. *National Petroleum Refiners* concluded that Section 6(g) gives the FTC the authority to "promulgate substantive rules of business conduct" based on a supposed "need to interpret liberally broad grants of rule-making authority." 482 F.2d at 673, 680. But if there ever was such a canon of construction, it since has long been repudiated by the Supreme Court, which recognizes that agencies have only the powers that Congress expressly granted to them. *E.g.*, *Whitman*, 531 U.S. at 467-68; *see* Ferguson Oral Statement 2. *National Petroleum Refiners* was wrong when it was decided, and it should not be followed now.

### B.    Section 5 Does Not Authorize The FTC To Declare That A Practice Harms Competition In The Aggregate

Because the FTC relies on Sections 5 and 6(g) together to support the Rule, Opening Br. 4-5; *see* 89 Fed. Reg. at 38,349, the lack of authority in Section 6(g) is enough to invalidate the Rule. The district court accordingly did not address Section 5. *See Ryan*, 2024 WL 3879954, at*12. That said, Section 5 also does not support the Rule.

Section 5 authorizes the FTC to prevent a business covered by the FTC Act from engaging in an "unfair method[] of competition."  15 U.S.C. § 45(a)(2).[3]  Section 5 sets out the process the FTC must follow whenever it "ha[s] reason to believe" that a business is using an unfair method of competition:  The FTC must engage in case-by-case adjudication by "issu[ing] and serv[ing]" a "complaint" on the business, holding a "hearing," and issuing a "report in writing," before it can enter a cease-and-desist order.  *Id.* § 45(b).  Section 5, by its terms, does not provide a process for the FTC to categorically prohibit a particular method of competition.

Further, to show that a practice is an unfair method of competition under Section 5, the FTC must show that the practice harms competition.  *E.g.*, *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362-63 (5th Cir. 2008).  The FTC's policy statement on Section 5 makes this clear:  To be an unfair method of competition, a practice must have a "tendency to negatively affect competitive conditions."  FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* 9 (Nov. 10, 2022).

---

[3]  Section 5 does not apply to banks, savings and loans institutions, federal credit unions, common carriers, air carriers, and companies subject to the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.*  *See* 15 U.S.C. § 45(a)(2).

The FTC has not attempted to show that every noncompete agreement harms competition or even has a "tendency" to do so. To the contrary, the FTC admits that individual noncompete agreements can benefit competition, *see* 89 Fed. Reg. at 38,422, and the only time the FTC found that a noncompete agreement restricted competition and tried to defend that finding in court, the Seventh Circuit reversed the FTC's finding as "lacking support in the record," *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837-38 (7th Cir. 1963).

Indeed, the Rule exempts existing noncompete agreements for certain senior executives, 89 Fed. Reg. at 38,439, which implicitly recognizes that noncompete agreements are not always anti-competitive. So the most that the FTC can claim is that noncompete agreements harm competition in the aggregate. Opening Br. 6-7; *see, e.g.*, 89 Fed. Reg. at 38,422. But Section 5 does not speak of aggregate harms or otherwise allow the FTC to regulate one employer's use of a method because of the cumulative effects of other employers' different uses of that method.

## C.    Any Doubts About The FTC's Power To Promulgate The Rule Should Be Resolved Against The FTC

If there was any doubt about the scope of the FTC's authority here, those doubts should be resolved against the FTC under the major-questions doctrine. Under the doctrine, an agency can regulate an issue "of deep

economic and political significance" only if Congress gives the agency "clear" authority to do so.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (internal quotation marks omitted).

The major-questions doctrine applies because the Rule is a "sweeping" new constraint that applies retroactively, *Props. of the Villages*, 2024 WL 3870380, at *9, and across "nearly the entire economy," Ferguson Dissent 12; *see* Ferguson Oral Statement 3 ("There is no doubt that the Final Rule presents a major question.").[4]  The FTC itself estimates that the Rule will invalidate 30 million existing noncompete agreements nationwide and that its economic impact will be hundreds of billions of dollars.  89 Fed. Reg. at 38,343, 38,433.  The FTC argues that Congress contemplated it would promulgate rules with "relatively large economic effects," Opening Br. 36, but it does not identify any existing unfair-competition regulation with the same sweeping and pervasive scope as the Rule.  Indeed, "'[n]o regulation premised on' Sections 5 and 6(g) 'has even begun to approach the size or scope' of the Final Rule."  Ferguson Dissent 19 (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021)).

---

[4]  The district court did not address the major-questions doctrine because it concluded that the FTC clearly lacked the authority to promulgate the Rule.  *See* 2024 WL 3879954, at *12.

