No. 24-10951

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

RYAN, L.L.C.,

*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, ET AL.,

*Intervenor Plaintiffs-Appellees,*

*v.*

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

On appeal from the United States District Court for
the Northern District of Texas, Case No. 3:24-cv-00986

## BRIEF OF *AMICI CURIAE* NATIONAL RETAIL FEDERATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., INTERNATIONAL FRANCHISE ASSOCIATION, ASSOCIATED BUILDERS AND CONTRACTORS, INC., NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, INDEPENDENT ELECTRICAL CONTRACTORS, CONSUMER TECHNOLOGY ASSOCIATION, UNITED STATES COUNCIL FOR INTERNATIONAL BUSINESS, THE HOME CARE ASSOCIATION OF AMERICA, AND THE RESTAURANT LAW CENTER IN SUPPORT OF APPELLEES

Erik W. Weibust     Katherine G. Rigby
Carolyn O. Boucek     A. Millie Warner
EPSTEIN, BECKER & GREEN, P.C.
*Counsel for Amici Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the briefs of the parties and other amici curiae, have an interest in the outcome of this case. These representations are made in order that the judges of the Court may evaluate possible disqualification or recusal.

*Amici Curiae:*
- The National Retail Federation
- Associated Builders and Contractors, Inc.
- The International Franchise Association
- National Association of Wholesaler-Distributors
- The National Federation of Independent Business Small Business Legal Center, Inc.
- Independent Electrical Contractors
- Consumer Technology Association
- United States Council for International Business
- The Home Care Association of America
- The Restaurant Law Center

Counsel: Erik Weibust, Katherine Rigby, A. Millie Warner, and Carolyn O. Boucek of Epstein Becker & Green, P.C.

*/s/ Erik W. Weibust*
Counsel of record for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .........................................i

STATEMENT OF INTEREST OF THE *AMICI CURIAE* ......................vi

STATEMENT CONCERNING PARTIES' CONSENT ..........................xi

STATEMENT CONCERNING MONETARY CONTRIBUTIONS ........xii

I.     PRELIMINARY STATEMENT .......................................................1

II.    INTRODUCTION AND SUMMARY OF ARGUMENTS.............2

III.   ARGUMENT .................................................................................5

    A.   The Commission Cherrypicked Data to Support its Pre-
Set Agenda to Ban Noncompetes While Ignoring Well-
Established Evidence of Their Benefits. ......................................6

        1. Noncompetes are not regularly used for low wage workers. .............7

        2. Noncompetes do not reduce workers' wages...................................9

        3. Noncompetes do not stifle innovation. .........................................13

        4. Employers do not regularly coerce workers into signing
noncompetes. ...............................................................................15

        5. Noncompetes do not harm consumers. ..........................................16

    B.   The Commission's Reasoning is Fallacious, Internally
Inconsistent Confirmation Bias Dressed as "Empirical
Evidence.".................................................................................17

        1. The Commission's Reliance on "Empirical" "Data" is Thin,
Inconsistent, and Highly Suspect.................................................18

        2. The Commission's Reliance on "Qualitative" "Data" from
Worker Comments is Misplaced. .................................................27

        3. In Propounding the Rule, the Commission Shirked One of
the Only Democratic Safeguards to its Rulemaking.....................30

IV.    CONCLUSION ...........................................................................32

CERTIFICATE OF SERVICE.................................................................34

CERTIFICATE OF COMPLIANCE.......................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Chamber of Com. v. SEC,*
   85 F.4th 760 (5th Cir. 2023) ............................................................ 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................... 6

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ........................................................................... 30

*Ryan, LLC v. FTC,*
   2024 WL 387954 (N.D. Tex. Aug. 20, 2024) ................................... 1, 5

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947) ......................................................................... 6

*U.S. v. Garner,*
   767 F.2d 104 (5th Cir. 1985) ........................................................... 6

*U.S. v. Johnson,*
   632 F.3d 912 (5th Cir. 2011) ........................................................... 30

## Statutes and Regulations

5 U.S.C.A. § 553 ................................................................................. 30

5 U.S.C.A. § 706 ................................................................................. 6, 30

16 C.F.R. Par 910 and 912 (May 7, 2024) ................................*passim*

820 ILCS 90/1, *et seq.* ....................................................................... 24

## Other Authorities

*Dissenting Statement of Commissioner Andrew Ferguson*, FEDERAL TRADE COMMISSION (June 28, 2024) .................. 5, 12, 14, 15

*Dissenting Statement of Commissioner Christine Wilson*, FEDERAL TRADE COMMISSION (Jan. 5, 2023) ...................................... 32

Epstein Becker & Green *50-State Noncompete Survey with Healthcare Supplement*, https://resources.ebglaw.com/ 50-state-noncompete-survey-download ..................................... 8, 9, 16

Evan P. Starr, *et al.*, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021) ................................. 11, 26

FEDERAL RESERVE BANK OF MINNEAPOLIS (June 21, 2023), https://www.minneapolisfed.org/ article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers.................................................................................. 25

*FTC Cracks Down on Companies that Impose Harmful Non-Compete Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION (Jan. 4, 2023), https://www.ftc.gov/news-events/ news/press-releases/ 2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers ........................................................... 23

Interview of Lina Khan, CNBC (Apr. 25, 2024) ...................................... 31

Lina M. Khan, "Noncompetes Depress Wages and Kill Innovation," *New York Times* (Jan. 9, 2023)...................................... 10

Matthew Johnson, et al., *The Labor Market Effects of Legal Restrictions on Worker Mobility*. SSRN (2021), https://ssrn.com/ abstract=3455381.............................................. 10, 11

Russell Beck, *et al.,* Comment of Practicing Noncompete Attorneys, FTC-2023-0007-21073 ...................................................... 26

Tyler Boesch, *et al.*, "New data on noncompete contracts and what
they mean for workers," FEDERAL RESERVE BANK OF MINNEAPOLIS
(June 21, 2023), https://www.minneapolisfed.org/article/2023/
new-data-on-non-compete-contracts-and-what-they-mean-for-
workers ............................................................................................ 25

Alfredo Ortiz, "How a group calling itself the 'Small Business
Majority' works to harm small businesses," Washington
*Examiner* (Apr. 4, 2018), https://www.washingtonexaminer.com/
news/business/2775313/how-a-group-calling-itself-the-small-
business-majority-works-to-harm-small-businesses/ ......................... 21

## STATEMENT OF INTEREST OF THE *AMICI CURIAE*

The *amici* are national and international trade organizations and their interest in the outcome of the litigation is that most of their members would qualify as "employers" under the Rule and the Rule would upend their contractual relations with their workforces.

