No. 24-10951

―――――――――――――――

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――――――――――――

RYAN, L.L.C.,

Plaintiff-Appellee,

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; BUSINESS ROUNDTABLE;
TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,

Intervenor-Plaintiffs-Appellees,

v.

FEDERAL TRADE COMMISSION,

Defendant-Appellant.

―――――――――――――――

On Appeal from the United States District Court
for the Northern District of Texas
(Honorable Ada Brown, District Judge)

―――――――――――――――

**BRIEF OF ATS TREE SERVICES, LLC AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLEE AND INTERVENOR-
PLAINTIFFS-APPELLEES URGING AFFIRMANCE**

―――――――――――――――

LUKE A. WAKE
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
LWake@pacificlegal.org

JOSHUA M. ROBBINS
SEAN J. RADOMSKI
Pacific Legal Foundation
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Telephone: (202) 945-9524
Fax: (916) 419-7747
JRobbins@pacificlegal.org
SRadomski@pacificlegal.org

*Counsel for Amicus Curiae
ATS Tree Services, LLC*

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons are entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- ATS Tree Services, LLC, *Amicus Curiae*

- Adam Servin, *Owner, ATS Tree Services, LLC*

- David Servin, *Owner, ATS Tree Services, LLC*

- Pacific Legal Foundation

- Joshua M. Robbins, *Counsel for Amicus Curiae ATS Tree Services, LLC*

- Sean Radomski, *Counsel for Amicus Curiae ATS Tree Services, LLC*

- Luke Wake, *Counsel for Amicus Curiae ATS Tree Services, LLC*

DATED: February 10, 2025.

<u>s/ *Joshua M. Robbins*</u>
JOSHUA M. ROBBINS
*Counsel for Amicus Curiae*
*ATS Tree Services, LLC*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae ATS Tree Services, LLC states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .........i

CORPORATE DISCLOSURE STATEMENT ...........................................ii

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF IDENTIFICATION .....................................................1

STATEMENT OF AUTHORSHIP AND FUNDING ..............................3

SUMMARY OF ARGUMENT ................................................................4

ARGUMENT ...........................................................................................6

I. THE COMMISSION LACKS THE AUTHORITY TO MAKE SUBSTANTIVE RULES FOR UNFAIR METHODS OF COMPETITION....................................................................................6

   A. The Text of the FTC Act Does Not Authorize Substantive Rulemaking for Unfair Methods of Competition ........................7

   B. The Historical Practice of the Commission and Congress Confirms the Lack of Substantive Rulemaking Authority.......10

   C. The Supreme Court Interpreted the FTC Act as Limited to Adjudication................................................................................13

   D. *National Petroleum* Was Wrongly Decided................................13

   E. Subsequent Amendments to the FTC Act Confirm the Commission Lacks Substantive Unfair Method of Competition Rulemaking Authority..........................................15

     1.The 1975 Amendments Were a New Grant of Substantive Rulemaking Authority Only for UDAPs................................16

     2.Congress Did Not Ratify the Commission's Substantive Rulemaking Through Section 46(g) .....................................19

     3.The 1980 Amendments Were Procedural Not Substantive............................................................................21

D. *Airlines for America v. Dept. of Transp.* Is Inapposite ............. 22

II. THE FTC ACT DOES NOT AUTHORIZE THE COMMISSION TO BAN ALL NON-COMPETE AGREEMENTS AS UNFAIR METHODS OF COMPETITION ...................................................... 23

III. THE FTC ACT UNCONSTITUTIONALLY DELEGATES LEGISLATIVE POWER TO THE COMMISSION ......................... 30

CONCLUSION ................................................................. 34

CERTIFICATE OF COMPLIANCE ....................................... 35

CERTIFICATE OF SERVICE ............................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
  295 U.S. 495 (1935).................................................................... *passim*

*Airlines for America v. Department of Transportation,*
  --- F.4th ---, 2025 WL 313998 (5th Cir. Jan. 28, 2025)........... 22–23, 32

*Am. Trucking Ass'ns v. United States,*
  344 U.S. 298 (1953)................................................................. 9

*ATS Tree Services, LLC v. FTC,*
  No. 2:24-cv-01743 (E.D. Pa.) ................................................. 2

*Corley v. United States,*
  556 U.S. 303 (2009).................................................... 12, 17

*E.I. du Pont de Nemours & Co. v. FTC,*
  729 F.2d 128 (2d Cir. 1984) .................................................... 24

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).......................................................... 7–8

*Federal Power Commission v. Texaco, Inc.,*
  377 U.S. 33 (1964).................................................................. 14

*FTC v. Bunte Bros. Inc.,*
  312 U.S. 349 (1941)............................................................ 11

*FTC v. Sperry & Hutchinson Co.,*
  405 U.S. 233 (1972) ............................................................... 8

*Holder v. Martinez Gutierrez,*
  566 U.S. 583 (2012)........................................................... 20

*ICC v. Cincinnati, N. O. & T. P. Ry. Co.,*
  167 U.S. 479 (1897).............................................. 22, 32–33

*Jama v. ICE*,
    543 U.S. 335 (2005) ............................................................... 16, 19–20

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ...................................................................... 8

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ................................................................... 14

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ................................................................... 33

*Mourning v. Family Publications Service, Inc.*,
    411 U.S. 356 (1973) ................................................................... 15

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ................................................................... 14

*National Petroleum Refiners Association v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ...................................... *passim*

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................... 8

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ................................................................ 7, 14

*NLRB v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974) ................................................................ 19, 21

*Sackett v. EPA*,
    598 U.S. 651 (2023) ................................................................... 21

