No. 24-10951

---

*In the*

# United States Court of Appeals

*for the*

# Fifth Circuit

---

RYAN, L.L.C.,
*Plaintiff-Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,
*Intervenor-Plaintiffs-Appellees,*

— v. —

FEDERAL TRADE COMMISSION,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 3:24-cv-00986-E, Hon. Ada Brown

---

**BRIEF *AMICUS CURIAE* OF THE NATIONAL ASSOCIATION OF
MANUFACTURERS IN SUPPORT OF PLAINTIFF-APPELLEE,
INTERVENOR PLAINTIFFS-APPELLEES, AND AFFIRMANCE**

---

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
 *NAM Legal Center*
 *733 10th Street NW, Suite 700*
 *Washington, DC*
 *(202) 637-3000*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
CALEB H. YONG
 *McDermott Will & Emery LLP*
 *500 North Capitol Street NW*
 *Washington, DC 20001*
 *(202) 756-8000*

*Counsel for* Amicus Curiae

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

No. 24-10951, *Ryan, L.L.C. v. Federal Trade Commission*

Pursuant to Fifth Circuit Rule 29.2 and Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case, in addition to those listed in the certificates of interested persons submitted by the parties and the various *amici curiae*. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. *Amicus curiae* the National Association of Manufacturers (NAM). The NAM is a nonprofit, tax-exempt organization located in the District of Columbia. It has no parent corporation, and no publicly held company has 10% or greater ownership in it.

2. Counsel for *amicus curiae* the NAM are Paul W. Hughes, Andrew A. Lyons-Berg, and Caleb H. Yong of McDermott Will & Emery LLP, and Erica T. Klenicki and Michael A. Tilghman II of the NAM Legal Center.

Respectfully submitted,

/s/ *Paul W. Hughes*
PAUL W. HUGHES

*Counsel for* Amicus Curiae

i

**TABLE OF CONTENTS**

Supplemental Certificate of Interested Persons ..............................................i

Table of Authorities........................................................................ iii

Introduction and Interest of the *Amicus Curiae* ..........................................1

Argument ...................................................................................5

I.  Non-compete agreements serve innovation by protecting trade
    secrets. ...............................................................................5

    A.  Effective protection for confidential and proprietary
        information is essential to innovation..........................................6

    B.  Non-compete agreements are necessary protections for
        trade secrets. ...................................................................8

    C.  NDAs are insufficient as a substitute for non-compete
        agreements........................................................................12

II. The FTC arbitrarily and capriciously disregarded these
    concerns. ............................................................................16

Conclusion...................................................................................22

# TABLE OF AUTHORITIES

## Cases

*A.O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*,
73 F.2d 531 (6th Cir. 1934) ........................................7

*BNSF Ry. Co. v. Fed. R.R. Admin.*,
62 F.4th 905 (5th Cir. 2023)........................................19

*Cataphote Corp. v. Hudson*,
422 F.2d 1290 (5th Cir. 1970) ....................................10

*Chamber of Com. of U.S. v. SEC*,
85 F.4th 760 (5th Cir. 2023)........................................17

*Chi. Lock Co. v. Fanberg*,
676 F.2d 400 (9th Cir. 1982) ........................................9

*City of Vernon v. FERC*,
845 F.2d 1042 (D.C. Cir. 1988) ..................................19

*Cynosure LLC v. Reveal Lasers LLC*,
2022 WL 18033055 (D. Mass. Nov. 9, 2022) ...............15, 16

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
45 F.4th 846 (5th Cir. 2022)................................16, 17, 21

*DHS v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................17

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ..............................................5, 16

*Flatiron Health, Inc. v. Carson*,
2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020).............15

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020) ...............................17, 19

*Int'l Bus. Machines Corp. v. Papermaster*,
2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008).............15

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .............................................6, 7, 8

*Mallet & Co. Inc. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ........................................10