The major-questions doctrine also applies because the FTC purported to "discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (internal quotation marks omitted). This is the first time that the FTC has claimed authority under Section 6(g) to issue a substantive rule regulating a purported unfair method of competition in nearly 50 years.[5] The FTC argues that its "core expertise and mandate" includes addressing unfair methods of competition, Opening Br. 36, but that misses the point – the question is whether Congress clearly gave the agency the power to address those methods "in the scope and the manner that it seeks to do with the final rule," *Props. of the Villages*, 2024 WL 3870380, at *9. It did not do so. *Id.*; *see* pp. 18-24, *supra*.

Finally, the major-questions doctrine applies because the FTC seeks to "intrude[] into an area that is the particular domain of state law." *Ala. Ass'n of Realtors*, 594 U.S. at 764; *see* Ferguson Dissent 13. States have regulated noncompete agreements since the Founding era. *See, e.g.*, *Pierce v. Fuller*, 8 Mass. 223 (1811). Each state has developed a robust body of

---

[5] Between 1963 and 1978, the FTC issued rules under Section 6(g) that targeted practices as unfair methods of competition and as unfair or deceptive acts or practices. *See* 89 Fed. Reg. at 38,349-50. That stopped after Congress enacted Section 18 of the FTC Act. *See id.* at 38,350.

case law to determine what types of agreements are allowed and in what circumstances, with only four states generally prohibiting noncompete agreements. *See* 89 Fed. Reg. at 38,424 n.767. In contrast, until this Rule, no federal agency has *ever* sought to categorically regulate noncompete agreements.

This is the first time in its 110-year history that the FTC has used the supposed aggregate harms of a method of competition to categorically prohibit that method nationwide. If Congress had intended to give the FTC that immense power, it would have done so clearly and expressly. "Nothing in the FTC Act comes close to clearing that bar." Ferguson Dissent 14.

### D.   The FTC Lacks Authority To Enact Retroactive Rules

Even if the FTC had authority to make rules regulating unfair competition, it does not have authority to make retroactive rules. A rule has retroactive effect if it "takes away or impairs vested rights[,] . . . creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (internal quotation marks omitted). Here, the Rule is retroactive because it invalidates all existing noncompete agreements, except for those of certain senior executives, 89 Fed. Reg. at 38,439 – thereby "tak[ing] away" rights employers bargained and paid for with

respect to those agreements and requiring employers to rescind and modify the agreements.

Congress must grant an agency authority to make retroactive rules "in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). This standard is "demanding," *INS v. St. Cyr*, 533 U.S. 289, 316-17 (2001); the statutory language must be "so clear that it could sustain only one interpretation," *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997).

The FTC has not pointed to any statutory provision that authorizes it to enact retroactive regulations. The only statutory provisions on which it relies, Sections 5 and 6(g), do not say anything about retroactive rulemaking. *See* 15 U.S.C. §§ 45, 46(g). Instead, the FTC argues that the Rule is not impermissibly retroactive because it only prohibits employers from enforcing existing noncompete agreements going forward, rather than imposing sanctions for past conduct. *See* 89 Fed. Reg. at 38,439.

The FTC takes too narrow a view of retroactivity. Imposing sanctions for past conduct is not the only way a rule can have a retroactive effect; a rule also has retroactive effect if it alters "vested rights" or "imposes a new duty" with respect to transactions "already past." *Landgraf*, 511 U.S. at 269 (internal quotation marks omitted). Here, the Rule would deprive employers across the financial-services industry of the benefits of noncompete

agreements for which they paid millions of dollars in consideration – altering the employers' "vested rights."  The Rule also would require employers across the industry to rescind existing noncompete agreements, modify existing employment contracts, and inform current and former employees of the changes.  Those are "new dut[ies]" with respect to transactions "already past" (*i.e.*, the existing contracts).  The retroactive provisions in the Rule therefore are invalid.

\* \* \* \* \*

For all of these reasons, the Court should affirm the district court's determination that the Rule is unlawful under the APA.  The Court also should affirm the district court's decision to "set aside" the Rule nationwide under 5 U.S.C. § 706(2).  2024 WL 3879954, at \*14.  Under Section 706(2), a court should "hold unlawful and set aside" any agency action that violates the APA.  5 U.S.C. § 706(2).  And as this Court has explained, when a court sets aside unlawful agency action under Section 706(2), that "has nationwide effect," because Section 706(2) "is not party-restricted" and thus the set-aside "affects persons in all judicial districts equally."  *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024).

## CONCLUSION

The district court's judgment should be affirmed.

Dated:  February 10, 2025

Respectfully submitted,

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky
Minh Nguyen-Dang
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
(202) 263-3052
nsaharsky@mayerbrown.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,049 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.


Dated:  February 10, 2025                    */s/ Nicole A. Saharsky*

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:  February 10, 2025          */s/ Nicole A. Saharsky*

## CERTIFICATE OF SERVICE

I certify that on February 10, 2025, I filed the foregoing via the CM/ECF system and the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


Dated:  February 10, 2025                    */s/ Nicole A. Saharsky*