**The National Retail Federation (NRF)** is the world's largest retail trade association, and a stalwart advocate for the people, brands, policies, and ideas that help the $5.3 trillion retail industry thrive. Retail is the largest private-sector employer in the United States, supporting one in four U.S. jobs, approximately 56 million American workers.

**Associated Builders and Contractors, Inc. (ABC)** is a national construction industry trade association representing more than 23,000 members. Founded on the merit shop philosophy, ABC and its 67 Chapters help members develop people, win work and deliver that work safely, ethically and profitably for the betterment of the communities in which ABC and its members work. ABC's membership represents all specialties within the U.S. construction industry and is comprised primarily of firms that perform work in the industrial and commercial sectors.

**The International Franchise Association (IFA)** is an organization of franchisors, franchisees, and franchise suppliers committed to protecting and enhancing franchising. For the past 60 years, IFA has contributed to the growth and stability of franchising by working with franchisors and franchisees on best practices and working alongside agencies including the Federal Trade Commission to develop appropriate, well-supported rules impacting franchises.

**National Association of Wholesaler-Distributors (NAW)** is a leading trade association representing the $8 trillion wholesale-distribution industry. Since its inception in 1946, NAW has worked tirelessly on behalf of national, regional, and state employers, trade associations, and industry stakeholders to develop the warehouse and distribution trade throughout the country.

**The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center)** is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is

the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

**Independent Electrical Contractors (IEC)** is a nonprofit trade association federation with over 50 educational campuses and affiliate local chapters across the country. IEC represents more than 3,600 member businesses that employ over 100,000 electrical and systems workers throughout the United States. The association educates nearly 16,000 electricians and systems professionals each year through world-class training programs. IEC contractor member companies are some of the premier firms in the industry and are responsible for over $10B in gross revenue annually.

**Consumer Technology Association (CTA)** is the trade association representing the $505 billion U.S. consumer technology industry, which supports more than 18 million U.S. jobs. CTA convenes companies of every size and specialty in the technology industry to move us all forward. CTA educates U.S. policymakers to ensure the innovation

economy is protected from laws and regulations that delay, restrict, or ban the development of technologies in all our sectors.

**United States Council for International Business (USCIB)** powers the success of U.S. business across the globe by promoting open markets, competitiveness and innovation, sustainable development, and corporate responsibility. Its members include U.S. based global companies and professional services firms from every sector of the economy, with operations in every region of the world, generating $5 trillion in annual revenues and employing over 11 million workers worldwide. As the U.S. affiliate to several leading international business organizations, including the International Chamber of Commerce (ICC), the International Organisation of Employers (IOE), and Business at OECD, USCIB advances U.S. business interests with policy makers and regulatory authorities across the globe.

**The Home Care Association of America (HCA)** is the home care community's leading trade association—currently representing over 4,600 companies that employ countless caregivers across the United States. HCA's member agencies provide medical, skilled, personal and companion home care, enabling seniors and individuals with disabilities

to remain in their homes at a cost that is more affordable than institutionalized care. HCA's members and their caregivers assist with a variety of non-medical activities of daily living, such as bathing, dressing, eating, and other services necessary for seniors and the disabled to thrive at home. Home care also encompasses private duty nursing, which is medically necessary nursing services under Medicaid caring for medically fragile patients, primarily children.

**The Restaurant Law Center (Law Center)** is the only independent public policy organization created specifically to represent the interests of the food service industry in the courts. This labor-intensive industry is comprised of over one million restaurants and other foodservice outlets employing nearly 16 million people—approximately 10 percent of the U.S. workforce. Restaurants and other foodservice providers are the second largest private sector employers in the United States. Through amicus participation, the Law Center provides courts with perspectives on legal issues that have the potential to significantly impact its members and their industry. The Law Center's amicus briefs have been cited favorably by state and federal courts.

## STATEMENT CONCERNING PARTIES' CONSENT

The *amici* hereby state that their counsel has obtained consent from all parties prior to filing this brief. Accordingly, pursuant to Federal Rule of Appellate Procedure 29(a)(2), the *amici* submit this brief without a motion for leave.

## <u>STATEMENT CONCERNING MONETARY CONTRIBUTIONS</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the *amici* hereby state that no party's counsel authored this brief, either in whole or in part, and that no party or its counsel, or any other person (other than *amici*, their members, and their counsel) made any monetary contribution intended to fund the preparation or submission of this brief.

## I.   <u>PRELIMINARY STATEMENT</u>

The ten *amici* represent thousands of companies that collectively employ tens of millions of employees at all levels across virtually every facet of the U.S. economy. The district court was correct when it held that the Federal Trade Commission's Non-Compete Clause Rule, 16 C.F.R. Part 910 and 912 (May 7, 2024) (the "Rule"), is arbitrary and capricious because it "is based on inconsistent and flawed empirical evidence, fails to consider the positive benefits of noncompete agreements, and disregards the substantial body of evidence supporting these agreements." *Ryan, LLC v. FTC*, 2024 WL 387954, at *13 (N.D. Tex. Aug. 20, 2024). The Rule is based on cherrypicked data that predictably supports the result desired by the Commission's then-majority, while ignoring or summarily dismissing data that contradicts its preferred policy outcome. But the data the Commission selectively chose to credit bears no rational relationship to the *amici*'s centuries of collective experience concerning how employers in their respective industries utilize noncompetes. The Rule is the very definition of arbitrary and capricious rulemaking. The Court should affirm the district court's ruling.