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of
Eng'rs*,
    531 U.S. 159 (2001) ................................................................... 33

*Texas v. Trump*,
    --- F.4th ---, 2025 WL 381581 (5th Cir. Feb. 4, 2025) ............ 8

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ...................................................................... 32

*United States v. Storer Broad. Co.,*
 351 U.S. 192 (1956) ............................................................ 14

*Wayman v. Southard,*
 23 U.S. (10 Wheat.) 1 (1825) ............................................ 30

*Whitman v. Am. Trucking Ass'ns,*
 531 U.S. 457 (2001) .......................................................... 30

## U.S. Constitution

U.S. Const. art. I, § 1 ........................................................... 30

## Statutes

15 U.S.C. § 45 ............................................................... *passim*

15 U.S.C. § 45(a)(1) ....................................................... 23–24

15 U.S.C. § 45(a)(2) ............................................................ 10

15 U.S.C. § 45(b) ......................................................... *passim*

15 U.S.C. § 45(l) ................................................................ 10

15 U.S.C. § 45(m) ............................................................. 10

15 U.S.C. § 46 ........................................................... 8–9, 17

15 U.S.C. § 46(g) ........................................................ *passim*

15 U.S.C. § 57a .......................................................... 12, 17

15 U.S.C. § 57a(a) .............................................................. 16

15 U.S.C. § 57a(a)(2) ...................................................... 17–18

15 U.S.C. § 57a(b)–(c) ........................................................ 16

15 U.S.C. § 57a(e) .............................................................. 16

49 U.S.C. § 40113(a) .......................................................... 23

49 U.S.C. § 41712 ............................................................ 22–23

Federal Trade Commission Act, ch. 311, § 5,
38 Stat. 717, 720 (1914) ......................................................... 9

Federal Trade Commission Improvements Act of 1980,
Pub. L. No. 96-252, 94 Stat. 374 (1980),
*codified at* 15 U.S.C. § 57b-3 ........................................... 21

Flammable Fabrics Act, Pub. L. No. 83-88,
67 Stat. 111 (1953) ............................................................... 12

Fur Products Labeling Act, ch. 298, § 8, 65 Stat. 175 (1951) ................. 12

Magnuson-Moss Warranty-Federal Trade Commission
Improvement Act, Pub. L. No. 93-637, § 202,
88 Stat. 2183 (1975) ................................................... *passim*

Wood Products Labeling Act of 1939, ch. 871, § 6,
54 Stat. 1128 ........................................................................ 12

## Regulation

Non-Compete Clause Rule, 89 Fed. Reg. 38,342
(May 7, 2024) ............................................................. *passim*

## Other Authorities

Annual Report of the Federal Trade Commission (1922) ...................... 11

*Any*, Black's Law Dictionary (4th ed. 1968)................................. 18

David Servin Comment, Dkt. FTC-2023-0007-9772 ..................... *passim*

Jeffers, Jessica S., *The Impact of Restricting Labor Mobility
on Corporate Investment and Entrepreneurship*,
37 Rev. Fin. Stud. 1 (2024) ................................................ 26

Johnson, Matthew S. & Lipsitz, Michael, *Why are Low-Wage
Workers Signing Noncompete Agreements?*,
57 J. Hum. Res. 689 (2022)............................................... 26

Merrill, Thomas W., *Antitrust Rulemaking: The FTC's
Delegation Deficit*, 75 Admin. L. Rev. 277 (2023) .................... 9, 11–12

Merrill, Thomas W. & Watts, Kathryn Tongue, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467 (2002) ..................................................... *passim*

*Prevent, Black's Law Dictionary* (4th ed. 1968) ..................................... 10

S. Conf. Rep. 93-1408 § 201 (1974) ........................................... 18

Starr, Evan, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete*, 72 I.L.R. Rev. 783 (2019) .................................... 25

U.S. Small Business Administration Office of Advocacy Comment, Dkt. FTC-2023-0007-21110 ....................................... 24–25

## STATEMENT OF IDENTIFICATION

ATS Tree Services, LLC files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief. ATS is a professional tree service business in Perkasie, Pennsylvania. As a small business, ATS operates on the basis of a mutual commitment between itself and its employees. ATS heavily invests in the training and professional development of its employees to ensure they have the skills necessary to engage in dangerous tree care work. In exchange, ATS requires its employees to sign reasonable non-compete agreements to protect ATS's significant investment. These agreements give ATS at least a year before the benefit of ATS's training can be used to the advantage of a nearby direct competitor while still allowing former ATS employees to pursue other opportunities. Without this agreement, it would not be feasible for ATS to invest in employee training in the same way because of the significant likelihood its well-trained employees would be poached by competitors. A ban on non-compete agreements would seriously harm both ATS and its employees—ATS would lose its stable, well-trained workforce that safely and proficiently performs tree care work, and the employees would lose

the benefit of the training and other professional development opportunities that they could otherwise use throughout their careers.

To protect this operational model, ATS filed its own legal challenge in the U.S. District Court for the Eastern District of Pennsylvania to the Federal Trade Commission's Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Final Rule"). *ATS Tree Services, LLC v. FTC*, No. 2:24-cv-01743 (E.D. Pa.). Since the district court in this case set aside the Final Rule nationwide, ROA.5612-5638, there is no relief for the Eastern District of Pennsylvania to award ATS while the district court's judgment is effective. As a result, ATS voluntarily dismissed its case. Plaintiff's Notice of Voluntary Dismissal, ECF No. 92, *ATS*, No. 2:24-cv-01743 (Oct. 4, 2024).