**Cases—continued**

*Marcam Corp. v. Orchard,*
    885 F. Supp. 294 (D. Mass. 1995) ............................................... 15

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.*
    *Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................... 19

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ................................................................ 4

*PepsiCo, Inc. v. Redmond,*
    54 F.3d 1262 (7th Cir. 1995) ............................................... 14, 21

*Phoseon Tech., Inc. v. Heathcote,*
    2019 WL 7282497 (D. Or. Dec. 27, 2019) .............................. 14

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ............................................... 17, 19

*Wexler v. Greenberg,*
    160 A.2d 430 (Pa. 1960) ............................................................. 7

**Statutes, Rules, and Regulations**

18 U.S.C.
    § 1836(b)(1) ............................................................................... 10
    § 1836(d) ................................................................................... 10
    § 1839(5) ................................................................................... 10
    § 1839(6) ................................................................................... 10
    § 1839(6)(B) ............................................................................. 10

15 C.F.R.
    § 910.1 ......................................................................................... 3
    § 910.2 ......................................................................................... 3
    § 910.3 ......................................................................................... 3
    § 910.4 ......................................................................................... 3
    § 910.5 ......................................................................................... 3
    § 910.6 ......................................................................................... 3

Fed. R. App. P. 29(a)(4)(E) ............................................................... 1

*Non-Compete Clause Rule*, 88 Fed. Reg. 3,482 (Jan. 19, 2023) ..................... 2

*Non-Compete Clause Rule*, 89 Fed. Reg. 38,342 (May 7, 2024) ........... *passim*

## Statutes, Rules, and Regulations—continued

Uniform Trade Secrets Act
  § 1(1) ..................................................................................10
  § 1(2) ..................................................................................10
  § 1 cmt. ...............................................................................10
  § 2(a) ..................................................................................10
  § 3 ......................................................................................10

## Other Authorities

Am. Intell. Prop. L. Ass'n, 2019 Report of the Economic Survey
  (2019) ..................................................................................11

David S. Almeling *et al.*, *A Statistical Analysis of Trade Secret
  Litigation in Federal Courts*, 45 Gonz. L. Rev. 291 (2010) .....................11

NAM, *NAM Policy Positions* (2024) .............................................................1

Pamela Passman, *Eight Steps to Secure Trade Secrets*, World
  Intell. Prop. Org. (Feb. 2016) .......................................................8

Pamela Passman *et al.*, *Economic Impact of Trade Secret Theft*,
  PricewaterhouseCoopers LLP (Feb. 2014) ...........................................6, 8

Restatement of Torts § 757, cmt. b (1939) .....................................................6

Restatement (Third) of Unfair Competition § 39 cmt. A (1995) ..................7

Stout, *Trends in Trade Secret Litigation Report 2020* 40 (2020) ...............11

Thomson Reuters Legal, *Trade Secret Litigation 101* (Nov. 23,
  2022) ....................................................................................11

## INTRODUCTION AND INTEREST OF THE *AMICUS CURIAE*[1]

The National Association of Manufacturers (NAM) is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector. Manufacturing employs nearly 13 million men and women, contributes $2.93 trillion to the economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development (R&D) in the nation, fostering the innovation that is vital for this economic ecosystem to thrive.

Manufacturing's massive investment in R&D, which reached $404.8 billion by 2023 (*Facts About Manufacturing*, NAM, https://perma.cc/2TB7-3NBK), is only possible because of intellectual property protections that assure manufacturers they can earn a return on their efforts at innovation. Among these essential intellectual property protections are protections for trade secrets and other proprietary and confidential information. *See* NAM, *NAM Policy Positions* 8-9 (2024), https://perma.cc/ER89-BMQ8.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or part; no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and no person other than *amicus*, its members, or its counsel contributed money intended to fund the brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

Non-compete agreements are a key instrument that manufacturers have long used to protect their trade secrets and confidential business information. According to a recent NAM survey, close to 87% of respondents use contractual tools such as non-compete, non-disclosure, or non-solicitation agreements, with around 70% stating that they use non-compete agreements. *See* NAM Comment, Dkt. FTC-2023-0007-20939, at 2. Manufacturers enter non-compete agreements selectively, targeting the tool to cover employees with highly specialized skillsets and/or knowledge of confidential, proprietary, or strategically important technical and business information, such as senior managers, engineers, and sales personnel. Manufacturers typically craft their non-compete agreements on an individualized, case-by-case basis, shaped by an employee's role within the company and his or her unique knowledge, expertise, or training.