1

## II.    <u>INTRODUCTION AND SUMMARY OF ARGUMENTS</u>

The Commission clearly lacks authority to ban noncompetes. However, to avoid repeating arguments Appellees have made, which the *amici* fully endorse, the *amici* instead focus this brief on the district court's holding that the Rule is arbitrary and capricious.

Specifically, the Rule is contradicted by centuries-old law dating back to the founding of our nation, legal principles that form the bedrock of our justice system, and basic logic. The district court was correct in setting it aside for at least two reasons.

First, the Rule is a textbook example of arbitrary and capricious rulemaking. Whether a method of competition is unfair has always been an individualized assessment in a particular factual context arising among specific workers, employers, and competitors. Here, the Commission deviated from that inquiry and decreed that the test for determining whether noncompetes are unfair is whether they could theoretically result in generalized social outcomes that its then-majority views as negative in the aggregate—ignoring the benefits of permitting employers and employees the freedom to bargain over reasonable post-employment restrictions.

In doing so, the Commission ignores that, since its birth, our nation has maintained a deeply-rooted history and tradition recognizing noncompetes as contractual relationships necessary to protect the legitimate business interests of employers—relationships that have been the province of state law for over 200 years—and assessing those relationships on a case-by-case basis. As with any contract, they are the product of a bargained-for-exchange, the terms of which can be fair and, in some cases, *more than fair* to workers. But, unlike other contracts, courts already subject noncompetes to a reasonableness inquiry and some states impose heightened consideration requirements, all of which is specifically designed and intended to protect workers.

Worse yet, to support its pre-set agenda to ban noncompetes, the Commission's stated reasoning for the Rule is incoherent, relies on cherrypicked data, and ignores the myriad concrete benefits of noncompetes. In other words, despite spending more than a year crafting the Rule after posting the Notice of Proposed Rulemaking ("NPRM"), the best the Commission could manufacture to support its predetermined outcome is a collection of poorly reasoned, self-serving, and aggrandizing conclusions. That is the *sine qua non* of arbitrary and capriciousness.

Second, as an administrative agency, the Commission is led and staffed by unelected bureaucrats who are not politically accountable. The Commission borrows derivative and expressly delegated congressional authority. Such authority is predicated and contingent on the Commission complying with certain procedural safeguards designed to hold administrative agencies like the Commission to public account, such as the public comment period for proposed rulemaking. In mandating the Rule, the Commission shirked this democratic safeguard. The Commission failed to account for significant points made in the public comments that highlight the numerous logical fallacies in the Rule, and either ignored or summarily dismissed a multitude of thoughtful, well-reasoned comments. If the district court's ruling is overturned, the Rule threatens executive accountability.

Because the Rule is the result of demonstrably arbitrary and capricious rulemaking that was plainly intended to reach a predetermined policy outcome, the district court was correct in setting it aside. This decision was appropriate and necessary to avoid the substantial harm the Rule would impose on the hundreds of thousands of American businesses, including the *amici's* members, that appropriately rely on narrowly

tailored noncompetes to protect their sensitive business information, customer relationships, and competitive postures, not to mention the benefits millions of American workers enjoy in exchange for their agreement not to unfairly compete with their former employers for a limited period of time post-employment.

## III.    ARGUMENT

Current Commission Chair (then-Commissioner) Ferguson said it best in his dissent to the Rule: "The Commission justifies the [ ] Rule by relying on academic papers. A handful of economic and sociological studies, it contends, demonstrates that noncompete agreements are universally unfair and anticompetitive. But the evidence on which the Commission relies is nowhere near sufficient to justify this sweeping rule." *Dissenting Statement of Commissioner Andrew Ferguson*, FEDERAL TRADE COMMISSION (June 28, 2024), at 37; *see id.* at 37–44. The district court agreed, holding that the Rule is arbitrary and capricious because it "is based on inconsistent and flawed empirical evidence, fails to consider the positive benefits of noncompete agreements, and disregards the substantial body of evidence supporting these agreements." *Ryan, LLC*, 2024 WL 387954, at *13. Respectfully, that holding should be affirmed.

**A.    The Commission Cherrypicked Data to Support its Pre-Set Agenda to Ban Noncompetes While Ignoring Well-Established Evidence of Their Benefits.**

Agency decisions that are not the product of reasoned decision-making are arbitrary and capricious and must be held unlawful and set aside under the Administrative Procedure Act ("APA"). 5 U.S.C.A. § 706(2)(A); *see e.g.*, *U.S. v. Garner*, 767 F.2d 104, 117–18 (5th Cir. 1985).

The arbitrary and capricious standard under the APA focuses on the rationality (or lack thereof) of the agency's articulated rationale, as opposed to the substance of the decision. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Garner*, 767 F.2d at 104 (citation omitted). Post-hoc explanations "are simply inadequate." *Id.* at 117. Courts may not supply reasoned bases for an agency's decision that the agency failed to provide. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Similarly, courts must not simply accept any stated reason that the agency happens to provide for its decision; agency decisions that fail to consider "an important aspect of the problem" or that run "counter to the evidence before the agency" are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

6

Here, the Commission provided five rationales for the Rule that it claims to have arrived at by assessing a series of academic studies: (1) noncompetes are regularly used for low wage workers; (2) noncompetes reduce workers' wages; (3) noncompetes stifle innovation; (4) employers regularly coerce workers into signing noncompetes; and (5) noncompetes harm consumers. *See* Rule ("R.") 7–21. None of these rationales match the extensive experience of the *amici* in their respective industries, and the district court thus properly found that the Rule is arbitrary and capricious.