ATS files this amicus brief to continue to press its arguments in opposition to the Final Rule's near-total ban on non-compete agreements. In particular, ATS provides insight into the fair use of non-compete agreements by small businesses, a category of business that relies on non-compete agreements for their successful operation.

## STATEMENT OF AUTHORSHIP AND FUNDING

This amicus brief was not authored in whole or in part by counsel for any party. No party or counsel for a party, and no person other than Amicus or its counsel, contributed money to fund this brief's preparation or submission.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's judgment setting aside the Final Rule because the Commission has neither statutory nor constitutional authority to promulgate it. The Commission claims the authority to issue sweeping legislative rules governing what it deems to be unfair methods of competition. But the Federal Trade Commission Act ("FTC Act") limits the Commission's authority to adjudicating the unfairness of particularized methods of competition. Even if the Commission had the statutory authority to issue such rules, the rules must be limited to conduct that is unfair, which the Final Rule does not do. Moreover, as the Supreme Court already determined in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532–34 (1935), rulemaking based on a statutory standard of fairness is an unconstitutional delegation of legislative authority. For these reasons, among others, the Commission does not have the authority to issue the Final Rule.

First, Congress has only granted the Commission statutory authority to *adjudicate* unfair methods of competition, not to make legislative rules. The FTC Act requires that if the Commission identifies

a potential unfair method of competition, it "shall" proceed through an adjudication. 15 U.S.C. § 45(b). It separately authorizes the Commission to make procedural rules for these adjudications and other interpretive rules or general statements of policy. 15 U.S.C. § 46(g). The Commission operated without making substantive competition rules for nearly all of its 110 years in existence. Congress confirmed this understanding in 1975 when it authorized substantive rulemaking for a separate category of conduct.

Second, the FTC Act limits the Commission to declaring only *unfair* methods of competition to be unlawful. With the Final Rule, the Commission banned many fair and reasonable non-compete agreements used by small businesses to protect their investments in their employees. For example, ATS uses non-compete agreements to make it feasible to provide extensive employee training in the dangerous work of tree care and removal. Without these reasonable agreements, ATS would simply become a free training program for its direct competitors, something ATS cannot afford to be. Indeed, the Commission acknowledged in the Final Rule that non-compete agreements promote employee training.

Third, a statute that permits the Commission to create legislative rules for competition with no more direction than the word "unfair" is an unconstitutional delegation of legislative authority. In *Schechter Poultry*, the Supreme Court already invalidated a statute that authorized the President to adopt codes of fair competition. In doing so, the Court distinguished as permissible the Commission's authorization to proceed against unfair methods of competition because it did so through adjudications. For the Commission to now claim that it can also issue legislative rules for unfair methods of competition puts itself squarely within the holding of *Schechter Poultry*.

## ARGUMENT

## I.     THE COMMISSION LACKS THE AUTHORITY TO MAKE SUBSTANTIVE RULES FOR UNFAIR METHODS OF COMPETITION

The Commission claims substantive rulemaking authority through section 46(g) of the FTC Act to ban any method of competition whenever any three Commissioners should conclude such practice is "unfair." 89 Fed. Reg. at 38,502. But the FTC Act does not permit the Commission to make substantive, legally binding rules for "[u]nfair methods of competition" ("UMC"). *See* 15 U.S.C. §§ 45, 46(g). The Commission was created to address UMCs through adjudications. *Id.* § 45(b); *Schechter*

*Poultry*, 295 U.S. at 532–34. Congress also granted the Commission, among other ancillary powers, limited authority to create procedural rules for these adjudications. 15 U.S.C. § 46(g). The Commission cannot rely on this procedural rulemaking authority to make substantive rules. *See NFIB v. OSHA*, 595 U.S. 109, 117 (2022).

## A. The Text of the FTC Act Does Not Authorize Substantive Rulemaking for Unfair Methods of Competition

Section 46(g) cannot be interpreted to authorize substantive competition rulemaking. The Commission asserts that section 46(g) empowers it to "'carry[] out'" section 45's directive to "'prevent'" UMCs through rulemaking. Doc. 41 at 20–22. But the correct interpretation of section 46(g) must take account of section 45's mandate for the Commission to "prevent" UMCs through adjudications. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). It is a "'fundamental canon of statutory construction'" that the relevant statutory text "'must be read ... with a view to [its] place in the overall statutory scheme.'" *Id.* Section 45(b) is explicit that if the Commission identifies a UMC, it "*shall* issue and serve ... a complaint stating its charges" and "a notice of a hearing." 15 U.S.C. § 45(b) (emphasis added). The use of "'shall'" "normally creates an obligation impervious to judicial

discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998). It demonstrates that Congress intended for adjudications to be the exclusive means for the Commission to proceed against unfair methods of competition. *See id.*; 15 U.S.C. § 45(b). That is the only way to "interpret the statute 'as a symmetrical and coherent regulatory scheme.'" *Brown & Williamson*, 529 U.S. at 133.

Section 46(g) also contains language that limits its rulemaking authority to procedural rules. Section 46(g) rules can only be issued for "carrying out the provisions" of the FTC Act. "[C]arrying out" presupposes there is a separate operative provision of the statute the rules implement—here, the power to prevent UMCs through adjudications. *See Nebraska v. Su*, 121 F.4th 1, 8 (9th Cir. 2024); *see also Texas v. Trump*, --- F.4th ---, 2025 WL 381581, at *3–4 (5th Cir. Feb. 4, 2025). And the Supreme Court has consistently recognized that the Commission's adjudicative function is an essential component of its implementation of Congress's declaration of UMCs to be unlawful. *See, e.g.*, *Schechter Poultry*, 295 U.S. at 532–34; *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972). Thus, section 46 is best read as

"enumerat[ing] additional powers that generally aid in the administration of that adjudication-focused scheme." ROA.5626-5627.