Despite the vital importance of non-compete agreements in sustaining innovation in the manufacturing sector and elsewhere, in 2023 the Federal Trade Commission (FTC) proposed a rule banning the use of non-compete clauses across the board as an unfair method of competition prohibited under Section 5 of the Federal Trade Commission Act (FTCA), and retroactively invalidating existing non-compete agreements. *Non-Compete Clause Rule*, 88 Fed. Reg. 3,482, 3,482-3,483 (Jan. 19, 2023). After receiving more

than 26,000 public comments, the FTC finalized its rule, thereby (1) imposing a comprehensive ban on any new non-compete clauses, and (2) barring employers from enforcing existing non-competes with workers other than senior executives. *Non-Compete Clause Rule*, 89 Fed. Reg. 38,342, 38,342 (May 7, 2024) (codified at 15 C.F.R. §§ 910.1-910.6) (Non-Compete Rule).

As explained in further detail below, the district court in this case correctly vacated the Non-Compete Rule, holding both that the agency exceeded its statutory authority in issuing the Rule, and that the Rule reflects arbitrary and capricious decision-making. *See* ROA.5612-ROA.5638.

Without the district court's vacatur of the Non-Compete Rule, the Rule's sweeping ban on non-compete agreements would have seriously damaged innovation in the manufacturing sector and undermined the competitiveness of American industry. Stripped of effective legal protections for their trade secrets and other proprietary information, manufacturers would have been forced to shift toward suboptimal and inefficient operational practices and procedures, including "self-help" measures to guard against misappropriation by departing employees. And faced with impaired incentives to invest in innovation, manufacturers and other businesses would have retrenched their R&D efforts.

Innovation in American industry would again be at risk should the district court's judgment be reversed on appeal; this Court should affirm and thereby avert the damage to innovation that the Rule threatens. While the NAM fully agrees with the district court that the FTC exceeded its lawful authority in promulgating the Rule, and that the Rule is unlawful because it is arbitrary and capricious (ROA.5633, ROA.5636), it files this brief to emphasize one specific "fail[ure]" by the FTC to "consider the positive benefits of non-compete agreements" and the "substantial body of evidence supporting" such agreements. ROA.5635. As the district court correctly explained, this failure rendered the agency's choice to impose a "sweeping prohibition" on non-competes, instead of "targeting specific, harmful non-competes," arbitrary and capricious. ROA.5635.

In particular, while the FTC cites trade secret misappropriation litigation and non-disclosure agreements (NDAs) as sufficient alternatives to non-competes in protecting companies' proprietary information, these tools are in fact wildly imperfect substitutes—as many commenters pointed out during the rulemaking. The agency's decision to nevertheless adopt a sweeping ban on non-competes was, for this reason, neither "reasonable [nor] reasonably explained" and thus arbitrary and capricious. *Ohio v. EPA*,

144 S. Ct. 2040, 2053 (2024) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).

## ARGUMENT

### I. NON-COMPETE AGREEMENTS SERVE INNOVATION BY PROTECTING TRADE SECRETS.

Manufacturers use non-compete agreements as an essential tool to protect their trade secrets and other proprietary information from misappropriation by their competitors. If allowed to stand, the Non-Compete Rule's comprehensive ban on non-compete clauses going forward will decimate manufacturers' ability to effectively safeguard their trade secrets from misappropriation by rival businesses, with predictably dire impacts on innovation and competitiveness in the manufacturing sector.