## 1. Noncompetes are not regularly used for low wage workers.

In the *amici's* collective experience, low wage workers are almost never subject to noncompetes in their respective industries. Indeed, the *amici* discourage such practices. While there are always outliers, the Commission—which has the burden of supporting its rulemaking with evidence—cites no empirical evidence that the use of noncompetes with low wage workers is the norm, only anecdotes. But low wage workers are only one facet of the workforce. And anecdotes are not evidence of a systemic issue.

Behind the scenes in each of the *amici's* industries, there are all manner of employees who have access to their employers' most sensitive business and technical information, as well as relationships with their employers' vendors and customers. These roles can range from senior executives, to finance, to marketing, to buyers, to information technology, to supply chain, to logistics—and many other roles where employees are compensated well in exchange for agreeing to reasonable noncompetes. If any such employee were free to leave at will, cross the street, and immediately start working for a direct competitor in the same or similar capacity, loss of highly confidential information is virtually inevitable—notwithstanding trade secret law and applicable confidentiality agreements—and by the time it is discovered it is often too late. However, properly tailored noncompetes can protect against such inevitable harm.

Indeed, if protecting low-wage workers were truly the Commission's concern, it could have taken a far more modest approach, as eleven states and the District of Columbia have done, such as limiting the Rule based on some form of generally applicable compensation threshold. *See* Epstein Becker & Green *50-State Noncompete Survey with Healthcare Supplement*, https://resources.ebglaw.com/50-state-noncompete-survey-download. A

full-scale ban goes well beyond what would be appropriate to accomplish the Commission's purported goal of protecting low-wage workers and blindly ignores that the nation's courts have committed to assessing noncompetes on a case-by-case basis for centuries, literally. Given the lack of evidence that noncompetes are regularly used with low-wage workers and the statutory and equitable protections already in place for employees in several states—with more following suit each year, *see id.*—the Rule is akin to using a sledgehammer to kill a fly.

### 2. Noncompetes do not reduce workers' wages.

Second, the Commission misestimates that "the Rule will increase workers' total earnings by an estimated $400 billion to $488 billion over ten years, at the ten-year present discounted value." R. 321. In other words, $40 to $48.8 billion per year.

As an initial matter, this is a far cry from the Commission's initial estimate in the NPRM that the proposed rule "would increase workers' total earnings by *$250 to $296 billion annually*." R. 441 (emphasis added). The Commission attempts surreptitiously to bury this *six-fold decrease* in estimated increased earnings to employees in the middle of its 570-page Rule without any explanation for the discrepancy in a

number that the Commission initially touted as one of the primary bases for the purported need to ban noncompetes, including in a *New York Times* Op-Ed by the then-Chair. *See* Lina M. Khan, "Noncompetes Depress Wages and Kill Innovation," *New York Times* (Jan. 9, 2023), https://www.nytimes.com/2023/01/09/opinion/linakhan-ftc-noncompete.html ("Surveying the literature, F.T.C. economists *conservatively estimate* that noncompetes suppress American workers' income by roughly 3 percent to 4 percent, or $250 billion to $296 billion.") (emphasis added). That, in and of itself, renders the Rule arbitrary and capricious.

Nevertheless, to support this conclusion, the Commission relies predominantly upon a 2023 study, co-authored by a Commission employee, purporting to "find [] that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay." R. 141. The Commission contends that "this study has the broadest coverage" and "is very robust." *Id.* But what the Commission omits is that in an earlier version of this study—the version cited in the NPRM—the authors acknowledged that noncompetes "might increase incentives for firms to invest in training, knowledge creation, and other portable assets … that could increase their workers' productivity and earnings." Matthew

Johnson, Kurt Lavetti, and Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility*. SSRN (2021), https://ssrn.com/abstract=3455381. The same study acknowledged that its findings with respect to the effect of noncompetes on wages were based on a "back of the envelope calculation using an out-of-sample extrapolation," and even then, it only "implies" that banning noncompetes would increase wages. *Id.* Yet that went completely unmentioned in the Rule.

Indeed, as the Commission acknowledges (but then summarily dismisses), there are, in fact, reputable studies showing correlationally exactly the opposite of what the Commission claims—*i.e.*, that workers who are presented with noncompetes before accepting job offers receive *higher wages* and *more training*, and are *more satisfied in their jobs* than those who are not bound by noncompetes. Evan P. Starr, *et al.*, *Noncompete Agreements in the US Labor Force*, 64 J. L. & Econ. 53, 53 (2021). As Chair Ferguson aptly pointed out in his dissent, one of the Commission's own economists assessed that "further research is needed in several areas because the existing empirical literature on non-compete agreements suffers from several importation limitations that raise questions as to whether it has successfully estimated the causal effect of

11

such agreements on mobility, wages, entrepreneurship, and innovation," and another expert on whom the Commission "heavily relies" "warned" that "the data we currently have is woefully inaccurate." *See* Ferguson Dissent at 44. Indeed, Chair Ferguson's dissent called attention to several reputable studies that concluded noncompetes are pro-competitive— studies that the Commission, perhaps unsurprisingly, waived away with nothing more than *ipse dixit* claims regarding the purported effects of alternatives to noncompetes. *Id.* at 38.

Regardless, the Commission's bald conclusion is simply not borne out in the *amici's* experience in their respective industries. To the contrary, employees are often asked to voluntarily sign noncompetes in connection with long term incentive plans, as consideration for discretionary bonuses, or in connection with promotions or generous separation packages. These not only provide consideration for the noncompete, but can be very substantial, which obviously *increases* the recipient's overall compensation. While they may not be "wages" *per se*, these are potentially lucrative forms of compensation that would not be provided in many cases absent the protection of noncompetes.