Additionally, the Commission lacks an enforcement mechanism for section 46(g) rules, including statutory penalties for violations. *See* 15 U.S.C. §§ 45–46. This is a key indicator that a statute does not grant substantive rulemaking authority. ROA.5628-5629; *see also Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953). Historically, Congress withheld enforcement authority when it was only granting *procedural* rulemaking authority. *See* Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 504–09 (2002). The Supreme Court has also linked substantive rulemaking with the presence of enforcement authority. *Am. Trucking*, 344 U.S. at 311. When section 46(g) was originally enacted in 1914, the Commission could not even issue final orders. Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 717, 720 (1914); Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 297 (2023). The Commission has gained enforcement authority over time for section 45 orders and violations of

substantive rules banning unfair or deceptive acts or practices ("UDAP"), but *not* for section 46(g) rules. *See* 15 U.S.C. § 45(*l*), (m).

Finally, the FTC Act's command for the Commission to "prevent" UMCs in section 45's adjudication authorization does not change the analysis. 15 U.S.C. § 45(a)(2). Among the definitions of "prevent" is "[t]o stop or intercept the approach, access, or performance of a thing." *Prevent, Black's Law Dictionary* (4th ed. 1968). The Commission's adjudications do just that for UMCs. 15 U.S.C. § 45(b). The only remedy in an adjudication is a cease-and-desist order, which is necessarily prospective. *Id.* These orders "prevent" a UMC from continuing. *Id.* § 45(a)(2). The Commission's cease-and-desist orders fulfill its mandate to "prevent" UMCs. *Id.* § 45(b).

## B. The Historical Practice of the Commission and Congress Confirms the Lack of Substantive Rulemaking Authority

For the first nearly fifty years of the Commission's existence, neither Congress nor the Commission understood the Commission to have substantive rulemaking authority. *See* Merrill & Watts, *supra*, at 549–52. The Commission did not issue its first substantive rule until 1963. *Id.* at 551–52; 89 Fed. Reg. at 38,349. But during that period the Commission demonstrated an interest in rulemaking by issuing non-

binding and interpretive rules. Merrill & Watts, *supra*, at 551–52. The issuance of non-binding, but *not* substantive, rules in this period reflects the Commission's understanding that it did not possess substantive rulemaking authority. This "want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred." *FTC v. Bunte Bros. Inc.*, 312 U.S. 349, 352 (1941). Indeed, the Commission said outright in its 1922 Annual Report that "[o]ne of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it." Annual Report of the Federal Trade Commission 36 (1922).

Congress confirmed the Commission's lack of general rulemaking authority by granting the Commission discrete rulemaking authority. During this same roughly fifty-year period, Congress authorized the Commission to make substantive rules for particular issues, including wood and fur products labeling and flammable fabrics. Merrill, *supra*, at 301. These rulemaking authorizations were not directions for the Commission to exercise rulemaking authority under section 46(g) but were stand-alone authorizations to make substantive rules in

furtherance of their respective statutes. Wood Products Labeling Act of 1939, ch. 871, § 6, 54 Stat. 1128, 1131; Fur Products Labeling Act, ch. 298, § 8, 65 Stat. 175, 179–80 (1951); Flammable Fabrics Act, Pub. L. No. 83-88, 67 Stat. 111, 112–13 (1953). Interpreting section 46(g) to authorize substantive rulemaking authority would impermissibly render these statutes superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009).

The Commission's brief period of unauthorized substantive rulemaking from 1963 to 1978 does not alter this analysis. 89 Fed. Reg. at 38,349–50. These rulemakings had no congressional authorization. Merrill & Watts, *supra*, at 551–52. The subject of these rulemakings was generally advertising and labeling, 89 Fed. Reg. at 38,349–50, subjects that today are covered by UDAP rulemakings, *see* Merrill, *supra*, at 305; 15 U.S.C. § 57a. Additionally, Congress affirmatively intervened to overrule one of these rules, implicitly rejecting the Commission's exercise of substantive rulemaking authority. Merrill, *supra*, at 302; Merrill & Watts, *supra*, at 553–54. Finally, the Commission did not issue any further substantive UMC rules through section 46(g) from 1978 until the Final Rule, another nearly 50-year span. *See* 89 Fed. Reg. at 38,349–50.

## C. The Supreme Court Interpreted the FTC Act as Limited to Adjudication

In addition to the (historic) Commission and Congress, the Supreme Court does not consider section 46(g) to authorize substantive rulemaking. *Schechter Poultry*, 295 U.S. at 532–33. In *Schechter Poultry*, the Court held that the National Industrial Recovery Act's ("NIRA") authorization for the President to adopt codes of "fair competition" was an unconstitutional delegation of legislative authority. *Id.* at 531, 541–42. The Court distinguished the Commission from the NIRA because the meaning of the phrase "unfair methods of competition" was "left to judicial determination [by the Commission] as controversies arise[,]" *not* rulemaking. *Id.* at 532. The Commission's structure as an exclusively adjudicatory agency was essential to the Court's reasoning in *Schechter Poultry*. *Id.* at 533–34. Indeed, the Court emphasized that the "procedure," in addition to the "subject-matter," distinguished the Commission from the NIRA. *Id.*

## D. *National Petroleum* Was Wrongly Decided

The Final Rule relies heavily on the D.C. Circuit's decision in *National Petroleum Refiners Association v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), to support its substantive rulemaking authority, but that decision

was wrong when it was decided. 89 Fed. Reg. at 38,350–51. *National Petroleum* held that the Commission had the authority to promulgate substantive rules pursuant to section 46(g). 482 F.2d at 678. But *National Petroleum* is not the law in the Fifth Circuit, has never been addressed by the Supreme Court, and should not be followed by this Court.