While the FTC suggests that there are alternative tools that businesses can use to protect their proprietary information, such as NDAs and trade secret misappropriation lawsuits, these are poor substitutes for non-compete agreements. And the Rule's expansive "functional" definition of non-compete clauses further limits the effectiveness of NDAs in protecting manufacturers' trade secrets.

## A. Effective protection for confidential and proprietary information is essential to innovation.

As the NAM explained in its comment letter, effective protection for trade secrets and other proprietary business information is critical to maintaining incentives for manufacturers and other companies to make the capital-intensive investments in R&D that ultimately power innovation and American economic competitiveness. *See* NAM Comment, *supra*, at 3-4, 11. Indeed, "[i]n the private sector, trade secrets are fundamental building blocks that drive investment, innovation, and economic growth." Pamela Passman *et al.*, *Economic Impact of Trade Secret Theft*, Pricewaterhouse-Coopers LLP 2 (Feb. 2014); *see* NAM Comment, *supra*, at 3 n.6 (citing Passman *et al.*).

A huge range of confidential business information critical to the success of a manufacturer can form the subject matter of a trade secret, including a "formula for a chemical compound, a process of manufacturing, treating, or preserving materials, a pattern for a machine or other device, or a list of customers." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) (quoting Restatement of Torts § 757, cmt. b (1939)). And, as the Supreme Court has acknowledged, effective protection of this valuable proprietary information is critical to the "encouragement of invention" through the "subsidization of research and development." *Id.* at 481-482. Without such pro-

tections, a business that invests in R&D or other innovative efforts to produce economically valuable information has no recourse against a competitor "who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discover[er]." *Id.* at 482 (quoting *A.O. Smith Corp. v. Petroleum Iron Works Co. of Ohio*, 73 F.2d 531, 539 (6th Cir. 1934)).

Effective trade secret protections also foster innovation by creating the conditions for businesses to efficiently exploit knowledge in their processes and operations. Absent effective legal protections for economically valuable confidential information, there would be "an increase in the amount of self-help that innovative companies would employ." *Kewanee*, 416 U.S. at 485-486. If businesses cannot rely on effective legal protection of their trade secrets, they will engage in "unproductive hoarding of useful information," minimizing "disclosure to employees, agents, licensees, and others who can assist in its productive use." Restatement (Third) of Unfair Competition § 39 cmt. A (1995); *see also Wexler v. Greenberg*, 160 A.2d 430, 435 (Pa. 1960) ("[T]he optimum amount of 'entrusting' [with economically valuable information] will not occur unless the risk of loss to the businessman through a breach of trust can be held to a minimum."). The net result of this unproductive investment in precautions against disclosure would be

that "organized scientific and technological research could become fragmented, and society, as a whole, would suffer." *Kewanee*, 416 U.S. at 486.

Indeed, even without further restrictions on companies' ability to protect their proprietary information, trade secret theft is a large and mounting problem. A 2014 study "estimated that the cost of trade secret misappropriation ranged from one to three percent of the U.S. Gross Domestic Product, potentially costing U.S. companies hundreds of billions per year." NAM Comment, *supra*, at 3 (citing Passman *et al.*, *supra*). And, 85% of these trade secret thefts are committed either by employees leaving for competitors, or by business partners. *Id.* (citing Pamela Passman, *Eight Steps to Secure Trade Secrets*, World Intell. Prop. Org. (Feb. 2016), perma.cc/VVF2-V2JQ). These enormous losses even under the status quo make it all the more crucial that reasonable tools currently available to companies to protect their confidential information not be further curtailed.

## B. Non-compete agreements are necessary protections for trade secrets.

For multiple reasons, non-compete agreements are essential to safeguarding the value of the confidential commercial information produced by innovation in the manufacturing sector, which drives the creation of life-

saving medications, critical machinery for the national defense, microprocessors that power every aspect of modern life, and other new products that enhance the economy.