### 3. Noncompetes do not stifle innovation.

Third, noncompetes do not stifle innovation in the *amici's* respective industries. If noncompetes really did make markets less competitive and discourage new ideas, then, until recently, most innovation in the U.S. would have come from California, North Dakota, and Oklahoma—the only states prohibiting post-employment noncompetes until Minnesota passed legislation doing so in mid-2023. But that is not the case, with many of the more recent hubs of innovation being in states that enforce noncompetes, including Arizona, Massachusetts, Texas, and Utah.

Moreover, the Commission's claim that abolishing noncompetes fosters innovation by removing barriers to information sharing is self-defeating because the Commission simultaneously claims that employers will mitigate the damage a prohibition on noncompetes would cause by swapping noncompetes for other barriers to information sharing, such as nondisclosure agreements ("NDAs") and trade secret protections, without any cogent data to suggest that such other barriers affect innovation differently than noncompetes. *See* District Court Docket, ECF No. 22 ¶ 65. In truth, as Chair Ferguson pointed out in his dissent, the Rule contains evidence that these alternatives are insufficient substitutions

13

for noncompetes, reasoning that, "[i]f alternatives could effectively replicate the benefits of noncompete agreements, these studies would have shown no relationship between noncompete agreements and procompetitive benefits." Ferguson Dissent at 38.

Indeed, banning noncompetes nationwide would likely *weaken* competition, in that new market entrants would be at enhanced risk of having key employees and critical information, techniques, and strategies stripped from them by well-heeled large incumbent companies. One might think the Commission would want to encourage small business formation of this sort.

To be sure, NDAs impose behavioral restrictions on post-employment behavior, while noncompetes impose a structural prohibition insofar as they ban an employee from working in a competitive role for a rival in the first place. As such, NDAs can never be as effective as noncompetes at protecting an employer's confidential information and trade secrets—and the Commission knows it. In fact, the Commission stated before Congress as recently as 2022 that it "strongly disfavor[s] behavioral remedies." *See* Ferguson Dissent at 39–40 (citing Prepared Statement of Fed. Trade Comm'n Before the United States

Senate Committee on the Judicial Subcommittee on Antitrust, Competition Policy and Consumer Rights "Oversight of the Enforcement of the Antitrust Laws," at 6 (Sept. 20, 2022)). Chair Ferguson said it best:

> The Commission's preference for structural relief rather than behavioral relief reflects straightforward concerns. Behavioral remedies are difficult to craft; violations are difficult to detect; and the remedies are complicated and difficult to enforce. The meager evidentiary record in the [Rule] does not justify the dismissal of commenters' analogous concerns about the behavioral alternatives to noncompete agreements.

Ferguson Dissent at 40.

### 4. Employers do not regularly coerce workers into signing noncompetes.

Fourth, it is simply untrue that employers in the *amici's* respective industries regularly coerce employees into signing noncompetes. While there undoubtedly are bad actors, the Commission has cited no evidence that employers regularly—or even often—coerce employees into signing noncompetes. To suggest otherwise ignores that employees often receive substantial consideration in exchange for signing noncompetes, not only in the form of a job, salary, and benefits, but often also equity and other potentially lucrative forms of compensation, as discussed above.

The Commission claims that there is unequal bargaining power between employers and employees. While that may have been true

historically for certain positions, that paradigm has shifted in the post-COVID era, as open positions often outstrip demand among the pool of available employees, and some businesses have been forced to close for lack of staffing. In any event, eight states and the District of Columbia have enacted laws to address this purported inequity by requiring advance notice of noncompetes often weeks before they are to take effect, giving employees time to make informed decisions before accepting new jobs and resigning from old ones, and notice of a right to counsel, all of which address any bargaining-power disparity favoring the employer. *See* Epstein Becker & Green *50-State Noncompete Survey*. Again, if "coercion" were truly the Commission's concern, it could have taken this narrower approach as well.

### 5. Noncompetes do not harm consumers.

Finally, far from harming consumers in the *amici's* respective industries, noncompetes benefit them in various ways. For example, it is a truism in any industry that an increase in the cost of wages—indeed, virtually all increased costs—is passed along to the consumer. Assuming the opposite is illogical.

Indeed, to the extent that noncompetes drive down wages (which the *amici* deny for the reasons outlined above), even the Commission admits

that lower prices are the natural result: "By suppressing workers' earnings, non-competes decrease firms' costs, which firms may theoretically pass through to consumers in the form of lower prices." R. 197. The opposite is indisputably true too; if noncompetes are prohibited, any increase in the cost of wages will likewise be passed along to consumers in the form of higher prices. Again, the Commission acknowledges that "it is theoretically possible that higher labor costs could be passed on to consumers in the form of higher prices," but quickly and curiously dismisses that possibility, summarily concluding that "there are several countervailing effects from prohibiting non-competes that would tend to lower prices." R. 200.

## B.   The Commission's Reasoning is Fallacious, Internally Inconsistent Confirmation Bias Dressed as "Empirical Evidence."

Upon closer inspection, and after wading through the Commission's mire of qualifications and hedges, the Commission's "empirical evidence" is vanishingly thin and self-contradictory. The *amici* initially intended to highlight all the fallacies in the Commission's reasoning, but space constraints preclude them from doing so. Nevertheless, this brief sets out a representative sample of the significant contradictions and fallacies in

17

the Commission's so-called "reasoning" that demonstrates just how arbitrary and capricious the Rule is.

### 1. The Commission's Reliance on "Empirical" "Data" is Thin, Inconsistent, and Highly Suspect.

What the Commission lacks in legal authority, it fails to make up for with either logical principles or cogent quantitative analysis. For instance, when commenters pointed to academic writings, including 2019 research by one of the *Commission's own economists* stating that there was limited evidence about the effects of noncompetes, the Commission responded by noting dismissively that the author wrote in his personal capacity and that "[t]he Commission finds these writings are generally outdated and disagrees with them," R. 152, despite being from 2019 and that the Commission relied on far older data. Yet when faced with anecdotes and conjecture from anonymous and unverified individual commenters that support its preordained outcome, the Commission has no such reservations.