*National Petroleum* decided to "liberally [] construe" section 46(g)'s rulemaking authorization in order to "further[]" the "broad, undisputed policies" underlying the FTC Act. *Id.* at 678, 686. This is an outdated mode of analysis, especially after the directive in *Loper Bright Enterprises v. Raimondo* that courts must "independently" decide the scope of delegated authority. 603 U.S. 369, 395 (2024). And worse, it ignored the foundational precept that agencies "possess only the authority that Congress has provided." *NFIB*, 595 U.S. at 117.

*National Petroleum* also generally misapplied the main cases on which it relied. 482 F.2d at 678–81. *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 215–20 (1943), addressed the scope and specificity of rulemaking authority as to certain activities. *United States v. Storer Broad. Co.*, 351 U.S. 192, 202–03 (1956), and *Federal Power Commission v. Texaco, Inc.*, 377 U.S. 33, 39–42 (1964), addressed whether agencies

could promulgate substantive rules that would serve as a threshold for whether non-compliant regulated entities received a hearing. And *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 371–73 (1973), addressed whether or to what extent a grant of rulemaking authority was limited by other statutory provisions. None of these cases engaged with whether the rulemaking authority at issue was substantive or procedural in a manner that supported the conclusion in *National Petroleum*. *See* Merrill & Watts, *supra*, at 556. But that is the threshold question here.

### E. Subsequent Amendments to the FTC Act Confirm the Commission Lacks Substantive Unfair Method of Competition Rulemaking Authority

Congress's authorization of substantive rulemaking authority for UDAPs in 1975 confirms that the Commission did not have substantive rulemaking authority through section 46(g). *See* Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193–98 (1975) (the "1975 Amendments"). After the Commission's brief period of unauthorized rulemaking and *National Petroleum*, *see supra* Part I.B, D, Congress settled the confusion by giving the Commission—for the first time—substantive rulemaking authority

*only* for UDAPs, 88 Stat. at 2193–98. This new grant of rulemaking authority cannot have ratified the Commission's prior interpretation or *National Petroleum* because Congress materially modified section 46(g). *See Jama v. ICE*, 543 U.S. 335, 349 (2005). And subsequent *procedural* amendments to the FTC Act in 1980 did not alter the scope of Congress's *substantive* rulemaking authorization. *See infra* Part I.E.3.

### 1. The 1975 Amendments Were a New Grant of Substantive Rulemaking Authority Only for UDAPs

The 1975 Amendments were an original grant of rulemaking authority for UDAPs. Section 57a(a) authorizes the Commission to "prescribe" "interpretive rules and general statements of policy" as well as "rules which define with specificity acts or practices which are [UDAPs]." 15 U.S.C. § 57a(a). This is drafted as an entirely new rulemaking authorization, rather than an amendment to section 46(g). *Id.* It requires the Commission to follow specific procedural requirements—including allowing for an "informal hearing" with interested parties. *Id.* § 57a(b)–(c). It also created a judicial review scheme, which does not exist for section 46(g) rules. *Id.* § 57a(e). There is nothing about the rulemaking authorization that indicated Congress was legislating against the backdrop of preexisting substantive rulemaking

authority in section 46(g). If it was, the procedural requirements and judicial review provisions could simply have been appended to section 46(g). As written, section 57a would be entirely pointless if the Commission already possessed substantive rulemaking authority through section 46(g). *See* ROA.5631-5632; *Corley*, 556 U.S. at 314.

The savings clause in the 1975 Amendments further confirmed that the 1975 Amendments newly granted substantive rulemaking authority and excluded UMCs. The savings clause distinguishes section 57a from section 46(g) as a source of substantive rulemaking authority. 15 U.S.C. § 57a(a)(2). It makes section 57a the exclusive means for the Commission to make UDAP rules. *Id.* Then it states that the new rulemaking authorization does not affect "any authority" the Commission has "to prescribe rules (including interpretive rules), and general statements of policy, with respect to [UMCs]." *Id.* This language does not grant the Commission any rulemaking authority; it simply references preexisting authority. ROA.5632. It is most naturally read to refer to the preexisting scope of rulemaking authority as established by sections 45 and 46, not as an acknowledgment that the Commission has all possible rulemaking authority for UMCs. The word "any" is defined as "[s]ome; one out of

many; an indefinite number." *Any*, Black's Law Dictionary 120 (4th ed. 1968). As such, it does not provide definition to the extent of the authority to which it is referring; here, that is determined by section 46(g). Finally, "any" is not further clarified by the rest of the savings clause. The text simply uses the words "rules" and "general statements of policy," and clarifies that "rules" "includ[es] interpretive rules." 15 U.S.C. § 57a(a)(2). Because section 46(g) does not authorize substantive rulemaking authority, "rules" refers only to procedural and interpretive rules. *See supra* I.A. At best for the Commission, "any" is an intentional expression of ambiguity by Congress as to the rulemaking authority the Commission already possessed for UMCs.