*First*, because trade secrets are—by their very nature—secret, it is often not possible to know whether or when a competitor *has* used a trade secret. For example, if a competitor hires an employee from a close rival who designed critical elements of a new production facility, the prior employer has no ready way to understand whether that individual is sharing confidential information with the new employer. That is, the existence and use of the misappropriated trade secrets is likely to be kept secret at the misappropriating company as well. *See, e.g.*, Intell. Prop. Owners Ass'n Comment, Dkt. FTC-2023-0007-19431 at 3; *see also id.* ("This often leaves a wronged trade secret owner without a remedy, as mere suspicion of trade secret misappropriation is not enough of a basis to justify bringing a lawsuit."). The FTC's insistence that trade secret protections suffice (89 Fed. Reg. at 38,426) thus fails as an initial practical matter because it incorrectly assumes that competitors have full knowledge of processes used in their rivals' facilities.

*Second*, while trade secrets enjoy legal protection, they "do not enjoy the absolute monopoly protection afforded patented processes." *Chi. Lock*

*Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir. 1982). The law at both state and federal levels provides a cause of action only for "misappropriation" of trade secrets. *See* 18 U.S.C. § 1836(b)(1), (d); Uniform Trade Secrets Act (UTSA) §§ 2(a), 3. Misappropriation requires the acquisition, use, or disclosure of a trade secret by "improper means," such as the breach or inducement of a breach of duty to maintain secrecy. 18 U.S.C. § 1839(5), (6); UTSA § 1(1), (2). This can be, as a functional matter, difficult to prove. A defendant may claim that it properly acquired knowledge of the trade secret, in particular through discovery by independent invention or by "reverse engineering." *See* 18 U.S.C. § 1839(6)(B); UTSA § 1 cmt.; *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 387 n.31 (3d Cir. 2021) ("[R]everse engineering is a defense to misappropriation of [a] trade secrets claim."). Because a trade secret is "protected only so long as competitors fail to duplicate it by legitimate, independent research" (*Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1293 (5th Cir. 1970)), trade secrecy law provides limited protections for critical intellectual property even if there *is* malfeasance, so long as the owner of the trade secret cannot prove it.

*Third*, trade secret litigation is costly and slow. One recent survey found that the median cost of litigating a trade secret case is *$7.4 million* when over $25 million is in controversy. *See, e.g.*, Gibson Dunn Comment,

10

Dkt. FTC-2023-0007-21072, at 8 n.17 (citing Am. Intell. Prop. L. Ass'n, 2019 Report of the Economic Survey 68 (2019)); *see also* Thomson Reuters Legal, *Trade Secret Litigation 101* (Nov. 23, 2022), perma.cc/MU2W-S84N. And such cases generally take several years to resolve, further diminishing their utility in alleviating immediate harm to affected businesses. *See* Stout, *Trends in Trade Secret Litigation Report 2020* 40 (2020), perma.cc/Y6GC-YDV4 (noting a mean time to resolution of nearly 4 years for federal trade secret actions filed in 2015, the most recent year of data); *see also* Comment of Lee Moore, Dkt. FTC-2023-0007-20909, at 5 & n.12 (citing the Stout report).

What is more, trade secret owners are able to successfully obtain preliminary injunctive relief in only about one-third of lawsuits—meaning that harm is often irreversible, regardless of the ultimate result of the litigation. *See* David S. Almeling *et al.*, *A Statistical Analysis of Trade Secret Litigation in Federal Courts*, 45 Gonz. L. Rev. 291, 316 tbl. 14 (2010); Comment of Lee Moore, *supra*, at 4 & n.6 (citing the Almeling study).