When confronted with issues in the methodologies or resulting conclusions of studies the Commission cites in support of the Rule, the Commission either downplays or altogether denies reliance on those studies in issuing the Rule. To illustrate, the Commission cites a study

suggesting that noncompetes negatively affect the race and gender gap. R. 141. More than fifteen pages later, and only when confronted with a commenter's criticism of its reliance on that study, however, the Commission states that it "does not rest its finding in this Rule that non-competes tend to negatively affect competitive conditions on findings of increased discriminatory behavior or exacerbation of gender and wage gaps." R. 158.

Similarly, despite its earlier bravado that noncompetes affect consumer pricing, the Commission tucked away a note admitting that the empirical literature on the effects of noncompetes on consumer pricing is thin—even thinner than the "evidence" on which the Commission relied with regard to new business formation and innovation (almost all of which had to be qualified and/or was criticized by experts, including the studies' own authors). R. 196. This informational bait-and-switch occurs with so much frequency, the *amici* have difficulty identifying the "empirical evidence" on which the Commission actually relied.

Furthermore, the Commission appears to have selected the studies it chose to credit not based on scientific methodology, but on whether the outcome corresponded with the Commission's pre-set agenda to ban

19

noncompetes. To illustrate, the Commission references Professor Evan Starr 115 times and Professors Norman Bishara and J.J. Prescott another 46 times each in the Rule, yet it cherry-picks which *individual findings* of those studies to credit. The Commission relies extensively on the three professors' seminal noncompete study for its conclusions that noncompetes are used with all manner of employees, R. 15–16; that employees rarely "seek assistance of counsel in connection with non-competes," *id.* 125; and that "employers frequently use non-competes even when they are unenforceable under State law," *id.* 437. Yet the Commission curiously gave only "minimal weight" to that study's conclusion that workers who are presented with noncompetes before accepting job offers receive higher wages and more training, and are more satisfied in their jobs than those who are not bound by noncompetes, because it "does not find that this evidence represents a causal relationship." *Id*; *see also id.* 311.[1]

---

[1] Professor Starr, upon whose research the Commission relied heavily on (if not predominantly) to support the Rule, has submitted an *amicus* brief that purports preemptively to rebut the *amici's* positions herein. ECF No. 66. But it utterly fails to do so. To be sure, Professor Starr's brief reads more like a reactive defense of his own surveys, and those of his fellow academics and Commission staffers (many of whom are openly hostile to noncompetes for ideological reasons), than a neutral, independent analysis of the available literature. Indeed, for his *amicus* submission in the district court, Professor Starr teamed up with a progressive advocacy group masquerading as

Similarly, the Commission gives curiously "little weight" to several other studies showing that noncompete use is associated with higher earnings because they "merely reflect correlation and are unlikely to reflect causation." *Id.* 146. This is a common refrain throughout the Commission's commentary when faced with a study's result it does not care for. *See, e.g., id.* 150, 152, 240, 311, 418.

But in giving this back-of-the-hand treatment to disfavored findings, the Commission overlooks the inconvenient fact that virtually all the studies it chose to cite show correlation—not causation; indeed, the

---

a small business organization that has no actual members (which, incidentally, sought unsuccessfully to intervene here). *See* Alfredo Ortiz, "How a group calling itself the 'Small Business Majority' works to harm small businesses," *Washington Examiner* (Apr. 4, 2018), https://www.washingtonexaminer.com/ news/business/2775313/how-a-group-calling-itself-the-small-business-majority-works-to-harm-small-businesses/. Professor Starr also disregards and seemingly denigrates the centuries of real-world experience of the *amici*—ten organizations representing thousands of companies that collectively employ tens of millions of employees nationwide—claiming that the *amici* have not proffered any actual evidence because they did not also rely exclusively on flawed and biased surveys handed down from ivory towers. Nonsense. And, finally, he (1) ignores many of the *amici's* most compelling arguments outlined herein; (2) cherry-picks the studies he cites and ignores or downplays the results of others, including his own finding referenced above that employees who are provided with notice receive higher wages, more training, and greater job satisfaction than those without noncompetes; (3) remarkably claims that NDAs are just as effective as noncompetes for protecting confidential information and trade secrets (and that irrelevant data on the number of trade secret cases filed somehow supports this), but curiously posits they do not have the same purportedly negative effects on information-sharing and thus innovation; and (4) admittedly relies on information that is outside the record, including numerous hearsay-laden media stories. Professor Starr's prebuttal to the *amici's* arguments should be given little, if any, weight.

21

Commission itself identifies *only one* study it relied upon that even "attempts to identify [a] causal link." R. 284. The Commission's apparent lack of qualms about relying on correlational studies when convenient to support its preferred policy outcome belies its stated rationale for dismissing contrary findings as "merely" correlational.

In what can only be described as a self-serving attempt to explain which studies it chose to weigh more heavily, the Commission states that it "gives more weight to studies with methodologies that it finds are more likely to yield accurate, reliable, and precise results," and then goes on to identify five "guiding principles" that give the Commission virtually unfettered discretion in determining which studies to credit. R. 107–11. Moreover, the Commission acknowledges that "[w]hile these five guiding principles are important indicators of the relative strength of empirical studies evaluated by the Commission for the purpose of this Rule, the Commission's assessment of empirical studies was holistic and relied on its economic expertise." *Id.* 111. In other words, the Commission set its own subjective and unspecified standards for determining which studies to credit, which it may or may not (it does not actually say) have disregarded in favor of an undefined "holistic" assessment based on its

22

purported "economic expertise."[2] Unsurprisingly, this results-oriented "analysis" led to the Commission crediting only those studies that support the worldview its then-Chair has publicly espoused for years.