In their full statutory context, the 1975 Amendments cannot be understood as just an imposition of procedural requirements, narrowing the Commission's rulemaking authority. *See* Doc. 41 at 25–27. The 1975 Amendments *expanded* the scope of the FTC Act by replacing the phrase "in commerce" in section 45 with the broader phrase "in or affecting commerce." 88 Stat. at 2193; S. Conf. Rep. 93-1408 § 201 (1974). It is implausible that Congress narrowed the Commission's rulemaking authority in a statute that simultaneously expanded the Commission's

jurisdiction. Congress also cleaned up the Commission's unauthorized substantive rulemakings. *See supra* Part I.B. The 1975 Amendments preserved the "validity of any rule which was promulgated under section [4]6(g)" or the development of which was "substantially completed" before the enactment of the 1975 Amendments. 88 Stat. at 2198. This would have been unnecessary if the Commission already had substantive rulemaking authority.

### 2. Congress Did Not Ratify the Commission's Substantive Rulemaking Through Section 46(g)

The Commission asserts that Congress ratified its interpretation of section 46(g) through the 1975 Amendments. Doc 41 at 25–28. But neither judicial nor administrative ratification is applicable here because Congress materially modified the scope of section 46(g). *See Jama*, 543 U.S. at 349; *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 274–75 (1974).

Congressional ratification of a judicial interpretation can only be assumed when Congress "simply reenact[s]" a statute "without change" and the "judicial consensus" about its meaning was "so broad and unquestioned that [the court] must presume Congress knew of and endorsed it." *Jama*, 543 U.S. at 349. Here, the 1975 Amendments did not

reenact section 46(g), they materially amended it. 88 Stat. at 2193–98. The 1975 Amendments directly addressed the Commission's rulemaking authority by granting it substantive UDAP rulemaking authority for the first time, a dramatic change to the statute. *Id.* And Congress specifically amended section 46(g) to correspondingly exclude "interpretive rules and general statements of policy with respect to [UDAPs]" from its rulemaking authorization. *Id.* at 2193, 2198. A change to the scope of section 46(g) could hardly be a more "relevant change" for purposes of congressional ratification. *Holder v. Martinez Gutierrez*, 566 U.S. 583, 593 (2012).

Even assuming the 1975 Amendments satisfy the reenactment prong of the judicial ratification analysis, there was no "judicial consensus" in 1975 as to the meaning of section 46(g). *See Jama*, 543 U.S. at 351. In 1975, only a single court of appeals had decided just 18 months prior that section 46(g) permitted substantive rulemaking. *Nat'l Petroleum*, 482 F.2d 672. A single judicial opinion is grossly insufficient to establish a "broad and unquestioned" judicial consensus. *Jama*, 543 U.S. at 349, 351.

Similarly, a preexisting administrative interpretation may be given "great weight" if it was "longstanding" and the statute was "re-enacted … without pertinent change." *Bell Aerospace*, 416 U.S. at 274–75. As discussed, section 46(g) was neither reenacted nor left unchanged. Additionally, the Commission's interpretation of section 46(g) was not longstanding in 1975; it dated only to 1963. 89 Fed. Reg. at 38,349. And it was preceded by "nearly a half-century" of no substantive rulemaking. Merrill & Watts, *supra*, at 552. The substantive rules the Commission did promulgate from 1963 to 1978 generally regarded advertising and labeling issues, *not* competition. 89 Fed. Reg. at 38,349–50. Given these circumstances, "the [Commission] cannot provide the sort of 'overwhelming evidence of acquiescence' necessary" to conclude Congress ratified its interpretation. *Sackett v. EPA*, 598 U.S. 651, 682 (2023).

### 3. The 1980 Amendments Were Procedural Not Substantive

Subsequently, Congress passed the Federal Trade Commission Improvements Act of 1980 (the "1980 Amendments") that added an exclusively procedural requirement for substantive rules and amendments that have a "significant impact." Pub. L. No. 96-252, 94 Stat. 374, 388–90 (1980), *codified at* 15 U.S.C. § 57b-3. The Commission

argues that Congress's definition of the term "rule" in the 1980 Amendments to include section 46(g) rules but exclude non-substantive rules reflected Congress's understanding that section 46(g) authorized substantive rulemaking. Doc. 41 at 28. But the definition of a word in a subsequent procedural statute cannot create substantive rulemaking authority. ROA.5632-5633; *cf. ICC v. Cincinnati, N. O. & T. P. Ry. Co.*, 167 U.S. 479, 505 (1897). Additionally, Congress preserved the validity of substantive rules promulgated under section 46(g) prior to the 1975 Amendments. 88 Stat. at 2198; 89 Fed. Reg. at 38,349–50. Congress would understandably want its new procedural requirements to apply to amendments to these rules where they meet the requirements of the 1980 Amendments.

### F. *Airlines for America v. Dept. of Transp.* Is Inapposite

This Court's recent decision in *Airlines for America v. Department of Transportation*, --- F.4th ---, 2025 WL 313998 (5th Cir. Jan. 28, 2025), is inapplicable to the FTC Act despite the superficial similarity of 49 U.S.C. § 41712. *Airlines* held that the U.S. Department of Transportation had statutory authority to promulgate fee disclosure rules for airlines pursuant to a statute that authorizes the Secretary of Transportation to

order airlines to stop engaging in an "unfair or deceptive practice or an unfair method of competition" after "notice and an opportunity for a hearing." 2025 WL 313998, at *7–9; 49 U.S.C. § 41712. But, as the Court noted, the Secretary of Transportation was also granted general rulemaking authority, 49 U.S.C. § 40113(a), and Congress set specific monetary penalties for "regulation[s] prescribed" pursuant to section 41712, 49 U.S.C. § 46301(a)(5)(D); *Airlines*, 2025 WL 313998, at *7. In contrast, the FTC has neither general substantive rulemaking authority—Congress limited it to UDAPs—nor civil penalty authority for rules issued pursuant to section 46(g). *See supra* Part I.A.