Because of these practical shortcomings in the protection provided by trade secret misappropriation litigation, businesses often resort to non-compete agreements to ensure that their trade secrets are effectively secured from misappropriation resulting from employees' departure to work for a

competitor. This is no irrational fear: As noted, in 85 percent of trade secret misappropriation lawsuits in the United States, the alleged misappropriator was either a former employee or business partner. Passman, *supra*; *see* NAM Comment, *supra*, at 3.

Instead of waiting to detect uses of their trade secrets by competitors who have hired away their former employees and then bringing an action *ex post* for misappropriation of trade secrets, businesses must be allowed to bargain with their employees to enter non-compete agreements—at the very least, with individuals who have special exposure to their trade secrets and other commercially valuable proprietary information. Because of their critical importance, the Non-Compete Rule's sweeping ban on non-compete agreements will fundamentally erode effective legal protections for trade secrets. And, given the essential role that trade secrecy plays in incentivizing innovation and creating the conditions for the productive deployment of information within firms, the Rule threatens to damage innovation and dynamism within American industry.

## C. NDAs are insufficient as a substitute for non-compete agreements.

The FTC does no better in suggesting (89 Fed. Reg. at 38,371-72) that non-disclosure agreements provide sufficient protection for trade secret and

other confidential information. To start with, NDAs share many of the same limitations of trade secret protection—there is no ready way to determine if the agreement has been breached, competitors may claim that they have independently obtained the information, and litigation is slow and expensive.

But there is yet a more fundamental problem with the FTC's assertion that NDAs will provide adequate safeguards for information: The Non-Compete Rule's "functional" definition of non-compete clauses will deem many—if not most—NDAs *to be* non-compete clauses, thus barring them wholesale. Under the Rule, a non-compete clause is defined as a term or condition of employment that "prohibits" a worker from, or "penalizes" a worker for, or "*functions to prevent*" a worker from, subsequently seeking or accepting work with a different employer. 89 Fed. Reg. at 38,502 (emphasis added). As the FTC itself clarifies, this "functions to prevent" language means that, if a term or condition of employment is "so broad or onerous that it has the same functional effect as a term or condition prohibiting or penalizing a worker from seeking or accepting other work or starting a business after their employment ends," then it is a non-compete clause for purposes of the Rule. *Id*. at 38,364.

For non-disclosure agreements to be effective, however, they will often have to restrain former employees from working in particular roles for competing businesses. Courts in at least 17 states have recognized this by adopting the so-called "inevitable disclosure" doctrine. *See Phoseon Tech., Inc. v. Heathcote*, 2019 WL 7282497, at \*11, \*11 n.8 (D. Or. Dec. 27, 2019) (collecting cases).

In the pivotal "inevitable disclosure" case, PepsiCo, Inc. sought—and the district court granted—a preliminary injunction to prevent the defendant, a former management employee, from starting work with his new employer, the Quaker Oats Company, which directly competed with PepsiCo in the sports drinks market. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1263-1264 (7th Cir. 1995). Concluding that the defendant's new employment would "inevitably lead him to rely on the plaintiff's trade secrets," in breach of the NDA he had entered into with PepsiCo, the Seventh Circuit affirmed the district court's entry of the preliminary injunction, even absent any non-compete agreement between the defendant and PepsiCo. *Id*. at 1269. Given the specific nature of the defendant's new job at Quaker Oats, unless he "possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions [in his new employment] by relying on his knowledge of [his former employer's] trade secrets." *Id*.

Following *PepsiCo*, courts across the United States have developed this "inevitable disclosure" doctrine as a basis to bar defendants from working in a new position where doing so will inevitably lead to the disclosure of the former employer's trade secrets. *See, e.g.*, *Flatiron Health, Inc. v. Carson*, 2020 WL 1320867, at *26 (S.D.N.Y. Mar. 20, 2020) (quoting *Int'l Bus. Machines Corp. v. Papermaster*, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008)). Courts have emphasized that, under certain circumstances, it is necessary to prevent a trade secret owner's former employee from working in a new position altogether, rather than to remedy any misappropriation *ex post*, because "the harm to the [trade secret owner] cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure." *Cynosure LLC v. Reveal Lasers LLC*, 2022 WL 18033055, at *12 (D. Mass. Nov. 9, 2022) (quoting *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995)).