The Commission's logic is lacking in several other respects. For instance, the Commission cites a study of Hawaii's tech industry noncompete and no-poach ban to make conclusions about noncompetes, dismissing the effect on wages from the no-poach ban as unlikely to have a "major effect" (whatever that means), in part because while no-poach agreements "may prevent some workers from hearing about some job opportunities, [ ] unlike noncompetes, they do not prevent workers from taking those opportunities." R. 155. The Commission must have a very dim view of its audience if it expects anyone to believe that preventing a

---

[2] The Commission claims this purported "expertise" based on its assertion that "non-competes have already been the subject of FTC scrutiny and enforcement actions, so subjecting them to rulemaking is a more incremental—and thus less significant—step than it would be for an agency to wade into an area not currently subject to its enforcement authority." R. 39. What the Commission leaves out, however, is that these three "enforcement actions," all of which ended in consent decrees, were announced just *one day* before it announced the NPRM, which ostensibly was timed so that the Commission could claim such expertise. Indeed, in the press release announcing the enforcement actions, the Commission acknowledged that "these actions mark the first time that the agency has sued to halt unlawful noncompete restrictions." *See FTC Cracks Down on Companies that Impose Harmful Non-Compete Restrictions on Thousands of Workers*, FEDERAL TRADE COMMISSION (Jan. 4, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers.

worker from learning of a job does not also mean preventing the worker from taking it.

Additionally, the Commission asserts that noncompetes have long been "disfavored" as a reason to eliminate them, R. 6, while ignoring that they have nevertheless existed since the nation's founding, and are enforceable in 46 states, because of their recognized value despite how supposedly "disfavored" they may be. The Commission's view that "existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets," R. 5, is fallacious for the reasons set forth above. But even if true, the Rule is not the solution.

Indeed, a number of state legislatures have spent time over the past several years revising their noncompete laws, some recently enough that the statistics upon which the Commission bases its rationale are outdated and not reflective of the current market realities. For instance, the data the Commission used to claim that 30 million workers are subject to noncompetes is from 2019, R. 14, before Illinois passed the Freedom to Work Act, 820 ILCS 90/1, *et seq.* (as just one example), and

before the pandemic changed the landscape of remote work. To further illustrate that the Commission's conclusions are based on outdated data, the most recent data in a study the Commission touts as "very robust" is already a decade old. R. 141.

Better, more recent data has become available, such as a 2023 report issued by the Federal Reserve Bank of Minneapolis that calls into question many of the assumptions in the Commission's analysis, finding, for example, that only 11.4%, not 20–25% (as the Commission claims), of workers are subject to noncompetes. *See* Tyler Boesch, *et al.*, "New data on noncompete contracts and what they mean for workers," FEDERAL RESERVE BANK OF MINNEAPOLIS (June 21, 2023), https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers. Notably, while Minnesota is the only state to ban noncompetes in well over a century, every other state that has considered doing so since 1890 has either enacted compromise legislation that suits the needs of its own economy and preferred socioeconomic outcomes, and balances the interests of *all* stakeholders, or has done nothing.[3]

---

[3] Michigan banned noncompetes in 1905 but repealed the ban in 1985.

Moreover, several of the "studies" the Commission cites are more accurately described as "surveys" that ask employees and employers about their experience with noncompetes, and then extrapolate and draw conclusions from the survey results. *See, e.g.*, Starr, *et al.*, *supra* § A.2. But this methodology has at least one major flaw. Specifically, as the term "noncompete" is a common colloquialism used to refer to all manner of post-employment restrictive covenants, the survey respondents, no matter how sophisticated they are, may not distinguish between noncompetes and other types of post-employment restrictions, claiming to be bound by "noncompetes" when that is not technically accurate. *See* Russell Beck, *et al.,* Comment of Practicing Noncompete Attorneys, FTC-2023-0007-21073, at p. 30.

While the surveys may be designed to avoid this, that is easier said than done, as the Commission itself concedes in another context: "Many of the comments from small businesses, as well as from other commenters, appear to confuse non-competes with other types of agreements, such as non-solicitation agreements or NDAs, and argue that non-competes are needed to prevent former workers from taking the employer's customers or clients or disclosing confidential information."

R. 535. In other words, the Commission relies on surveys that necessarily require those surveyed to fully understand this distinction, and assumes that they do, but dismisses comments from small business owners and others for purportedly not being able to do so.

These examples are only a small subset of the logical and statistical fallacies pervading the Commission's analysis. That the Commission made subjective choices among stale data in support of its pre-set agenda does not a reasoned decision make.

### 2. The Commission's Reliance on "Qualitative" "Data" from Worker Comments is Misplaced.

Perhaps as a nod to the gaping holes in its quantitative analysis, the Commission relies heavily in numerous places on the "qualitative evidence" of the harms of noncompetes as "demonstrated" by workers in the comments to the NPRM, stating that "the comments provide strong support for the Commission's finding that non-competes are exploitative and coercive because they trap workers in jobs or force them to bear significant harms and costs." R. 131; *see also id.* 10–14, 119–121, 127–28, 147–49, 163, 360, 366, 368, 378. The Commission's reliance on certain comments for support, while ignoring and downplaying others, is questionable at best and certainly not grounds to overhaul employment

relationships for hundreds of thousands of employers and tens of millions of employees nationwide.

First, the "exemplary" comments the Commission decided to pull from the 26,000+ submitted are from workers in various industries, such as asphalt sales, power-washing, bartending, etc., as well as from physicians and other professionals. *Id.* 11.[4] While those individuals may bring their personal perspectives and speculations about market conditions and forces, the overwhelming majority of worker-commenters lack the economic and analytic backgrounds to assess the relevant factors on a sociological (or even industrywide) scale or to determine whether a complete ban on noncompetes would actually help their economic condition (as opposed to potential less-draconian regulations).