## II.     THE FTC ACT DOES NOT AUTHORIZE THE COMMISSION TO BAN ALL NON-COMPETE AGREEMENTS AS UNFAIR METHODS OF COMPETITION

Even if the FTC Act permits the Commission to issue substantive rules for UMCs, the Commission cannot issue a blanket ban of non-compete agreements because the statute only declares *unfair* methods of competition to be unlawful. 15 U.S.C. § 45(a)(1). The Commission has not concluded that all the non-compete agreements covered by the Final Rule are unfair, ignoring their reasonable use by small businesses. *See, e.g.*, 89 Fed. Reg. at 38,493. Its aggregate analysis necessarily sweeps in non-

compete agreements that are *fair* (like many of those used by small businesses) and therefore are not "unlawful" under 15 U.S.C. § 45(a)(1). Permitting the Commission to evaluate business practices in the aggregate—banning fair and unfair iterations—is contrary to the text of section 45 and would "permit arbitrary or undue government interference with the reasonable freedom of action that has marked our country's competitive system." *E.I. du Pont de Nemours & Co. v. FTC ("Ethyl")*, 729 F.2d 128, 137 (2d Cir. 1984).

In particular, the Final Rule incorrectly dismisses *fair* uses of non-compete agreements by small businesses to protect their investments in employee training. *See, e.g.*, David Servin Comment, Dkt. FTC-2023-0007-9772, 1–3; U.S. Small Business Administration Office of Advocacy Comment, Dkt. FTC-2023-0007-21110, 3 ("SBA Off. Advocacy Comment"). Without non-compete agreements, valuable training and proprietary processes could be lost to larger direct competitors and disadvantage the small business against larger businesses. Servin Comment 1–3; SBA Off. Advocacy Comment 3; 89 Fed. Reg. at 38,492–93. Small business commenters specifically noted that they used non-compete agreements in response to "workers they had trained

extensively" leaving for "a larger competitor." 89 Fed. Reg. at 38,493.

Additionally, small businesses have a diminished ability to bear the costs

of losing employees, valuable training, and proprietary information to

direct competitors. *Id.* at 38,492. Without the protection of non-compete

agreements, small businesses "could face a serious risk of loss and

potential closure." SBA Off. Advocacy Comment 3.

Indeed, the Final Rule identifies non-compete agreements that are

used to protect investments in employees as being beneficial. 89 Fed. Reg.

at 38,422–23. The Commission acknowledges that "[t]here is some

empirical evidence that non-competes increase investment in human

capital of workers." *Id.* at 38,422. One study cited by the Commission

identified a 14.7% reduction in the number of workers who receive

training in occupations in which non-compete agreements are widely

used when those agreements become unenforceable. *Id.* Evan Starr,

*Consider This: Training, Wages, and the Enforceability of Covenants Not
to Compete*, 72 I.L.R. Rev. 783, 796–97 (2019). Another found that

"knowledge-intensive firms invest substantially less in capital

equipment" when non-compete enforceability is decreased and concluded

one likely cause is that "firms may be more likely to invest in capital

when they train their workers." 89 Fed. Reg. at 38,423; Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1, 28–29 (2024). And a third study comparing hair salons that do and do not use non-compete agreements found that salons "that use non-competes train their employees at a higher rate." 89 Fed. Reg. at 38,423; Matthew S. Johnson & Michael Lipsitz, *Why are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689, 711 (2022). The Commission also acknowledges that the Final Rule may negatively impact employee investment by as much as $41 billion. 89 Fed. Reg. at 38,470.

ATS's own successful experience using reasonable non-compete agreements is further evidence that the Final Rule extends beyond the Commission's statutory authority to agreements that are fair. ATS provides a variety of tree care services, including tree trimming and removal, tree preservation, emergency responses to storm damage, and the preparation of tree management plans. The tree care ATS engages in requires specialized skills that ATS develops in its employees through extensive training to ensure that limbs or entire trees can be safely removed without unnecessary risks. This training includes instruction in

ATS's proprietary procedures developed over 10 years in operation that allows ATS to provide high quality tree trimming services at competitive rates. *See* Servin Comment 1. Indeed, ATS is known in its community for its tree care expertise and is regularly called upon by other tree care companies to assist with technically difficult tree removals.

ATS employs around a dozen people to whom ATS is committed as both people and tree care professionals. *See id.* 1–2. The core of ATS's commitment to its employees is its training program. *See id.* ATS's employee training includes the opportunity to apprentice for six different roles or certifications. Each apprenticeship includes specialized training and the acquisition of any necessary internal or third-party certifications at ATS's expense. *See id.* For example, ATS trains interested employees to become skilled tree climbers, which includes on-the-job climbing training in the use of specialized climbing devices and technical rigging for lowering tree limbs. For just the climbing training, ATS spends thousands of dollars to provide individual technical climbing gear and sacrifices productivity and income to ensure that the apprenticing employee develops the necessary skills.

ATS views its commitment to its employees as a two-way street. *Id.* 2–3. In exchange for ATS's investment, ATS requires its employees to make a limited commitment to ATS through a non-compete clause in the employment agreement. *Id.* 1–3. In general, the agreement requires, or would only be enforced to require, ATS employees not to engage in the same type of work they performed at ATS at a competitor tree care service provider within the geographic area in which the employee worked while at ATS for one year after leaving. *Id.* 1.