In other words, when a departing employee goes to work for a competitor, "he does not go with *tabula rasa* with respect to [the trade secret owner's] products, its development strategies, its marketing plans, its customers and other significant business information." *Cynosure*, 2022 WL 18033055, at *12 (quoting *Marcam*, 885 F. Supp. at 297). As such, it is inconceivable "how all of the information stored in [the former employee's]

memory can be set aside as he applies himself to a competitor's business and its products." *Id.*

As the "inevitable disclosure" doctrine recognizes, an NDA can be effective only if it precludes a departing employee from working in parallel positions for key competitors when doing so will make it impossible for the employee to avoid disclosure of the proprietary information protected by the NDA. But by defining non-compete clauses so broadly as to include so-called "functional" non-competes (*see* 89 Fed. Reg. at 38,362), the Non-Compete Rule bars this use of an NDA, stripping away another tool essential to the protection of trade secrecy and other proprietary information.

## II. THE FTC ARBITRARILY AND CAPRICIOUSLY DISREGARDED THESE CONCERNS.

The notice-and-comment process repeatedly surfaced concerns about the harm that an across-the-board ban on non-competes would inflict on innovation in American industry. Yet the FTC brushed these concerns aside with unreasoned *ipse dixit*, and what little analysis it did provide is seriously flawed. These failings render the Non-Compete Rule arbitrary and capricious under the Administrative Procedure Act (APA).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *Prometheus*,

141 S. Ct. at 1158); *see also id.* ("[W]e must ensure that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision." (quotation marks omitted)). And while courts "must not substitute [their] own policy judgment for that of the agency," APA "review is not toothless." *Id.* at 855-856 (quotation marks omitted). To the contrary, "after *Regents*, it has serious bite." *Id.* at 856; *see DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020).

In particular, the arbitrary-and-capricious standard "requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023). And simply "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner" is not sufficient. *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)).

Here, commenter after commenter, including the NAM, explained that NDA and trade secret misappropriation litigation are insufficient to protect companies' investments in their intellectual property and confidential business information: These tools are costly, difficult to prove, and time-consuming to litigate; they cover only certain types of information; and, critically, they function only retrospectively, attempting to compensate for detected and completed wrongdoing rather than preventing it in the first

place. *See, e.g.*, NAM Comment, *supra*, at 4; U.S. Chamber of Com. Comment, Dkt. FTC-2023-0007-19345, at 30-32; Gibson Dunn Comment, *supra*, at 7-9; Intell. Prop. Owners Ass'n Comment, *supra*, at 3-4; Nat'l Restaurant Ass'n Comment, Dkt. FTC-2023-0007-18276, at 4. Indeed, the Small Business Administration Office of Advocacy explained that these litigation alternatives "often involve[] protracted proceedings and astronomical legal fees which small entities may not be able to afford," and opposed an across-the-board ban. SBA Comment, Dkt. FTC-2023-0007-21110, at 3-4.

The FTC, however, failed to meaningfully respond. It recounted commenters' concerns that these alternative tools are not effective on their own, but then dismissed them with a single conclusory statement: "That employers prefer to wield non-competes as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition." 89 Fed. Reg. at 38,427; *see also id.* at 38,428 (same, with respect to concerns that trade secret litigation is expensive and difficult to prosecute). But the entire *point* is that these "specific legal tools" are not sufficient on their own to protect proprietary information and incentivize innovation—a concern that the FTC did not seriously address. By merely "[n]odding to" commenters' concerns on this critical issue, "only to dismiss them in a conclusory manner," the FTC acted arbitrarily and capriciously,

and its action must be set aside. *Texas*, 10 F.4th at 556 (quoting *Gresham*, 950 F.3d at 103).

Nor is there any substance to the FTC's repeated contention that, because trade secret misappropriation litigation is widespread, it must be sufficient on its own to protect companies' proprietary information, such that other tools that businesses regularly rely on for that purpose—like non-competes—are unnecessary. *See, e.g.*, 89 Fed. Reg. at 38,425 ("The viability of trade secret law as a means for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law.") (citing statistics on the prevalence of trade secret litigation).

Simply put, the agency's conclusion (that trade secret lawsuits are a sufficient substitute for non-competes) just does not follow from the premise (that companies regularly file trade secret actions). Indeed, the same reasoning would hold that, because lots of people wear raincoats when it rains, umbrellas are unnecessary and can safely be banned without anyone getting wet. The FTC therefore has failed to "articulate … a 'rational connection between the facts found and the choice made'"—an independent APA violation. *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910 (5th Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also, e.g.*, *City of Vernon v. FERC*, 845

F.2d 1042, 1048 (D.C. Cir. 1988) ("[A]n agency is not entitled under the APA to respond with a non-sequitur.").

As for NDAs, many commenters also pointed out the irrationality of basing the decision to ban non-competes, in part, on the availability of NDAs as a purportedly adequate substitute for non-compete agreements, yet turning around and banning many NDAs too, as functional non-competes. *See, e.g.*, U.S. Chamber of Com. Comment, *supra*, at 31-32; Gibson Dunn Comment, *supra*, at 8-9. The FTC's only response is that its rule "will not prevent employers from adopting garden-variety NDAs; rather, it prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business." 89 Fed. Reg. at 38,426; *see also id.* at 38,362 (listing "an NDA . . . written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment" as an "example" of an impermissible "functional non-compete[]").

But, as discussed above, in the many states where it applies, the inevitable-disclosure doctrine often *does* prohibit employees who have signed an NDA and have been exposed to trade secrets from accepting new work, based on the common-sense principle that unless an employee "possesse[s] an uncanny ability to compartmentalize information," he or she will "necessarily be making decisions [in the new employment] by relying on …

knowledge of [the former employer's] trade secrets." *PepsiCo*, 54 F.3d at 1269; *see supra* at 14-16. Thus, contrary to the FTC's explanation (89 Fed. Reg. at 38,365), the agency's non-compete ban likely does reach NDAs beyond just those that are overbroad on their face. And this fact renders entirely arbitrary the FTC's separate citation (89 Fed. Reg. at 38,427) of the inevitable disclosure doctrine as an available tool for companies that will mitigate the harmful effects of the non-compete ban. Once again, the agency is justifying its ban based on the availability of alternatives with one hand, while banning those very same alternatives with the other. It is hard to see what could be more arbitrary and capricious.

In sum, because the Non-Compete Rule makes clear that the FTC has not "reasonably considered the relevant issues and reasonably explained the decision" with respect to the insufficiency of NDAs and trade secret misappropriation litigation alone to protect companies' valuable, investment-backed proprietary information, its action cannot stand. *Data Mktg. P'ship*, 45 F.4th at 855 (quotation marks omitted). This reason alone is sufficient to sustain the district court's holding that the Non-Compete Rule must be set aside as arbitrary and capricious.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: February 10, 2025

Respectfully submitted,

ERICA T. KLENICKI
MICHAEL A. TILGHMAN II
  *NAM Legal Center*
  *733 10th Street NW, Suite 700*
  *Washington, DC*
  *(202) 637-3000*

/s/ *Paul W. Hughes*
PAUL W. HUGHES
ANDREW A. LYONS-BERG
CALEB H. YONG
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 4,402 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2; and

(ii)     complies with the typeface requirements of Rule 32(a)(5)(A) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook LT Std font in a size equivalent to 14 points or larger.

Dated: February 10, 2025          */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: February 10, 2025          */s/ Paul W. Hughes*