---

[4] The Commission asserts that "Among these [26,000+] comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes." R. 10. But that is a red herring. It is also unsurprising, if true. It is, of course, far simpler to email a one or two sentence message of support, as many of these 25,000+ commenters did, than to prepare a thoughtful, substantive opposition, as most of the opponents did. Not to mention, the companies that oppose the Commission's efforts are all possible targets of the Commission's enforcement activities—hence the dearth of individual company responses in opposition to the NPRM, and their reliance instead on industry organizations like the *amici* to communicate their views. This implicit threat is likely another reason the Commission announced the resolution of several enforcement actions just one day before announcing the NPRM and kicking off the public comment period—ironic, indeed, given the Commission's stated distaste for the purported *in terrorem* effects of noncompetes.

Second, commenters are neither a monolith in support of a total ban, nor are they necessarily representative of the average worker subject to a noncompete, as the Commission would have the public believe. The Commission claims that thousands of the 25,000 comments supporting the Rule were from workers who have been subject to noncompetes. R. 10. But that figure undoubtedly conflates support for additional regulations of noncompetes with a total ban, or at the very least infers positions from comments that are not necessarily intended.

Third, the Commission overplays worker support of its ban. Although "thousands" of workers submitted supportive comments, R. 10, that is only a miniscule percentage of the *30 million Americans* the Commission claims are subject to noncompetes (less than one tenth of one percent, in fact). Furthermore, the Commission inexplicably ignores the participation bias in that figure because only workers with strong negative experiences are likely to comment publicly. The Commission completely ignored the 29.99 million or so impacted American workers (according to its own count) who lacked strong enough views to comment. Because the worker-commenters are not a random sample, they are not representative of the general population. Additionally, as the Commission

noted, "[f]ew workers who submitted comments reported being compensated for signing a non-compete[,]" R. 123, rendering them poor representatives. Accordingly, the Commission's "strong" reliance on anecdotal evidence of anonymous and unverified commenters is unfounded and irrational.

### 3. In Propounding the Rule, the Commission Shirked One of the Only Democratic Safeguards to its Rulemaking.

The APA sets out strict rulemaking requirements for agencies like the Commission to follow before promulgating legislative rules, like the Rule, which will have the force and effect of law. 5 U.S.C.A. § 553. It is a three-step process starting with (1) the agency issuing a notice of proposed rulemaking, followed by (2) notice of a public comment period, and finished with (3) the agency considering and responding to significant comments received during the public comment period. *Id.*; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). The process is designed to "assure fairness and mature consideration of rules having a substantial impact on those regulated." *U.S. v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) (citation omitted). And yet, the Commission ignored the APA in numerous respects.

30

First, the exception for senior executives containing both a salary threshold and a policy-making duties test was not in the NPRM and, therefore, was not subject to public comment or the procedural safeguards inherent therewith. And the Commission cannot explain why future noncompetes with senior executives are so egregious as to warrant banning forevermore, yet existing noncompetes with the same class of employee are fine. Indeed, this "exception" is so ambiguous and poorly conceived that even the then-Chair does not fully understand it.[5]

Second, where, as here, the agency blindly maintains commitment to its position that noncompetes should be banned despite evidence in the comments undermining its rationale, the agency fails to demonstrate that the proposed rule is a product of reasoned decision-making. *See, e.g.*, *Chamber of Com. v. SEC*, 85 F.4th 760, 777–80 (5th Cir. 2023).

---

[5] During an interview on CNBC, the Commission's then-Chair said the following in response to a question about the use of noncompetes with television personalities, who are decidedly not "senior executives" under the Rule: "[I]f you have a current contract that reflects the fact that this noncompete is in the contract, your compensation package probably also reflects that, *we don't want to disturb that because we realized that for people who are, you know, doing very well for themselves, who are well-situated to bargain the contract, and the compensation already reflects the value of the noncompete*." Interview of Lina Khan, CNBC (Apr. 25, 2024) (emphasis added), https://www.cnbc.com/2024/04/25/cnbc-transcript-ftc-chair-lina-khan-speaks-with-cnbcs-andrew-ross-sorkin-on-squawk-box-today.html. But while that is an accurate factual statement, and perhaps should be the policy, it is not what the Rule actually says. Not even close.

As it stands, the Commission is a regulating body consisting of unelected political appointees and staffed by career bureaucrats that has shirked one of the only democratic safeguards on its otherwise unfettered authority. Just as former Commissioner Wilson said way back on January 5, 2023, in her dissent to the NPRM, the *amici* are, and respectfully submit that the Court should be, "dubious that three unelected technocrats have somehow hit upon the right way to think about non-competes, and that all the preceding legal minds to examine this issue have gotten it wrong. The current rulemaking record does not convince [the *amici*] otherwise." *Dissenting Statement of Commissioner Christine Wilson*, FEDERAL TRADE COMMISSION (Jan. 5, 2023) at 3. Nor should it the Court.

## IV.    <u>CONCLUSION</u>

The district court's ruling that the Rule is arbitrary and capricious should be affirmed.

Dated: February 10, 2025

Respectfully submitted,

*/s/ Erik W. Weibust*

Erik W. Weibust
Katherine G. Rigby
EPSTEIN, BECKER & GREEN, P.C.
125 High Street, Suite 2114
Boston, Massachusetts 02100
Tel: 617-603-1090
eweibust@ebglaw.com
krigby@ebglaw.com

Carolyn O. Boucek
EPSTEIN, BECKER & GREEN, P.C.
227 W. Monroe Street, Suite 4500
Chicago, Illinois 60606
Tel: 312-499-1486
cboucek@ebglaw.com

A. Millie Warner
EPSTEIN, BECKER & GREEN, P.C.
875 Third Avenue
New York, New York 10022
Tel: 212-351-4752
mwarner@ebglaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I electronically filed the foregoing with the Clerk of Court of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served via the CM/ECF system. Counsel for all parties waived service of paper copies in lieu of electronic service via the CM/ECF system.

Dated: February 10, 2025

*/s/ Erik W. Weibust*
Erik W. Weibust

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,459 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6); it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 using 14-point Century Schoolbook font.

Dated: February 10, 2025

*/s/ Erik W. Weibust*
Erik W. Weibust