This mutual commitment between ATS and its employees is a critical component of ATS's internal operations and overall success in the tree care industry. It results in benefits both to ATS and its employees. ATS is able to maintain a stable, well-trained workforce that is practiced in ATS's specific processes, including safety protocols. *Id.* 1–3. ATS also gets one year to replace an employee that leaves—and the training and skills imparted by ATS on that employee—before the former employee can use the ATS-provided training for the benefit of a direct competitor. *See id.* 3. This makes it feasible for ATS to provide the training and professional development opportunities that it does. *Id.* 1. The employees receive training and third-party certifications that they can take with

them throughout their careers should they decide to leave ATS. The employees also benefit from working for a company that is personally invested in their individual growth. *See id.* 1–3.

The Final Rule would eliminate all these benefits for ATS and its employees. Without the ability to enforce its non-compete agreements, ATS would face the risk that its employees would leave and immediately transfer the benefit of ATS's training and investment to a direct competitor. *Id.* This is a significant risk because ATS's training program and reputation make ATS employees a prime target for poaching by competitors. Without its reasonable non-compete agreements, it would not be feasible for ATS to provide the same level of training and professional development if its investment could be lost to a direct competitor at any time. *Id.* 1. Instead, to the detriment of ATS and unskilled workers trying to enter the tree care trade, ATS may have to focus on hiring tree care employees who are already skilled, including from competitors. *Id.* 3. The result will be to reduce the quality and safety of tree care services as the competition for employees crowds out companies' commitment to training, quality, and safety, and to reduce the value of ATS going forward by disrupting its successful business

model. *See id.* 2–3. It will also result in a lower quality work environment for tree care employees as they become valued exclusively for what they can provide to tree care businesses rather than part of a mutually beneficial business strategy focused on long-term growth and development. *See id.* 2–3.

## III.  THE FTC ACT UNCONSTITUTIONALLY DELEGATES LEGISLATIVE POWER TO THE COMMISSION

If the Commission has statutory authority for the Final Rule, the FTC Act violates the nondelegation doctrine by delegating power for the Commission to make rules defining unfair methods of competition without a sufficient standard. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States...." U.S. Const. art. I, § 1. As a result of this vesting clause, Congress may not "delegate ... powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825). Administrative agencies may only "fill up the details" on "subjects … of less interest." *Id.* at 43. To avoid an unconstitutional delegation, Congress must provide executive branch agencies with an "'intelligible principle'" by which to regulate. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

*Schechter Poultry* already decided that rulemaking authority based solely on a standard of fair competition is an unconstitutional delegation of legislative authority. 295 U.S. at 530, 541–42. In *Schechter Poultry*, the defendants were criminally charged with violating the Live Poultry Code, promulgated under section 3 of the NIRA, which "authorize[d] the President to approve 'codes of fair competition.'" 295 U.S. at 508, 521–22. "[F]air competition" was undefined in the NIRA, which was otherwise devoid of any meaningful standard or limitation on the President's authority. *Id.* at 531, 541. *Schechter Poultry* took a similarly dim view of the phrase "unfair methods of competition" in the FTC Act, explaining "that it does not admit of precise definition." *Id.* at 532. But critically, the Court found that the term would *not* be defined through substantive rulemaking as in the NIRA. *Id.* at 533. Instead, its meaning would be "determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." *Id.* This finding was key to the Court's rejection of the NIRA, given that the Court explained that the "procedure" in addition to the "subject-matter" were major factors. *See id.* at 533–34.

Here, the Final Rule erases the Commission's distinctive role as an exclusively adjudicative body by creating the Commission's own code of fair competition in the labor market and claiming the authority to do the same for any other purportedly unfair method of competition. In fact, this very scenario was contemplated in *Schechter Poultry* because the NIRA provided that violations of the codes of fair competition "[were] to be deemed 'an unfair method of competition' within the meaning of the [FTC] Act." *Id.* at 534. So, the Final Rule functions in a nearly identical way as the unconstitutional fair competition codes in *Schechter Poultry*.[1]

Rulemaking authority has long required clearer and more specific congressional authorization than adjudicative authority. *See, e.g.*, *Cincinnati*, 167 U.S. at 493, 501. Despite their "judicial form[]," adjudications "are exercises of … the executive Power." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotation marks omitted). In contrast, rulemaking implicates the *legislative* power. *Cincinnati*, 167 U.S. at 505. A scheme where agencies may conduct adjudications but cannot legislate through substantive rules comports with our

---

[1] This Court did not consider *Schechter Poultry* when it declared the phrase "'unfair method[s] of competition'" to be an intelligible principle in *Airlines*, 2025 WL 313998, at *11.

constitutional system of separated powers. *Id.* at 505–06. Thus, because Congress "cannot delegate legislative power," *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892), the Commission's adjudication authority does not mean that it can also make rules, *see Cincinnati*, 167 U.S. at 505–06.

At a minimum, the FTC Act should not be interpreted to permit substantive rulemaking for unfair methods of competition to avoid this "'serious constitutional problem[].'" *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001).

## CONCLUSION

For all the foregoing reasons, this Court should AFFIRM the judgment of the district court setting aside the Final Rule.

DATED: February 10, 2025.

Respectfully submitted,
*s/ Joshua M. Robbins*
JOSHUA M. ROBBINS
SEAN J. RADOMSKI
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 945-9524
JRobbins@pacificlegal.org
SRadomski@pacificlegal.org

LUKE A. WAKE
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
LWake@pacificlegal.org

*Counsel for Amicus Curiae*
*ATS Tree Services, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,192 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook font.

DATED: February 10, 2025.

s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS
*Counsel for Amicus Curiae*
*ATS Tree Services, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on February 10, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: February 10, 2025.

s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS